## SUMMONS

Attorney(s) David P. Silber, Esq.

Office Address 9500 K Johnson Boulevard

Town, State, Zip Code Bordentown, NJ 08505

Telephone Number 609-298-0085 ext. 121

Attorney(s) for Plaintiff KJohnson Urban Renewal, LLC

---

Plaintiff(s)

vs.

Performance Spine and Sports

Medicine, LLC

Defendant(s)

## Superior Court of
## New Jersey

Burlington ▼ County

Law          Division

Docket No: BUR-L-000591-21

## CIVIL ACTION
## SUMMONS

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov/forms/10153_deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov/forms/10153_deptyclerklawref.pdf.

*Michelle Smith*
Clerk of the Superior Court

DATED: 03/18/2021

Name of Defendant to Be Served: Performance Spine and Sports Medicine, LLC

Address of Defendant to Be Served: 4056 Quakerbridge Road, Suite 111, Lawrenceville, NJ 08505

Revised 11/17/2014, CN 10792-English (Appendix XII-A)

**DAVID P. SILBER, ESQ.**
Attorney ID: 013202010
9500 K Johnson Blvd.
Bordentown, New Jersey 08505
(609) 298-0085
dsilber@kjohnsonenterprises.com
Attorneys for Defendant, K Johnson Urban Renewal, LLC

---

| | |
|---|---|
| KJOHNSON URBAN RENEWAL, LLC | **SUPERIOR COURT OF NEW JERSEY** |
| | **BURLINGTON COUNTY** |
| Plaintiff(s), | **LAW DIVISION** |
| | **DOCKET NO.** |
| vs. | |
| | *CIVIL ACTION* |
| PERFORMANCE SPINE AND SPORTS | |
| MEDICINE, LLC, CORPORATIONS 1-100 | **COMPLAINT** |
| such names being fictitious, JOHN DOES 1- | |
| 100, such names being fictious. | |
| Defendant(s) | |

---

KJohnson Urban Renewal, LLC ("Plaintiff"), is a limited liability company in the state of New Jersey having a principal address of 9500 KJohnson Blvd, Bordentown, NJ 08505, by way of this Complaint against the defendant, Performance Spine and Sports Medicine, LLC ("Defendant"), says:

### THE PARTIES

1. Upon information and belief, Defendant, Performance Spine and Sports Medicine, LLC, a/k/a Performance Pain & Sports Medicine is and at all relevant times was, a limited liability company in the state of New Jersey, having a principal place of business of 4056 Quakerbridge Road, Suite 111, Lawrenceville, NJ 08648.

2. Plaintiff is, and at all relevant times was, a limited liability company in the state of New Jersey having a principal address of 9500 K Johnson Boulevard, Bordentown, NJ 08505.

## JURISDICTION

3. Jurisdiction and venue are proper herein by reason that the Plaintiff is a resident of Burlington County, New Jersey, and the transactions relevant to the Plaintiff's underlying causes of action took place in Burlington County, New Jersey.

## BACKGROUND

4. The Plaintiff is the owner of real property located at 9500 K Johnson Boulevard, Bordentown, NJ 08505 (the "Property"). Defendant rents two floors of the building located at 9500 K Johnson Boulevard, Bordentown, NJ 08505, from the Plaintiff pursuant to a written lease (See **Exhibit A**), entered by the parties on July 16, 2012. The lease commenced on or about January 1, 2014. The initial Term of the lease is Ten (10) years, concluding on December 1, 2023. Defendant has been repeatedly late in paying the rent on the property pursuant to the lease and ceased all payments as of February 1, 2021.

5. The Parties entered into multiple amendments, none of which advised or in which the Plaintiff agreed that the lease could be transferred to another entity. The only party Plaintiff remains in privity of contract with is Performance Spine and Sports Medicine, LLC. **(See Exhibit (B & C).** The Parties as evidenced by their actions on January 20, 2020 permitted assignments of the lease from KJohnson Industries, LLC to KJohnson Urban Renewal, LLC **See Exhibit C paragraph 3.** No such assignment was requested by Defendant or agreed to by Plaintiff.

6. Defendant did sublease the property to two (2) tenants see attached **Exhibit D and Exhibit E,** under the Entity of Performance Spine and Sports Medicine of Bordentown, LLC, an entity not in privity of contract with Plaintiff.

2

7. Plaintiff alleges that Defendant is currently in year eight of the lease and the invoice was sent on February 1, 2021 (**Exhibit F**) and late notice were sent on February 15, 2021, when Defendant failed to Pay Rent. (**Exhibit G**) Based on the invoice sent on February 1, 2021, the lease agreement dated, July 16, 2012, Defendant's monthly payments for Fixed Basic Rent (Section 6) (**Exhibit A**) and the updated invoice sent out on February 15, 2021 is Twenty-Four Thousand Six Hundred Dollars /100 ($24,600.00) per month for the year of 2021. The monthly payments are due "on the first day of the calendar month." (See Section 6 of **Exhibit A**). The Fixed Basic Rent increases on a yearly basis, in 2022 it is $25,333.33 a month or $304,000.00 a year and in 2023 the Fixed Basic Rent is $26,093.333 per month or $313,120.00 per year.

8. Plaintiff further alleges, that under the lease agreement dated, July 16, 2012, Defendant is responsible for monthly payments for Real Estate Taxes (Section 7 of **Exhibit A**) which average Three Thousand Thirty-Seven Dollars 67/100 ($3,037.67) per month but may change each tax year. This payment is due "on the first day of each month...." (See Section 7(b)(1)(a) of **Exhibit A**)

9. Plaintiff further alleges that Based on the lease agreement dated, July 16, 2012, Defendant is responsible for monthly payments for Operating Expenses (Section 8) (**Exhibit A**) these expenses vary monthly but average Seven Thousand Seventy-Three Dollars 70/100 ($7,073.70) per month. This payment is due "on the first day of each month...." (See Section 8(b)(1)(a) of the Lease Agreement).

10. Plaintiff alleges that the total amount due for the Month of February 2021 was Thirty-Four Thousand Seven Hundred Eleven Dollars and 37/100 ($34,711.37). All payments for the month of February 2021 were and are delinquent. (**See Exhibit A and Exhibit F and G**).

3

11. Plaintiff alleges that the total amount due for the Month of March 2021 was Thirty-Four Thousand Nine Hundred Thirteen Dollars and 97/100 ($34,913.97). (**See Exhibit H**). All payments for the month of March 2021 were and are delinquent.

12. Plaintiff further alleges that there is currently a balance due for the rent increase for the year of 2020 in the amount of Eight Thousand Three Hundred Twenty Dollars 00/100 ($8,320.00) and a balance due for the rent increase for January 2021 in the amount of One Thousand Four Hundred Thirteen Dollars 33/100 ($1,413.33). (**See Exhibit G**).

13. As of March 16, 2021, there is a total amount due and owing in the amount of Seventy-Nine Thousand Three Hundred Fifty-Eight Dollars 67/100 ($79,358.67). Not including the addition of interest, costs, or attorney fees.

14. Further, Plaintiff is entitled to all damages outlined under Section 28(c) of the Lease including the following damages:

    a. An amount equal to the sum of all Rent then in arrears plus the aggregate of all Rent which is payable under this lease for the balance of the Term, computed as if no Event of Default had occurred and any re-entry had not been made (including, without limitation, Operating Expenses and Real Estate Taxes Allocable to Tenant and other Additional Rent that would be owing for the remainder of the Term as reasonably estimated by Landlord); plus.

    b. (b) all costs and expenses incurred by Landlord in connection with the Event of Default and any reletting of the Premises, including without, limitation,

        i. Costs of reentry, repair, and renovation,

4

ii. (ii) the value of all inducements granted or paid to new tenants of the Premises in connection with reletting of the Premises including without limitation construction allowances and the value of rent-free periods,

iii. (iii) brokers' commissions and advertising expenses,

iv. (iv) watchman's wages and any sheriff's, marshal's, constable's, or other officials' commissions, whether chargeable to the Landlord or Tenant, and

(v) reasonable attorneys' fees, costs, and expenses; plus

c. Interest accrued on the aggregate of the aforesaid sums from the date each was payable (or, with respect to sums owing under clause (b) from the date each was incurred by Landlord) until paid by Tenant (whether before or after judgment); which sum shall be credited with (d) all rentals actually received by Landlord during the remainder of the Term from any replacement tenant to which the Premises are relet.

15.    At this time, Defendant's violation of the leasing agreement pursuant to Section 9 (**Exhibit A**) entitles the Landlord to charge a late payment charge of five percent (5%) plus "Any amount due from Tenant to Landlord which is not paid when due shall bear interest at an interest rate equal to the Prime Rate published from time to time in the Money Rates column of the Wall Street Journal plus two percent (2%) (or if lower, the highest rate then allowed under the usury laws of the State of New Jersey)(the 'Interest Rate') from the date due until the date paid." Defendant currently owes interest in the amount of 10.25% (5% +2%+3.25%). As of the date of this complaint Defendant owes approximately Eight Thousand One Hundred Thirteen Dollars and 50/100 (8,113.50) in Interest.

16.     Defendant is also responsible for all attorney fees and Costs of Plaintiff.
Plaintiff at this time has incurred approximately $10,000.00 in Costs and Attorney Fees.

17. Defendant failed to provide any meaningful response to Plaintiff's request for
payment (**See Exhibit I**), as such Plaintiff filed a related eviction matter bearing docket # MER-
LT-364-21, which is scheduled to be heard on March 31, 2021 (**See Exhibit J**).

18. Defendant continues to utilize the property and allows its subtenants to utilize the
property without paying rent to Plaintiff.

19. As of the date of this Complaint, the Defendant has failed to tender its monthly rent
obligation to the Plaintiff for February 2021, March 2021, and Other outstanding items further,
due to provision 28(c), the amount due under the lease has accelerated and Defendant now owes
all amounts due through the remainder of the lease term. Plaintiff has utilized past bills for
Section 7 and Section 8 of the Monthly Rental Fee and added that to the Fixed Basic Rent
outlined under the lease for the remaining two (2) years and ten (10) months of the lease, added
interest and the currently outstanding balance of $97,472.17 set forth above. This calculation
does not include the other costs outlined in paragraph 14 above and Plaintiff does not waive
those damages.

20. Based on the foregoing Defendant, currently owes the Plaintiff $1,206,519.92 plus
$123,668.29 in interest, plus $97,472.17 from the amount referenced above for a total of
**$1,427,660.38** plus all additional costs and fees as outlined in paragraph 28(c) of **Exhibit A.**

21. The Plaintiff has made several unsuccessful attempts to amicably resolve the
Defendant's default and indebtedness prior to filing the immediate Complaint. (Exhibit I.)

## **FIRST COUNT**

### **(Breach of Contract)**

6

22. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs of Plaintiff's Complaint as if fully set forth at length herein.

23. Defendant failed to perform in accordance with the terms of the Written Lease attached as **Exhibit A** amongst the parties, thereby breaching the agreement.

24. Due to the breach of contract, Plaintiff suffered, and continues to incur additional, damages.

25. Plaintiff suffered consequential damages as the proximate and foreseeable result of Defendant's breach.

**WHEREFORE** Plaintiff demands judgment against Performance Spine and Sports Medicine, LLC, John Does1-100, and Corporations 1-100, in the amount of **$1,427,660.38** for unpaid rent as defined under the Lease, reasonable attorney's fees, as well as costs associated with this suit, consequential and compensatory damages, interest and any other relief that the Court deems just and equitable.

### SECOND COUNT
### (Unjust Enrichment)

26. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs of Plaintiff's Complaint as if fully set forth at length herein.

27. Defendant, Performance Spine and Sports Medicine, LLC, is and at all relevant times was, a New Jersey resident with home address located at 4056 Quakerbridge Road, Suite 111, Lawrenceville, NJ 08648.

28. Defendant received services from the Plaintiff in the form of the use and occupancy of the Property. Plaintiff has made numerous requests for payment and for possession of the

7

Property from Defendant prior to the filing of this Complaint. To date, Defendant owes Plaintiff for unpaid rent, property taxes and utilities resultant from his occupancy of the Property, CAM charges and various other damages Defendant has caused to Plaintiff.

29. Defendant has been enriched by the receipt Plaintiff's services despite refusing to fully compensate Plaintiff for same.

30. At the time Plaintiff conferred the benefit of its services upon Defendant, it reasonably expected to receive compensation for same.

31. Defendant has unjustly denied the Plaintiff compensation and that nonpayment has financially benefitted the Defendant.

32. Plaintiff has been, and continues to be, damaged by Defendant's refusal to pay for the use and occupancy of the Property.

**WHEREFORE** Plaintiff demands judgment against the Performance Spine and Sports Medicine, LLC, John Does1-100, and Corporations 1-100, in the amount of **$1,427,660.38** for unpaid amounts including but not limited to rent, utilities, plus penalties, reasonable attorney's fees, as well as costs associated with this suit, consequential and compensatory damages, interest and any other relief that the Court deems just and equitable.

**SECOND COUNT**
**(Promissory Estoppel)**

33. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs of Plaintiff's Complaint as if fully set forth at length herein.

34. The Defendant agreed and represented to the Plaintiff that he would compensate the Plaintiff for the use and occupancy of his Property through a Written Lease.

35. Defendant made this representation with the expectation and intention that Plaintiff would rely upon it in permitting the Defendant to use and occupy the Property.

36. The Plaintiff reasonably relied upon the representation of the Defendant to compensate it in exchange for the Defendant's use and occupancy of the Property.

37. The Plaintiff suffers damages as a result of its reasonable reliance upon Defendants' promise to compensate it for use and occupancy of the Property.

**WHEREFORE** Performance Spine and Sports Medicine, LLC, John Does 1-100, and Corporations 1-100, in the amount of **$1,427,660.38** but not limited to rent, utilities, plus penalties, reasonable attorney's fees, as well as costs associated with this suit, consequential and compensatory damages, interest and any other relief that the Court deems just and equitable.

**DAVID P. SILBER, ESQ.**
Attorneys for Defendant K.Johnson Urban
Renewal, LLC

Dated: March 16, 2021                By: _____
                                          DAVID P. SILBER

## CERTIFICATION OF NO OTHER ACTION PENDING

Pursuant to <u>R</u>. 4:5-1, it is hereby stated that the matter in controversy is not the subject of any other action pending before any court, except for an action for possession under MER-LT-354-21 and a Bankruptcy filed by the entity of Performance Spine and Sports Medicine of Bordentown, LLC (not the Defendant) under 21-11786-KCF. Further, other than the parties set forth in this pleading, at the present time we know of no other parties who should be joined in the within action. However, it is anticipated that as discovery in this matter is taken, additional parties will be added to the case.

DAVID P. SILBER, ESQ.
Attorneys for Defendant KJohnson Urban
Renewal, LLC

Dated: March 16, 2021                    By: _____
                                              DAVID P. SILBER

## JURY DEMAND

Defendant, KJohnson Urban Renewal, LLC, Inc. hereby demands a trial by jury as to the claims.

DAVID P. SILBER, ESQ.
Attorneys for Defendant KJohnson Urban
Renewal, LLC

Dated: March 16, 2021                    By: _____
                                              DAVID P. SILBER

## DESIGNATION OF TRIAL COUNSEL

Pursuant to the provisions of Rule 4:25-4, the Court is advised that David P. Silber, Esq. is hereby designated as trial counsel on behalf of the defendant.

DAVID P. SILBER, ESQ.
Attorneys for Defendant KJohnson Urban
Renewal, LLC

Dated: March 16, 2021                    By: _____
                                              DAVID P. SILBER

# EXHIBIT A

# LEASE

by and between

## K JOHNSON INDUSTRIES LIMITED LIABILITY COMPANY

(as Landlord)

And

## Performance Spine and Sports Medicine LLC

(as Tenant)

Date: July 16, 2012

**Premises: Building F, located at New Jersey State Highway Route 130**
**Block 57, Lot 6.01, Bordentown Township, Burlington County, New Jersey**

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| 1. | Definitions. | 5 |
| 2. | Premises. | 5 |
| 3. | Completion of Premises. | 6 |
| 4. | Commencement Date. | 6 |
| 5. | Use of Premises. | 7 |
| 6. | Fixed Basic Rent. | 7 |
| 7. | Real Estate Taxes. | 7 |
| 8. | Operating Expenses. | 9 |
| 9. | Interest and Late Charge. | 15 |
| 10. | Insurance. | 15 |
| 11. | Repairs and Maintenance. | 18 |
| 12. | Utilities and Services. | 19 |
| 13. | Governmental Regulations. | 20 |
| 14. | Alterations, Additions and Fixtures. | 20 |
| 15. | Construction Liens. | 22 |
| 16. | Negative Covenants of Tenant. | 22 |
| 17. | Landlord's Right of Entry; Right to Cure. | 25 |
| 18. | Damage by Fire or Other Casualty. | 26 |
| 19. | Non-Abatement of Rent. | 27 |
| 20. | Indemnification. | 27 |
| 21. | Eminent Domain. | 28 |
| 22. | Quiet Enjoyment. | 29 |
| 23. | Rules and Regulations. | 29 |
| 24. | Assignment and Sublease. | 29 |
| 25. | Subordination. | 32 |
| 26. | Curing Tenant's Defaults. | 32 |
| 27. | Surrender. | 32 |
| 28. | Defaults-Remedies. | 33 |
| 29. | Brokers' Commission. | 35 |
| 30. | Notices. | 36 |
| 31. | Inability to Perform. | 36 |
| 32. | Survival. | 36 |
| 33. | Corporate Tenant. | 36 |
| 34. | Waiver of Invalidity of Lease. | 37 |
| 35. | Security Deposit. | 37 |
| 36. | Estoppel Certificate. | 37 |
| 37. | Rights Reserved by Landlord. | 37 |
| 38. | Miscellaneous. | 38 |
| 39. | OFAC. | 40 |

THIS LEASE (this "**Lease**") is made the 16th day of July, 2012 between **K JOHNSON INDUSTRIES, LIMITED LIABILITY COMPANY** ("**Landlord**"), a New Jersey limited liability company, and **PERFORMANCE SPINE AND SPORTS MEDICINE LLC** ("**Tenant**"), a New Jersey limited liability company.

## PREAMBLE

## BASIC LEASE PROVISIONS AND DEFINITIONS

In addition to other terms elsewhere defined in this Lease, the following terms whenever used in this Lease shall have only the meanings set forth in this Section, unless such meanings are expressly modified, limited or expanded elsewhere in this Lease.

A. **ADDITIONAL RENT** shall mean all sums in addition to Fixed Basic Rent payable by Tenant to Landlord or to third parties pursuant to the provisions of the Lease.

B. **ASSOCIATION** shall mean any association created under any Declaration or Master Deed.

C. **BUILDING** shall mean an approximately 16,000 square foot, two story medical office building known as Building F,

D. **BUILDING HOLIDAYS** shall be those holidays listed on Exhibit D.

E. **COMPLEX** shall mean Lot 6.02 and a portion of Lot 6.01 in Block 57 on the tax map of the Township of Bordentown, excluding that portion of Lot 6.01 containing the granary business and more particularly described on the site plan attached as Exhibit B-2 to this Lease, including all of the buildings and improvements thereon and commonly known as the "Team Campus," as such area may be amended or subdivided by Landlord from time to time.

F. **COMMENCEMENT DATE** shall mean the date that Tenant receives a temporary or final certificate of occupancy permitting it to occupy the Premises for the Permitted Use, but in no event more than 120 days after the Possession Date.

G. **DATE OF THIS LEASE** shall mean the date of acceptance and execution of this Lease by Landlord, following execution and delivery thereof to Landlord by Tenant and that date shall be inserted in the space provided in the Preamble.

H. **DECLARATION** shall mean such declarations, covenants, restrictions and agreements of public record to which the Property or the Complex may be subject relating to the development, operation and maintenance of the Complex.

I. **DELIVERY DATE** shall be on or about 425 days from the date Landlord receives building permits necessary to commence construction of the Building

J. **EXHIBITS** shall be the following, attached to this Lease and incorporated in this Lease and made a part of this Lease:

Rider A                  Renewal Options
Rider B                  Option to Purchase Unit

Exhibit A             Premises
Exhibit B-1         Legal Description of Property
Exhibit B-2        Legal Description of the Premises
Exhibit C             Landlord Work Letter
Exhibit D             Building Holidays
Exhibit E             Janitorial Specifications
Exhibit F             Rules and Regulations
Exhibit G             Tenant Estoppel Certificate
Exhibit H             Confirmation of Lease Term
Exhibit I              Tenant Work Letter

K.    **FIXED BASIC RENT** shall mean:

| Lease Year | Rentable Square Feet | Rate Per Rentable Square Feet | Annual Fixed Basic Rent | Monthly Installment of Fixed Basic Rent |
|---|---|---|---|---|
| 1 | 16,000 | $15.00 | $240,000.00 | $20,000.00 |
| 2 | 16,000 | $15.45 | $247,200.00 | $20,600.00 |
| 3 | 16,000 | $15.91 | $254,560.00 | $21,213.33 |
| 4 | 16,000 | $16.39 | $262,240.00 | $21,853.33 |
| 5 | 16,000 | $16.88 | $270,080.00 | $22,506.67 |
| 6 | 16,000 | $17.39 | $278,240.00 | $23,186.67 |
| 7 | 16,000 | $17.91 | $286,560.00 | $23,880.00 |
| 8 | 16,000 | $18.45 | $295,200.00 | $24,600.00 |
| 9 | 16,000 | $19.00 | $304,000.00 | $25,333.33 |
| 10 | 16,000 | $19.57 | $313,120.00 | $26,093.33 |
| **First Renewal Term** | | | | |
| 11 | 16,000 | $20.16 | $322,560.00 | $26,880.00 |
| 12 | 16,000 | $20.76 | $332,160.00 | $27,680.00 |
| 13 | 16,000 | $21.38 | $342,080.00 | $28,506.67 |
| 14 | 16,000 | $22.02 | $352,320.00 | $29,360.00 |
| 15 | 16,000 | $22.68 | $362,880.00 | $30,240.00 |
| **Second Renewal Term** | | | | |
| 16 | 16,000 | $23.36 | $373,760.00 | $31,146.67 |
| 17 | 16,000 | $24.06 | $384,960.00 | $32,080.00 |
| 18 | 16,000 | $24.78 | $396,480.00 | $33,040.00 |
| 19 | 16,000 | $25.52 | $408,320.00 | $34,026.67 |

#15241254 v7

| 20 | 16,000 | $26.29 | $420,640.00 | $35,053.33 |

L.　**EXCLUDED USE** shall be any use for medical office and clinical uses, ambulatory surgery, radiation oncology, dialysis, and hyperbaric oxygen therapy; health, sport and/or fitness club; and health or wellness center. Landlord shall have the right to add additional uses to supplement the Excluded Uses by written notice to Tenant, except that if at the time of the notice Tenant is actively engaged in any additional Excluded Use contained in the notice, Tenant may continue such use for so long as the additional Excluded Use continues without interruption, termination or default. Notwithstanding anything to the contrary contained in this Lease, the term "Excluded Use" shall not be deemed to include the Permitted Use.

M.　**EXCLUSIVE USE** shall be for physical rehabilitation services, which shall include physical medicine, chiropractic services, acupuncture and physical therapy, which incorporate the following subservices: gait training, balance training, postural analysis, movement analysis, manual therapy, neuromuscular reeducation, therapeutic exercise, therapeutic activities, aquatic therapy, joint mobilizations, electrotherapy modalities, hydrotherapy and physical agents, and related self-care, injury prevention and occupational therapy. The term "Exclusive Use" shall not include personal sports training or personal training for physical fitness or athletic performance.

N.　**FORCE MAJEURE** shall mean a strike, labor troubles, acts of war, terrorism, or bioterrorism, a general utility outage, extraordinary weather event, or any other cause whatsoever beyond Landlord's control

O.　**IMPROVEMENT ALLOWANCE** shall mean the sum of Twenty-Five Dollars ($25.00) per rentable square foot of the Premises, for a total of Four Hundred Thousand Dollars and 00/100 Dollars ($400,000.00).

P.　**LANDLORD** as used in this Lease includes the Landlord named above as well as its successors and assigns, each of whom shall have the same rights, remedies, powers, authorities and privileges as it would have had it originally signed this lease as Landlord. Any such person, whether or not named herein, shall have no liability hereunder after ceasing to hold title to the Property. No principal of Landlord, whether disclosed or undisclosed, shall have any personal liability with respect to any of the provisions of this Lease, the Premises, the Property or the Complex.

Q.　**LEASE YEAR** shall mean, with respect to the first Lease Year, the period commencing on the Commencement Date and ending on the last day of the month which is twelve (12) consecutive calendar months following the Commencement Date and, with respect to each Lease Year thereafter, each consecutive twelve (12) calendar month period thereafter.

R.　**MORTGAGE or mortgage** as used in this Lease includes any lien or encumbrance on the Premises or the Property or on any part of or interest in or appurtenance to any of the foregoing, including without limitation any ground rent or ground lease if Landlord's interest is or becomes a leasehold estate. The word "Mortgagee" or "mortgagee" is used herein to include the holder of any such mortgage, including any ground lessor if Landlord's interest is or becomes a leasehold estate. Whenever any right is given to a mortgagee, that right may be

#15241254 v7

exercised on behalf of such mortgagee by any representative or servicing agent of such mortgagee.

S.     **PERSON** shall mean a natural person, a partnership, a corporation, an association, and any other form of business association or entity.

T.     **RENT** shall mean all Fixed Basic Rent and Additional Rent and any other rent or other sums due from Tenant under this Lease.

U.     **PERMITTED USE** shall mean use of the Premises for, physical therapy and other rehabilitative services, to include a spine and sports medicine center performing all phases of rehabilitation, including without limitation, chiropractic, physical therapy, occupational therapy, acupuncture, nutritional counseling and non-surgical spine and sports medicine and related activities.

V.     **POSSESSION DATE** shall mean the date of Substantial Completion of Landlord's Work (as defined in Exhibit C) in accordance with Exhibit C.

W.     **PREMISES** shall mean the entire Building, consisting of approximately 16,000 rentable square feet as shown on Exhibit A.

X.     **PREMISES TAX** shall mean (i) Tenant's Building Proportionate Share of any Real Estate taxes separately assessed to the Building; and/or (ii) any taxes that are payable by Landlord under a financial agreement with the Township of Bordentown based on the rents received under the terms of this Lease.

Y.     **PROPERTY** shall mean Block 57, Lot 6.01 on the tax map of the Township of Bordentown, as more particularly described on Exhibit B-1 attached to the Lease.

Z.     **SECURITY DEPOSIT** shall be the sum of $40,000.00 which shall be held in accordance with Section 36 of the Lease.

AA.     **TENANT** as used in this Lease includes Tenant named above as well as its heirs, successors and assigns, each of which shall be under the same obligations, liabilities and disabilities and each of which shall have the same rights, privileges and powers as it would have possessed had it originally signed this Lease as Tenant. Each and every person named above as Tenant shall be bound jointly and severally by the terms, covenants and agreements contained herein. However, no such rights, privileges or powers shall inure to the benefit of any assignee of Tenant, immediate or remote, unless the assignment to such assignee is permitted or has been approved in writing by Landlord. Any notice required or permitted by the terms of this Lease may be given by or to any one of the persons named above as Tenant, and shall have the same force and effect as if given by or to all of them.

BB.     **TENANT'S BUILDING PROPORTIONATE SHARE** shall mean the fraction, the numerator of which shall be the total square footage of the Premises and the denominator of which shall be the total square footage of the Building.

-4-

CC. **TENANT'S COMPLEX PROPORTIONATE SHARE** shall mean a fraction, the numerator of which shall be the total square footage of the Premises, and the denominator of which shall be the total square footage of all of the buildings in the Complex that have received a certificate of occupancy at the time any costs assessed hereunder are accrued. The denominator shall not include the square footage of any of the Common Facilities, the indoor practice field or the maintenance building on Lot 6.01. Tenant acknowledges that Landlord is in the process of developing the Complex and therefore Tenant's Complex Proportionate Share is subject to change.

DD. **TENANT'S PROPORTIONATE TAX SHARE** shall mean the fraction, the numerator of which shall be the total square footage of the Premises, and the denominator of which shall be the total square footage of the buildings on the Property that have been approved by the Township of Bordentown. As of the date hereof the parties agree the total square footage approved is 202,300 square feet, which is subject to adjustment if the actual square footage of all of the buildings is more or less than 202,300 square feet, after all buildings have received certificates of occupancy. The denominator shall not include the square footage of any of the Common Facilities or the indoor practice field.

EE. **TENANT'S TAX SHARE** shall mean the Premises Tax plus Tenant's Proportionate Tax Share of any Real Estate Taxes chargeable to (1) the land (excluding any improvements thereon) constituting the Property; (2) the Common Facilities; and (3) any other Real Estate Taxes assessed against the Property as a whole and not associated with any improvements thereon, including, for example a payment in lieu of taxes based on the Rent received under the terms of this Lease pursuant to a financial agreement with the Township of Bordentown. To the extent that the Premises Tax cannot be separated from the Real Estate Taxes on the Property, Tenant's Tax Share shall be Tenant's Proportionate Tax Share of the Real Estate Taxes on the Property. Any taxes paid by Tenant on the land constituting the Property shall be credited against the Premises Tax payable by Tenant to the same extent Landlord receives such a credit pursuant to a financial agreement with the Township of Bordentown.

FF. **TERM** shall mean the period of time commencing on the Commencement Date (as defined in Section 4 of the Lease) and ending on the date which is ten (10) Lease Years following the Commencement Date, unless otherwise terminated or extended pursuant to the terms of this Lease.

For and in consideration of the covenants contained in this Lease, and upon the terms and conditions set forth in this Lease, Landlord and Tenant, intending to be legally bound, agree as follows:

1. **Definitions.** The definitions set forth in the preceding Preamble shall apply to the same capitalized terms appearing in this Lease. Additional definitions are contained in Section 41 and throughout this Lease.

2. **Premises.**

a. Landlord hereby demises and leases the Premises to Tenant and Tenant hereby leases and takes the Premises from Landlord for the Term and upon the terms, covenants,

#15241254 v7

conditions, and provisions set forth in this Lease, including the Preamble. Tenant's interest in the Premises as tenant shall include the right, in common with Landlord and other occupants of the Complex, to use driveways, sidewalks, storm water management basin, loading and parking areas and other facilities which are located within the Complex and that are designated by Landlord from time to time for the use of all of the tenants of the Complex (the "**Common Facilities**"). Notwithstanding anything to the contrary contained in this paragraph, Tenant shall at all times have available to it (for itself, its employees, patients and invitees) at least 40 parking spaces in the area designated on Exhibit B-2.

        b.      Tenant acknowledges that Landlord may subject the Complex, including the Premises, to a master deed under the New Jersey Condominium Act (a "**Master Deed**") or to a Declaration, in which case some of Landlord's obligations hereunder may be undertaken by an Association pursuant to the Declaration or the Master Deed and the parties' obligations shall be amended to account for any changes made necessary by such Declaration or Master Deed. Landlord shall deliver a copy of Landlord's proposed form of Master Deed or Declaration to Tenant prior to recording such document with the Burlington County Clerk, and Landlord shall not record the same without the prior written consent of Tenant, which consent shall not be unreasonably withheld, conditioned or delayed; provided that Tenant may only object to such Master Deed or Declaration on the grounds that it (i) materially affects Tenant's use and enjoyment of, or access to, the Premises and/or the Common Facilities, and/or (ii) results in any increase to the financial obligations of Tenant. If Tenant fails to deliver to Landlord its written objections to Landlord's form of Declaration or Master Deed on or before the thirtieth (30th) day after the date Tenant receives the copy of such Master Deed or Declaration from Landlord, Tenant shall be deemed to have consented to the same, and Landlord may proceed with the recording thereof.

        3.      **Completion of Premises.**  The Premises shall be completed in accordance with the Landlord Work Letter attached hereto as Exhibit C and the Tenant Work Letter attached hereto as Exhibit I. If the Landlord's Work is not Substantially Completed (as defined in the Landlord Work Letter) and delivered to Tenant on or before the Delivery Date for any reason, whether or not within Landlord's control, Landlord shall not be subject to any liability to Tenant and no such failure to deliver the Premises by the Delivery Date or any other date shall in any respect affect the validity or continuance of this Lease of any obligation of Tenant hereunder; provided, however, that in the event the Premises are not Substantially Completed on or before September 1, 2013 (as such date shall be extended due to Tenant Delay or Force Majeure), Tenant shall have the right to terminate this Lease by written notice to Landlord, in which event Landlord shall fully and promptly return to Tenant the Security Deposit and this Lease shall be NULL and VOID and neither party shall have any further obligation to the other. Landlord shall have the right to re-measure the Premises following the Possession Date and/or the Commencement Date and if the Premises are found to contain more or less than 16,000 rentable square feet, the relevant provisions of this Lease shall be adjusted accordingly.

        4.      **Commencement Date.**  The Term shall commence on the Commencement Date, provided however, that if Tenant has been unable to obtain a Certificate of Occupancy for the Permitted Use from the Township of Bordentown prior to the Commencement Date based solely upon a failure of Landlord to complete the Landlord Work in accordance with the Landlord Work Letter, the Commencement Date shall be postponed by the number of required for

Landlord to complete such work. Upon Landlord's request, Tenant shall execute the Confirmation of Lease Term attached hereto as Exhibit H.

5. **Use of Premises.** Tenant shall occupy the Premises throughout the Term and shall use the same for, and only for, the Permitted Use. Landlord covenants and agrees that during the Term, as long as no Event of Default has occurred, Landlord shall not lease or permit any property within the Complex to be used for an Exclusive Use hereunder. Tenant shall forfeit its right to the Exclusive Uses upon the occurrence of an Event of Default. In no event shall Tenant use the Premises for any Excluded Use or permit any subtenant, assignee, or Space Tenant (as defined in Section 24(b) below) to use the Premises for any Excluded Use.

6. **Fixed Basic Rent.** Commencing on the Commencement Date, Tenant shall pay, throughout the Term, the annual Fixed Basic Rent in the amount specified in the Preamble, without notice or demand and without setoff or deduction, in monthly installments equal to one-twelfth of the annual Fixed Basic Rent, in advance, on the first day of each calendar month during the Term.

7. **Real Estate Taxes.**

a. **Definitions.** The following terms shall be defined as hereinafter provided:

(1) "**Real Estate Taxes**" shall mean all taxes, liens, charges, imposts and assessments of every kind and nature, ordinary or extraordinary, foreseen or unforeseen, general or special, levied, assessed or imposed by any governmental authority, including without limitation payments in lieu of taxes, with respect to the Property, as well as all fees or assessments payable on account of the Property being located in any special services district. Notwithstanding the foregoing:

(a) if at any time during the Term the present system of ad valorem taxation of real property shall be changed or supplemented so that in lieu of or in addition to the ad valorem tax on real property there shall be assessed on Landlord or the Property any tax of any nature which is imposed in whole or in part, in substitution for, addition to, or in lieu of any tax which would otherwise constitute a Real Estate Tax, such tax shall be included within the term "Real Estate Taxes," but only to the extent that the same would be payable if the Property were the only property of Landlord;

(b) Real Estate Taxes shall also encompass all of Landlord's expenses, including but not limited to reasonable attorney's fees and expenses, incurred by Landlord in any effort to minimize Real Estate Taxes whether by contesting proposed increases in assessments, applying for the benefit of any tax abatement program available for the Property, appealing the denial of any such tax abatement, or contesting any challenge to the validity of any tax abatement program or its applicability to the Property or by any other means or procedures appropriate in the circumstances; provided, however, that under no circumstances shall Landlord have any obligation to undertake any contest, appeal or other procedure to minimize Real Estate Taxes or to obtain or maintain the benefits of any tax abatement program for the Property; and

(c) except as otherwise provided in Section 7a1(a) above, there shall be excluded from Real Estate Taxes all net income, excess profit (except to the extent such

net income and/or excess profits are used by the applicable taxing authority for the purpose of calculating a payment in lieu of taxes based on the Rent received under the terms of this Lease pursuant to a financial agreement with the Township of Bordentown), excise, franchise, estate, succession and inheritance taxes, penalties due to Landlord's lateness or failure to pay taxes when due and transfer taxes imposed on Landlord.

(2) "**Tax Year**" shall mean each calendar year, or such other period of twelve (12) months as now or hereafter may be duly adopted as the fiscal year for real estate tax purposes of the governmental unit in which the Property is located, occurring during the Term.

(3) "**Tax Statement**" shall mean a statement provided by Landlord, setting forth in reasonable detail: (a) the Real Estate Taxes for the Tax Year(s) (or portion thereof if less than full Tax Year(s) immediately preceding the Tax Year in which such statement is issued, (b) Tenant's Tax Payment (defined in Section 7b) for such preceding Tax Year(s), prorated if only a part of a Tax Year falls within the Term; (c) the amount of payments made by Tenant on account of Tenant's Tax Payment during such preceding Tax Year(s); (d) the amount of payments of the Monthly Tax Payment Estimate (defined in Section 7b(1)(a)) made to date by Tenant in the Tax Year in which the Tax Statement is issued; and (e) the Monthly Tax Payment Estimate for the Tax Year in which the Tax Statement is issued.

b. **Payment of Tenant's Tax Payment**. Commencing on the Commencement Date, Tenant shall pay to Landlord, as Additional Rent hereunder, an amount equal to Tenant's Tax Share, prorated for any partial Tax Year within the Term ("**Tenant's Tax Payment**").

(1) Such Tenant's Tax Payment shall be paid in the following manner:

(a) Beginning on the Commencement Date and continuing thereafter during each Tax Year during the Term on the first day of each month until receipt of the next Tax Statement, Tenant will pay Landlord an amount set by Landlord sufficient to pay Landlord's estimate (reasonably based on the actual Real Estate Taxes for the preceding Tax Years (but subject to the provision of Section 7(b)(ii) below) and Landlord's projections of any anticipated increases or decreases thereof) of Tenant's Tax Payment for the current Tax Year (or remaining portion thereof) (the "**Monthly Tax Payment Estimate**"). The Monthly Tax Payment Estimate for a period less than a full calendar month shall be duly prorated.

(b) Following the end of each Tax Year, Landlord shall furnish Tenant a Tax Statement setting forth the information described in Section 7a(3) above. Within thirty (30) days following the receipt of such Tax Statement (the "**Tax Expense Share Date**") Tenant shall pay to Landlord: (i) the amount by which the Tenant's Tax Payment for the Tax Year (or portion thereof) covered by the Tax Statement exceeds the aggregate of Monthly Tax Payment Estimates paid by Tenant with respect to such Tax Year (or portion thereof); and (ii) the amount by which the Monthly Tax Payment Estimate for the current Tax Year as shown on the Tax Statement multiplied by the number of months elapsed to date in the current Tax Year (including the month in which payment is made) exceeds the aggregate amount of payments of the Monthly Tax Payment Estimate theretofore made in the Tax Year in which the Tax

Statement is issued. Landlord shall diligently endeavor to furnish Tenant a Tax Statement not later than one hundred and twenty (120) days following the end of each Tax Year.

(c)     On the first day of the first month following receipt by Tenant of any annual Tax Statement and continuing thereafter on the first day of each succeeding month until the issuance of the next ensuing Tax Statement, Tenant shall pay Landlord the amount of the Monthly Tax Payment Estimate shown on the Tax Statement.

(d)     If on any Tax Expense Share Date Tenant's payments of the installments of the Monthly Tax Payment Estimate for the preceding year's Real Estate Taxes are greater than Tenant's Tax Payment for such preceding Tax Year, Landlord shall credit Tenant with any excess, which credit may be offset by Tenant against next due installments of Rent. If the Term expires prior to the Tax Expense Share Date for the applicable Tax Year and if Tenant's payments of Monthly Tax Payment Estimate either exceed or are less than Tenant's Tax Payment, Landlord shall send the Tax Statement to Tenant, and an appropriate payment from Tenant to Landlord or refund from Landlord to Tenant shall be made on the Tax Expense Share Date. The provisions of this Section 7(b)(i)(4) shall remain in effect notwithstanding any termination of this Lease; provided however, that if upon termination of this Lease Tenant owes Landlord any sums under this Lease (for Rent or otherwise), Landlord shall have the right to reduce the amount of any refund due Tenant under this Section 7(b)(i)(4) against such sums owed by Tenant to Landlord.

(2)     Real Estate Taxes with respect to a Tax Year which is the subject of an appeal filed by or on behalf of Landlord shall be paid on the basis of the amount reflected in the tax bill and shall not be adjusted until the final determination of the appeal. Upon such determination of any appeal, Landlord will notify Tenant in writing of the actual amount of Tenant's Tax Share of the Real Estate Taxes for the year or years which were the subject of the appeal and the amount, if any, remaining due by Tenant in excess of Tenant's estimated payments. Tenant shall pay such entire amount so due on the due date for the next installment of Fixed Basic Rent, or if this Lease has terminated, Tenant shall pay the amount due within fifteen (15) days after receipt of Landlord's notice. If the final determination of the appeal results in a reduction of the Real Estate Taxes at issue and Landlord receives a cash refund from the taxing authority on account of overpayment of Real Estate Taxes for such year, Tenant shall receive a credit against the installment of Fixed Basic Rent next coming due in the amount by which Tenant's payments on account of Tenant's Tax Share of such Real Estate Taxes exceeded the payments actually due for the applicable year.

c.     **Tenant's Personalty**. Tenant shall pay all taxes imposed upon Tenant's furnishings, trade fixtures, equipment or other personal property.

8.     **Operating Expenses.**

a.     **Definitions**. As used in this Section 8 the following terms shall be defined as hereinafter provided:

(1)   **Operating Year**" shall mean each calendar year, or such other period of twelve (12) months as hereafter may be adopted by Landlord as its fiscal year, occurring either in whole or in part during the Term.

(2)   **Operating Expense Statement**" shall mean a statement provided by Landlord, setting forth in reasonable detail: (a) the Operating Expenses for the Operating Year (or portion thereof if less than a full Operating Year) immediately preceding the Operating Year in which the statement is issued, reasonably detailed by major categories, (b) the Tenant's Expense Payment (defined in Section 8b) for such preceding Operating Year, prorated if only a part of the Operating Year falls within the Term, (c) the amount of payments made by Tenant on account of the Tenant's Expense Payment during such preceding Operating Year, (d) the amount of payments of the Monthly Operating Expense Estimate (defined in Section 8b(1)(a)) made to date by Tenant in the Operating Year in which the Expense Statement is issued, and (e) the Monthly Operating Expense Estimate for the Operating Year in which the Operating Expense Statement is issued.

(3)   **Operating Expenses**" shall mean

(a)   The expenses incurred by Landlord in connection with the operation, repair, maintenance, protection and management of the Premises, Building, Common Facilities and Complex, from and after the completion of the Project upon the Property by Landlord, including by way of example rather than of limitation, the following:

i)   Wages, salaries, fees and other compensation and payments, payroll taxes, contributions to any social security, unemployment insurance, welfare, pension or similar fund and payments for other fringe benefits made to or on behalf of any and all employees of Landlord performing services rendered in connection with the operation, repair, maintenance, protection and management of the Complex, including, without limitation: window cleaners; porters; janitors; miscellaneous handymen; watchmen; persons engaged in patrolling and protecting the Complex; carpenters; engineers; firemen; mechanics; electricians; plumbers; landscapers; insurance risk managers; building superintendent and assistants; property manager; and clerical and administrative personnel all of which expenses shall not exceed the market rate for such services for other comparable buildings in the area of the Building. Landlord may contract for any of the foregoing to be performed by independent contractors, in which event all sums paid to such independent contractors shall be included within Operating Expenses pursuant to Section 8(a)(iii)(1)(p) below.

ii)   The cost of employee uniforms, and the cleaning, pressing and repair thereof.

iii)   Cleaning costs for the Complex, including the facade, windows and sidewalks, all costs for snow and rubbish removal and the costs of all labor, supplies, equipment and materials incidental to such cleaning.

iv)   Premiums and other charges incurred by Landlord with respect to all insurance relating to the Complex and the operation and maintenance thereof, including without limitation: all risk of physical damage or fire and extended coverage

insurance; public liability insurance; elevator insurance; workmen's compensation insurance; boiler and machinery insurance; sprinkler leakage insurance; rent insurance; and health, accident and group life insurance for employees.

v)      The cost of heat, electricity, gas, water, sewer and all other utility services, servicing the Building and/or the Complex generally to the extent not billed directly to Tenant in accordance with Section 12(a) below.

vi)      Costs incurred for operation, service, maintenance, inspection and repairs of the Complex, including the heating, air conditioning, ventilating, plumbing, electrical and elevator systems of the Building, and the costs of labor, materials, supplies and equipment used in connection with all of the aforesaid items.

vii)      Sales and excise taxes and the like upon any of the expenses enumerated herein.

viii)      Management fees of the managing agent for the Building.

ix)      Legal fees, other than those incurred in the negotiation or enforcement of tenant leases.

x)      The cost of tools, equipment, and supplies and any replacement thereof.

xi)      All assessments and fees payable pursuant to any Declaration or Master Deed or assessed by any Association pursuant to such Declaration or Master Deed.

xii)      The cost of repainting or otherwise redecorating any part of the Building, and the cost of displays or decorations for public portions of the Complex.

xiii)      The cost of telephone, telecopier and courier services, postage and delivery charges, office supplies, maintenance and repair of office equipment, and similar costs.

xiv)      The cost of licenses, permits and similar fees and charges.

xv)      Auditing and accounting fees including accounting fees incurred in connection with the preparation and certification of the Tax Statements and the Operating Expense Statements.

xvi)      All costs incurred by Landlord to comply with governmental requirements enacted after the Commencement Date, whether federal, state or municipal; and all repairs, replacements and improvements which are appropriate for the continued operation of the Building as a first class building, including capital expenditures,

xvii)   All costs and expenses associated with the acquisition and installation of any energy or cost saving devices or alternative renewable energy devices or sources, but only to the extent of savings realized by Tenant as a result of the installation and/or use of such improvements, devices or sources.

xviii)   Cost of independent contractors performing services, including, but not limited to, cleaning, janitorial, window-washing, rubbish removal, security, landscaping, snow and ice removal services, electrical, painting, plumbing, elevator, heating, ventilation and air conditioning maintenance and repair and all fees due such independent contractors.

xix)   Capital expenditures necessitated by casualties to the extent the same are not covered by insurance.

xx)   Any and all other expenditures of Landlord which are properly expensed in accordance with generally applied real estate accounting practices consistently applied with respect to the operation, repair, maintenance, protection and management of first-class buildings in the locality of the Building.

xxi)   If Landlord shall purchase any item of capital equipment or make any capital expenditure as described in Sections 8(a)(iii)(1)(n), or 8(a)(iii)(1)(o), or 8(a)(iii)(1)(q, or 8(a)(iii)(1)(r) above (jointly the "**Capital Expenditures**") then the costs for same shall be amortized on a straight line basis beginning in the year of installation and continuing for the useful life thereof, but not more than ten (10) years, or such shorter time as may be hereinafter provided, with a per annum interest factor equal to the rate of Interest on the date of purchase of any item described in Sections 8(a)(iii)(1)(n), or 8(a)(iii)(1)(o), or 8(a)(iii)(1)(q), or 8(a)(iii)(1)(r) above.  The amount of amortization for such costs shall be included in Operating Expenses for each Operating Year to which the amortization relates. Tenant agrees that the determination by Landlord's accountants of the useful life of the subject of such Capital Expenditures shall be binding on Tenant.  If Landlord shall lease such items of capital equipment, then the lease shall be included in Operating Expenses for each Operating Year in which they are incurred.  Notwithstanding the foregoing, if Landlord shall effectuate savings in labor or energy related costs as a result of the installation of new devices or equipment, then Landlord may, in lieu of the above, elect to include up to the full amount of any such savings in each Operating Year (beginning with the Operating Year in which the equipment is placed in service) as an Operating Expense until Landlord has recovered thereby the cost of installation of said devices or equipment and interest thereon as above provided, even if the result of such application will result in the amortization of such costs over a period shorter than the useful life of such installation.  Landlord shall notify Tenant in writing if Landlord elects to apply such savings to the cost of such equipment and shall include a statement of the amount of such savings in the Expense Statement for each applicable Operating Year.  Operating Expenses shall thereafter be reduced by the amount of any previous capital expenditures included therein expensed pursuant to this Section 8(a)(3)(a)(xxi) when such amortization has been completed.

(b)   Operating Expenses shall be "net" and, for that purpose, shall be reduced by the amounts of any reimbursement or credit received by Landlord with respect to an item of cost that is included within Operating Expenses.

-12-

(c)     Notwithstanding the provisions of Section 8, "Operating Expenses" shall not include expenditures for any of the following:

i)     Any capital addition made to the Complex except as set forth in Sections 8(a)(iii)(1)(n), or 8(a)(iii)(1)(o), or 8(a)(iii)(1)(q), or 8(a)(iii)(1)rt) above.

ii)     Repairs or other work occasioned by fire, windstorm or other insured casualty or hazard, to the extent that Landlord shall receive proceeds of such insurance.

iii)     Leasing commissions and advertising expenses incurred in leasing or procuring new tenants.

iv)     Repairs or rebuilding necessitated by condemnation to the extent that Landlord has received condemnation proceeds for such repairs or rebuilding.

v)     Depreciation and amortization of the Building, other than as permitted pursuant to Section 8(a)(iii)(1)(s).

vi)     Real Estate Taxes.

vii)     The salaries and benefits of executive officers of Landlord, if any.

viii)     Debt service payments on any indebtedness applicable to the Complex, including any mortgage debt.

ix)     Development and construction costs for the Project.

b.     **Tenant's Expense Payment**. Commencing on the Commencement Date, Tenant shall pay to Landlord as Additional Rent hereunder an amount equal to Tenant's Building Proportionate Share of all Operating Expenses incurred with respect to the Building and Operating Expenses incurred with respect to the Complex generally that are allocable to the Building ("**Tenant's Expense Payment**"). For any portion of an Operating Year less than a full twelve (12) month period occurring within the Term, Tenant's Expense Payment shall be prorated on a per diem basis.

(1)     Such Tenant's Expense Payment shall be paid in the following manner:

(a)     Beginning on the Commencement Date and continuing thereafter during each Operating Year during the Term on the first day of each month until receipt of the next Operating Expense Statement, Tenant will pay Landlord an amount set by Landlord sufficient to pay Landlord's estimate (reasonably based on the actual Operating Expenses for the preceding Operating Year and Landlord's projections of any anticipated increases or decreases thereof) of Tenant's Expense Payment for the current Operating Year (or remaining portion thereof) (the "**Monthly Operating Expense Estimate**"). The Monthly Operating Expense Estimate for a period less than a full calendar month shall be duly prorated.

-13-

(b)     Following the end of each Operating Year, Landlord shall furnish Tenant an Operating Expense Statement setting forth the information described in Section 8(a)(ii) above. Within thirty (30) days following the receipt of such Operating Expense Statement (the "**Expense Share Date**") Tenant shall pay to Landlord: (i) the amount by which the Tenant's Expense Payment for the Operating Year (or portion thereof) covered by the Operating Expense Statement exceeds the aggregate of Monthly Operating Expense Estimates paid by Tenant with respect to such Operating Year (or portion thereof); and (ii) the amount by which the Monthly Operating Expense Estimate for the current Operating Year as shown on the Operating Expense Statement multiplied by the number of months elapsed to date in the current Operating Year (including the month in which payment is made) exceeds the aggregate amount of payments of the Monthly Operating Expense Estimate theretofore made in the Operating Year in which the Operating Expense Statement is issued. Landlord shall diligently endeavor to furnish Tenant an Operating Expense Statement not later than one hundred and twenty (120) days following the end of each Operating Year.

(c)     On the first day of the first month following receipt by Tenant of any annual Operating Expense Statement and continuing thereafter on the first day of each succeeding month until the issuance of the next ensuing Operating Expense Statement, Tenant shall pay Landlord the amount of the Monthly Operating Expense Estimate shown on the Operating Expense Statement.

(d)     If on any Expense Share Date Tenant's payments of the installments of the Monthly Operating Expense Estimate for the preceding year's Operating Expenses are greater than Tenant's Expense Payment for such preceding Operating Year, Landlord shall credit Tenant with any excess, which credit may be offset by Tenant against next due installments of Rent. If the Term expires prior to the Expense Share Date for the applicable Operating Year and if Tenant's payments of Monthly Operating Expense Estimate either exceed or are less than Tenant's Expense Payment, Landlord shall send the Operating Expense Statement to Tenant, and an appropriate payment from Tenant to Landlord or refund from Landlord to Tenant shall be made on the Expense Share Date. The provisions of this Section 8(b)(i)(4) shall remain in effect notwithstanding any termination of this Lease; provided however, that if upon termination of this Lease Tenant owes Landlord any sums under this Lease (for Rent or otherwise), Landlord shall have the right to reduce the amount of any refund due Tenant under this Section 8(b)(i)(4) against such sums owed by Tenant to Landlord.

c.     **Tenant's Audit Right**. Any Operating Expense Statement, Tax Statement or other notice from Landlord pursuant to this Section 8 shall be deemed approved by Tenant as correct unless, within sixty (60) days after the furnishing thereof, Tenant shall notify Landlord in writing that it disputes the correctness of the Operating Expense Statement, Tax Statement or other notice, specifying in detail the basis for such assertion. Within thirty (30) days of Tenant's dispatch of such notice, Tenant shall have the right, at its sole cost and expense, to audit or have its appointed accountant, agents or employees audit, Landlord's records related to actual Operating Expenses or Real Estate Taxes, provided that any such audit may not occur more frequently than once each calendar year, nor apply to any years prior to the year of the applicable statement. Books and records shall be made available to Tenant, Tenant's employees, accountants or agents to conduct the audit, which (at Landlord's option) may be either at the Premises, or at Landlord's property manager's office for the area in which the Premises are

-14-

located. Pending resolution of any such audit, Tenant shall make payments in accordance with the applicable Operating Expense Statement, Tax Statement or other notice. In the event Tenant's audit discloses any discrepancy, in the amount of Operating Expenses and/or Real Estate Taxes billed to Tenant, the appropriate party shall, within thirty (30) days after the date of such determination, pay the other party the deficiency or overpayment, as applicable. Tenant may use its usual auditors of its normal books and records (provided the same are certified public accountants) or any firm of independent certified public accountants having at least fifty (50) partners or shareholders and a reputation in the industry for performing quality audits similar to those performed by any of the so-called "big four" accounting firms to conduct the audit described in this Section so long as such auditor is not being compensated on a contingency, commission or bonus basis depending on the results obtained. Tenant shall pay Landlord, within sixty (60) days after receipt of invoice and reasonable backup and as Additional Rent, Landlord's actual out of pocket cost without markup or fee for: (a) the photocopying of documents; and (b) the retrieval of documents from Landlord's storage archives. If the audit reveals that the applicable Operating Expense Statement, Tax Statement or other notice set forth dollar amounts in excess of the actual expenses, Landlord shall reimburse Tenant for expenses incurred in connection with the audit.

9.     **Interest and Late Charge.** Landlord may charge a late payment charge of five percent (5%) of any installment of Fixed Basic Rent or Additional Rent that is not paid within five (5) days of the due date thereof. Any amount due from Tenant to Landlord which is not paid when due shall bear interest ("**Interest**") at an interest rate equal to the Prime Rate published from time to time in the Money Rates column of the Wall Street Journal plus two percent (2%) (or, if lower, the highest rate then allowed under the usury laws of the State of New Jersey) (the "**Interest Rate**") from the date due until the date paid. The right of Landlord to charge a late charge and interest with respect to past due installments of Fixed Basic Rent and Additional Rent is in addition to Landlord's rights and remedies upon an Event of Default.

10.     **Insurance.**

a.     **Tenant's Insurance.**

(1)     Tenant covenants and represents, such covenants and representations being specifically designed to induce Landlord to execute this Lease, that during the entire Term, at its sole cost and expense, Tenant shall obtain, maintain and keep in full force and affect the following insurance:

(a)     "Special Form" property insurance against fire, theft, vandalism, malicious mischief, sprinkler leakage and such additional perils as are now, or hereafter may be, included in a standard extended coverage endorsement from time to time in general use in the State of New Jersey upon property of every description and kind owned by Tenant and or under Tenant's care, custody or control located within the Premises or for which Tenant is legally liable, including by way of example and not by way of limitation, furniture, fixtures, fittings, installations and any other personal property in an amount equal to the full replacement cost thereof.

-15-

(b)     Commercial General Liability Insurance coverage to include personal injury, bodily injury, broad form property damage, operations hazard, contractual liability, products and completed operations liability naming Landlord and Landlord's mortgagee or trust deed holder and ground lessors (if any) as additional named insureds in limits of not less than Three Million Dollars ($3,000,000.00).

(c)     Business interruption insurance in such amounts as will reimburse Tenant for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent tenants or assumed by Tenant pursuant to this Lease or attributable to prevention or denial of access to the Premises as a result of such perils.

(d)     Workers' Compensation insurance in form and amount as required by law.

(e)     Any other form or forms of insurance or any increase in the limits of any of the aforesaid enumerated coverages or other forms of insurance as Landlord or the mortgagees or ground lessors (if any) of Landlord may reasonably require from time to time if in the reasonable opinion of Landlord or said mortgagees or ground lessors said coverage and/or limits become inadequate or less than that commonly maintained by prudent tenants in similar buildings in the area by tenants making similar uses.

(2)     All property insurance policies shall be taken out with insurers rated A-VIII (or if such ratings are not in effect, the equivalent thereof) by Best Rating Service, or any successor thereto (or if there be none, an organization having a national reputation) who are licensed to do business in the state in which the Property is located and shall be in form satisfactory from time to time to Landlord. A policy or certificate evidencing such insurance together with a paid bill shall be delivered to Landlord not less than fifteen (15) days prior to the date of commencement of the construction of the Tenant Improvements. Such insurance policy or certificate will provide that the insurers to notify Landlord and the mortgagees or ground lessors (if any) of Landlord in writing not less than thirty (30) days prior to any material change, reduction in coverage, cancellation, or other termination thereof. Should a certificate of insurance initially be provided a policy shall be furnished by Tenant within thirty (30) days of the Commencement Date. The aforesaid insurance shall be written with commercially reasonable deductibles.

(3)     In the event of damage to or destruction of the Building and/or Premises entitling Landlord or Tenant to terminate this Lease pursuant to Section 18 of this Lease, and if this Lease shall be so terminated, Tenant shall immediately pay to Landlord all of its insurance proceeds, if any, relating to the leasehold improvements and alterations (but not Tenant's trade fixtures, equipment, furniture or other personal property of Tenant in the Premises) which have become Landlord's property on installation or would have become Landlord's property at the Term's expiration or sooner termination. If the termination of the Lease, at Landlord's election, is due to damage to the Building, and if the Premises have not been so damaged, Tenant will deliver to Landlord, in accordance with the provisions of this Lease, the improvements and alterations to the Premises which have become an installation or would have become at the Term's expiration, Landlord's property.

-16-

(4)     Tenant agrees that it will not keep or use or offer for sale (if sales of goods is a permitted use pursuant to this Lease) in or upon the Premises or within the Complex any article which may be prohibited by any insurance policy in force from time to time covering the Complex or Premises. In the event Tenant's occupancy or conduct of business in or on the Premises or in the Complex, whether or not Landlord has consented to the same, results in any increase in premiums for insurance carried from time to time by Landlord with respect to the Complex or the Premises, Tenant shall pay such increase in premiums as Additional Rent within ten (10) days after being billed therefor by Landlord. In determining whether increased premiums are a result of Tenant's use and occupancy a schedule issued by the organization computing the insurance rate on the Complex or Premises showing the components of such rate shall be conclusive evidence of the items and charges making up such rate. Tenant shall promptly comply with all reasonable requirements of the insurance authority or of any insurer now or hereafter in effect relating to the Complex or Premises.

(5)     If any insurance policy carried by either party as required by this Section 10 shall be cancelled or cancellation shall be threatened or the coverage thereunder reduced or threatened to be reduced in any way by reason of the use or occupation of the Premises or any part thereof by Tenant or any assignee or subtenant of Tenant or anyone permitted by Tenant to be upon the Premises, and if Tenant fails to remedy the conditions giving rise to such cancellation or threatened cancellation or reduction in coverage on or before (i) forty-eight (48) hours after notice thereof from Landlord, or (ii) prior to such cancellation or reduction becoming effective, Tenant shall be in default and an Event of Default shall occur under this Lease and Landlord shall have all of the remedies available to Landlord pursuant to this Lease.

b.     **Landlord's Insurance.** Landlord covenants and agrees that throughout the Term it will insure the Complex and the Building (excluding any property with respect to which Tenant is obligated to insure pursuant to Section 10(a)(i)(1) above) against damage by perils covered by the "special form" of property insurance and commercial general liability insurance in such reasonable amounts with such reasonable deductibles as required by any mortgagee or ground lessor, or, if none, as would be carried by a prudent owner of a similar building in the area. In addition, Landlord shall maintain and keep in force and effect during the Term, rental income insurance insuring Landlord against abatement or loss of Fixed Basic Rent, including items of Additional Rent, in case of fire or other casualty similarly insured against, in an amount at least equal to the Fixed Basic Rent and Additional Rent during, at the minimum, one Lease Year hereunder. Landlord may, but shall not be obligated to, take out and carry any other forms of insurance as it or the mortgagee or ground lessor (if any) of Landlord may require or reasonably determine available. All costs and expenses incurred by Landlord for insurance carried by Landlord on the Building and the Complex or in connection with its ownership or operation thereof shall be included as Operating Expenses pursuant to Section 8. Notwithstanding its inclusion as an Operating Expense or any contribution by Tenant to the cost of insurance premiums by Tenant as provided herein, Tenant acknowledges that it has no right to receive any proceeds from any such insurance policies carried by Landlord although Landlord shall use such proceeds in the repair and reconstruction of the Complex and the Premises. Tenant further acknowledges that the exculpatory provisions of this Lease as set forth in this Section 10 as to Tenant's insurance are designed to insure adequate coverage as to Tenant's property and business without regard to fault and avoid Landlord obtaining similar coverage for

-17-

such loss for its negligence or that of its agents, servants or employees which would result in double coverage for the same perils includable as part of Operating Expenses which are payable in part by Tenant. Landlord will not carry insurance of any kind on Tenant's furniture or furnishings, or on any fixtures, equipment, appurtenances or improvements of Tenant under this Lease, and Landlord shall not be obligated to repair any damage thereto or replace the same.

   c. **Waiver of Subrogation.** Any policy or policies of fire, extended coverage or similar property insurance, which either party obtains in connection with the Premises, Building or Complex, shall include a clause or endorsement denying the insurer any rights of subrogation against the other party (i.e. Landlord or Tenant) for all perils covered by such policy. Should such waiver not be available then the policy for which the waiver is not available must name the other party as an additional named insured affording it the same coverage as that provided the party obtaining such coverage. Any provision of this Lease to the contrary notwithstanding, Landlord and Tenant hereby release the other from any and all liability or responsibility to the other or anyone claiming through or under them by way of subrogation or otherwise (a) from any and all liability for any loss or damage to the property of the releasing party, (b) for any loss or damage that may result, directly or indirectly, from the loss or damage to such property (including rental value and business interruption), and (c) from legal liability for any loss or damage to property (no matter who the owner of the property may be), all to the extent that the releasing party's loss or damage is insured or, if not insured, was insurable under commercially available "special form" property insurance policies, including additional coverages typically obtained by owners and tenants of comparable buildings in the vicinity of the Building, even if such loss or damage or legal liability shall be caused by or result from the fault or negligence of the other party or anyone for whom such party may be responsible and even if the releasing party is self insured in whole or in part or the amount of the releasing party's insurance is inadequate to cover the loss or damage or legal liability. It is the intention of the parties that Landlord and Tenant shall look solely to their respective insurance carriers for recovery against any such property loss or damage or legal liability, without such insurance carriers having any rights of subrogation against the other party.

  11. **Repairs and Maintenance.**

   a. **Tenant's Obligations.** Tenant shall, throughout the Term, and at Tenant's sole cost and expense subject to Section 11(b) of this Lease, keep and maintain the Premises in a neat and orderly condition; and, upon expiration of the Term or earlier termination of this Lease, Tenant shall leave the Premises in broom clean condition, ordinary wear and tear, damage by fire or other casualty alone excepted, and for that purpose and except as stated in this sentence, Tenant will make all necessary repairs and replacements to the Premises to deliver it in such condition. Tenant shall not permit any waste to the Premises. Tenant shall not use any portion of the Common Facilities for other than their intended use as reasonably specified by Landlord from time to time.

   b. **Landlord's Obligations.** Landlord shall, throughout the Term, make all necessary repairs to the roof, foundation, structural elements and Building operating systems, mechanical, electrical and HVAC systems and exterior windows and doors of the Premises. Landlord shall, throughout the Term, make all necessary repairs to the parking, sidewalks and walkways and the Common Facilities; provided, however, that Landlord shall have no

-18-

responsibility to make any repairs in the Premises unless and until Landlord receives written notice of the need for such repair. All interior Premises repairs that are necessary to the Premises and are not Landlord's responsibility shall be performed at Tenant's sole cost and expense. Landlord shall keep and maintain all Common Facilities of the Complex and any sidewalks, parking areas, curbs and access ways adjoining the Complex in a good order and repair, in a clean and orderly condition, free of accumulation of dirt and rubbish and ice and snow and shall keep and maintain all landscaped areas within the Complex in a neat and orderly condition. All repairs and maintenance shall be done in a first class manner in keeping with comparable first class buildings in the locale of the Building. All costs and expenses incurred by Landlord in connection with Landlord's obligations under this Section 11(b) shall be included in Operating Expenses unless such expense is expressly excluded from the definition of Operating Expenses.

        c.      **Infectious Waste.** Notwithstanding anything to the contrary contained in this Lease, Tenant shall be responsible and shall pay for all costs of disposing of all Infectious Waste generated by Tenant at or from the Building. All Infectious Waste shall be identified, segregated, measured, stored and disposed of by Tenant in a manner that complies with all federal, state and local laws or regulations applicable to Infectious Waste. As used herein, the term "**Infectious Waste**" means any infectious waste as defined in the infectious waste regulations of the State of New Jersey, as amended from time to time.

12.      **Utilities and Services.**

        a.      **Services to the Premises.**

            (1)      Tenant shall have access to the Premises, including elevators as set forth in Section 12(c) and utilities including HVAC, electricity, water, and heat twenty-four hours per day, seven days per week.

            (2)      Tenant agrees to apply for all utilities necessary for its use of the Premises in its own name and to pay monthly as Additional Rent (but not as an Operating Expense) all charges for electricity and other utilities used by Tenant at the Premises. Tenant shall pay all bills for utility usage at the Premises on or before the date due. Tenant shall authorize each utility provider to provide to Landlord upon Landlord's request information about Tenant's utility consumption and billing (including copies of bills).

            (3)      In addition, Tenant agrees to pay as Additional Rent Tenant's Building Proportionate Share for any common, untenantable areas of the Building and Tenant's Complex Proportionate Share of all charges for electricity used for Common Facilities at the Complex and not within tenantable areas of the Complex. In no event will the charges under Section 12(a)(ii) or this Section 12(a)(iii), as the case may be, duplicate any charges under any other provision. Tenant shall be charged for such electricity at the rate Landlord is charged for same without mark-up or fee assessed by Landlord, other than any meter reading fee charged by a third party, and Tenant acknowledges that the effective rate charged to Tenant may be different than the actual rate charged by the electricity provider for any particular kilowatt hour of electricity consumption.

-19-

(4)     Tenant's use of electric energy in the Premises shall not at any time exceed the safe capacity of any of the electric conductors and equipment in or otherwise serving the Premises.

b.     **Light Bulbs.** Landlord, upon Tenant's request, shall replace light bulbs, tubes and ballasts for lighting fixtures when required in the Premises.  The cost of replacement light bulbs, tubes, and ballasts, plus the reasonable costs incurred by Landlord for such replacement, shall be paid by Tenant as Additional Rent in accordance with Landlord's then current schedule of costs and assessments therefor.

c.     **Common Facilities.** Within the Common Facilities of the Complex and consistent with other first class buildings in the locale of the Building, Landlord shall furnish (i) adequate electricity and utilities, (ii) landscaping, (iii) parking facility maintenance, (iv) Common Facilities maintenance; and (v) snow and ice removal.  Landlord shall also furnish cleaning services for the Premises (on a five-day a week basis except for Building Holidays) after 6:00 p.m. in accordance with Exhibit E attached hereto and made a part hereof.  The cost of the services provided by Landlord pursuant to this Section 12(c) shall be included as part of the Operating Expenses.

d.     **Liability.** Landlord shall not be liable for any damages to or incurred by Tenant (and Tenant's property located in the Premises) resulting from the quality, quantity, failure, unavailability or disruption of any services and the same shall not constitute a termination of this Lease or an actual or constructive eviction or entitle Tenant to an abatement of Rent unless caused by Landlord's reckless or willful conduct.

13.     **Governmental Regulations.**  Tenant shall comply with all laws, ordinances, notices, orders, rules, regulations and requirements of all federal, state and municipal government or any department, commission, board of officer thereof, or of the National Board of Fire Underwriters or any other body exercising similar functions, relating to its use and occupancy of the Premises.  Tenant shall not knowingly do or commit, or suffer to be done or committed anywhere in the Building, the Property or the Complex any act or thing contrary to any of the laws, ordinances, regulations and requirements referred to in this Section.  Tenant shall give Landlord prompt written notice of any accident in the Premises and of any breakage, defect or failure in any of the systems or equipment servicing the Premises or any portion of the Premises.

14.     **Alterations, Additions and Fixtures.**

a.     **Tenant Alterations.** Tenant and its Space Tenants (as hereinafter defined) shall have the right to install in the Premises (excluding the roof and exterior of the Building) any trade fixtures and other removable property including without limitation, phone and alarm systems, equipment, shelving, lighting, and other personal property which is capable of being removed from the Premises without material damage thereto ("**Tenant's Property**") provided, however, that no such installation and no removal thereof shall be permitted which materially adversely affects any structural component or operating system of the Building and that Tenant shall repair and restore any damage or injury to the Premises or the Complex caused by installation or removal.  All of Tenant's Property which may be installed or placed in or upon the

-20-

Premises shall remain the property of Tenant. Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term. Landlord waives any right it may have in Tenant's Property. To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such lien or security interest. Landlord shall provide to Tenant, within twenty (20) days after Tenant's request therefor, a written waiver in form reasonably satisfactory to Tenant and Landlord evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.

   b.   **Trade Fixtures.** Tenant shall have the right to install in the Premises any trade fixtures; provided, however, that no such installation and no removal thereof shall be permitted which affects any structural component or operating system of the Premises without Landlord's approval and that Tenant shall repair and restore any damage or injury to the Premises or the Complex caused by installation or removal.

   c.   **Notice and Consent.** Tenant shall not make or permit to be made any alterations, improvements or additions to the Premises or Complex without on each occasion first presenting plans and specifications to Landlord and obtaining Landlord's prior written consent, which shall not be unreasonably withheld or delayed, but may be conditioned upon compliance with reasonable requirements of Landlord as provided in this Lease. If Landlord consents to any proposed alterations, improvements or additions, then Tenant at Tenant's sole cost and expense, may make the proposed alterations, improvements and additions provided that: (i) Tenant supplies any necessary permits and approvals; (ii) such alterations and improvements do not, in Landlord's judgment, impair the structural strength of the Building, or any other improvements or reduce the value of the Property and are at least equal in quality to the Tenant Improvements; (iii) Tenant takes or causes to be taken all steps that are otherwise required by Section 15 of this Lease and that are required or permitted by law in order to avoid the imposition of any construction liens upon the Premises or the Property; (iv) Tenant uses a contractor approved by Landlord, such approval not to be unreasonably withheld, conditioned or delayed, so long as such contractor shall not disturb labor relations with or interfere with Landlord's employees, agents, contractors or subcontractors; (v) Tenant ensures that the occupants of the Property and the Complex are not annoyed or disturbed by such work; (vi) the alterations, improvements or additions shall be installed in accordance with the approved plans and specifications and completed according to a construction schedule approved by Landlord such approval not to be unreasonably withheld, conditioned or delayed; (vii) Tenant maintains or causes its Space Tenants or contractors to maintain insurance of the types and coverage amounts reasonably required by Landlord; and (viii) Tenant takes or causes its Space Tenants and their respective contractors to take such reasonable steps and implement such reasonably appropriate policies and practices to preserve labor harmony at the Complex. Any and all alterations, improvements and additions to the Premises which are constructed, installed or otherwise made by Tenant shall be the property of Tenant until the expiration or sooner termination of this Lease; at that time all such alterations and additions shall remain on the Premises and become the property of Landlord without payment by Landlord unless, upon the termination of this Lease, Landlord instructs Tenant in writing to remove the same in which event Tenant will remove such alterations, improvements and additions, and repair and restore any damage to the Property or the Premises caused by the installation or removal. Notwithstanding anything to the contrary contained in this

-21-

Lease, Landlord may withhold its approval to any proposed alterations, additions or improvements to the Premises in its absolute and sole discretion with respect to any such alteration, addition or improvement which Landlord determines involves any modification to the Building's exterior or its structural, electrical, mechanical or plumbing systems and any components thereof.

15. **Construction Liens.**

a. **No Encumbrances.** Tenant covenants that it shall not (and has no authority to) create or allow any encumbrance against the Premises, the Property, or any part thereof or of Landlord's interest therein.

b. **No Liens.** Tenant covenants that it shall not suffer or permit to be created, or to remain, any lien or claim thereof (arising out of any work done or services, material, equipment or supplies furnished for or at the request of Tenant or by or for any contractor or subcontractor of Tenant, other than such furnished by Landlord) which is or may become a lien upon the Premises, the Property, or any part of any thereof or the income therefrom or any fixture, equipment or similar property therein.

c. **Removal of Liens.** If any lien or claim shall be filed, Tenant shall within ten (10) business days after notice of the filing thereof, cause the same to be discharged of record by payment, deposit, bond or otherwise. If Tenant shall fail to cause such lien or claim to be discharged and removed from record within that period, then, without obligation to investigate the validity thereof and in addition to any other right or remedy Landlord may have, Landlord may, but shall not be obligated to, contest the lien or claim or discharge it by payment, deposit, bond or otherwise; and Landlord shall be entitled, if Landlord so decides, to compel the prosecution of an action for the foreclosure of such lien by the lienor and to pay the amount of the judgment in favor of the lienor with interest and costs. Any amounts so paid by Landlord and all costs and expenses, including attorneys' fees, incurred by Landlord in connection therewith, together with Interest from the respective dates of Landlord's making of the payment or incurring of the cost or expense, shall constitute Additional Rent payable by Tenant under this Lease and shall be paid by Tenant to Landlord promptly on demand.

d. **Tenant's improvements not for Landlord's Benefit.** Notwithstanding anything to the contrary in this Lease or in any other writing signed by Landlord, neither this Lease nor any other writing signed by Landlord shall be construed as evidencing, indicating, or causing an appearance that any erection, construction, alteration or repair to be done, or caused to be done, by Tenant is or was in fact for the immediate use and benefit of Landlord. Further, notwithstanding anything contained herein to the contrary, nothing contained in or contemplated by this Lease shall be deemed or construed in any way to constitute the consent or request on the part of Landlord for the performance of any work or services or the furnishing of any materials for which any lien could be filed against the Premises or the Property or any part of any thereof, nor as giving Tenant any right, power, or authority to contract for or permit the performance of any work or services or the furnishing of any materials for which any lien could be filed against the Premises, the Property or any part of any thereof.

16. **Negative Covenants of Tenant.**

#15241254 v7

a. **System Changes.** Supplementing the provisions of Section 14 above, Tenant shall not install any equipment of any kind or nature whatsoever which would or could, in Landlord's reasonable judgment, necessitate any change, replacement or addition to (or which might cause damage to) the plumbing, heating, air-conditioning or electrical systems serving the Premises or any portion thereof without the prior written consent of Landlord, which shall not be unreasonably withheld, unless such change affects any Building system servicing other Building tenants, in which case such change, replacement or addition shall be approved in Landlord's sole discretion. In the event such consent is granted, all costs in connection with such changes, replacements or additions shall be paid for by Tenant in advance.

b. **Sales.** Without the prior written consent of Landlord, Tenant shall not exhibit, sell or offer for sale (or permit the exhibition, sale or offering for sale) in the Premises, or at the Property, any article or thing except those articles and things connected with the Permitted Use of the Premises by Tenant.

c. **Prohibited Uses.** Tenant will not make or permit to be made any use of the Premises or any part thereof which would violate any of the covenants, agreements, terms, provisions and conditions of this Lease or which directly or indirectly is forbidden by public law, ordinance, governmental regulation, or matters of record or which may be dangerous to life, limb or property or which may invalidate or increase the premium cost of any policy of insurance carried on the Complex or covering its operation or which will suffer or permit the Premises or any part thereof to be used in any manner or which would permit anything to be brought into or kept therein which, in the reasonable judgment of Landlord, would in any way impair or tend to impair the character, reputation or appearance of the Building as a high quality building or which would impair or interfere with or tend to impair or interfere with any of the services performed by Landlord for the Building or which could threaten the safety of the Building or any of its occupants.

d. **Signs.** Tenant shall be permitted to install signage on the exterior of the Building and to install monument signage on the Property (in an area immediately adjacent to the Building) at Tenant's sole cost and expense, subject to Landlord's prior written approval (which shall not be unreasonably withheld), including without limitation Landlord's approval of the size, location and construction of any such signage, and Tenant's receipt of all necessary permits and approvals for same from governmental authorities and any Association, if required pursuant to any Declaration or Master Deed.

e. **Advertising.** Without Landlord's prior written consent in each instance, Tenant shall not: (1) advertise the business, profession or activities of Tenant conducted at the Premises in any manner which violates the letter or spirit of any code of ethics adopted by any recognized association or organization pertaining to such business, profession or activities; or (2) use the name of the Building for any purpose other than that of the business address of Tenant; or (3) advertise (or otherwise notify third parties) that the Premises or any part therefore are available for lease or sublease.

f. **Locks.** Locks or similar devices may only be attached to or removed from any door or window in the Premises with Landlord's prior written consent.

-23-

### g.    Hazardous Substances.

(1)    Tenant represents, warrants and covenants that (1) the Premises shall not be used by Tenant, its employees, licensees, agents, sublessees or contractors (collectively, "**Tenant Parties**") for any dangerous, noxious or offensive trade or business and that Tenant Parties will not cause or maintain a nuisance there, (2) Tenant Parties shall not bring, generate, treat, store or dispose of Hazardous Substances (as hereinafter defined) at the Premises in violation of Environmental Laws, (3) Tenant Parties shall at all times comply with all Environmental Laws (as hereinafter defined) and shall cause the Premises to comply, (4) Tenant shall keep the Premises free of any lien imposed pursuant to any Environmental Laws by reason of Tenant's breach of any of the foregoing warranties and covenants, and (5) Tenant shall not perform or cause to be performed any environmental testing on the Premises or the Property without Landlord's prior written approval, to be given or withheld in Landlord's sole discretion.

(2)    Tenant shall enter into a contract with a licensed disposal company for the regular and lawful disposal of all medical waste generated at the Premises and shall provide Landlord with evidence thereof (together with all required manifests, if any) promptly upon written request for same. Tenant warrants that it shall promptly deliver to Landlord, (i) copies of any documents received from the United States Environmental Protection Agency and/or any state, county or municipal environmental or health agency concerning Tenant's operations upon the Premises, (ii) copies of any documents submitted by Tenant to the United States Environmental Protection Agency and/or any state, county or municipal environmental or health agency concerning its operations on the Premises, including but not limited to copies of permits, licenses, annual filings and registration forms, and (iii) upon the request of Landlord, Tenant shall provide Landlord with evidence of compliance with Environmental Laws.

(3)    At the expiration or earlier termination of this Lease, Tenant shall surrender the Premises to Landlord free of any and all Environmental Defaults (defined below).

(4)    An "**Environmental Default**" shall mean the occurrence of any one or more of the following: (1) a breach of Tenant's warranty contained in Section 16(g)(i), above, (2) a release, spill or discharge of a Hazardous Substance on or from the Premises by any Tenant Party, or (3) the discovery of an environmental condition requiring response which violation, release, or condition is attributable to the acts or omissions of any Tenant Party, or (4) an emergency environmental condition caused by or attributable to any Tenant Party. Upon occurrence of an Environmental Default, Landlord shall have the right, but not the obligation, to immediately enter the Premises, to supervise and approve any actions taken by Tenant to address the violation, release, or environmental condition, or if Landlord deems it necessary, then Landlord may perform, at Tenant's expense, any lawful actions necessary to address the violation, release, or environmental condition.

(5)    Tenant shall indemnify, defend (with counsel approved by Landlord, such approval not to be unreasonably withheld) and hold Landlord and Landlord's affiliates, shareholders, directors, officers, employees and agents harmless from and against any and all claims, judgments, damages (including consequential damages), penalties, fines, liabilities, losses, suits, administrative proceedings, costs and expense of any kind or nature, known or unknown, contingent or otherwise, which arise at any time during or after the Term

-24-

(including, but not limited to, reasonable attorneys', consultant, laboratory and expert fees and including, without limitation, diminution in the value of the Building or Property or Complex, damages for the loss or restriction on use of rentable space or of any amenity of the Building or Property or Complex and damages arising from any adverse impact on marketing of space in the Building or Complex), arising from or related to the occurrence of one or more Environmental Defaults during the Term.

(6) Definitions.

(a) The term "**Hazardous Substances**" means (i) asbestos and any asbestos containing material and any substance that is then defined or listed in, or otherwise classified pursuant to, any Environmental Laws or any applicable laws or regulations as a "hazardous substance", "hazardous material", "hazardous waste," "infectious waste", "toxic substance", "toxic pollutant" or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, toxicity, reproductive toxicity, or Toxicity Characteristic Leaching Procedure (TCLP) toxicity, (ii) any petroleum and drilling fluids, produced waters, and other wastes associated with the exploration, development or production of crude oil, natural gas, or geothermal resources, and (iii) petroleum products, polychlorinated biphenyls, urea formaldehyde, radon gas, radioactive material (including any source, special nuclear, or by-product material), and medical waste.

(b) The term "**Environmental Laws**" collectively means and includes all present and future laws and any amendments thereto (whether common law, statute, rule, order, regulation or otherwise), permits, and other requirements or guidelines of governmental authorities applicable to the Premises and relating to the environment and environmental conditions or to any Hazardous Substance (including, without limitation, CERCLA, 42 U.S.C. §601, et seq., the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §901, et seq., the Hazardous Materials Transportation Act, 49 U.S.C. §801, et seq., the Federal Water Pollution Control Act, 33 U.S.C. §51, et seq., the Clean Air Act, 33 U.S.C. §401, et seq., the Clean Air Act, 42 U.S.C. §41, et seq., the Toxic Substances Control Act, 15 U.S.C. §601-2629, the Safe Drinking Water Act, 42 U.S.C. §300f-300j, the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. §101, et seq., and any so-called "Super Fund" or "Super Lien" law, any law requiring the filing of reports and notices relating to hazardous substances, environmental laws administered by the Environmental Protection Agency, and any similar state and local laws and regulations, all amendments thereto and all regulations, orders, decisions, and decrees now or hereafter promulgated thereunder concerning the environment, industrial hygiene or public health or safety).

(c) Survival. The provisions of this Section 16(g) shall survive any termination of this Lease or the expiration of the Term.

h. **Floor Load**. Tenant shall not place or permit to be placed upon any floor of the Premises any item of any nature the weight of which shall exceed such floor's rated floor load limit unless additional floor loads are approved in writing by Landlord in advance.

17. **Landlord's Right of Entry; Right to Cure.**

-25-

a. **Entry for Inspection and Repairs.** Tenant shall permit Landlord and the authorized representatives of Landlord and of any mortgagee or any prospective mortgagee to enter the Premises at all reasonable times, with prior notice to Tenant, for the purpose of (i) inspecting the Premises or (ii) making any necessary repairs to the Premises and performing any work therein. During the progress of any work on the Premises, Landlord will use commercially reasonable efforts not to inconvenience Tenant, but shall not be liable for inconvenience, annoyance, disturbance, loss of business or other damage to Tenant by reason of making any repair or by bringing or storing materials, supplies, tools and equipment in the Premises during the performance of any work, and the obligations of Tenant under this Lease shall not be thereby affected in any manner whatsoever.

b. **Entry to Show.** Landlord shall have the right at all reasonable times, with prior notice to Tenant, to enter and to exhibit the Premises for the purpose of inspection or showing the Premises in connection with a sale or mortgage and, during the last twelve (12) months of the Term, to enter upon and to exhibit the Premises to any prospective tenant.

c. **Entry upon Vacation by Tenant.** If the Premises are vacated or abandoned by Tenant, Landlord shall be permitted to show the Premises at any time and to prepare the Premises for re-occupancy, including the demolition, alteration and reconstruction of tenant improvements therein provided, however, nothing herein shall relieve Tenant of its obligation to pay Rent in accordance with the terms of this Lease.

d. **Entry upon Default.** In the event Tenant fails to comply with any provision of this Lease following the expiration of any applicable notice and cure period, Landlord may, at its option but without obligation, and without notice to Tenant, perform any and all of Tenant's required obligations and otherwise cure such default as it deems appropriate in its sole and absolute discretion. All costs and fees incurred by Landlord in the exercise of such right, including without limitation consultant fees and reasonable legal fees, shall be deemed Additional Rent payable by Tenant upon demand, together with interest thereon at the Interest Rate from the date of demand until paid in full.

18. **Damage by Fire or Other Casualty.**

a. **Repairs by Landlord.** If the Premises or Building is damaged or destroyed by fire or other casualty, Tenant shall promptly notify Landlord whereupon Landlord shall, subject to the consent of Landlord's present or future mortgagee and to the conditions set forth in this Section 18, repair, rebuild or replace such damage and restore the Premises to substantially the same condition as the Premises were in immediately prior to such damage or destruction; provided, however, that Landlord shall only be obligated to restore such damage or destruction to the extent of the proceeds of fire and other extended coverage insurance policies. Notwithstanding the foregoing, if the Premises is destroyed or damaged to the extent that the Premises cannot be repaired or restored within one (1) year after such casualty, as estimated by Landlord in Landlord's reasonable judgment, then, in such event, either Landlord or Tenant may terminate this Lease by written notice to the other party within ninety (90) days after the date of such casualty.

-26-

b.  **Time for Repairs.** The repair, rebuilding or replacement work shall be commenced promptly and completed with due diligence, taking into account the time required by Landlord to effect a settlement with, and procure insurance proceeds from, the insurer, and for delays beyond Landlord's reasonable control.

c.  **Insurance.** The net amount of any insurance proceeds recovered by reason of the damage or destruction of the Building (meaning the gross insurance proceeds excluding proceeds received pursuant to a rental coverage endorsement and the cost of adjusting the insurance claim and collecting the insurance proceeds) shall be applied towards the cost of restoration. Notwithstanding anything to the contrary in this Lease, if in Landlord's reasonable opinion the net amount of insurance proceeds will not be adequate to complete such restoration, Landlord shall have the right to terminate this Lease and all the unaccrued obligations of the parties hereto by sending a written notice of such termination to Tenant specifying a termination date no less than ten (10) days after its transmission; provided, however, that Tenant may require Landlord, except during the last two (2) years of the Term unless Tenant has exercised a Renewal Option (and Tenant shall be permitted to exercise same early for this purpose), to withdraw the notice of termination by agreeing to pay the cost of restoration in excess of the net insurance proceeds and by giving Landlord adequate security for such payment prior to the termination date specified in Landlord's notice of termination. If the net insurance proceeds are more than adequate, the amount by which the net insurance proceeds exceed the cost of restoration will be retained by Landlord or applied to repayment of any mortgage secured by the Property.

d.  **Limitations on Landlord's Obligations.** Notwithstanding the foregoing, Landlord's obligation or election to restore the Premises under this Section or to terminate this Lease shall be subject to the terms of any present or future mortgage affecting the Premises and to the mortgagee's consent if required in the mortgage and shall not, in any event, include the repair, restoration or replacement of the fixtures, improvements, alterations, furniture or any other property owned, installed, made by, or in the possession of Tenant.

e.  **Rent Proration.** If Tenant is dispossessed of the Premises due to fire or other casualty, Tenant will receive a pro-rata abatement of its Fixed Basic Rent and Additional Rent during the period Tenant is dispossessed to the extent of such dispossession.

19.  **Non-Abatement of Rent.** Except as otherwise expressly set forth in this Lease, there shall be no abatement or reduction of the Fixed Basic Rent, Additional Rent or other sums payable under this Lease for any cause whatsoever and this Lease shall not terminate, nor shall Tenant be entitled to surrender the Premises, in the event of fire, casualty or condemnation or any default by Landlord under this Lease.

20.  **Indemnification.** Unless such loss, costs or damages were caused by negligence of Landlord, its employees, agents or contractors, Tenant hereby agrees to indemnify, defend and hold Landlord and its employees, agents and contractors harmless from any loss, costs and damages (including reasonable attorney's fees and costs) suffered by Landlord, its agents, employees or contractors, as a result of any claim by a third party, its agents, employees or contractors arising from Tenant's use or occupancy of the Premises. Tenant shall have the right to designate counsel acceptable to Landlord, such approval not to be unreasonably withheld, to

-27-

assume the defense of any such third party claim on behalf of itself and Landlord. Landlord shall not have the right to settle any claim without the prior written consent of Tenant which shall not be unreasonably withheld. This indemnity shall survive the expiration of the Term or earlier termination of this Lease.

21. **Eminent Domain.**

a. **Total or Partial Taking**. In the event of exercise of the power of eminent domain whereby:

(1) such portion of the Property is taken that access to the Premises is permanently impaired thereby and reasonable alternate access is not provided by Landlord within a time period which is reasonable under the circumstances; or

(2) all or substantially all of the Premises or the Property is taken; or

(3) less than substantially all of the Property is taken but Landlord, acting in good faith, determines that it is economically unfeasible to continue to operate the uncondemned portion of the Building for the Permitted Use; or

(4) less than substantially all of the Premises is taken, but Tenant, acting in good faith, determines that because of such taking it is economically unfeasible to continue to conduct its business in the uncondemned portion of the Premises;

then in the case of (i) or (ii), either party, and in the case of (iii), Landlord, and in the case of (iv), Tenant, shall have the right to terminate this Lease as of the date when possession of that part which was taken is required to be delivered or surrendered to the condemning authority; and in such case all Fixed Basic Rent, Additional Rent and other charges shall be adjusted to the date of termination. A "taking" as such term, is used in this Section 21 shall include a transfer of title or of any interest in the Property by deed or other instrument in settlement of or in lieu of transfer by operation of law incident to condemnation proceedings.

b. **Temporary Taking**. Notwithstanding anything hereinabove provided, in the event of a taking of only the right to or for possession of the Premises or any part thereof for a fixed period of time or for the duration of an emergency or other temporary condition, then this Lease shall continue in full force and effect with an abatement of Fixed Basic Rent and Additional Rent from the date of such temporary condemnation, and the amounts payable by the condemnor with respect to any period of time prior to the expiration or sooner termination of this Lease shall be paid by the condemnor to Landlord and the condemnor shall be considered a subtenant of Tenant. The above notwithstanding, if any such temporary taking shall continue for a period in excess of one hundred eighty (180) days, Tenant shall have the right to terminate this Lease upon ten (10) days written notice to Landlord.

c. **Tenant's Waiver**. Regardless of whether this Lease shall terminate, Tenant shall have no right to participate or share in any condemnation claim, damage award or settlement in lieu thereof with respect to any taking of any nature; provided, however, that Tenant shall not be precluded from claiming or receiving payment for Tenant's relocation and

-28-

moving expenses and the value of Tenant's improvements as may be permitted under applicable law so long as the amount of same does not reduce the award that Landlord is entitled to receive.

22.     **Quiet Enjoyment.** Tenant, upon paying the Fixed Basic Rent, Additional Rent and other charges herein required and observing and keeping all covenants, agreements and conditions of this Lease, shall quietly have and enjoy the Premises during the Term without hindrance or molestation by anyone claiming by or through Landlord, subject, however, to the exceptions, reservations and conditions of this Lease, any Declaration, matters of public record and any mortgage to which this Lease shall be subordinate.

23.     **Rules and Regulations.** Landlord hereby reserves the right to prescribe, from time to time, at its sole discretion, reasonable rules and regulations, (herein collectively called the "**Rules and Regulations**"), which shall include rules and regulations set forth in any Declaration or Master Deed or prescribed by an Association, governing the use and enjoyment of the Premises and the remainder of the Complex and the current Rules and Regulations are attached hereto as Exhibit F. The Rules and Regulations shall not materially interfere with Tenant's use and enjoyment of the Premises in accordance with the provisions of this Lease for the Permitted Use and shall not materially increase or modify Tenant's obligations under this Lease. In the event of a conflict between this Lease and such rules and regulations, this Lease shall control. Tenant shall comply at all times with the Rules and Regulations and shall cause its agents, employees, invitees, visitors, and guests to do so. Landlord shall not be responsible to Tenant for non-observance or violation of any of the Rules and Regulations by any tenant of the Complex, but shall enforce such Rules and Regulations in a uniform manner.

24.     **Assignment and Sublease.**

a.     **Conditions.** Tenant may assign this Lease or sublet the whole or any portion of the Premises, subject to Landlord's prior written consent, not to be unreasonably withheld, conditioned or delayed, on the basis of the following terms and conditions:

(1)     Tenant shall provide to Landlord the following:

(a)     The name and address of the proposed assignee or subtenant;

(b)     All the terms and conditions of the assignment or subletting;

(c)     The nature and character of the business of the proposed assignee or subtenant;

(d)     Banking, financial and other credit information relating to the proposed assignee or subtenant reasonably sufficient to enable Landlord to determine the proposed assignee's or sublessee's financial responsibility; and

(e)     In the event of a sublease of only a portion of the Premises, plans and specifications for the proposed tenant's layout, partitioning, and electrical installations for the portion of the Premises to be subleased.

-29-

(2)     Tenant acknowledges that it shall not be unreasonable for Landlord to withhold its consent if Tenant shall seek to assign or sublet to the following:

(a)     To a government or quasi-government agency; or

(b)     To an entity whose financial or business character is not consistent with the other tenants of the Complex; or

(c)     To any tenant of Landlord or any affiliate of Landlord; or

(d)     To any entity with which Landlord or any affiliate of Landlord is negotiating a lease or the terms of a lease.

(3)     The assignee or subtenant shall assume, in the case of an assignee, or agree to be bound by, in the case of a subtenant, by written instrument, all of the obligations of Tenant as provided by this Lease, and a copy of such assumption agreement or sublease agreement shall be furnished to Landlord within ten (10) days of its execution, provided, however, any such subtenants shall only be obligated to assume Tenant's obligations arising under this Lease with respect to the portion of the Premises sublet. Any sublease shall expressly acknowledge that said subtenant's rights in and to the Premises shall be no greater than those of Tenant. In addition, any request by Tenant for Landlord's consent to an assignment or sublease other than an assignment under Section 24(b) shall not include any option or right of expansion, renewal, first refusal, option or first offer or first refusal to purchase or any other right or option with respect to the Premises, any other portion of the Complex or for any period of time beyond the original Term, Tenant hereby acknowledging that such rights and options, if any, are personal to Tenant.

(4)     Tenant and each assignee shall be and remain liable for the observance of all the covenants and provisions of this Lease, including, but not limited to, the payment of Fixed Basic Rent and Additional Rent reserved herein, through the entire Term as the same may be renewed, extended or otherwise modified.

(5)     In any event, the acceptance by Landlord of any rent from the assignee or from any of the subtenants or the failure of Landlord to insist upon a strict performance of any of the terms, conditions and covenants herein shall not release Tenant herein, nor any assignee or subtenant, from any and all of the obligations to be performed by it in accordance herewith during and for the entire Term.

(6)     Tenant shall pay to Landlord the sum of Seven Hundred Fifty Dollars ($750.00) to cover its handling charges for each consent to any sublet or assignment prior to its consideration of the same. Tenant acknowledges that its sole remedy with respect to any assertion that Landlord's failure to consent to any sublet or assignment is unreasonable shall be the remedy of specific performance and Tenant shall have no other claim or cause of action against Landlord as a result of Landlord's actions in refusing to consent thereto.

b.     **Assignments or Subleases to Affiliates.** Notwithstanding the foregoing, Tenant may assign this Lease or sublease all or a portion of the Premises to any of the following without Landlord's prior written consent, provided notice of same is delivered to Landlord at

-30-

least ten (10) business days prior to the effective date of such assignment or sublease (each a "**Permitted Affiliate Transfer**"): (i) any parent company of Tenant, (ii) any wholly owned subsidiary of Tenant, (iii) any entity controlling, controlled by or under common control with Tenant, (iv) with respect to space leases, license agreements or concessions only for the Permitted Use and made in the ordinary course of business at the Premises, third parties (the "**Space Tenants**"). Notwithstanding the foregoing, in the event of a Permitted Affiliate Transfer, the Tenant named herein shall remain liable for the observance of all the covenants and provisions of this Lease, including, but not limited to, the payment of Fixed Basic Rent and Additional Rent reserved herein, through the entire Term, as the same may be renewed, extended or otherwise modified

      c.    **Corporate Transfers.** If Tenant is a corporation other than a corporation whose stock is listed and traded on a nationally recognized stock exchange, the provisions of Section 24(a) hereof shall apply to a transfer (however accomplished, whether in a single transaction or in a series of related or unrelated transactions) of stock (or any other mechanism such as, by way of example, the issuance of additional stock, a stock voting agreement or change in class(es) of stock) which results in a change of control of Tenant as if such transfer of stock (or other mechanism) which results in a change of control of Tenant were an assignment of this Lease, and if Tenant is a partnership, limited liability company or joint venture, said provisions shall apply with respect to a transfer (by one or more transfers) of an interest in the distributions of profits and losses of such partnership, limited liability company or joint venture (or other mechanism, such as, by way of example, the creation of additional general partnership or limited partnership or member interests) which results in a change of control of such a partnership, limited liability company or joint venture, as if such transfer of an interest in the distributions of profits and losses of such partnership or joint venture which results in a change of control of such partnership, limited liability company or joint venture were an assignment of this Lease; but said provisions shall not apply to transactions with a corporation into or with which Tenant is merged or consolidated or to which all or substantially all of Tenant's assets are transferred, provided that in the event of such merger, consolidation or transfer of all or substantially all of Tenant's assets (i) the successor to Tenant has a net worth computed in accordance with generally accepted accounting principles at least equal to the greater of (1) the net worth of Tenant immediately prior to such merger, consolidation or transfer, or (2) the net worth of Tenant herein named on the date of this Lease; and (ii) proof satisfactory to Landlord of such net worth shall have been delivered to Landlord at least ten (10) days prior to the effective date of any such transaction (each, a "**Permitted Corporate Transfer**" and collectively, with Permitted Affiliate Transfers, "**Permitted Transfers**").

      d.    **Bankruptcy.** Without limiting any of the provisions of this Section 24, if pursuant to the Federal Bankruptcy Code (herein referred to as the "**Code**"), or any similar law hereafter enacted having the same general purpose, Tenant is permitted to assign this Lease notwithstanding the restrictions contained in this Lease, adequate assurance of future performance by an assignee expressly permitted under such Code shall be deemed to mean the deposit of cash security in an amount equal to the sum of one year's Fixed Basic Rent plus an amount equal to the Additional Rent for the calendar year preceding the year in which such assignment is intended to become effective, which deposit shall be held by Landlord for the balance of the Term, without interest, as security for the full performance of all of Tenant's

obligations under this Lease, to be held and applied in the manner specified for any security deposit required hereunder.

      e.    **Limitations.** Except as specifically set forth above, no portion of the Premises or of Tenant's interest in this Lease may be acquired by any other person or entity, whether by assignment, mortgage, sublease, transfer, operation of law or act of Tenant, nor shall Tenant pledge its interest in this Lease.

      25.    **Subordination.** This Lease and Tenant's rights under this Lease shall be subject and subordinate at all times in lien and priority to any mortgage or other encumbrance now or hereafter placed upon or affecting the Property or the Premises, and to all renewals, modifications, consolidations and extensions thereof, without the necessity of any further instrument or act on the part of Tenant. Tenant shall execute and deliver upon demand any instrument or instruments confirming the subordination of this Lease to the lien of any such mortgage, and any further instrument or instruments of attornment that may be desired by any such mortgagee or Landlord, provided, however, that any holder of such lien or mortgage agrees not to disturb the use and occupancy of the Premises in accordance with the terms of this Lease upon any foreclosure. Notwithstanding the foregoing, any mortgagee may at any time subordinate its mortgage to this Lease, without Tenant's consent, by giving notice in writing to Tenant and thereupon this Lease shall be deemed prior to such mortgage without regard to their respective dates of execution and delivery. In that event such mortgagee shall have the same rights with respect to this Lease as though this Lease had been executed prior to the execution and delivery of the mortgage and had been assigned to such mortgagee. Provided that Landlord complies with the provisions set forth in Section 2(b), then, in such event, (i) Landlord and Tenant each acknowledge that this Lease shall be subject and subordinate to any Declaration or Master Deed without the necessity of any further instrument or act on the part of Tenant; (ii) Tenant shall execute and deliver upon demand any instrument or instruments confirming the subordination of this Lease to any Declaration or Master Deed as may be desired by Landlord or any Association; and (iii) Tenant shall comply with the terms and conditions of any Declaration or Master Deed to the extent same affects the Premises.

      26.    **Curing Tenant's Defaults.** If Tenant defaults in the performance of any of its obligations under this Lease, Landlord may, without any obligation to do so and in addition to any other rights it may have in law or equity, elect to cure such default on behalf of Tenant after written notice (except in the case of emergency) to Tenant and a reasonable opportunity to cure. Tenant shall reimburse Landlord upon demand for any sums paid or costs incurred by Landlord in curing such default, including Interest thereon from the respective dates of Landlord's making the payments and incurring such costs, which sums and costs together with interest thereon shall be deemed Additional Rent payable within ten (10) days of demand.

      27.    **Surrender.**

      a.    **Broom Clean Condition.** At the expiration of the Term or earlier termination of this Lease, Tenant shall promptly yield up the Premises and all improvements, alterations and additions thereto, and all fixtures and equipment servicing the Premises in a condition which is clean of garbage and debris and broom clean and in the same condition, order and repair in which they are required to be kept throughout the Term, ordinary wear and tear and

damage from casualty (provided the related insurance proceeds are retained by Landlord) excepted.

        b.    **Holdover Rent.** If Tenant, or any person claiming through Tenant, continues to occupy the Premises after the expiration of the Term or earlier termination of this Lease or any renewal thereof without prior written consent of Landlord, the Fixed Basic Rent during such continued occupancy shall be one hundred fifty percent (150%) of the Fixed Basic Rent for the last year of the Term. In addition, Tenant shall indemnify Landlord for any loss or damage incurred by reason of Tenant's failure to surrender the Premises. Anything to the contrary notwithstanding, any holding over by Tenant without Landlord's prior written consent shall constitute an Event of Default under this Lease and shall be subject to all the remedies set forth in Section 29(b) of this Lease.

    28.    **Defaults-Remedies.**

        a.    **Defaults.** It shall be an Event of Default under this Lease if any one or more of the following events occurs (each, an "**Event of Default**"):

        (1)    Tenant fails to pay in full any and all installments of Fixed Basic Rent or Additional Rent or any other charges or payments due and payable under this Lease whether or not herein included as Rent within five (5) days after the same is first due and payable.

        (2)    Tenant violates or fails to perform or otherwise breaches any agreement, term, covenant or condition contained in this Lease within thirty (30) days following receipt of notice from Landlord specifying the nature of the breach; provided, however, that in the case of a violation or breach that requires longer than thirty (30) days to cure, such violation or breach shall not be an Event of Default so long as Tenant commences a cure of such violation or breach within such thirty (30) day period and diligently pursues the same to completion, but in no event for longer than ninety (90) days.

        (3)    Tenant abandons the Premises without notice.

        (4)    Tenant fails to furnish a Tenant Estoppel Certificate within ten (10) days following receipt of notice from Landlord of Tenant's failure to furnish such Tenant Estoppel Certificate within the time period provided by Section 37.

        (5)    Tenant becomes insolvent or bankrupt in any sense or makes an assignment for the benefit of creditors or if a petition in bankruptcy or for reorganization or for an arrangement with creditors under any federal or state law is filed by or against Tenant, or a bill in equity or other proceeding for the appointment of a receiver or similar official for any of Tenant's assets is commenced, or if any of the real or personal property of Tenant shall be levied upon by any sheriff, marshal or constable; provided, however, that any proceeding brought by anyone other than the parties to this Lease under any bankruptcy, reorganization arrangement, insolvency, readjustment, receivership or similar law shall not constitute an Event of Default until such proceeding, decree, judgment or order has continued unstayed for more than sixty (60) consecutive days.

-33-

(6)     Any of the events enumerated in Sections (a)(i) through (a)(v) of this Section 29 happen to any guarantor of this Lease.

b.      **Remedies.**  Upon the occurrence of an Event of Default under this Lease, Landlord shall have all of the following rights:

(1)     Landlord may charge a late payment charge and Interest in accordance with Section 9 of this Lease.  If Landlord incurs a late charge in connection with any payment which Tenant has failed to make within the times required in this Lease, Tenant shall pay Landlord, in addition to such payment due, the full amount of such late charge incurred by Landlord. Nothing in this Lease shall be construed as waiving any rights of Landlord arising out of any default of Tenant, by reason of Landlord's imposing or accepting any such late charge(s) and/or Interest; the right to collect such late charge(s) and/or Interest is separate and apart from any rights relating to remedies of Landlord after default by Tenant including, without limitation, the rights and remedies of Landlord provided herein.

(2)     Landlord shall be entitled to damages computed in accordance with Section 28(c) below.

(3)     Landlord may re-enter the Premises and, at the option of Landlord, remove all persons and all or any property therefrom, either by self-help or by summary dispossess proceedings or by any suitable action or proceeding at law or by force or otherwise, without being liable for prosecution or damages therefor, and Landlord may repossess and enjoy the Premises.  Upon recovering possession of the Premises by reason of or based upon or arising out of a default on the part of Tenant, Landlord may, at Landlord's option, either terminate this Lease or make such alterations and repairs as may be necessary, as reasonably determined by Landlord, in order to relet the Premises and may relet the Premises or any part or parts thereof, either in Landlord's name or otherwise, for a term or terms which may, at Landlord's option, be less than or exceed the period which would otherwise have constituted the balance of the Term and at such rent or rents and upon such other terms and conditions as in Landlord's sole discretion may seem advisable and to such person or persons as may in Landlord's discretion seem best; upon each such reletting all rents received by Landlord from such reletting shall be applied as follows: first, to the payment of any costs and expenses of such reletting, including all costs of alterations and repairs; second, to the payment of any indebtedness other than Fixed Basic Rent, Additional Rent or other charges due hereunder from Tenant to Landlord; third, to the payment of Fixed Basic Rent, Additional Rent and other charges due and unpaid hereunder; and the residue, if any, shall be held by Landlord and applied in payment of future rent as it may become due and payable hereunder.  If rentals received from reletting during any month are less than that to be paid during that month by Tenant, Tenant shall pay any such deficiency to Landlord.  Such deficiency shall be calculated and paid monthly.  No such re-entry or taking possession of the Premises or the making of alterations or improvements thereto or the reletting thereof shall be construed as an election on the part of Landlord to terminate this Lease unless written notice of termination is given to Tenant.  Landlord shall in no event be liable in any way whatsoever for failure to relet the Premises or, in the event that the Premises or any part or parts thereof are relet, for failure to collect the rent thereof under such reletting.  Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for such previous breach.

-34-

(4)    Landlord may terminate this Lease and the Term without any right on the part of Tenant to waive the forfeiture by payment of any sum due or by other performance of any condition, term or covenant broken.

c.    **Damages.**

Regardless of whether Landlord elects to terminate this Lease pursuant to Section 29(b)(iv) above, notwithstanding reentry upon the Premises by Landlord, Tenant shall be and remain liable to Landlord in an amount computed as follows: (a) an amount equal to the sum of all Rent then in arrears plus the aggregate of all Rent which is payable under this Lease for the balance of the Term, computed as if no Event of Default had occurred and any reentry had not been made (including, without limitation, Operating Expenses and Real Estate Taxes allocable to Tenant and other Additional Rent that would be owing for the remainder of the Term, as reasonably estimated by Landlord); plus (b) all costs and expenses incurred by Landlord in connection with the Event of Default and any reletting of the Premises, including, without limitation, (i) costs of reentry, repair and renovation, (ii) the value of all inducements granted or paid to new tenants of the Premises in connection with reletting including, without limitation, construction allowances and the value of rent-free periods, (iii) brokers' commissions and advertising expenses, (iv) watchman's wages and any sheriff's, marshall's, constable's or other officials' commissions, whether chargeable to Landlord or Tenant, and (v) reasonable attorneys' fees, costs and expenses; plus (c) Interest accrued on the aggregate of the aforesaid sums from the date each was payable (or, with respect to sums owing under clause (b) from the date each was incurred by Landlord) until paid by Tenant (whether before or after judgment); which sum shall be credited with (d) all rentals actually received by Landlord during the remainder of the Term from any replacement tenant to which the Premises are relet.

d.    **Waiver of Jury Trial; Attorneys Fees.** IT IS MUTUALLY AGREED BY AND BETWEEN LANDLORD AND TENANT THAT (A) THEY HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTER-CLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES OR CLAIM OF INJURY OR DAMAGE, AND (B) IN ANY ACTION ARISING HEREUNDER, THE REASONABLE ATTORNEYS' FEES AND COSTS OF THE PREVAILING PARTY WILL BE PAID BY THE OTHER PARTY TO THE ACTION.

e.    **Rights and Remedies Cumulative.** No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy provided herein or by law, but each shall be cumulative and in addition to every other right or remedy given herein or now or hereafter existing at law or in equity or by statute. Landlord shall have no duty to mitigate its damages in the event of Tenant's default under this Lease.

29.    **Brokers' Commission.** Landlord and Tenant each represent and warrant to one another that it has negotiated with no brokers in bringing about this Lease and each party agrees to indemnify and hold the other party (and, in the case of Landlord, its mortgagee(s)) harmless from any and all claims of other brokers and expenses in connection therewith arising out or in connection with the breach of the foregoing representation and warranty by such party.

-35-

30.     **Notices.** All notices, demands, requests, consents, certificates, and waivers required or permitted hereunder from either party to the other shall be in writing and sent by United States certified mail, return receipt requested, postage prepaid, or by nationally recognized overnight courier, addressed as follows:

If to Tenant:

At the Premises.

with a copy to:
Donna J. Wengiel, Esquire
Stuckert and Yates
2 North State Street
PO Box 70
Newtown, PA 18940

If to Landlord:


with a copy to:
Michael J. Mann, Esquire
Pepper Hamilton LLP
301 Carnegie Center, Suite 400
Princeton, NJ 08543-5276

Either party may at any time, in the manner set forth for giving notices to the other, specify a different address to which notices to it shall thereafter be sent. All notices shall be effective upon receipt or rejection of receipt by the addressee. Notices from either party may be given by such party's agent or attorney.

31.     **Inability to Perform.** If Landlord is delayed or prevented from performing any of its obligations under this Lease due to Force Majeure the period of such delay or such prevention shall be deemed added to the time herein provided for the performance of any such obligation by Landlord.

32.     **Survival.** Notwithstanding anything to the contrary contained in this Lease, the expiration of the Term, whether by lapse of time or otherwise, shall not relieve Tenant from its obligations accruing prior to the expiration of the Term.

33.     **Corporate Tenant.** Tenant hereby covenants and warrants that: Tenant is a duly formed limited liability company qualified to do business in the State of New Jersey; Tenant will remain qualified to do business in the State of New Jersey throughout the Term and any renewals thereof; and the person(s) executing this Lease on behalf of Tenant are duly authorized to execute and deliver this Lease on behalf of the Tenant. Tenant hereby represents and warrants to Landlord that (i) Tenant's most recent financial statements delivered to Landlord in connection with the execution of this Lease are true in all material respects and no material adverse changes have occurred with respect thereto and (ii) on each anniversary of the Commencement Date,

-36-

Tenant will deliver to Landlord current financial statements which shall be prepared in accordance with generally accepted accounting principles consistently applied.

34.     **Waiver of Invalidity of Lease.** Each party agrees that it will not raise or assert as a defense to any obligation under this Lease or make any claim that this Lease is invalid or unenforceable due to any failure of this document to comply with ministerial requirements including, without limitation, requirements for corporate seals, attestations, witnesses, notarizations or other similar requirements and each party hereby waives the right to assert any such defenses or make any claim of invalidity or unenforceability due to any of the foregoing.

35.     **Security Deposit.** As additional security for the full and prompt performance by Tenant of the terms and covenants of this Lease, Tenant has deposited with Landlord the Security Deposit. The Security Deposit shall not constitute Rent for any month (unless so applied by Landlord on account of Tenant's default hereunder). Tenant shall, upon demand, restore any portion of the Security Deposit which may be applied by Landlord to cure any default by Tenant hereunder. To the extent that Landlord has not applied the Security Deposit or any portion thereof on account of a default, the Security Deposit, or such remaining portion of the Security Deposit, shall be returned to Tenant, without interest, within thirty (30) days following the termination of this Lease.

36.     **Estoppel Certificate.** Tenant shall from time to time, within ten (10) days after Landlord's request or that of any mortgagee of Landlord, execute, acknowledge and deliver to Landlord a written instrument in recordable form, substantially in the form attached hereto as Exhibit G (the "**Tenant Estoppel Certificate**").

37.     **Rights Reserved by Landlord.** Landlord waives no rights, except those that may be specifically waived herein, and explicitly retains all other rights including, without limitation, the following rights, each of which Landlord may exercise without notice to Tenant and without liability to Tenant for damage or injury to property, person or business on account of the exercise thereof, and the exercise of any such rights shall not be deemed to constitute an eviction or disturbance of Tenant's use or possession of the Premises and shall not give rise to any claim for set-off or abatement of Rent or any other claim:

   a.  To change the street address of the Building;

   b.  The right to use the name of the Building for all purposes;

   c.  To change or alter the land that constitutes the Property or the Complex and to change or alter the Common Facilities, provided such change does not materially alter or interfere with Tenant's Permitted Use of the Premises and Tenant is given at least thirty (30) days advanced notice;

   d.  To decorate or to make repairs, alterations, additions, or improvements, whether structural or otherwise, in and about the Building, or any part thereof, and for such purposes to enter upon the Premises and during the continuance of any of such work, to temporarily close doors, entry ways, public space and corridors in the Building and to interrupt or temporarily suspend services or use of Common Facilities, all without affecting any of Tenant's obligations hereunder, so long as the Premises are reasonably accessible and usable;

-37-

e.     To furnish door keys for the entry door(s) in the Premises on the Commencement Date and to retain at all times, and to use in appropriate instances, keys to all doors within and into the Premises.  Upon the expiration of the Term or Tenant's right to possession, Tenant shall return all keys to Landlord and shall disclose to Landlord the combination of any safes, cabinets or vaults left in the Premises;

f.     To designate and approve all window coverings used in the Building;

g.     To approve the weight, size and location of safes, vaults and other heavy equipment and articles in and about the Premises and the Building so as not to exceed the legal load per square foot designated by the structural engineers for the Building;

h.     To erect, use and maintain pipes, ducts, wiring and conduits, and appurtenances thereto, in and through the Premises; provided that such materials are concealed and do not interfere with Tenant's Permitted Use of the Premises;

i.     The right to use or dispose of the use of the roof of the Building; and

j.     During the last six (6) months of the term of this Lease, if during or prior to that time Tenant has vacated the Premises, to decorate, remodel, repair, alter or otherwise prepare the Premises for reoccupancy, without affecting Tenant's obligation to pay Rent for the Premises.

38.     **Miscellaneous.**

a.     **Irrevocable Offer and Required Approval**. The submission of this Lease for examination does not constitute an offer to lease, or a reservation of or option for the Premises.  This Lease shall only become effective only upon execution and delivery thereof by both Landlord and Tenant.

b.     **Non Waiver**. The failure of either party hereto in any one or more instances to insist upon the strict performance of any one or more of the agreements, terms, covenants, conditions or obligations of this Lease, or to exercise any right, remedy or election herein contained, shall not be construed as a waiver or relinquishment of the right to insist upon such performance or exercise in the future, and such right shall continue and remain in full force and effect with respect to any subsequent breach, act or omission.

c.     **Partial Payment**. No payment by Tenant or receipt by Landlord of a lesser amount than the correct Fixed Basic Rent or Additional Rent due hereunder shall be deemed to be other than a payment on account, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed to effect or evidence an accord and satisfaction and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance or pursue any other remedy in this Lease or at law provided.

d.     **Entire Agreement**. This Lease constitutes the entire agreement between the parties relating to the subject matter contained herein.  Neither party hereto has made any representations or promises to the other except as expressly contained herein.  This Lease

-38-

supersedes all prior negotiations, agreements, informational brochures, letters, promotional information and other statements and materials made or furnished by Landlord or its agents. No rights, easements or licenses are acquired in the Property or in any land adjacent thereto, by Tenant by implication or otherwise, except as expressly set forth in this Lease. No agreement hereinafter made shall be effective to change, modify, discharge or effect an abandonment of this Lease, in whole or in part, unless such agreement is in writing and signed by the party against whom enforcement of the change, modification, discharge or abandonment is sought.

e.     **Partial Invalidity**. If any of the provisions of this Lease, or the application thereof to any person or circumstances, shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such provision or provisions to persons or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and every provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

f.     **Choice of Law**. This Lease has been executed and delivered in the State of New Jersey and shall be construed in accordance with the laws of the State of New Jersey. Any action brought to enforce or interpret this Lease shall be brought in the court of appropriate jurisdiction in the county in which the Building is located. Should any provision of this Lease require judicial interpretation, it is agreed that the court interpreting or considering same shall not apply the presumption that the terms hereof shall be more strictly construed against a party by reason of the rule or conclusion that a document should be construed more strictly against the party who itself or through its agent prepared the same. It is agreed and stipulated that all parties hereto have participated equally in the preparation of this Lease and that legal counsel was consulted by each responsible party before the execution of this Lease.

g.     **No Recordation**. This Lease shall not be recorded in whole or in memorandum form by either party hereto without the prior written consent of the other.

h.     **Receipt of Money**. No receipt of money by Landlord from Tenant after the termination of this Lease or after the service of any notice or after the commencement of any suit, or after final judgment for the possession of the Premises, shall reinstate, continue or extend the term of this Lease or affect any such notice, demand or suit or imply consent for any action for which Landlord's consent is required.

i.     **No Joint Venture**. This Lease shall create only the relationship of Landlord and Tenant between Landlord and Tenant and no estate shall pass out of Landlord. Nothing herein is intended to be construed as creating a joint venture or partnership relationship between the parties hereto.

j.     **No Third Party Beneficiaries**. Notwithstanding anything to the contrary contained herein, no provision of this Lease is intended to benefit any party other than the signatories hereto and their permitted heirs, personal representatives, successors and assigns, and no provision of this Lease shall be enforceable by any other party.

k.     **Exhibits**. All exhibits referred to in this Lease are attached hereto and shall be deemed an integral part hereof.

l.     **Captions**. The captions included in this Lease, whether for sections, subsections, paragraphs, Table of Contents, Exhibits, or otherwise, are inserted and included solely for convenience and shall not be considered or given any effect in construing the provisions hereof, and are not to be used in interpreting this Lease or for any other purpose in the event of any controversy.

m.     **Representations**. Landlord has made no representation, agreement, condition, warranty, understanding, or promise, either oral or written, other than as set forth herein, with respect to this Lease, the Property, the Premises, and the Complex or otherwise.

n.     **Gender; Plural Terms; Persons**. The masculine, feminine, or neuter pronoun shall each include the masculine, feminine, and neuter genders. A reference to person shall mean a natural person, a trustee, a corporation, a partnership and any other form of legal entity. All references (including pronouns) in the singular or plural number shall be deemed to have been made, respectively, in the plural or singular number as well, as the context may require.

o.     **Time**. Time is of the essence of this Lease with respect to the performance by the parties of all of their obligations hereunder.

39.     **OFAC.** Tenant represents, warrants and covenants that neither Tenant nor any of Tenant's officers or directors (i) is listed on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Asset Control, Department of the Treasury ("**OFAC**") pursuant to Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) ("Order") and all applicable provisions of Title III of the USA Patriot Act (Public Law No. 107-56 (October 26, 2001)); (ii) is listed on the Denied Persons List and Entity List maintained by the United States Department of Commerce; (iii) is listed on the List of Terrorists and List of Disbarred Parties maintained by the United States Department of State; (iv) is listed on any other publicly available list of terrorists, terrorist organizations or narcotics traffickers maintained by the United States Department of State, the United States Department of Commerce or any other governmental authority or pursuant to the Order, the rules and regulations of OFAC (including without limitation the Trading with the Enemy Act, 50 U.S.C. App. 1-44; the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06; the unrepealed provision of the Iraq Sanctions Act, Publ.L. No. 101-513; the United Nations Participation Act, 22 U.S.C. § 2349 as-9; The Cuban Democracy Act, 22 U.S.C. §§ 6001-10; The Cuban Liberty and Democratic Solidarity Act, 18 U.S.C. §§ 2332d and 233; and The Foreign Narcotic Kingpin Designation Act, Publ. L. No. 106-120 and 107-108, all as may be amended from time to time); or any other applicable requirements contained in any enabling legislation or other Executive Orders in respect of the Order (the Order and such other rules, regulations, legislation or orders are collectively called the "**Orders**"); (v) is engaged in activities prohibited in the Orders; or (vi) has been convicted, pleaded nolo contendere, indicted, arraigned or custodially detained on charges involving money laundering or predicate crimes to money laundering, drug trafficking, terrorist-related activities or other money laundering predicate crimes or in connection with the Bank Secrecy Act (31 U.S.C. §§ 5311 et seq.). Tenant hereby agrees to defend, indemnify, and hold harmless Landlord from and against any and all claims, damages, losses, risks, liabilities, and expenses (including reasonable attorney's fees and costs) arising from or related to any breach of the foregoing representation, warranty and covenant.

-40-

**IN WITNESS WHEREOF**, and in consideration of the mutual entry into this Lease and for other good and valuable consideration, and intending to be legally bound, each party hereto has caused this agreement to be duly executed under seal.

**Landlord:**

Date Signed: 7/16/12

K JOHNSON INDUSTRIES LIMITED LIABILITY COMPANY

By: _____
Kevin Johnson, sole member

**Tenant:**

Date Signed: 7/16/2012

PERFORMANCE SPINE AND SPORTS MEDICINE LLC

By: _____
Name: Percy Naranjo
Title: Chief Financial Officer

#15241254 v7

# RIDER A

## RENEWAL OPTIONS

Tenant is hereby granted two (2) options (each, a "**Renewal Option**") to renew this Lease for five (5) years each (each, a "**Renewal Term**") upon all the terms and conditions of this Lease and the Fixed Basic Rent for each Renewal Term shall be as set forth in the Preamble of this Lease. As a condition to the effectiveness of each Renewal Option, at the time of the exercise of each Renewal Option and at the commencement of each Renewal Term, Tenant shall not be in default of this Lease beyond any applicable grace or notice periods. If Tenant wishes to exercise a Renewal Option, Tenant shall so notify Landlord in writing no later than twelve (12) months prior to the expiration of the then current Term. Tenant's failure to timely exercise any Renewal Option shall automatically be deemed a waiver of such Renewal Option and all subsequent Renewal Options.

# RIDER B

## RIGHT OF FIRST OFFER TO PURCHASE UNIT

If Landlord decides to impose a condominium regime on the Property as provided in Section 2(b) of the Lease whereby the lot, unit or tract of land on which the Building is located could be sold in fee simple, separate and apart from the balance of the Property, except as otherwise set forth herein, and Landlord desires to sell the condominium unit on which the Building is located (the "Unit"), Landlord agrees to notify Tenant in writing of such desire and the price (the "ROFO Price") and other terms at which Landlord so desires to sell the Unit. Tenant shall advise Landlord within ten (10) business days after receiving such notice if Tenant is interested in purchasing the Unit for the ROFO Price and upon such other terms. If Tenant fails to respond within such time period and/or if Tenant responds that Tenant is not interested in purchasing the Unit, then Tenant shall have no further right hereunder to purchase the Unit under the terms set forth in Landlord's notice. However, if Tenant notifies Landlord within such time period that Tenant is interested in purchasing the Unit at the ROFO Price and upon such other terms set forth in Landlord's notice, then Landlord and Tenant shall have thirty (30) days following Landlord's receipt of such notice from Tenant within which to negotiate and execute a mutually satisfactory agreement for the sale of the Unit to Tenant.

In the event that Landlord and Tenant fail to enter into an agreement of sale and purchase within such thirty (30) day period, then Tenant shall have no further right hereunder to purchase the Unit with respect to such offer, subject to the balance of this paragraph. Thereafter, Landlord may negotiate with any third party for the sale and purchase of the Unit; provided, however, that Landlord will not finally enter into an agreement of sale with any third party for an effective purchase price that is less than 90% of the ROFO Price (or on economic terms materially less favorable to Landlord than those offered to Tenant with the ROFO Price) unless Landlord first allows Tenant ten (10) days within which to agree to purchase the Unit at such lesser price and/or upon such amended terms. Upon any sale to a third party made in compliance with this Rider B, Tenant's rights under this Rider B shall terminate and be of no further force and effect and upon Landlord's request, Tenant agrees to execute and acknowledge a memorandum, in proper form, for recording evidencing such termination.

If Landlord and Tenant enter into an agreement of sale and purchase but transfer of the Unit to Tenant is not consummated for any reason other than Landlord's default under such agreement of sale and purchase, then Tenant shall have no further right hereunder to purchase the Unit.

Tenant's right of first offer set forth above shall not apply to (but shall not be extinguished by) (i) any transfer of the Unit in mortgage foreclosure, by deed in lieu of foreclosure or as part of a settlement with the mortgagee, or (ii) a condemnation or transfer by deed in lieu of condemnation, (iii) any transfer of the Unit to an affiliate of Landlord or to a joint venture in which Landlord or its affiliate is a controlling venturer or has a material interest, or (iv) a transfer in which Landlord proposes to sell the Unit together with other buildings, improvements and/or property located at the Property or elsewhere.

Landlord shall have no obligation to notify Tenant of Landlord's intention to sell and Tenant shall have no right to purchase the Unit (or any portion thereof) at any time during which Tenant is in default under any of the provisions of this Lease beyond the expiration of any applicable notice and cure period.

From the time of Tenant's exercise of its right to purchase the Unit as aforesaid until the closing of the conveyance of the Unit to Tenant, Tenant and Landlord shall continue to enjoy and be bound by all of their respective rights and obligations under this Lease, including the obligation of Tenant to pay Rent as required herein through the date of such conveyance.

**EXHIBIT A**

**PREMISES**

**EXHIBIT B-1**

**LEGAL DESCRIPTION OF PROPERTY**

**EXHIBIT B-2**

**LEGAL DESCRIPTION OF COMPLEX**

# EXHIBIT C

## LANDLORD WORK LETTER
### ATTACHED TO AND MADE PART OF LEASE BETWEEN
### KJOHNSON INDUSTRIES LIMITED LIABILITY COMPANY, AS LANDLORD,
### AND PERFORMANCE SPINE
### AND SPORTS MEDICINE LLC, AS TENANT

As a material inducement to Tenant to enter into the Lease, and in consideration of the covenants herein contained, Landlord and Tenant, intending to be legally bound, agree as follows:

1. **Lease; Defined Terms.** The Lease is hereby incorporated by reference to the extent that the provisions of this Landlord Work Letter apply thereto. Terms not otherwise defined in this Landlord Work Letter shall have the meanings given to them in the Lease. The Building Shell, Core and Site work (described in Section 2) is sometimes referred to as "**Landlord's Work.**"

2. **Base Building Work.**

   a.      Landlord has retained, at its sole cost and expense, the services of architects and engineers for the design and engineering of the base Building and the development of the base Building site ("**Landlord's Design Professionals**"). Landlord shall cause Landlord's Design Professionals to prepare plans and specifications for the construction of the Building shell, core and site (the "**Building Shell, Core and Site Work**"), which for purposes of this Lease shall mean the improvements described in the preliminary plans and outline specifications set forth on Schedule 2 attached hereto ("**Base Building Plans**"). The Base Building Plans shall be prepared in conjunction with Tenant. Tenant shall participate in such design and construction meetings and provide Tenant's design requirements as may be necessary for Landlord's Design Professionals to prepare the Base Building Plans. The Base Building Plans shall conform with all applicable federal, state and local laws, ordinances including the Americans With Disabilities Act and building and zoning codes, and requirements of public authorities and insurance underwriters (collectively, "**Laws and Requirements**").

   b.      The Base Building Plans shall be submitted to Tenant for Tenant's review and approval on or before the date set forth on the Project Schedule attached hereto as Schedule 1 for the submission of the Base Building Plans. Tenant shall have the time period identified in the Project Schedule to approve or disapprove of the Base Building Plans. Any notice of disapproval from Tenant shall state the specific reasons for such disapproval. Tenant shall be obligated to approve the Base Building Plans unless the Building Shell, Core and Site Work as delineated therein (i) does not conform with Laws and Requirements, (ii) does not conform to the preliminary plans and outline specifications set forth on Schedule 2, (iii) would, in Tenant's reasonable judgment, adversely affect the integrity or effectiveness of any building system, including, without limitation, HVAC, electrical, plumbing, fire protection, sprinkler, security or life safety systems, or (iv) would, in Tenant's reasonable opinion, create a health hazard within the Building. In the event Tenant does not approve or disapprove the Base Building Plans (or

relevant portion thereof) within the applicable time period provided on the Project Schedule, as provided above, Tenant will be deemed to have approved such plans. If Tenant disapproves of the Base Building Plans, Tenant shall provide to Landlord the requested revisions thereto and Landlord shall incorporate the revisions to which it agrees in its reasonable judgment and the resubmit same to Tenant for its review and approval during the time period set forth on the Project Schedule.

        c.      Landlord shall provide to Tenant a preliminary budget of the cost of the Building Shell, Core and Site Work for Tenant's approval and Tenant within the time period set forth on the Project Schedule shall either approve the budget or request revisions to the Base Building Plans in order to achieve cost savings. Landlord shall incorporate the requested revisions to which it agrees in its reasonable judgment and resubmit the Base Building Plans, as revised, to Tenant for its review and approval on or before the date for such resubmission as set forth on the Project Schedule.

        d.      Following Tenant's approval of the Base Building Plans after any revisions are incorporated as described in Section 2(c) above, Landlord shall cause Landlord's Design Professionals to prepare construction documents based upon the final approved Base Building Plans (the "**Base Building Construction Documents**"). The Base Building Construction Documents shall contain any value engineering add-alternates being evaluated by the parties and shall be prepared and submitted to Tenant for Tenant's review on or before the date set forth on the Project Schedule for such preparation and delivery and Tenant shall have the time period set forth on the Project Schedule to review and approve of same. Tenant shall be obligated to approve of the Base Building Construction Documents unless they (i) do not conform to Laws and Requirements or (ii) do not conform to the approved Base Building Plans. Once approved by Tenant, the Base Building Construction Documents shall become the "Final Base Building Construction Documents."

        e.      Landlord shall enter into a construction contract with a reputable contractor it selects ("**Base Building Contractor**") on or before the applicable date on the Project Schedule.

        f.      Landlord may make minor, non-material changes or additions to the Final Base Building Construction Documents, those necessitated by field conditions, and those required in connection with the governmental approvals for Landlord's Work without the prior written approval of Tenant; with respect to other changes requiring Tenant's approval, such approval shall not be unreasonably withheld, delayed or conditioned. Tenant shall not be obligated to consent to the change or addition unless the proposed change or addition (i) is consistent with the quality and scope of the Building Shell, Core and Site Work as set forth in the existing Final Base Building Construction Documents, (ii) does not interfere with Tenant's Permitted Use of the Premises, and (iii) does not increase Tenant's monetary obligations under this Lease. In the event Tenant does not respond to Landlord's request for approval of any change or addition to the Final Base Building Construction Documents within ten (10) days after receipt of Landlord's written request therefor, Tenant shall be deemed to have approved the proposed change or addition. Any notice of disapproval or request for clarification sent by Tenant shall state the specific reasons for such disapproval and/or the items to be clarified, as applicable. Any changes to the Final Base Building Construction Documents shall be

documented by Landlord, in writing, at the regular job meetings and shall be communicated to Tenant's representative.

g.      Landlord shall cause, at Landlord's sole cost and expense, the Base Building Contractor to commence and diligently pursue to completion the construction of the Building Shell, Core and Site Work in accordance with Final Base Building Construction Documents.

3.      **Tenant Delay**.  As used in this Landlord Work Letter, the term "**Tenant Delay**" shall mean any:

a.      delays caused by Tenant's failure to comply with the specific time periods established in this Landlord Work Letter including, but not limited to, the failure to timely review and/or approve any plans, documents or budgets;

b.      delays resulting from any changes to Landlord's Work requested by Tenant;

c.      delays, not caused by Landlord, in furnishing materials or procuring labor for completion of Landlord's Work.

4.      **Work Standards**.  Landlord shall cause Landlord's Work to be done in a good and workmanlike manner in conformity with the Final Base Building Construction Documents and all Laws and Requirements.  Landlord shall cause Landlord's Work to be carried forward expeditiously and with adequate work forces so as to achieve Substantial Completion of Landlord's Work on or before the Delivery Date (as defined in the Lease), as such date shall be extended one (1) day for each one (1) day of Tenant Delay.  Landlord shall secure and pay for the building permit and all other permits and fees, licenses, and inspections necessary for the proper execution and completion of the Building Shell, Core and Site Work.  Landlord shall be responsible for initiating, maintaining, and supervising all safety precautions and programs in connection with performance of Landlord's Work.  Landlord shall obtain all customary warranties available from contractors and manufacturers in connection with Landlord's Work.  Landlord shall enforce all warranties from contractors and manufacturers on behalf of Landlord and Tenant to the extent such warranties are not solely in favor of Tenant.  Landlord, without cost to Tenant, shall promptly repair, replace, restore, or rebuild any work included in Landlord's Work that Landlord has been given notice (during the one (1) year period following the date of Substantial Completion of Landlord's Work) contains defects in material or workmanship, or to which damage has occurred because of such defects.

5.      "**Substantial Completion**" shall mean that Landlord's Work has been completed in a good and workmanlike manner in accordance with the Final Base Building Construction Documents and in compliance with all Laws and Requirements, subject only to the completion of minor finishing and other minor construction aspects of Landlord's Work and has received a certificate from Landlord's architect certifying the foregoing.

## SCHEDULE 1

## PROJECT SCHEDULE

|  | Date(s)/Periods |
|---|---|
| Base Building Plans Submission Date |  |
| Tenant Review and Approval/Rejection of Base Building Plans |  |
| Base Building Plans Resubmitted to Tenant (if applicable) |  |
| Revised Base Building Plans Approved by Tenant (if applicable) |  |
| Base Building Preliminary Budget |  |
| Base Building Plans Revised and Final (if applicable) |  |
| Base Building Construction Documents |  |
| Tenant Review and Approval/Rejection of Base Building Construction Documents |  |
| Final Base Building Construction Documents |  |
| Commence Building Shell, Core and Site Work |  |
| Delivery Date |  |

# SCHEDULE 2

## BASE BUILDING PRELIMINARY PLANS AND SPECIFICATIONS

**EXHIBIT D**

**BUILDING HOLIDAYS**

\* NEW YEAR'S DAY \*

\* MEMORIAL DAY \*

\* INDEPENDENCE DAY \*

\* LABOR DAY \*

\* THANKSGIVING DAY \*

\* CHRISTMAS DAY \*

**EXHIBIT E**

**JANITORIAL SPECIFICATIONS**

## RULES AND REGULATIONS

6. **DESIGNATED SMOKING AREA:**

Tenant, its employees and guests shall comply with the restrictions on smoking on the Property as set by Landlord.

7. **WINDOWS:**

Windows in the Premises shall not be covered or obstructed by Tenant. No bottles, parcels or other articles shall be placed on the window sills, in the halls, or in any other part of the Building other than the Premises. No article shall be thrown out of the doors or windows of the Premises.

8. **PROJECTIONS FROM BUILDING:**

No awnings, air-conditioning units, or other fixtures shall be attached to the outside walls or the window sills of the Building or otherwise affixed so as to project from the Building, without prior written consent of Landlord.

9. **FLOOR COVERING:**

Tenant shall not lay linoleum or other similar floor covering so that the same shall come in direct contact with the floor of the Premises. If linoleum or other similar floor covering is desired to be used, an interlining of builder's deadening felt shall first be fixed to the floor by a paste or other material that may easily be removed with water, the use of cement or other similar adhesive material being expressly prohibited.

10. **LOCKS:**

Tenant, before closing and leaving the Premises, shall ensure that all windows are closed and entrance doors locked. All locks and hardware must conform to Building Standard and be keyed to the Building master.

11. **CONTRACTORS:**

No contract of any kind with any supplier of towels, water, toilet articles, waxing, rug shampooing, venetian blind washing, furniture polishing, lamp servicing, cleaning of electrical fixtures, removal of waste paper, rubbish, garbage, or other like service shall be entered into by Tenant, nor shall any machine of any kind be installed in the Building or the Premises, without the prior written consent of Landlord. Tenant shall not employ any persons other than Landlord's janitors for the purpose of cleaning the Premises without prior written consent of Landlord. Landlord shall not be responsible to Tenant for any loss of property from the Premises occurring, or for any damage to the effects of Tenant by such janitors or any of its employees, or by any other person or any other cause.

## 12. ACTIVITIES PROHIBITED ON PREMISES:

Tenant shall not conduct, or permit any other person to conduct, any auction upon the Premises, manufacture or store goods, wares or merchandise upon the Premises without the prior written approval of Landlord, except the storage of usual supplies and other inventory to be used by Tenant in the conduct of its business, make any unusual noises in the Premises, permit to be played musical instrument on the Premises, permit any radio to be played, or television, recorded or wired music in such loud manner as to disturb or annoy other tenants, or permit any unusual odors to be produced on the Premises. No bicycles, vehicles or animals of any kind shall be brought into or kept in or about the Premises.

## 13. PLUMBING AND ELECTRIC FACILITIES:

Plumbing facilities shall not be used for any purpose other than those for which they were constructed; and no sweepings, rubbish, ashes, newspaper or other substances of any kind shall be thrown into them. Waste (including beverages of any kind) and excessive or unusual amounts of water is prohibited.

## 14. SAFES AND OTHER HEAVY EQUIPMENT:

Landlord reserves the right to prescribe the weight and position of all safes and other heavy equipment so as to distribute properly the weight thereof and to prevent any unsafe condition from arising.

## 15. PARKING:

Tenant and its employees shall park their cars only in those portions of the parking area designated by Landlord. Tenant and its employees are prohibited from parking in the designated visitor parking areas and areas clearly marked as Fire Lanes.

## 16. SPEED LIMIT:

All users shall comply with the posted Speed Limit for the Property at all times.

F-2

# EXHIBIT G

## TENANT ESTOPPEL CERTIFICATE

TO: _____ ("_____") pursuant to that certain __ Agreement (the "Agreement") dated _____, 20__, by and between _____ and _____ ("Landlord").

     17.    The undersigned ("Tenant") is the tenant under that certain Lease dated _____, 20__, by and between Landlord and Tenant (the "Lease"), covering a portion of those certain premises commonly known and designated as_____ ____ _____ _____, New Jersey, consisting of approximately _____ square feet (the "Premises"). A true, complete and correct copy of the Lease is attached hereto as Exhibit "A".

     18.    The Lease has not been modified, changed, altered or amended in any respect (except as indicated following this sentence) and is the only lease or agreement between the undersigned and Landlord affecting the Premises. If none, state "none".

_____

_____

     19.    The undersigned has made no agreements with Landlord or its agents or employees, which are not described in the Lease concerning free rent, partial rent, rebate of rental payments or any other type of rental concession with respect to the Lease (except as indicated following this sentence). If none, state "none".

_____

_____

     20.    The undersigned accepted possession of the Premises on _____, 20__, currently occupies the Premises and has been open for business since _____, 20__. The current term of the Lease began on _____, 20__. The current term of the Lease will expire on _____, 20__, and Tenant has no present right to cancel or terminate the Lease under the terms thereof, or otherwise. No Rent payable pursuant to the Lease has been prepaid for more than one (1) month, and no monies otherwise payable to Landlord under the Lease have been paid in advance of the due date therefor as set forth in the Lease. The Fixed Basic Rent currently being paid under the Lease is $_____ per month. Future changes to the Fixed Basic Rent are as set forth in the Lease. The undersigned also pays amounts on account of its share of Operating Expenses and Real Estate Taxes, as set forth in the Lease, which amounts have been paid to and including _____, 20__.

     21.    The Lease is fully valid and enforceable and is currently in full force and effect. Neither Landlord nor Tenant is in default thereunder, and all conditions and obligations on the part of Landlord to be fulfilled under the terms of the Lease have been satisfied or fully performed including, without limitation, all required tenant improvements, allowances, alterations, installations and construction, and payment therefor has been made in full. Tenant has no offset, claim, defense or counterclaim against any Rent or other sum payable by Tenant

under the Lease or against any other obligation of Tenant under the Lease. No condition exists which with the giving of notice or the passage of time, or both, would constitute a default under the Lease.

22.     Tenant has not suffered any assignment of the Lease or sublet the Premises or any portion thereof, and no person or entity, other than Tenant, has any possessory interest in the Premises or right to occupy the Premises or any portion thereof, except as permitted under the Lease.

23.     Tenant claims no right, title or interest in or to the Premises or right to possession of the Premises, except as tenant under the terms of the Lease. The Lease does not contain and the undersigned does not have any outstanding options or rights of first refusal to purchase the Premises or any portion thereof or the Property of which the Premises are a part, except as otherwise set forth below. If none, state "none".

_____

_____

24.     No actions, whether voluntary or otherwise, are pending against the undersigned under the bankruptcy laws of the United States or any state thereof, and Tenant knows of no fact or pending or threatened claim or litigation that might result in the insolvency or bankruptcy of Tenant.

25.     Tenant is a [corporation][limited partnership][general partnership] duly organized and validly existing and in good standing under the laws of the State of _____ [and qualified to do business in the State of New Jersey]. [_____, a _____, owns and holds all of the issued and outstanding stock in and of Tenant, and is a separate and distinct entity from Tenant].

26.     Tenant's occupancy of the Premises complies fully with all local, state and federal laws, ordinances, codes, rules, regulations and orders including, without limitation, those concerning hazardous wastes, hazardous materials, asbestos, oil and underground storage tanks. In addition, no such hazardous wastes, hazardous materials, asbestos, oil or underground storage tanks have been or are incorporated in, stored on or under, released from, treated on, transported to or from or disposed of, on or from the Premises or any portion thereof except as permitted by law with respect to medical waste.

27.     All inspections, licenses, permits, consents, permissions, approvals and certificates required, whether by law, regulation or insurance standards, to be made or issued with respect to the conduct of Tenant's business, the Premises and the use and occupancy of the Premises by Tenant have been made by or issued by all necessary private parties, the appropriate governmental or quasi-governmental authorities or other authorities having jurisdiction over the Premises and/or Tenant's business, are in full force and effect, and Tenant has not received notification from any such authority that Tenant or the Premises is in material noncompliance with such laws, regulations or standards, that the Premises is being used, operated or occupied unlawfully or that Tenant has failed to obtain such inspections, permits, consents, permissions, approvals, licenses or certificates, as the case may be. Tenant has not received notice of any

violation or failure to conform to any such law, ordinance, regulation, standard, license, permit, consent, permission, approval or certificate.

28.    All insurance policies required to be maintained by Tenant under the Lease have been maintained, are in full force and effect and all premiums with respect thereto have been paid in full.

29.    [Upon receipt of notice of the closing of the purchase and sale of the Premises as set forth in the Agreement, Tenant shall recognize ___ as landlord under the Lease, and all payments of rent and other sums due to landlord under the Lease and all communications permitted or required under the Lease shall be directed to _____ c/o

_____ , and all communications permitted or required under the Lease shall be directed to Tenant at the address for Tenant set forth in the Lease (except as otherwise indicated following this sentence), unless and until otherwise specified in written notice by the party to whom notice is to be given at such address.  If none, state "none".

_____

_____ ]

30.    [This certification is made to induce _____ [to enter into the Agreement] [to provide financing to Landlord] knowing that _____ is relying upon the truth of this Tenant Estoppel Certificate in [entering into the Agreement,] [providing such financing] and that [the acquisition of the Premises by _____ pursuant to the Agreement] [the financing provided to Landlord] shall be deemed good and valuable consideration to Landlord for the foregoing representations made by Tenant.]

Dated this ____ day of _____, 200_.

TENANT:

_____ ,

a _____

BY:_____

Name:_____

Title:_____

G-3

**EXHIBIT H**

**CONFIRMATION OF LEASE TERM**

THIS MEMORANDUM is made as of the ___ day of _____, 20___, between _____, a _____, with an office at _____("Landlord") and _____, a _____, with its principal place of business at _____ _____ ("Tenant"), who entered into a lease dated for reference purposes as _____ __, 20__ (the "Lease"), covering certain premises located at _____. All capitalized terms, if not defined herein, shall be defined as they are defined in the Lease.

     1.    The parties to this Memorandum hereby agree that the date of _____, 20__ is the "Commencement Date" of the Term, and the date of _____ is the expiration date of the Lease.

     2.    Tenant hereby confirms the following:

          a.    That it has accepted possession of the Premises pursuant to the terms of the Lease;

          b.    That the improvements, including Landlord's Work, required to be furnished according to the Lease by Landlord have been Substantially Completed;

          c.    That Landlord has fulfilled all of its duties of an inducement nature or they are otherwise set forth in the Lease;

          d.    That there are no offsets or credits against rentals, and the $_____ Security Deposit has been paid as provided in the Lease;

          e.    That there is no default by Landlord or Tenant under the Lease and the Lease is in full force and effect.

     3.    This Memorandum, each and all of the provisions hereof, shall inure to the benefit of, or bind, as the case may require, the parties hereto, and their respective successors and assigns, subject to the restrictions upon assignment and subletting contained in the Lease.

**Landlord:**
Date Signed:_____

By:_____
Name:_____
Title:_____
Attest:_____

**Tenant:**
Date Signed:_____

By:_____
Name:_____
Title:_____
Attest:_____

## EXHIBIT I

## TENANT WORK LETTER
## ATTACHED TO AND MADE PART OF
## LEASE BETWEEN K JOHNSON INDUSTRIES LIMITED LIABILITY COMPANY, AS LANDLORD, AND PERFORMANCE SPINE AND SPORTS MEDICINE LLC, AS TENANT

As material inducement to Tenant to enter into the Lease, and in consideration of the covenants herein contained, Landlord and Tenant, intending to be legally bound, agree as set forth herein. The Lease is hereby incorporated by reference to the extent that the provisions of this Tenant Work Letter apply thereto. Terms not otherwise defined in this Tenant Work Letter shall have the meanings given to them in the Lease.

## ARTICLE 1
## DESCRIPTION AND COORDINATION OF WORK

1.1     Tenant's Work. The work to be performed by Tenant and paid from the Improvement Allowance provided by Landlord consists of the construction of tenant improvements and the installation of fixtures, equipment and cabling in the Premises required by Tenant for its occupancy and any other costs incurred in the construction of the Tenant Improvements as described in more detail in the Tenant's Final Construction Documents, as defined in Article 2 of this Tenant Work Letter (the "Tenant's Work" or the "Tenant    and Improvements").

1.2     Representatives.

a)     Appointment of Representatives. Landlord and Tenant have appointed or shall appoint representatives to act for each of them with respect to all construction and construction related matters involving the Tenant's Work (respectively, "Landlord's Construction Representative" and "Tenant's Construction Representative", and together, the "Representatives"). The Representatives shall be available to attend regularly scheduled and special meetings with each other in person or by conference call.

b)     Tenant's Representative. Tenant's Construction Representative will be Percy Naranjo, provided, however, Tenant may change such person from time to time, which change shall be effective upon receipt by Landlord of written notice of such change. Tenant's Construction Representative shall have the authority to act on Tenant's behalf at all times (including at all construction meetings and inspections) and to bind Tenant with respect to issues relating to the construction of the Tenant Improvements including, but not limited to, cost and scheduling changes, change orders and financial matters involving items previously approved by Landlord or Tenant, as the case may be, or any new item.

c)     Landlord's Construction Representative. Landlord's Construction Representative will be Kevin Johnson, provided, however, Landlord may change such person from time to time, which change shall be effective upon the receipt by Tenant of written notice of such change or changes. Landlord's Construction Representative shall be generally available at the Premises during the construction of the Tenant Improvements and shall inspect the Tenant

Improvements from time to time to determine compliance with requirements of this Tenant Work Letter. Landlord's Construction Representative shall have the authority to act on Landlord's behalf at all times and to bind Landlord with respect to issues relating to the construction of the Tenant Improvements.

## ARTICLE 2
## TENANT'S PLANS

2.1 <u>Tenant's Design Professionals</u>. Tenant will engage an architect ("Tenant's Architect") to document the design of the Tenant Improvements. Each of Tenant's Architect and any other design professional engaged by Tenant or Tenant's Architect to design any aspect of the Tenant Improvements ("Tenant's Design Professionals"), shall maintain at all times errors and omissions professional liability insurance in an amount not less than $1,000,000 per occurrence and $2,000,000 in the aggregate covering any negligent act, error or omission of such party, evidence of which shall be provided to Landlord upon request. Tenant's Design Professionals shall also maintain Worker's Compensation, Employer's Liability Insurance and Commercial General Liability, in commercially reasonable amounts.

2.2 <u>Tenant's Proposed Space Plan</u>. Tenant shall cause to be prepared by Tenant's Architect and delivered to Landlord, for Landlord's approval as described below, a space plan (the "Tenant's Proposed Space Plan") for the construction of the Tenant Improvements. To facilitate Landlord's review of the Tenant's Proposed Space Plan, Tenant shall forward to Landlord and Landlord's architect from time to time at reasonable intervals interim drafts of all or any portion of the Tenant's Proposed Space Plan. In reviewing such partial and/or interim Tenant's Proposed Space Plan, Landlord shall endeavor to promptly identify any problems which would be grounds for rejection of Tenant's Proposed Space Plan based upon the criteria applicable to rejection of Tenant's Construction Documents by Landlord under Section 2.4 below. Landlord and Tenant will work cooperatively so that Tenant's Architect can commence preparation of construction documents based upon the approved Tenant's Proposed Space Plan.

2.3 <u>Tenant's Construction Documents</u>. Tenant shall cause to be prepared by Tenant's Architect and delivered to Landlord, for Landlord's approval as described below, complete architectural drawings, specifications and finish schedules (the "Tenant's Construction Documents") for the Tenant Improvements, based upon Tenant's Proposed Space Plan as approved by Landlord. The Tenant's Construction Documents, once completed and ready for submission to Landlord for approval by Landlord under Section 2.4 below, shall, in the opinion of Tenant's Architect, be ready to be signed and sealed by Tenant's Architect (and, if applicable, any other Tenant's Design Professionals) licensed and registered in the State of New Jersey. The Tenant's Construction Documents shall conform to all applicable Laws and Requirements. The Tenant's Construction Documents shall contain, at a minimum and where applicable, floor plans, reflected ceiling plans, finish schedules and all related details and schedules. Tenant's Architect shall provide mechanical, plumbing and electrical drawings, plans and specifications for the Tenant Improvements and prepare the life safety and fire protection plans for the Tenant Improvements. Tenant, at its cost, shall provide engineering services as necessary, in connection with Tenant's Construction Documents.

## 2.4    Landlord Approval of Tenant's Construction Documents

a)    Standards for Approval.  Within ten (10) days after receipt of Tenant's Construction Documents for the Premises, Landlord shall give notice to Tenant either approving or disapproving the Tenant's Construction Documents.  The applicable time period within which Landlord is required to respond to Tenant's submissions or resubmission of Tenant's Construction Documents under this Section 2.4 is hereinafter referred to as "Landlord's Approval Response Period".  Any notice of disapproval from Landlord shall state the specific reasons for such disapproval.  Landlord shall be obligated to approve the Tenant's Construction Documents unless the Tenant Improvements as delineated therein (i) do not conform with all applicable Laws and Requirements or Tenant's Construction Documents, as then amended (ii) would, in Landlord's reasonable judgment, adversely affect the integrity or effectiveness of any building system, including, without limitation, HVAC, electrical, plumbing, fire protection, sprinkler, security or life safety systems, (iii) would impair the structural integrity of the Building, (iv) would affect the appearance of the Building from outside the Building, (v) do not otherwise conform with the requirements set forth in Section 2.3 above, or (vi) would, in Landlord's reasonable opinion, create a health hazard within the Building.  Landlord's review of the Tenant's Construction Documents shall be solely for the benefit of Landlord and may not be relied upon by Tenant or any other party as being in conformity with any Laws or Requirements.

b)    Rejection of Tenant's Construction Documents by Landlord.  In the event Landlord rejects the Tenant's Construction Documents or any portion thereof as provided in Section 2.4(a) above, Tenant shall resubmit to Landlord the Tenant's Construction Documents or relevant portion thereof, including the revisions required by Landlord.  Landlord shall review and approve any resubmitted plans within seven (7) days after receipt, provided they contain all of the revisions, modifications or changes which are unacceptable to Landlord applying the standards set forth in Section 2.4(a) above.  The Tenant's Construction Documents, as completed by Tenant's Architect and in the form finally approved by Landlord are referred to hereinafter as the "Tenant's Final Construction Documents".  Upon completion of the Tenant Improvements, Tenant shall have Tenant's Architect furnish Landlord a copy of the Tenant's Final Construction Documents with any changes made by Tenant's Architect noted thereon, as well as copies of any CADD disks.

c)    In the event Landlord does not approve or disapprove Tenant's Construction Documents (or relevant portion thereof) within the Landlord's Approval Response Period, Landlord will be deemed to have approved such documents.

## 2.5    Permits.  Tenant, at Tenant's sole cost and expense shall file (or cause the general contractor to file) Tenant's Final Construction Documents with the governmental agencies having jurisdiction and obtain all necessary permits for same.

## ARTICLE 3
## PERFORMANCE OF TENANT'S WORK

3.1    Performance of Tenant's Work.

a)    Tenant, at its sole cost and expense, subject to Landlord's obligation to pay the Improvement Allowances provided for herein, shall, except as provided below, perform the Tenant's Work with architects, construction managers, general contractors of Tenant's own choosing, subject to Landlord's prior approval thereof, such approval not to be unreasonably withheld, conditioned or delayed.  Tenant shall perform the Tenant's Work in accordance with (i) the Tenant's Final Construction Documents, (ii) good construction practices, (iii) all Laws and Requirements, (iv) all other requirements of this Tenant Work Letter, and (v) all requirements set forth in the Lease for the performance of alterations by Tenant.

b)    Tenant and its contractors and subcontractors shall be solely responsible for the transportation, storage and safekeeping of materials and equipment used in the performance of the Tenant's Work, for the removal of waste and debris resulting therefrom on a daily basis, and for any damage caused by them to any portion of the Building.

c)    In addition to any insurance which may be required under the Lease, throughout the prosecution of the Tenant's Work, Tenant shall secure, pay for and maintain or cause Tenant's contractors to secure, pay for and maintain insurance (and provide evidence of same to Landlord upon request) in the following minimum coverage and limits of liability:

1.    Worker's compensation in statutory limits for the State of New Jersey, and Employer's Liability Insurance in statutory limits.

2.    Comprehensive General Liability Insurance including Broad Form Contractual, Broad Form Property Damage, Personal Injury, Completed Operations and Products coverage, and deletion of any exclusion pertaining to explosion, collapse and underground property damage hazards, with limits of not less than $5,000,000.00 combined single limit for bodily injury and property damage.

3.    Comprehensive Automobile Liability Insurance including Owned, Non-Owned and Hired Car coverage, with limits of not less than $1,000,000.00 combined single limit for both bodily injury and property damage.

d)    At any time after the Tenant's Final Construction Documents are approved by Landlord and thereafter throughout Tenant's prosecution of the Tenant's Work, Tenant shall be permitted to direct changes in the Tenant's Work (each a "Tenant Change Order") it being agreed, however, that Tenant must obtain Landlord's approval, not to be unreasonably withheld, conditioned or delayed, before prosecuting any Tenant Change Order it being agreed that Landlord shall either approve or reject the Tenant Change Order within three (3) business days. Once approved by Landlord, a Tenant Change Order shall become part of the Tenant's Final Construction Documents and the work shown on such Tenant Change Order shall be part of the

J-4

Tenant's Work. In the event Landlord does not approve or reject the Tenant Change Order within the time required, Landlord will be deemed to have approved such Tenant Change Order.

   e) Landlord shall reasonably cooperate with Tenant's efforts to obtain, at Tenant's expense, any permits, certificates or final approvals in connection with any portion of the Tenant's Work including, without limitation, executing and delivering any documents or instruments that Landlord is required to sign and which are reasonably required by Tenant in connection therewith.

   f) Landlord shall permit Tenant to bring and store on the Premises all equipment, supplies and other property required or appropriate in connection with the Tenant's Work. Tenant entry upon the Premises prior to the Commencement Date for the purpose of prosecuting Tenant's Work shall be upon all of the terms and conditions of the Lease except with respect to payment of Fixed Basic Rent, Operating Expenses or Real Estate Taxes (and except with respect to provisions such as use and maintenance that are inapplicable during Tenant's construction).

   g) The work of Tenant's contractors shall be performed in coordination with any work being performed by Landlord or its contractors at the Property.

   h) Tenant shall cause its contractor to use due care with respect to and to be responsible for (i) transportation, safekeeping and storage of materials and equipment used in the performance of the work by its contractors, (ii) for removal of debris and waste resulting therefrom, (iii) for defective design and work caused by its separate contractors and (iv) for any damage caused by its separate contractors.

   i) Tenant shall cause its contractor to use reasonable efforts not to cause labor disruptions at the Building and shall at all times adopt and implement policies and practices which are intended to have the effect of avoiding work stoppages, slowdowns, disputes, or strikes at the Property. If Tenant's contractors cause work stoppages, slowdowns, disputes, or strikes at the Property, then Landlord upon one (1) business day prior written notice to Tenant shall be permitted to cause Tenant to cease all work at the Premises until such time as it can be completed without such disruptions and Landlord shall have the right to equitable relief from a court of competent jurisdiction in order to accomplish same.

**ARTICLE 4**
**IMPROVEMENT ALLOWANCE**

   4.1 <u>Disbursement of Allowance</u>. Landlord shall pay without offset or deduction to Tenant or to others as designated by Tenant the Improvement Allowance from time to time in accordance with the provisions of this Article 4. The Improvement Allowance will be paid to Tenant without offset or deduction and disbursed as provided below. Tenant may request payment of the allowance applicable to such work from time to time (but not more frequently than once a calendar month) by delivering to Landlord a disbursement request (each, a "Disbursement Request"), each of which Disbursement Requests shall be accompanied by (i) a certificate from Tenant's Architect or project manager that the portion of Tenant's Work requested in the Disbursement Request is substantially complete; and (ii) photocopies of invoices

J-5

evidencing that the amount being requested pursuant to such Disbursement Request has been paid or incurred by Tenant in connection with the Tenant's Work; and (iii) except in the case of the first Disbursement Request, lien releases from Tenant's general contractor (or construction manager, as the case may be) for all work and services completed by such persons through the date of the Disbursement Request immediately preceding the Disbursement Request in question. Provided Landlord receives such request, together with all supporting documentation required above, on or before the 10th day of the calendar month in which the request is made, Landlord, on or before the 30th day of the same month, shall pay to Tenant or to others as designated by Tenant the amount being requested in such Disbursement Request. Notwithstanding anything to the contrary contained herein, the final Disbursement Request shall not be paid until all of the following have occurred: (i) the Tenant's Work is substantially completed and invoices therefor are presented to Landlord; (ii) Tenant provides evidence that the Tenant's Work has otherwise been paid for in full or will be paid in full upon final disbursement; (iii) Tenant's project manager has certified substantial completion, and Landlord has approved the Tenant's Work to the extent required in this Tenant Work Letter; (iv) if requested, Tenant shall have provided an estoppel to Landlord and its lender in the form required by the Lease; (v) if required by applicable Laws and Requirements, Tenant shall have obtained a certificate of occupancy, or its equivalent from the local governmental authorities for the Premises; and (viii) Tenant has provided to Landlord final releases of liens from the contractor in form and substance reasonably satisfactory to Landlord or the time period in which a mechanics lien would be required to be filed in order to be enforceable shall have elapsed without the filing thereof. Landlord agrees to timely fund without offset or deduction the final Disbursement Request to Tenant when Tenant becomes entitled thereto in accordance with the preceding sentence.

4.2     No Further Obligations. Tenant acknowledges and agrees that, except for Landlord's obligation to pay the Improvement Allowance, it is Tenant's responsibility to prepare Tenant's Final Construction Documents for the Tenant's Work, to perform Tenant Improvements and to pay the entire cost of Tenant's Work. Notwithstanding Landlord's obligation to pay the Improvement Allowance, Landlord shall have no privity of agreement with any contractors, subcontractors or third party vendors.

# TENANT ESTOPPEL CERTIFICATE

TO:     TD Bank, N.A. (the "Bank") pursuant to that certain Loan Agreement (the "Agreement") dated July 16, 2012, by and between the Bank and KJohnson Urban Renewal, LLC ("Landlord").

1.      The undersigned ("Tenant") is the tenant under that certain Lease dated July 16, 2012, by and between Landlord and Tenant (the "Lease"), covering a portion of those certain premises commonly known and designated as Block 57, Lot 6.01 on the tax map of the Township of Bordentown, Burlington County, New Jersey, consisting of approximately 16,000 rentable square feet (the "Premises"). A true, complete and correct copy of the Lease is attached hereto as Exhibit "A".

2.      The Lease has not been modified, changed, altered or amended in any respect (except as indicated following this sentence) and is the only lease or agreement between the undersigned and Landlord affecting the Premises. If none, state "none".

None_____

3.      The undersigned has made no agreements with Landlord or its agents or employees, which are not described in the Lease concerning free rent, partial rent, rebate of rental payments or any other type of rental concession with respect to the Lease (except as indicated following this sentence). If none, state "none".

___None._____

_____

4.      The undersigned has not yet accepted possession of the Premises. The initial term of the Lease will be for the period of time commencing on the Commencement Date (as defined in the Lease) and ending on that date which is ten (10) Lease Years following the Commencement Date, subject to Tenant's right to renew for two (2) additional five (5) year terms. Tenant has no present right to cancel or terminate the Lease under the terms thereof, or otherwise. No rent payable pursuant to the Lease has been prepaid for more than one (1) month, and no monies otherwise payable to Landlord under the Lease have been paid in advance of the due date therefor as set forth in the Lease. The Fixed Basic Rent scheduled to be paid under the Lease is $20,000.00 per month. Future changes to the Fixed Basic Rent are as set forth in the Lease. The undersigned will also be responsible to pay amounts on account of its share of Operating Expenses, Common Expenses, and Real Estate Taxes, as set forth in the Lease.

5.      The Lease is fully valid and enforceable and is currently in full force and effect. Neither Landlord nor Tenant is in default thereunder. Tenant has no offset, claim, defense or counterclaim against any rent or other sum payable by Tenant under the Lease or against any other obligation of Tenant under the Lease. No condition exists which with the giving of notice or the passage of time, or both, would constitute a default under the Lease.

6.      Tenant has not suffered any assignment of the Lease or sublet the Premises or any portion thereof, and no person or entity, other than Tenant, has any possessory

interest in the Premises or right to occupy the Premises or any portion thereof, except as permitted under the Lease.

7.    Tenant claims no right, title or interest in or to the Premises or right to possession of the Premises, except as tenant under the terms of the Lease. The Lease does not contain and the undersigned does not have any outstanding options or rights of first refusal to purchase the Premises or any portion thereof or the Property of which the Premises are a part, except as otherwise set forth below. If none, state "none".

In the event that Landlord subjects the Property to a condominium regime making the Building a separate unit from the rest of the Property improvements and decides to sell the unit containing the Building, Tenant has a right of first offer to purchase such unit, as set forth in Rider B to the Lease.

8.    No actions, whether voluntary or otherwise, are pending against the undersigned under the bankruptcy laws of the United States or any state thereof, and Tenant knows of no fact or pending or threatened claim or litigation that might result in the insolvency or bankruptcy of Tenant.

9.    Tenant is a nonprofit corporation duly organized and validly existing and in good standing under the laws of the State of New Jersey.

10.   All insurance policies required to be maintained by Tenant under the Lease have been maintained, are in full force and effect and all premiums with respect thereto have been paid in full.

11.   This certification is made to induce the Bank to provide financing to Landlord knowing that the Bank is relying upon the truth of this Tenant Estoppel Certificate in providing such financing and that the financing provided to Landlord shall be deemed good and valuable consideration to Landlord for the foregoing representations made by Tenant.

Dated this 16th day of July 2012.


TENANT:

PERFORMANCE SPINE AND SPORTS
MEDICINE, LLC,
a New Jersey limited liability company

Name: Percy Naranjo
Title:

2

# **EXHIBIT B**

# FIRST AMENDMENT TO LEASE

by and between

## KJOHNSON URBAN RENEWAL, LLC

(as Landlord)

And

## Performance Sports and Spine Medicine of Bordentown, LLC

(as Tenant)

Date: April 25, 2013

Premises: Building F, located at New Jersey State Highway Route #130
Block 57, lot 6.01, Bordentown Township, Burlington County, New Jersey

**IN WITNESS WHEREOF** [illegible text]

**Landlord:**

Date Signed [illegible]

BY [illegible]

**Tenant**

Date Signed 4/25/2013

BY

Name: Perg Narangu
Title: CEO

# EXHIBIT C

## SECOND AMENDMENT TO THE LEASE

**THIS SECOND AMENDMENT TO THE LEASE** entered into this ___ day of December 2019, by and between KJOHNSON URBAN RENEWAL, LLC OR ITS DESIGNEE hereinafter referred to as "Landlord", and **PERFORMANCE SPINE AND SPORTS MEDICINE LLC** hereinafter referred to as "Tenant"

**WHEREAS**, by LEASE dated the 16th Day of July 2012, commencing on the 1st day of January 2014, (hereinafter referred to as "Lease") which consists of 16,000 square feet of rentable space after allocating for common areas in the building located at 9500 K. Johnson Boulevard, Building F, Bordentown, New Jersey 08505 hereinafter referred to as the ("Building")

**WHEREAS**, the LEASE was amended by the FIRST AMENDMENT TO LEASE executed by the Parties on April 25, 2013. (hereinafter referred to "First Amendment")

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereto do hereby covenant and agree to and with each other as follows:

1. **Paragraph U of the Lease titled Permitted Use:** Paragraph U of the Lease titled Permitted Use, which is incorporated by reference, shall be amended as follows to include the following additional language:

    a. In addition to the Permitted Uses outlined in Paragraph U of the Lease, Permitted Use shall mean use of the Premises for, Varicose Vein Treatment, noninvasive skin tightening procedures, noninvasive subcutaneous fat removal, medical and cosmetic, including but not limited to RF closure, EVLT, Ambulatory Phlebectomy as well as treatment of spider veins using surface laser and visual sclerotherapy.

    b. For the avoidance of any doubt all Permitted uses Outlined in Paragraph 1(a) of this Second Amendment to The Lease are NOT EXCLUSIVE USES of Tenant. Landlord will be permitted to lease office space to Tenants who perform and/or have substantially similar and/or identical practices. Furthermore, Landlord may revoke the uses outlined in Paragraph 1(a) of this Second Amendment to The Lease at any time upon thirty (30) days written notice to Tenant. Upon receipt of Thirty (30) day written notice from Landlord, Tenant must cease performing all Permitted Uses outlined in Paragraph 1(a) on or before the thirty-first (31st) day after receipt of said written notice. In the event Tenant fails to cease said uses after receipt of written notice, Landlord will be permitted to proceed with appropriate legal action to enforce the terms of this Second Amendment to The Lease and Tenant will be responsible for all expenses and damages incurred by Landlord in enforcing this Second Amendment to the Lease, including but not limited to; attorney's fees, court costs, compensatory damages, general damages, property damage, nominal

damages and expenses not here listed incurred by Landlord in enforcing this Amendment.

2. **Modification to Rules and Regulations pursuant to Paragraph 23 and Exhibit F of the Lease:** Exhibit F of the Lease, which is incorporated by reference, shall be modified to include the following additional language, which has been agreed to by both Landlord and Tenant:

   a. **PETS AND/OR ANIMALS**: Tenant shall not permit, pets and/or animals of any kind to come into and/or onto the premises, this includes but is not limited to Emotional Support Animals. Service Animals as defined under the New Jersey Law Against Discrimination (NJLAD) and the American with Disabilities Act (ADA) are the only type of animals excluded from this restriction and permitted on the premises.

   b. **HOURS OF OPERATION:** The hours of operation for the premises, shall be:

| Day Of Week | Hours of Operation |
|---|---|
| Monday | 7:00 a.m. to 9:00 p.m. |
| Tuesday | 7:00 a.m. to 9:00 p.m. |
| Wednesday | 7:00 a.m. to 9:00 p.m. |
| Thursday | 7:00 a.m. to 9:00 p.m. |
| Friday | 7:00 a.m. to 9:00 p.m. |
| Saturday | 7:00 a.m. to 9:00 p.m. |
| Sunday | 7:00 a.m. to 9:00 p.m. |

Any divergence from these hours of operation, must be requested via written notice with Landlord at least twenty-four (24) hours in advance. Landlord must agree to allow the divergence from these hours, notice of the request will not be considered acceptance of said request.

   c. **PARKING**: In addition to the prior language outlined in Paragraph 15 of Exhibit F incorporated by reference, the following additional language on parking is to be added and included in Paragraph 15 of Exhibit F.

      i. Tenant, its employees, contractors, patrons, subtenants, patrons of subtenants and/or contractors of subtenants shall not leave a vehicle in the parking area designated by Landlord for more than twenty-four (24) hours. Any vehicles left in the parking area for more than twenty-four (24) hours are subject to removal from the premises by the Landlord. A removal of any vehicle by the Landlord, will be at the cost, expense and liability of the vehicle owner. Landlord shall not be responsible for any damages or expenses associated with the removal of said vehicle. Tenant agrees to indemnified, defended and hold the landlord harmless of any action brought

against Landlord because of the removal of said vehicle by the Tenant, its employees, contractors, patrons, subtenants, patrons of subtenants and/or contractors of subtenants as a result of the removal of said vehicle.

    d. **DEFAULT**: A violation of this Second Amendment to the Lease shall be governed by Paragraph 28 of the lease titled Defaults-Remedies and incorporated by reference to this Second Amendment to the Lease.

**3. Assignment of Lease by Landlord**: Pursuant to Paragraph P of the Lease, Landlord has assigned the lease from K Johnson Industries, LLC to the signatory of this Second Amendment to the Lease, K Johnson Urban Renewal, LLC. Pursuant to Paragraph P of the Lease, K Johnson Urban Renewal, LLC its successors and assigns, each of whom will have the same rights, remedies, powers, authorities and privileges as it would have had if it originally signed the lease as Landlord. K Johnson Industries, LLC shall no longer have any liability under this lease as they have ceased to hold title to the Property. Consistent with Paragraph P of the Lease, no principal of Landlord, K Johnson Urban Renewal, LLC., whether disclosed or undisclosed, shall have any personal liability with respect to the provisions of this Lease, the Premises, the Property or the Complex. All language within Paragraph P of the Lease shall remain in full force and effect except as modified herein. By execution of this agreement Tenant, acknowledges that they have received proper notice with respect to the Assignment of the Lease by Landlord.

**4.** Except as herein modified, all of the terms and conditions of the Lease and First Amendment to Lease shall remain in full force and effect.

    **IN WITNESS WHEREOF**, the parties hereto have duly executed this **SECOND AMENDMENT TO THE LEASE** delivered to the parties hereto and is effective as of the day and year first written above.

*-Signatures on Following Page-*

**Landlord**

Date Signed: 1/20/2010

KJOHNSON URBAN RENEWAL, LLC
A New Jersey Limited Liability Company

By: _____
Kevin Johnson, Sole Member

**Tenant**

Date Signed: 1/20/20

PERFORMANCE SPINE AND SPORTS
MEDICINE, LLC
A New Jersey Limited Liability Company

By: _____
Name: MATTHIAS HWIEDERHOLD MD
Title: OWNER

# EXHIBIT D

## SUBLEASE AGREEMENT

**THIS SUBLEASE AGREEMENT** (this "Sublease") is made and entered into effective as of June \_\_\_, 2019 (the "Effective Date") by and between **PERFORMANCE SPINE AND SPORTS MEDICINE OF BORDENTOWN, LLC**, a New Jersey limited liability company, having an address at 122 US Highway Route 130, 9500 K. Johnson Boulevard, Building F, Suite \_\_\_, Bordentown, New Jersey 08505 (the "Sublessor"); and **PT Administrative Services, LLC**, a Delaware Limited Liability Company, having an address at 900 Route 9 North, Suite 410, Woodbridge, New Jersey 07095 (the "Sublessee"; and together with the Sublessor, each, a "Party" and collectively, the "Parties"). Capitalized terms that are used but otherwise undefined in this Sublease shall have the meaning ascribed to them in the Lease (as defined below).

## BACKGROUND

A.    Pursuant to the Agreement of Lease, dated January 22, 2012, by and between K. Johnson Urban Renewal LLC (the "Landlord") and the Sublessor, a copy of which is attached to this Sublease as **Exhibit "A"** (the "Lease"), the Sublessor leases the Premises from the Landlord, which consists of 16,000 square feet of rentable space after allocating for common areas) in the building located at 9500 K. Johnson Boulevard, Building F, Bordentown, New Jersey 08505 (the "Building").

B.    The Sublessee desires to sublease from the Sublessor the Subleased Premises (a defined in section 1, below), and the Sublessor is willing to sublease the Subleased Premises to the Sublessee, upon the terms and subject to the conditions set forth in this Sublease.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained in this Sublease and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereby agree as follows:

## TERMS

1.    **Agreement to Sublease**.

A.    **Sublease of Subleased Premises**.  Subject at all times to the terms and conditions of the Lease, the Sublessor hereby subleases to the Sublessee during the Sublease Term (as defined in Section 2, below) and the Sublessee hereby subleases from the Sublessor, that portion of the Premises shown as the cross-hatched area on the diagram attached to this Sublease as **Exhibit "B"** (the "Exclusive Subleased Premises"), which consists of approximately five thousand (5,000) square feet of rentable space, all in accordance with the terms and conditions of this Sublease.  The Sublessee shall abide by all of the terms and conditions of the Lease, except as modified by the terms of the Sublease with respect to its obligations to the Sublessor, and shall neither do nor permit anything to be done that would breach any obligation of, or cause a default by, the Sublessor under the Lease.  The Sublessor hereby represents and warrants that the Lease is in full force and effect and that the Sublessor is, and covenants that it shall be, on and as of the Commencement Date (as defined below), in material compliance with its obligations under the Lease, and the Sublessor represents that it has received no notice of any default or breach by Sublessor of any of its obligations under the Lease. Sublessee will have no rights to enforce any terms of the Lease between Sublessor and Landlord. Sublessee shall be bound by all terms of the Lease but will

have no remedy against Landlord. All rights associated with the Lease shall remain the rights of the Sublessor and Landlord. At no time is this sublease to be considered, construed, altered or interpreted as an assumption of the rights of Sublessor by Sublessee

B.    Non-Exclusive Use of Shared Spaces. In connection with this Sublease of the Subleased Premises, during the Sublease Term the Sublessee shall be permitted to use as a courtesy without additional Rent, on a non-exclusive basis, and in accordance with the terms of this Sublease, the following areas of the Premises,: (i) first floor front desk/reception area; (ii) second floor kitchen; and, (iii) second floor conference room, subordinate to the use thereof by the Sublessor (collectively, the "Shared Space"), together with the Exclusive Subleased Premises, collectively, the "Subleased Premises").

2.    Term.

A.    Initial Term. The term of this Sublease shall be for an initial period of sixty (60) months commencing _____, 2019 (the "Initial Term"), and shall not automatically renew unless the Sublessor at its sole discretion elects to exercise its rights in and under the Renewal Option(s) as more particularly described in Rider A of the Lease. Further, the Option to Purchase as more particularly described in Rider B of the Lease shall remain the sole right of the Sublessor and the Sublessee shall have no right therein.

B.    Terms and Conditions of Renewal Terms. Each Renewal Term shall be on the same terms and conditions as the Initial Term, except as may otherwise be expressly provided in this Sublease.

3.    Termination of Sublease Upon Termination of Lease.

A.    Automatic Termination. If, for any reason, the Lease is terminated, this Sublease shall automatically terminate effective the date of such termination, and neither Party shall have any further obligations to the other under this Sublease except with regard to any unsatisfied obligations that arose during the Sublease Term and those which, under the express terms of this Sublease, survive the expiration or other termination of this Sublease.

B.    No Liability. Unless the termination of this Sublease is due to a default by the Sublessor under the Lease which does not arise from the Sublessee's breach of any of the terms or conditions of, or its failure to perform any of its obligations under, this Sublease, the Sublessee shall have no claim against the Sublessor by reason of such termination.

4.    Rent.

A.    Base Rent. During the Sublease Term, the Sublessee shall pay to the Sublessor the current annual base rent of $84,400.00 in twelve (12) equal current monthly installments of $7,033.3x, and as adjusted each Lease Year pursuant to Paragraph K. of the Basic Lease Provisions and Definitions of the Lease (the "Base Rent"; and together with the Additional Rent (as defined below), the "Rent") equal to its proportionate share of the Annual Rent payable by the Sublessor under the Lease, which shall be equal to thirty one and one quarter (31 1/4%) percent of the Annual Rent (its "Proportionate

Share" of the Premises), based on the percentage of the Premises (rentable square feet) exclusively used by either Party that constitutes the Exclusive Subleased Premises (i.e., 5,000 rentable square feet divided by 16,000 rentable square feet, which latter amount represents the sum of the Exclusive Subleased Premises (rentable square feet) and the approximate amount of the rentable square feet within the Premises that will be exclusively used by the Sublessor after giving effect to this Sublease (i.e., 11,000 rentable square feet). Sublessor will advise Sublessee, in writing and in advance of the corresponding due date, of the actual monthly Rent amount (including Base Rent and Additional Rent) that is due and payable by Sublessee hereunder, including any subsequent changes to such monthly Rent amount.

B.     **Payment of Base Rent.** The Base Rent shall be due and payable to the Sublessor in advance on the first (1st) day of each calendar month of the Sublease Term without any prior demand, offset or deduction of any kind whatsoever. If the Commencement Date occurs on a day other than the first day of a month, the Base Rent shall be prorated for such month.

C.     **Additional Rent.** The Sublessee acknowledges and agrees that the Lease is triple net to the Landlord and it is the Parties' mutual intention that, as between the Sublessor and the Sublessee, the Sublessee shall, in addition to the Base Rent, be responsible for, and shall pay to the Sublessor as "Additional Rent", its Proportionate Share of the Additional Rent based on its Proportionate Shae of the Premises or thirty one and one quarter (31 1/4%) percent, including without limitation, Premises Tax, Sublessor's Building Proportionate Share, Sublessor's Complex Proportionate Share, Sublessor's Proportionate Tax Share, Sublessor's Share, Real Estate Taxes, Operating Expenses, Sublessor's Expense Payment, repairs and maintenance, all as more specifically defined in, and in accordance with the terms and conditions of, the Lease.

D.     **Audit.** Sublessor shall have all rights of audit under this Sublease as set forth in and under the terms and conditions of Section 8.c. of the Lease. Sublessee shall have no rights of audit under this Sublease and in no way can assume those rights from Sublessor. Sublessee will not be permitted, authorized or allowed at any time to review, gain possession or have access to any of the materials provided in an audit requested by Sublessor, unless such access are permitted in writing by Landlord, which Landlord may deny such request at any time for any reason, whether deemed to be reasonable or unreasonable. This right is fully at the discretion of the Landlord, neither Sublessor nor Sublessee shall be permitted to supersede this right. Both Sublessor and Sublessee, by signing this agreement, agree to this provision and will be required to pay any and all of Landlord's legal costs, damages or fees in the event of litigation of this matter. This legal costs, damages or fees will be borne by the Sublessee and Sublessor irrespective of the outcome of said litigation.

E.     **Payment of Additional Rent.** The Sublessee shall pay to the Sublessor in monthly installments on the first day of each month its Proportionate Share of the Additional Rent based on the estimated payments for such items due from the Sublessor to Landlord under the Lease. The Sublessee shall pay to the Sublessor, within ten (10) days after receipt by the Sublessor of each End of Year Expense Statement, its Proportionate Share of any amounts due from the Sublessor to Landlord under the Lease, due to the fact that the estimated payments were less than the actual amount due. Any excess amount paid shall be applied to the next installment of Additional Rent due or, if the Term has expired, the Sublessor shall pay the Sublessee its Proportionate Share of such excess amount.

3

F.    Insurance, Utilities and Other Services.  The Sublessee shall also be responsible to pay as Additional Rent its Proportionate Share of (i) the Sublessor's policies of general liability and fire and casualty insurance covering the Premises; and (ii) any utility or other service that is separately billed to the Premises, including without limitation, office cleaning and medical waste disposal services. Payment of the foregoing shall be due within ten (10) days of delivery to the Sublessee of a copy of the invoice for such service.  In addition, if requested by the Sublessor, the Sublessee agrees to maintain in full force and effect during the term of this Sublease, the Sublessee's own policies of general liability insurance and property damage/casualty insurance in such amounts as may be mutually agreed between the Sublessor and the Sublessee, under which policies the Sublessor and the Landlord shall be named an additional insureds and the insurers shall agree to indemnify and hold the Sublessor and the Landlord harmless from and against all costs, expenses or liability arising out of all claims, accidents, injuries or damages caused to any person or property during the Sublease Term in or about the Subleased Premises and relating to the actions or omissions of the Sublessee and/or its agents or invitees (other than those damages caused by the grossly negligent or intentional conduct of the Sublessor and/or the Landlord and/or their respective agents or invitees).  The Sublessee also shall keep and maintain, at the Sublessee's sole expense, professional liability insurance coverage of not less than One Million Dollars ($1,000,000.00) per claim/occurrence, and Three Million Dollars ($3,000,000.00) per annual aggregate, insuring all aspects of the Sublessee's and its professionals' practice within the Subleased Premises (including all professional services rendered by the Sublessee's employees or agents therein).  If the foregoing professional liability insurance coverage shall, at any time during the term of this Sublease, be provided pursuant to a policy of insurance written on a "claims made" basis, then and in such event, the Sublessee shall be required to pay for and maintain such "tail/prior acts" coverage as shall be necessary to continue the Sublessee's malpractice insurance coverage with respect to any malpractice claims that might be made against the Sublessee subsequent to the termination of the Sublessee's "claims made" policy and that relate to any acts or omissions of the Sublessee or its employees or agents within the Subleased Premises that occurred at any time during the term of this Sublease.  The Sublessee also shall maintain workers' compensation insurance coverage with respect to the services furnished by the Sublessee's employees within the Subleased Premises, in amounts not less than the minimum coverage levels required by applicable law.  The foregoing insurance policies shall provide that they may not be canceled or amended without at least thirty (30) days prior written notice to each insured or indemnified party.  The Sublessee shall furnish the Sublessor with certificates evidencing the foregoing insurance coverages, upon the Sublessor's request.

G.    Late Charges.  In the event the Sublessee fails to pay any installment of Rent within five (5) days after the date when due, the Sublessee shall pay, along with the delinquent installment of Rent, an additional payment in the amount of five percent (5%) of the delinquent Rent as a late charge in order to defray the Sublessor's costs and expenses incurred in collection of the delinquent installment ("Late Charges").  Payment of any Late Charges shall be in addition to, and not in lieu of, any and all other rights and remedies available to the Sublessor under this Sublease, at law or in equity.

H.    No Accord and Satisfaction.  Any payment by the Sublessee or acceptance by the Sublessor of a lesser amount of Rent than is due shall be treated solely as a payment on account and not as an accord and satisfaction, regardless of any endorsement or statement that such lesser amount is payment in full.

4

I.     Fair Market Rental Payments.  The Parties acknowledge and agree that the Rent under this Sublease was arrived at through good faith and arms-length negotiations, and is consistent with the fair market rental value of the Subleased Premises for general commercial purposes, not taking into account the Sublessee's intended use of the Subleased Premises or reflecting any additional value that either Party attributes to the proximity or convenience of referral sources.  The Parties also expressly acknowledge and agree that neither Party is obligated or expected to refer patients to the other Party, that no portion or purpose of the Rent (or any other arrangements between the Parties) is intended to induce or reward such referrals, and that the arrangements described in this Sublease are commercially reasonable even if no referrals are made between the Parties.

5.     Use of Subleased Premises.

A.     Permitted Use.  The Sublessee shall use the Subleased Premises solely for the following Permitted Use: such shall be for physical therapy which incorporates the following subservices: gait training, balance training, postural analysis, movement analysis, manual therapy, neuromuscular reeducation, therapeutic exercise, therapeutic activities, aquatic therapy, joint mobilizations, electro therapy modalities, hydrotherapy and physical agents, and related selfcare, injury prevention and occupational therapy, that are within the Exclusive Use of the Subleased Premises under the Lease (the "Permitted Use or "Exclusive Use").  The Sublessee shall not use nor permit any use of the Subleased Premises: (i) for other than for the Permitted Use; (ii) in violation of the Lease or this Sublease; or (iii) in any manner that would cause any increase in premium for any insurance which the Landlord and/or the Sublessor may then have in effect with respect to the Demised Premises.

B.     Excluded Use.  Such shall be any use for medical office and clinical uses, ambulatory surgery, radiation oncology, dialysis, and hyperbaric oxygen therapy; heath, sport and/or fitness club and health or wellness center. Sublessor, consistent with the rights of the Landlord under the Lease, shall have the right to add additional uses to supplement the Excluded Uses by written notice to Sublessee. Notwithstanding anything to the contrary contained in the Lease, the term "Excluded Use" shall not be deemed to include the Permitted Use.

C.     Compliance with Laws.  In occupying and conducting its business at the Subleased Premises, the Sublessee shall fully comply with all applicable federal, New Jersey and local governmental statutes, rules, regulations, ordinances, codes, permits, licenses and approvals, the Lease, including the Rules and Regulations Rider to the Lease, and this Sublease (collectively, "Applicable Laws").

D.     Acceptance of Subleased Premises.  The Sublessee acknowledges that the Sublessee has inspected the Subleased Premises, is fully familiar with its physical condition and has agreed to sublease the Subleased Premises in "as is" condition and not in reliance upon any representation, express or implied, made by the Sublessor or any of its representatives, regarding the conditions, suitability, habitability, fitness for purpose, or its compliance with any laws, regulations or ordinances, including, without limitation, the Americans Against Disabilities Act of 1991, as Amended.

6.     No Assignment of Sublease.  The Sublessee shall not, whether voluntarily or involuntarily, assign, sublease, mortgage, pledge or otherwise encumber this Sublease or the Subleased Premises, in whole or in part, at any time without the prior written consent of the Landlord and the Sublessor, which

5

consent may be withheld by the Landlord and/or the Sublessor in its sole and unfettered discretion. The Sublessor shall have the right, in its sole discretion, to assign this Sublease, subject only to the terms of the Lease, including the prior written consent of the Landlord.

7. **Maintenance and Repair of Subleased Premises; No Liens**.

    A.     <u>Additional Improvements, Maintenance and Repairs</u>. During the Sublease Term, the Sublessee shall maintain the Subleased Premises in accordance with the terms and conditions of the Lease, this Sublease and all Applicable Laws. The Sublessee shall not perform any alterations or improvements of any nature whatsoever to the Subleased Premises, including non-structural improvements, without the prior written consent of the Sublessor and the Landlord, which consent may be withheld by the Landlord and/or the Sublessor in its sole and unfettered discretion.

    B.     <u>Liens</u>. In the event the Subleased Premises becomes subject to any construction lien resulting from labor or material furnished, or claimed to have been furnished, to the Sublessee in connection with the Subleased Premises, the Sublessee shall remove or discharge the lien, at its sole cost and expense, within ten (10) days after the Sublessee receives notice of the lien. If the Sublessee fails to do so, the Sublessor shall have the right, but not the obligation, to pay the amount required to discharge the lien without inquiring into its validity, in which event such amount shall become Additional Rent due and payable with the next installment of Base Rent.

    C.     <u>Disposition of Improvements</u>. Upon the expiration or earlier termination of this Sublease, all of the property that is affixed to, or otherwise constitutes fixtures at, the Subleased Premises shall become the property of the Sublessor and shall remain at the Subleased Premises unless the Sublessor provides written notice to the Sublessee requiring the Sublessee to remove such fixtures. In that event, the Sublessee shall promptly remove the fixtures and shall leave the Subleased Premises in substantially the same condition as at the Commencement Date.

8.     **Indemnification**. The Sublessee shall defend, indemnify, and hold the Sublessor and Landlord, its owners, officers, directors, employees, representatives and agents, successors and assigns (collectively, its "<u>Agents</u>"), harmless from and against all claims, causes of actions, liabilities, costs and expenses of any nature whatsoever, including reasonable attorneys' fees and disbursements (collectively, "<u>Claims</u>"), arising out of or relating to: (i) the Sublessee's failure to fully satisfy all of its obligations under, or fully comply with each of the terms and conditions of, this Sublease, including any Event of Default (as defined below); (ii) any misrepresentation made by the Sublessee in this Sublease; or (iii) any act or omission by the Sublessee that results in a breach by the Sublessor of any of its obligations under the Lease or an increase in the Sublessor's obligations under the Lease.

9.     **Defaults by the Sublessee**. The occurrence of any of the following events shall constitute an event of default by the Sublessee under this Sublease (an "<u>Event of Default</u>"):

    A.     The Sublessee fails to pay any installment of Rent on or prior to the date when due;

    B.     The Sublessee fails to fully satisfy, when due, any other of its obligations under, or violates or breaches any of the terms, conditions or provisions of, this Sublease, and does not satisfy

such obligation or cure such breach to the sole satisfaction of the Sublessor within fifteen (15) days after delivery to the Sublessee of notice thereof;

C.    The Sublessee files a petition in voluntary bankruptcy under the United States Bankruptcy Code or any similar state or federal law;

D.    Involuntary proceedings are filed against the Sublessee under the United States Bankruptcy Code or any similar state or federal law and such proceedings are not vacated or stayed within sixty (60) days after the filing or if the Sublessee files an answer to the proceedings admitting insolvency or inability to pay its debts; or

E.    The Sublessee: (i) makes an assignment for the benefit of creditors; (ii) admits in writing its inability to pay its debts generally as they become due; (iii) consents to the appointment of a receiver or trustee or liquidator of all or the major part of its property or the Subleased Premises; or (iv) a trustee or receiver is appointed for the Sublessee or its property and is not discharged within sixty (60) days.

10.    **Sublessor's Remedies**.  Upon an Event of Default, the Sublessor shall have all of the following rights and remedies, each of which is in addition to, and not in lieu of, the others:

A.    To seek specific performance by the Sublessee of any of its obligations under this Sublease;

B.    Without releasing the Sublessee from any of its obligations to fully perform all of its covenants, conditions and agreements under this Sublease, to cure the Event of Default at the Sublessee's cost, which cost shall become Additional Rent immediately due from Sublessee, including, in addition to any Late Charges, interest which shall accrue at twelve percent (12%) per annum on any unpaid amount until paid, in full ("Default Interest");

C.    To terminate this Sublease by written notice to the Sublessee and to recover as damages the full amount of Rent due under this Sublease for the remainder of the Sublease Term, which at the Sublessor's option, shall be accelerated and be due and payable at once, including: (i) the amount of the Additional Rent reasonably estimated by the Sublessor due for the remainder of the Sublease Term; (ii) the reasonably incurred actual cost of restoring the Subleased Premises to good condition, normal wear and tear excepted; (iii) all amounts due from, but unpaid by, the Sublessee under this Sublease arising prior to the date of termination; and (iv) the Sublessor's actual costs of recovering possession of the Subleased Premises, including reasonable attorneys' fees, court costs and disbursements; and

D.    To exercise any other right or remedy available to the Sublessor under this Sublease or available at law or in equity.

11.    **Surrender**.  Upon the expiration or earlier termination of this Sublease, the Sublessee shall surrender to the Sublessor the Subleased Premises in good order and condition, ordinary wear and tear excepted, in vacant and broom-clean condition.  The Sublessor shall have the right upon or at any time after the expiration or termination of this Sublease to, without notice, enter upon and reenter the Subleased Premises and possess and repossess the same by force, summary proceedings, ejectment or otherwise and remove the Sublessee and all other persons and property from the Subleased Premises and

7

to re-let the Subleased Premises on any terms it elects and to receive and retain all rental income. The Sublessee shall, prior to the expiration or termination of this Sublease, remove from the Subleased Premises all of its property, including all equipment and moveable trade fixtures (excluding any property that constitutes fixtures unless directed by the Sublessor pursuant to Section 7.C., above), and promptly repair any damage caused by such removal. If it fails to do so, the Sublessor may, at its option, treat such property as having been relinquished and abandoned by the Sublessee, in which event the property shall become the property of the Sublessor as if Sublessee had never owned or otherwise had any interest in such items.

12. **Holding Over**. If the Sublessee fails to vacate the Subleased Premises upon the expiration or earlier termination of this Sublease, the Sublessee shall be deemed to be in possession of the Subleased Premises on a month-to-month tenancy subject to the terms and conditions of this Sublease, except that the Base Rent shall be two hundred percent (200%) of the Base Rent then payable under this Sublease. The acceptance of Rent pursuant to a holdover tenancy shall not constitute or be deemed as a waiver by the Sublessor of any rights of reentry set forth in this Sublease or as a renewal of this Sublease.

13. **Statements by Sublessor and Sublessee**. Each Party shall, at any time and from time to time, upon not less than ten (10) days' prior written notice, execute, acknowledge and deliver to the other Party, a statement in writing certifying that: (i) this Sublease is unmodified and in full force and effect (or, if there have been modifications, a statement that this Sublease is in full force and effect as modified and stating the modifications); (ii) the dates to which the Rent and any other sums payable under this Sublease have been paid; (iii) whether or not, to the knowledge of such Party, there then exist any defaults or Events of Default under this Sublease or any events which, with the giving of notice or the passage of time, or both, would constitute a default or an Event of Default under this Sublease (and, if so, specifying the same); and (iv) such other information confirming the status of existing provisions of the Sublease as the other Party may reasonably require.

14. **Common Areas**. The Sublessee, its employees and invitees, shall have the non-exclusive right, in common with others, to use any common entrances, lobbies, drivers, elevators, stairs and similar access and service ways in and adjacent to the Building, as well as the parking areas provided by the Landlord, subject to the rules and reasonable regulations adopted by the Landlord.

15. Omitted.

16. **Security Deposit**. The Parties agree that the following security deposit of $ 0.00 shall be required under this Sublease. Under such circumstances where Sublessee is late with the Rent, in whole or part, two (2) consecutive months or three (3) times during any twelve (12) month period the Sublessor may require and demand Sublessee deposit with Sublessor a security deposit equal to one and one-half (1 ½) months of Base Rent. Sublessor may deposit and use any such security deposit without segregating such money.

17. **Subordination to Lease**. This Sublease and all rights of the Sublessee under this Sublease are in all respects subject and subordinate to the Lease and to all of the terms, covenants and conditions of the Lease, and to all easements, mortgages, encumbrances and other rights now affecting the Lease or the Landlord's rights in the Building. The foregoing provisions shall be self-operative and no further instrument of subordination shall be necessary, unless required by the Landlord, in which event the

8

Sublessee shall, on demand, at any time or times, to execute, acknowledge and deliver to the Landlord, any and all instruments that may be reasonably requested to confirm the subordination of this Sublease, and all rights of the Sublessee under this Sublease, to the Lease.

18.  **Signage.**    Sublessee shall have no rights to install any signage in, on or around the premises under this Sublease and the Sublessee is not permitted to assume those rights from Sublessor. Sublessee will not be permitted, authorized or allowed at any time to install signage on the property, unless such requests by Sublessee are authorized in writing by Landlord, which Landlord may deny such request at any time for any reason, whether such denials are deemed to be reasonable or unreasonable. The right to allow for the installation of any signage rests fully at the discretion of the Landlord, neither Sublessor nor Sublessee shall be permitted to supersede this right. In the event that Landlord agrees to allow Sublessee to install signage in and around the Premises, Sublessor and Sublessee shall be jointly and severally responsible for all costs associated with the installation of the signage, including but not limited to any repairs, governmental approvals, maintenance, damages or expenses associated with the installation of said signage. Both Sublessor and Sublessee, by signing this agreement, agree to this provision and will be required to pay any and all of Landlord's legal costs, damages or fees in the event of litigation of this matter. This legal costs, damages or fees will be borne jointly and severally by the Sublessee and Sublessor irrespective of the outcome of said litigation. This provision is not to be construed to mean that Landlord must allow Sublessee to install signage in and around the Premises, the Landlord may reject this request for any reason, whether reasonable or unreasonable.

19.  **Modification of Premises.** Sublessee shall not be permitted to make any modifications to the premises, without prior written approval from Landlord. Sublessee shall not have any rights to make any modifications or changes in, on or around the premises under this Sublease and in no event is the Sublessee permitted to assume similar rights from the Sublessor. Sublessee will not be permitted, authorized or allowed to make any physical changes to the Premises, unless such requests for modifications to the premises are authorized in writing by Landlord, which Landlord may deny such request at any time for any reason, whether such denials are deemed to be reasonable or unreasonable. The right to allow for any physical modifications of the Premises rests fully at the discretion of the Landlord, neither Sublessor nor Sublessee shall be permitted to supersede this right. In the event that Landlord agrees to allow Sublessee to make physical modifications to the Premises, Sublessor and Sublessee shall be jointly and severally responsible for all costs associated with the installation of any modifications to the Premises, including but not limited to any repairs, governmental approvals, maintenance, damages or expenses associated with the installation of said modifications to the Premises. Both Sublessor and Sublessee, by signing this agreement, agree to this provision and will be required to pay any and all of Landlord's legal costs, damages or fees in the event of litigation of this matter. This legal costs, damages or fees will be borne jointly and severally by the Sublessee and Sublessor irrespective of the outcome of said litigation. This provision is not to be construed to mean that Landlord must allow Sublessee to install signage in and around the Premises, the Landlord may reject this request for any reason, whether reasonable or unreasonable.

20. **Miscellaneous.**

    A.    <u>Notices</u>. All notices required or permitted to be given under this Sublease shall be in writing and delivered by hand delivery, overnight courier or certified mail to the address of the Party set forth in the introductory paragraph of this Sublease.

    B.    <u>Governing Law</u>. This Sublease is subject to, and shall be governed by and construed in accordance with, the laws of the State of New Jersey without regard to its principles of conflict of laws.

    C.    <u>Construction</u>. This Sublease has been negotiated by the Parties and its interpretation shall not be construed against either Party as a result of its having drafted this Sublease.

    D.    <u>Entire Agreement</u>. This Sublease and all Exhibits constitute the entire understanding of the Parties with regard to its subject matter and it may not be modified or altered except in writing by the Parties.

    E.    <u>Partial Invalidity</u>. If any term or provision of this Sublease shall be held invalid or unenforceable by a court of competent jurisdiction, the remaining terms and provisions of this Sublease shall not be affected and shall be valid and enforceable to the fullest extent permitted by law.

    F.    <u>Binding Agreement</u>. This Sublease shall be binding upon and shall inure to the benefit of each Party and its respective successors and permitted assigns.

    G.    <u>Counterparts; Signatures</u>. This Sublease may be executed in any number of counterparts and/or by facsimile or electronic signature.

    H.    <u>Meaning of Including</u>. Whenever used in this Sublease the term "including" shall be deemed to mean "including, but not limited to."

    I.    <u>Waiver of Jury Trial; Attorneys' Fees</u>. It is mutually agreed by and between Sublessor and Sublessee that (A) they hereby waive trial by jury in any action, proceeding or counter-claim brought by either of the parties hereto against the other on any matter whatsoever arising out of or in any way connected with this Sublease and/or the Lease, the relationship of sublessor and sublessee, Sublessor's use or occupancy of the Exclusive Use Premises and/or Premises or claim of injury or damage, and (B) in any action arising hereunder, the reasonable attorneys' fees and costs of the prevailing party will be paid by the other party to the action.

    J.    <u>Choice of Law</u>. This Sublease has been executed and delivered in the State of New Jersey and shall be construed in accordance with the laws of the State of New Jersey. Any action brought to enforce or interpret this Sublease and/or Lease shall be brought in the court of appropriate jurisdiction in the county in which the Building is located. Should any provision of this Sublease and/or Lease require judicial interpretation, it is agreed that the court interpreting or considering same shall not apply the presumption that the terms hereof shall be more strictly construed against a party by reason of the rule or conclusion that a document should be construed more strictly against the party who itself through its agent prepared the same. It is agreed and stipulated that all parties hereto have participated equally in the

preparation of this Sublease and that legal counsel was consulted by each responsible party before the execution of this Sublease.

**K.    No Recordation.** This Sublease shall not be recorded in whole or in Memorandum form by either party hereto without the prior written consent of the other and the Landlord.

**L.    Time is of the Essence.** Time is of the essence of this Sublease and the Lease with respect to the performance by the parties of all of their obligations hereunder.

**M.    Conflict with Lease.** In the event of any conflict between the provisions of the Lease and this Sublease, the Lease shall govern and control except to the extent directly contradicted by the terms of this Sublease.

**N.    Pre-condition/Contingency.** The Lease requires that Sublessor obtain the consent of Landlord to any subletting by Sublessor. This Sublease shall not be effective unless and until Landlord signs a consent to this subletting satisfactory to Sublessor.

**IN WITNESS WHEREOF,** the Parties have executed this Sublease as of the Effective Date.

WITNESS:                                    SUBLESSOR:

                                            PERFORMANCE SPINE AND SPORTS
                                            MEDICINE OF BORDENTOWN, LLC

                                            By:
Name:                                       Name/Title:

                                            SUBLESSEE:

                                            PT ADMINISTRATIVE SERVICES, LLC

                                            By:
Name:                                       Name/Title:
                                            EVP, Project Agreement

CONSENT BY LANDLORD SIGNATURE ON SUNSEQUENT PAGE

11

## CONSENT BY LANDLORD

By executing below, the Landlord hereby consents, pursuant to Section 24 of the Lease, to the sublease of the Subleased Premises to the Sublessee in accordance with the terms and conditions of this Sublease.

Further, Landlord also hereby consents, pursuant to Section 24 of the Lease, to the additional sublease of the Subleased Premises to JAG Physical Therapy, LLC ("Sublessee #2"), with an address at 900 Route 9 North, Suite 410, Woodbridge, New Jersey 07095, a wholly owned subsidiary of the Sublessee, in accordance with the terms and conditions of this Sublease and the Lease. Sublessee #2 signs in the space set forth hereinbelow acknowledging its acceptance of the Sublease and its obligations thereunder.

WITNESS:

Name: _____

K JOHNSON URBAN RENEWAL LLC

By: _____

Dated: June _//_, 2019


SUBLESSEE #2:

JAG Physical Therapy, LLC

By: _____

Name/Title: _____ , EJP

Dated: June ___, 2019

Name: _____

12

## Exhibit "A"

### Agreement of Lease

[attached]

13

## Exhibit "B"

### Subleased Premises

[attached]

14

# EXHIBIT E

## SUBLEASE AGREEMENT

. **THIS SUBLEASE AGREEMENT** (this "Sublease") is made and entered into effective as of January 3[ , 2020 (the "Effective Date") by and between **PERFORMANCE SPINE AND SPORTS MEDICINE OF BORDENTOWN, LLC**, a New Jersey limited liability company, having an address at 122 US Highway Route 130, 9500 K. Johnson Boulevard, Building F, 2nd Floor Bordentown, New Jersey 08505 (the "Sublessor"); and **Richard J Daniels, MD, PA** having an address at 9500 K. Johnson Boulevard #3, Bordentown, New Jersey 08505 (the "Sublessee"); and together with the Sublessor, each, a "Party" and collectively, the "Parties"). Capitalized terms that are used but otherwise undefined in this Sublease shall have the meaning ascribed to them in the Lease and all amendments thereto (as defined below).

## BACKGROUND

A.     Pursuant to the Agreement of Lease, dated January 16, 2012, First Amendment to Lease dated April 25, 20113, and Second Amendment to Lease executed on January 20, 2020 between Landlord and Sublessor, all by and between K Johnson Urban Renewal LLC (the "Landlord") and the Sublessor, copies of which are collectively attached to this Sublease as **Exhibit "A"** (collectively the "Lease"), the Sublessor leases from the Landlord 16,000 square feet of rentable space (the "Premises"), after allocating for common areas, in the building located at 9500 K. Johnson Boulevard, Building F, Bordentown, New Jersey 08505 (the "Building").

B.     Sublessor entered into a Sublease Agreement dated June 12, 2019 between Sublessor and PT Administrative Services, LLC, for five thousand (5,000) square feet of the Premises.

C.     The Sublessee desires to sublease from the Sublessor the Subleased Premises (a defined in section 1, below), and the Sublessor is willing to sublease the Subleased Premises to the Sublessee, upon the terms and subject to the conditions set forth in this Sublease.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained in this Sublease and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereby agree as follows:

## TERMS

1.     **Agreement to Sublease**.

A.     **Sublease of Subleased Premises**.  Subject at all times to the terms and conditions of the Lease, the Sublessor hereby subleases to the Sublessee during the Sublease Term (as defined in Section 2, below) and the Sublessee hereby subleases from the Sublessor, that portion of the Premises shown as the cross-hatched area on the diagram attached to this Sublease as **Exhibit "B"** (the "Exclusive Subleased Premises"), which consists of approximately one thousand (1,000) square feet of rentable space, all in accordance with the terms and conditions of this Sublease.  The Sublessee shall abide by all of the terms and conditions of the Lease, except as modified by the terms of the Sublease with respect to

its obligations to the Sublessor, and shall neither do not permit anything to be done that would breach any obligation of, or cause a default by, the Sublessor under the Lease. The Sublessor hereby represents and warrants that the Lease is in full force and effect and that the Sublessor is, and covenants that it shall be, on and as of the Commencement Date (as defined below), in material compliance with its obligations under the Lease, and the Sublessor represents that it has received no notice of any default or breach by Sublessor of any of its obligations under the Lease. Sublessee will have no rights to enforce any terms of the Lease between Sublessor and Landlord. Sublessee shall be bound by all terms of the Lease but will have no remedy against Landlord. All rights associated with the Lease shall remain the rights of the Sublessor and Landlord. At no time is this sublease to be considered, construed, altered or interpreted as an assumption of the rights of Sublessor by Sublessee

B.    <u>Non-Exclusive Use of Shared Spaces</u>. In connection with this Sublease of the Subleased Premises, during the Sublease Term the Sublessee shall be permitted to use as a courtesy without additional Rent, on a non-exclusive basis, and in accordance with the terms of this Sublease, the following areas of the Premises,: (i) second floor kitchen; and, (ii) second floor conference room, subordinate to the use thereof by the Sublessor (collectively, the "<u>Shared Space</u>"), together with the Exclusive Subleased Premises, collectively, the "<u>Subleased Premises</u>").

2.    <u>Term</u>.

A.    <u>Initial Term</u>. The term of this Sublease shall be for an initial period of twelve (12) months commencing February 1, 2020 (the "<u>Initial Term</u>") and shall not automatically renew. Further, the Option to Purchase as more particularly described in Rider B of the Lease shall remain the sole right of the Sublessor and the Sublessee shall have no right therein.

3.    <u>Termination of Sublease Upon Termination of Lease</u>.

A.    <u>Automatic Termination</u>. If, for any reason, the Lease is terminated, this Sublease shall automatically terminate effective the date of such termination, and neither Party shall have any further obligations to the other under this Sublease except with regard to any unsatisfied obligations that arose during the Sublease Term and those which, under the express terms of this Sublease, survive the expiration or other termination of this Sublease.

B.    <u>Termination On Notice</u>. This Lease shall terminate upon thirty (30) days Notice by Sublessor to Sublessee, effective sixty (60) days following the date of such Notice. This Lease shall terminate upon thirty (30) days Notice by Sublessee to Sublessor, effective sixty (60) days following the date of such Notice.

C.    <u>Termination Upon Termination of Permitted Use</u>. Should Landlord terminate the Permitted Use described in paragraph 5.A. hereof and as consistently described in paragraph 1 of the Second Amendment to The Lease, the within Sublease Agreement shall forthwith terminate contemporaneously with the termination of the Permitted Use.

D.    <u>No Liability</u>. Unless the termination of this Sublease is due to a default by the Sublessor under the Lease which does not arise from the Sublessee's breach of any of the terms or conditions of, or

2



its failure to perform any of its obligations under, this Sublease, the Sublessee shall have no claim against the Sublessor by reason of such termination.

4.  **Rent.**

    A.    **Base Rent.** During the Sublease Term, the Sublessee shall pay to the Sublessor the current annual base rent of $18,450.00 in twelve (12) equal current monthly installments of $1,537.50, of the Basic Lease Provisions and Definitions of the Lease (the "Base Rent"); and, together with the Additional Rent (as defined below), the "Rent", equal to its proportionate share of the Annual Rent payable by the Sublessor under the Lease, which shall be equal to six and one quarter (6.25%) percent of the Annual Rent (its "Proportionate Share" of the Premises), based on the percentage of the Premises (rentable square feet) exclusively used by either Party that constitutes the Exclusive Subleased Premises (i.e., 1,000 rentable square feet divided by 16,000 rentable square feet, which latter amount represents the sum of the Exclusive Subleased Premises (rentable square feet) and the approximate amount of the rentable square feet within the Premises that will be exclusively used by the Sublessor after giving effect to this Sublease (i.e., 1,000 rentable square feet). Sublessor will advise Sublessee, in writing and in advance of the corresponding due date, of the actual monthly Rent amount (including Base Rent and Additional Rent) that is due and payable by Sublessee hereunder, including any subsequent changes to such monthly Rent amount.

    B.    **Payment of Base Rent.** The Base Rent shall be due and payable to the Sublessor in advance on the first (1st) day of each calendar month of the Sublease Term without any prior demand, offset or deduction of any kind whatsoever. If the Commencement Date occurs on a day other than the first day of a month, the Base Rent shall be prorated for such month.

    C.    **Additional Rent.** The Sublessee acknowledges and agrees that the Lease is triple net to the Landlord and it is the Parties' mutual intention that, as between the Sublessor and the Sublessee, the Sublessee shall, in addition to the Base Rent, be responsible for, and shall pay to the Sublessor as "Additional Rent", its Proportionate Share of the Additional Rent based on its Proportionate Share of the Premises or six and one quarter (6.25%) percent, including without limitation, Premises Tax, Sublessor's Building Proportionate Share, Sublessor's Complex Proportionate Share, Sublessor's Proportionate Tax Share, Sublessor's Share, Real Estate Taxes, Operating Expenses, Sublessor's Expense Payment, repairs and maintenance, all as more specifically defined in, and in accordance with the terms and conditions of, the Lease.

    D.    **Audit.** Sublessor shall have all rights of audit under this Sublease as set forth in and under the terms and conditions of Section 8.c. of the Lease. Sublessee shall have no rights of audit under this Sublease and in no way can assume those rights from Sublessor. Sublessee will not be permitted, authorized or allowed at any time to review, gain possession or have access to any of the materials provided in an audit requested by Sublessor, unless such access are permitted in writing by Landlord, which Landlord may deny such request at any time for any reason, whether deemed to be reasonable or unreasonable. This right is fully at the discretion of the Landlord, neither Sublessor nor Sublessee shall be permitted to supersede this right. Both Sublessor and Sublessee, by signing this agreement, agree to this provision and will be required to pay any and all of Landlord's legal costs, damages or fees in the event of litigation of this matter. This legal costs, damages or fees will be borne by the Sublessee and Sublessor irrespective of the outcome of said litigation.

3



E.  **Payment of Additional Rent**.  The Sublessee shall pay to the Sublessor in monthly installments on the first day of each month its Proportionate Share of the Additional Rent based on the estimated payments for such items due from the Sublessor to Landlord under the Lease.  The Sublessee shall pay to the Sublessor, within ten (10) days after receipt by the Sublessor of each End of Year Expense Statement, its Proportionate Share of any amounts due from the Sublessor to Landlord under the Lease, due to the fact that the estimated payments were less than the actual amount due.  Any excess amount paid shall be applied to the next installment of Additional Rent due or, if the Term has expired, the Sublessor shall pay the Sublessee its Proportionate Share of such excess amount.

F.  **Insurance, Utilities and Other Services**.  The Sublessee shall also be responsible to pay as Additional Rent its Proportionate Share of (i) omitted; and (ii) any utility or other service that is separately billed to the Premises, including without limitation, office cleaning.  Payment of the foregoing shall be due within ten (10) days of delivery to the Sublessee of a copy of the invoice for such service.  In addition, if requested by the Sublessor, the Sublessee agrees to maintain in full force and effect during the term of this Sublease, its own policies of general liability insurance and property damage/casualty insurance in such amounts as may be mutually agreed between the Sublessor and the Sublessee, under which policies the Sublessor and the Landlord shall be named an additional insureds and the insurers shall agree to indemnify and hold the Sublessor and the Landlord harmless from and against all costs, expenses or liability arising out of all claims, accidents, injuries or damages caused to any person or property during the Sublease Term in or about the Subleased Premises and relating to the actions or omissions of the Sublessee and/or its agents or invitees (other than those damages caused by the grossly negligent or intentional conduct of the Sublessor and/or the Landlord and/or their respective agents or invitees).  The Sublessee also shall keep and maintain, at the Sublessee's sole expense, professional liability insurance coverage of not less than One Million Dollars ($1,000,000.00) per claim/occurrence, and Three Million Dollars ($3,000,000.00) per annual aggregate, insuring all aspects of the Sublessee's and its professionals' practice within the Subleased Premises (including all professional services rendered by the Sublessee's employees or agents therein).  If the foregoing professional liability insurance coverage shall, at any time during the term of this Sublease, be provided pursuant to a policy of insurance written on a "claims made" basis, then and in such event, the Sublessee shall be required to pay for and maintain such "tail/prior acts" coverage as shall be necessary to continue the Sublessee's malpractice insurance coverage with respect to any malpractice claims that might be made against the Sublessee subsequent to the termination of the Sublessee's "claims made" policy and that relate to any acts or omissions of the Sublessee or its employees or agents within the Subleased Premises that occurred at any time during the term of this Sublease.  The Sublessee also shall maintain workers' compensation insurance coverage with respect to the services furnished by the Sublessee's employees within the Subleased Premises, in amounts not less than the minimum coverage levels required by applicable law.  The foregoing insurance policies shall provide that they may not be canceled or amended without at least thirty (30) days prior written notice to each insured or indemnified party.  The Sublessee shall furnish the Sublessor with certificates evidencing the foregoing insurance coverages, upon the Sublessor's request.

G.  **Late Charges**.  In the event the Sublessee fails to pay any installment of Rent within five (5) days after the date when due, the Sublessee shall pay, along with the delinquent installment of Rent, an additional payment in the amount of five percent (5%) of the delinquent Rent as a late charge in order to defray the Sublessor's costs and expenses incurred in collection of the delinquent installment ("Late

4

Charges"). Payment of any Late Charges shall be in addition to, and not in lieu of, any and all other rights and remedies available to the Sublessor under this Sublease, at law or in equity.

H.    No Accord and Satisfaction.  Any payment by the Sublessee or acceptance by the Sublessor of a lesser amount of Rent than is due shall be treated solely as a payment on account and not as an accord and satisfaction, regardless of any endorsement or statement that such lesser amount is payment in full.

I.    Fair Market Rental Payments.  The Parties acknowledge and agree that the Rent under this Sublease was arrived at through good faith and arms-length negotiations, and is consistent with the fair market rental value of the Subleased Premises for general commercial purposes, not taking into account the Sublessee's intended use of the Subleased Premises or reflecting any additional value that either Party attributes to the proximity or convenience of referral sources. The Parties also expressly acknowledge and agree that neither Party is obligated or expected to refer patients to the other Party, that no portion or purpose of the Rent (or any other arrangements between the Parties) is intended to induce or reward such referrals, and that the arrangements described in this Sublease are commercially reasonable even if no referrals are made between the Parties.

5.    **Use of Subleased Premises.**

A.    Permitted Use(s).  The Sublessee shall use the Subleased Premises solely for the following Permitted Use(s): In addition to the Permitted Use(s) outlined in Paragraph U of the Lease Preamble, Permitted Use shall mean use of the Premises and Leased Premises for the following, Varicose Vein Treatment, noninvasive skin tightening procedures, noninvasive subcutaneous fat removal, medial and cosmetic, including but not ,limited to RF closure, EVLT, Ambulatory Phlebectomy as well as treatment of spider veins using surface laser and visual sclerotherapy (the "Permitted Use" NOT EXCLUSIVE USE). For the avoidance of doubt the Permitted Use is not an Exclusive Use. The Sublessee shall not use nor permit any use of the Subleased Premises: (i) for other than for the Permitted Use; (ii) in violation of the Lease or this Sublease; or (iii) in any manner that would cause any increase in premium for any insurance which the Landlord and/or the Sublessor may then have in effect with respect to the Subleased Premises and/or Premises.

B.    Termination of Permitted Use.  Landlord as well as Sublessor will be permitted to sublease Premises and other office space, respectively, to other sublessees and prospective tenants, respectively, who perform and/or have substantially similar and/or identical practices. Furthermore, Landlord or Sublessor may revoke the Permitted Uses outlined in Paragraph 5.A. of this Sublease Agreement at any time upon thirty (30) days written Notice to Sublessee. Upon receipt of thirty (30) day written Notice from Sublessor, Sublessee shall cease performing all Permitted Uses outlined in Paragraph 5.A. on or before the thirty first (31 st) day after receipt of said written Notice. In the event Sublessor fails to cease said Permitted Uses after receipt of written Notice, Sublessor will be permitted to proceed with appropriate legal action to enforce the terms of this Sublease Agreement and the terms of the Second Amendment to Lease and Sublessor will be responsible for expenses and damages incurred by Sublessor and Landlord in enforcing the terms of this Sublease Agreement and the Second amendment to Lease, including but not limited to attorneys' fees, court costs, compensatory damages, general damages, property damage, nominal damages and expenses not here listed by Sublessor in enforcing this Sublease Agreement.



5

C.     Excluded Use. Such shall be any use for medical office and clinical uses, ambulatory surgery, radiation oncology, dialysis, and hyperbaric oxygen therapy; heath, sport and/or fitness club; and health or wellness center, physical therapy which incorporates the following subservices: gait training, balance training, postural analysis, movement analysis, manual therapy, neuromuscular reeducation, therapeutic exercise, therapeutic activities, aquatic therapy, joint mobilizations, electro therapy modalities, hydrotherapy and physical agents, and related selfcare, injury prevention and occupational therapy; medical services which incorporates nonsurgical orthopedics, minimally invasive fluoroscopic procedures, pain management, interventional pain management, sports medicine, chiropractic, acupuncture, electro diagnostic studies, nerve conduction velocity studies, physical medicine and rehabilitation, regenerative medicine; which incorporates but not limited to the following subservices: Stem Cell Therapy, Platelet Rich Plasma (PRP), and percutaneous tenotomies and/or focused aspiration of soft tissue for Achilles tendonitis or plantar fasciitis. Sublessor, consistent with the rights of the Landlord under the Lease, shall have the right to add additional uses to supplement the Excluded Uses by written notice to Sublessee. Notwithstanding anything to the contrary contained in the Lease, the term "Excluded Use" shall not be deemed to include the Permitted Use.

D.     Compliance with Laws. In occupying and conducting its business at the Subleased Premises, the Sublessee shall fully comply with all applicable federal, New Jersey and local governmental statutes, rules, regulations, ordinances, codes, permits, licenses and approvals, the Lease, including the Rules and Regulations Rider to the Lease, and this Sublease (collectively, "Applicable Laws").

E.     Acceptance of Subleased Premises. The Sublessee acknowledges that the Sublessee has inspected the Subleased Premises, is fully familiar with its physical condition and has agreed to sublease the Subleased Premises in "as is" condition and not in reliance upon any representation, express or implied, made by the Sublessor or any of its representatives, regarding the conditions, suitability, habitability, fitness for purpose, or its compliance with any laws, regulations or ordinances, including, without limitation, the Americans Against Disabilities Act of 1991, as Amended.

6.     No Assignment of Sublease. The Sublessee shall not, whether voluntarily or involuntarily, assign, sublease, mortgage, pledge or otherwise encumber this Sublease or the Subleased Premises, in whole or in part, at any time without the prior written consent of the Landlord and the Sublessor, which consent may be withheld by the Landlord and/or the Sublessor in its sole and unfettered discretion. The Sublessor shall have the right, in its sole discretion, to assign this Sublease, subject only to the terms of the Lease, including the prior written consent of the Landlord.

7.     Maintenance and Repair of Subleased Premises; No Liens.

A.     Additional Improvements, Maintenance and Repairs. During the Sublease Term, the Sublessee shall maintain the Subleased Premises in accordance with the terms and conditions of the Lease, this Sublease and all Applicable Laws. The Sublessee shall not perform any alterations or improvements of any nature whatsoever to the Subleased Premises, including non-structural improvements, without the prior written consent of the Sublessor and the Landlord, which consent may be withheld by the Landlord and/or the Sublessor in its sole and unfettered discretion.

6



B.    **Liens**.  In the event the Subleased Premises becomes subject to any construction lien resulting from labor or material furnished, or claimed to have been furnished, to the Sublessee in connection with the Subleased Premises, the Sublessee shall remove or discharge the lien, at its sole cost and expense, within ten (10) days after the Sublessee receives notice of the lien.  If the Sublessee fails to do so, the Sublessor shall have the right, but not the obligation, to pay the amount required to discharge the lien without inquiring into its validity, in which event such amount shall become Additional Rent due and payable with the next installment of Base Rent.

C.    **Disposition of Improvements**.  Upon the expiration or earlier termination of this Sublease, all of the property that is affixed to, or otherwise constitutes fixtures at, the Subleased Premises shall become the property of the Sublessor and shall remain at the Subleased Premises unless the Sublessor provides written notice to the Sublessee requiring the Sublessee to remove such fixtures. In that event, the Sublessee shall promptly remove the fixtures and shall leave the Subleased Premises in substantially the same condition as at the Commencement Date.

8.    **Indemnification**.  The Sublessee shall defend, indemnify, and hold the Sublessor and Landlord, its owners, officers, directors, employees, representatives and agents, successors and assigns (collectively, its "Agents"), harmless from and against all claims, causes of actions, liabilities, costs and expenses of any nature whatsoever, including reasonable attorneys' fees and disbursements (collectively, "Claims"), arising out of or relating to: (i) the Sublessee's failure to fully satisfy all of its obligations under, or fully comply with each of the terms and conditions of, this Sublease, including any Event of Default (as defined below); (ii) any misrepresentation made by the Sublessee in this Sublease; or (iii) any act or omission by the Sublessee that results in a breach by the Sublessor of any of its obligations under the Lease or an increase in the Sublessor's obligations under the Lease.

9.    **Defaults by the Sublessee**.  The occurrence of any of the following events shall constitute an event of default by the Sublessee under this Sublease (an "Event of Default"):

A.    The Sublessee fails to pay any installment of Rent on or prior to the date when due;

B.    The Sublessee fails to fully satisfy, when due, any other of its obligations under, or violates or breaches any of the terms, conditions or provisions of, this Sublease, and does not satisfy such obligation or cure such breach to the sole satisfaction of the Sublessor within fifteen (15) days after delivery to the Sublessee of notice thereof;

C.    The Sublessee files a petition in voluntary bankruptcy under the United States Bankruptcy Code or any similar state or federal law;

D.    Involuntary proceedings are filed against the Sublessee under the United States Bankruptcy Code or any similar state or federal law and such proceedings are not vacated or stayed within sixty (60) days after the filing or if the Sublessee files an answer to the proceedings admitting insolvency or inability to pay its debts; or

E.    The Sublessee: (i) makes an assignment for the benefit of creditors; (ii) admits in writing its inability to pay its debts generally as they become due; (iii) consents to the appointment of a receiver

7

or trustee or liquidator of all or the major part of its property or the Subleased Premises; or (iv) a trustee or receiver is appointed for the Sublessee or its property and is not discharged within sixty (60) days.

10.   **Sublessor's Remedies**.  Upon an Event of Default, the Sublessor shall have all of the following rights and remedies, each of which is in addition to, and not in lieu of, the others:

A.   To seek specific performance by the Sublessee of any of its obligations under this Sublease;

B.   Without releasing the Sublessee from any of its obligations to fully perform all of its covenants, conditions and agreements under this Sublease, to cure the Event of Default at the Sublessee's cost, which cost shall become Additional Rent immediately due from Sublessee, including in addition to any Late Charges, interest which shall accrue at twelve percent (12%) per annum on any unpaid amount until paid, in full ("Default Interest");

C.   To terminate this Sublease by written notice to the Sublessee and to recover as damages the full amount of Rent due under this Sublease for the remainder of the Sublease Term, which at the Sublessor's option, shall be accelerated and be due and payable at once, including: (i) the amount of the Additional Rent reasonably estimated by the Sublessor due for the remainder of the Sublease Term; (ii) the reasonably incurred actual cost of restoring the Subleased Premises to good condition, normal wear and tear excepted; (iii) all amounts due from, but unpaid by, the Sublessee under this Sublease arising prior to the date of termination; and (iv) the Sublessor's actual costs of recovering possession of the Subleased Premises, including reasonable attorneys' fees, court costs and disbursements; and

D.   To exercise any other right or remedy available to the Sublessor under this Sublease or available at law or in equity.

11.   **Surrender**.  Upon the expiration or earlier termination of this Sublease, the Sublessee shall surrender to the Sublessor the Subleased Premises in good order and condition, ordinary wear and tear excepted, in vacant and broom-clean condition.  The Sublessor shall have the right upon or at any time after the expiration or termination of this Sublease to, without notice, enter upon and reenter the Subleased Premises and possess and repossess the same by force, summary proceedings, ejectment or otherwise and remove the Sublessee and all other persons and property from the Subleased Premises and to re-let the Subleased Premises on any terms it elects and to receive and retain all rental income.  The Sublessee shall, prior to the expiration or termination of this Sublease, remove from the Subleased Premises all of its property, including all equipment and moveable trade fixtures (excluding any property that constitutes fixtures unless directed by the Sublessor pursuant to Section 7.C., above), and promptly repair any damage caused by such removal.  If it fails to do so, the Sublessor may, at its option, treat such property as having been relinquished and abandoned by the Sublessee, in which event the property shall become the property of the Sublessor as if Sublessee had never owned or otherwise had any interest in such items.

12.   **Holding Over**.  If the Sublessee fails to vacate the Subleased Premises upon the expiration or earlier termination of this Sublease, the Sublessee shall be deemed to be in possession of the Subleased Premises on a month-to-month tenancy subject to the terms and conditions of this Sublease, except that the Base Rent shall be two hundred percent (200%) of the Base Rent then payable under this Sublease.

8



The acceptance of Rent pursuant to a holdover tenancy shall not constitute or be deemed as a waiver by the Sublessor of any rights of reentry set forth in this Sublease or as a renewal of this Sublease.

13. **Statements by Sublessor and Sublessee.** Each Party shall, at any time and from time to time, upon not less than ten (10) days' prior written notice, execute, acknowledge and deliver to the other Party, a statement in writing certifying that: (i) this Sublease is unmodified and in full force and effect (or, if there have been modifications, a statement that this Sublease is in full force and effect as modified and stating the modifications); (ii) the dates to which the Rent and any other sums payable under this Sublease have been paid; (iii) whether or not, to the knowledge of such Party, there then exist any defaults or Events of Default under this Sublease or any events which, with the giving of notice or the passage of time, or both, would constitute a default or an Event of Default under this Sublease (and, if so, specifying the same); and (iv) such other information confirming the status of existing provisions of the Sublease as the other Party may reasonably require.

14. **Common Areas.** The Sublessee, its employees and invitees, shall have the non-exclusive right, in common with others, to use any common entrances, lobbies, drivers, elevators, stairs and similar access and service ways in and adjacent to the Building, as well as the parking areas provided by the Landlord, subject to the rules and reasonable regulations adopted by the Landlord.

15. Intentionally Omitted.

16. **Security Deposit.** The Parties agree that the following security deposit of $ 0.00 shall be required under this Sublease. Under such circumstances where Sublessee is late with the Rent, in whole or part, two (2) consecutive months or three (3) times during any twelve (12) month period the Sublessor may require and demand Sublessee deposit with Sublessor a security deposit equal to one and one-half (1 ½) months of Base Rent. Sublessor may deposit and use any such security deposit without segregating such money.

17. **Subordination to Lease.** This Sublease and all rights of the Sublessee under this Sublease are in all respects subject and subordinate to the Lease and to all of the terms, covenants and conditions of the Lease, and to all easements, mortgages, encumbrances and other rights now affecting the Lease or the Landlord's rights in the Building. The foregoing provisions shall be self-operative and no further instrument of subordination shall be necessary, unless required by the Landlord, in which event the Sublessee shall, on demand, at any time or times, to execute, acknowledge and deliver to the Landlord, any and all instruments that may be reasonably requested to confirm the subordination of this Sublease, and all rights of the Sublessee under this Sublease, to the Lease.

18. **Signage.** Sublessee shall have no rights to install any signage in, on or around the premises under this Sublease and the Sublessee is not permitted to assume those rights from Sublessor. Sublessee will not be permitted, authorized or allowed at any time to install signage on the property, unless such requests by Sublessee are authorized in writing by Landlord, which Landlord may deny such request at any time for any reason, whether such denials are deemed to be reasonable or unreasonable. The right to allow for the installation of any signage rests fully at the discretion of the Landlord, neither Sublessor nor Sublessee shall be permitted to supersede this right. In the event that Landlord agrees to allow Sublessee to install signage in and around the Premises, Sublessor and Sublessee shall be jointly and severally responsible for all costs associated with the installation of the signage, including but not

9



limited to any repairs, governmental approvals, maintenance, damages or expenses associated with the installation of said signage. Both Sublessor and Sublessee, by signing this agreement, agree to this provision and will be required to pay any and all of Landlord's legal costs, damages or fees in the event of litigation of this matter. This legal costs, damages or fees will be borne jointly and severally by the Sublessee and Sublessor irrespective of the outcome of said litigation. This provision is not to be construed to mean that Landlord must allow Sublessee to install signage in and around the Premises, the Landlord may reject this request for any reason, whether reasonable or unreasonable.

19.   **Modification of Premises**. Sublessee shall not be permitted to make any modifications to the premises, without prior written approval from Landlord. Sublessee shall not have any rights to make any modifications or changes in, on or around the premises under this Sublease and in no event is the Sublessee permitted to assume similar rights from the Sublessor. Sublessee will not be permitted, authorized or allowed to make any physical changes to the Premises, unless such requests for modifications to the premises are authorized in writing by Landlord, which Landlord may deny such request at any time for any reason, whether such denials are deemed to be reasonable or unreasonable. The right to allow for any physical modifications of the Premises rests fully at the discretion of the Landlord, neither Sublessor nor Sublessee shall be permitted to supersede this right. In the event that Landlord agrees to allow Sublessee to make physical modifications to the Premises. Sublessor and Sublessee shall be jointly and severally responsible for all costs associated with the installation of any modifications to the Premises, including but not limited to any repairs, governmental approvals, maintenance, damages or expenses associated with the installation of said modifications to the Premises. Both Sublessor and Sublessee, by signing this agreement, agree to this provision and will be required to pay any and all of Landlord's legal costs, damages or fees in the event of litigation of this matter. This legal costs, damages or fees will be borne jointly and severally by the Sublessee and Sublessor irrespective of the outcome of said litigation. This provision is not to be construed to mean that Landlord must allow Sublessee to install signage in and around the Premises, the Landlord may reject this request for any reason, whether reasonable or unreasonable.

20.   **Miscellaneous**.

A.   **Notices**. All notices required or permitted to be given under this Sublease shall be in writing and delivered by hand delivery, overnight courier or certified mail to the address of the Party set forth in the introductory paragraph of this Sublease.

B.   **Governing Law**. This Sublease is subject to, and shall be governed by and construed in accordance with, the laws of the State of New Jersey without regard to its principles of conflict of laws.

C.   **Construction**. This Sublease has been negotiated by the Parties and its interpretation shall not be construed against either Party as a result of its having drafted this Sublease.

D.   **Entire Agreement**. This Sublease and all Exhibits constitute the entire understanding of the Parties with regard to its subject matter and it may not be modified or altered except in writing by the Parties.

E. **Partial Invalidity**. If any term or provision of this Sublease shall be held invalid or unenforceable by a court of competent jurisdiction, the remaining terms and provisions of this Sublease shall not be affected and shall be valid and enforceable to the fullest extent permitted by law.

F. **Binding Agreement**. This Sublease shall be binding upon and shall inure to the benefit of each Party and its respective successors and permitted assigns.

G. **Counterparts; Signatures**. This Sublease may be executed in any number of counterparts and/or by facsimile or electronic signature.

H. **Meaning of Including**. Whenever used in this Sublease the term "including" shall be deemed to mean "including, but not limited to."

I. **Waiver of Jury Trial; Attorneys' Fees**. It is mutually agreed by and between Sublessor and Sublessee that (A) they hereby waive trial by jury in any action, proceeding or counter-claim brought by either of the parties hereto against the other on any matter whatsoever arising out of or in any way connected with this Sublease and/or the Lease, the relationship of sublessor and sublessee, Sublessor's use or occupancy of the Exclusive Use Premises and/or Premises or claim of injury or damage, and (B) in any action arising hereunder, the reasonable attorneys' fees and costs of the prevailing party will be paid by the other party to the action.

J. **Choice of Law**. This Sublease has been executed and delivered in the State of New Jersey and shall be construed in accordance with the laws of the State of New Jersey. Any action brought to enforce or interpret this Sublease and/or Lease shall be brought in the court of appropriate jurisdiction in the county in which the Building is located. Should any provision of this Sublease and/or Lease require judicial interpretation, it is agreed that the court interpreting or considering same shall not apply the presumption that the terms hereof shall be more strictly construed against a party by reason of the rule or conclusion that a document should be construed more strictly against the party who itself through its agent prepared the same. It is agreed and stipulated that all parties hereto have participated equally in the preparation of this Sublease and that legal counsel was consulted by each responsible party before the execution of this Sublease.

K. **No Recordation**. This Sublease shall not be recorded in whole or in Memorandum form by either party hereto without the prior written consent of the other and the Landlord.

L. **Time is of the Essence**. Time is of the essence of this Sublease and the Lease with respect to the performance by the parties of all of their obligations hereunder.

M. **Conflict with Lease**. In the event of any conflict between the provisions of the Lease and this Sublease, the Lease shall govern and control except to the extent directly contradicted by the terms of this Sublease.

N. **Pre-condition/Contingency**. The Lease requires that Sublessor obtain the consent of Landlord to any subletting by Sublessor. This Sublease shall not be effective unless and until Landlord signs a consent to this subletting satisfactory to Sublessor.



[REMAINDER OF THIS PAGE IS LEFT BLANK WITH SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, the Parties have executed this Sublease as of the Effective Date.

WITNESS:                                    SUBLESSOR:

                                            PERFORMANCE SPINE AND SPORTS
                                            MEDICINE OF BORDENTOWN, LLC

                                            By: _____
_____               Name/Title:
Name:

                                            SUBLESSEE:
                                            Richard J. Daniels, MD PA
                                            Rick Daniels MD, PA

                                            By: _____  President
_____               Name/Title:
Name:

[CONSENT BY LANDLORD SIGNATURE ON SUBSEQUENT PAGE]

12

## CONSENT BY LANDLORD

By executing below, the Landlord hereby consents, pursuant to Section 24 of the Lease, to the sublease of the Subleased Premises to the Sublessee in accordance with the terms and conditions of this Sublease.

Further, Landlord also hereby consents, pursuant to Section 24 of the Lease, to the additional sublease of the Subleased Premises to Rick Daniels MD ("Sublessee #2"), with an address at 9500 K. Johnson Blvd #3, Bordentown, NJ 08505, in accordance with the terms and conditions of this Sublease and the Lease. Sublessee #2 signs in the space set forth hereinbelow acknowledging its acceptance of the Sublease and its obligations thereunder.

WITNESS:                                    K JOHNSON URBAN RENEWAL LLC

_____        By: _____

Name:                                        Dated: January ___, 2020   March 4, 2020

                                             SUBLESSEE #2:
                                             Richard J. *Davich, MD PA*
                                             ~~Rick Daniels MD,~~ PA

_____        By: _____  *President*

Name:                                        Name/Title:
                                             Dated: January ___, 2020

13

# Exhibit "A"

## Agreement of Lease with First and Second Amendments

[attached]

14

# Exhibit "B"

## Subleased Premises

### [attached]



15

**ACORD**

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
02/27/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| AUTOMATIC DATA PROCESSING INS/PAC<br>76250815<br>71 HANOVER ROAD<br>FLORHAM PARK NJ 07932 | PHONE (A/C, No, Ext): (800) 524-7024 | | FAX (A/C, No): (800) 524-4013 |
| | E-MAIL ADDRESS: | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A: Sentinel Insurance Company Ltd. | | 11000 |
| INSURED<br>RICHARD J DANIELS, MD PC<br>27712 MOUNT PLEASANT RD<br>COLUMBUS NJ 08022-9705 | INSURER B: | | |
| | INSURER C: | | |
| | INSURER D: | | |
| | INSURER E: | | |
| | INSURER F: | | |

**COVERAGES**     **CERTIFICATE NUMBER:**     **REVISION NUMBER:**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | COMMERCIAL GENERAL LIABILITY<br>CLAIMS-MADE [X] OCCUR<br>[X] General Liability | X | | 76 SBW IV9454 | 09/28/2019 | 09/28/2020 | EACH OCCURRENCE | $2,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $1,000,000 |
| | | | | | | | MED EXP (Any one person) | $10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $2,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER:<br>POLICY [ ] PRO-JECT [ ] [X] LOC<br>OTHER: | | | | | | GENERAL AGGREGATE | $4,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $4,000,000 |
| | | | | | | | | |
| | AUTOMOBILE LIABILITY<br>ANY AUTO<br>ALL OWNED AUTOS / SCHEDULED AUTOS<br>HIRED AUTOS / NON-OWNED AUTOS | | | | | | COMBINED SINGLE LIMIT (Ea accident) | |
| | | | | | | | BODILY INJURY (Per person) | |
| | | | | | | | BODILY INJURY (Per accident) | |
| | | | | | | | PROPERTY DAMAGE (Per accident) | |
| | | | | | | | | |
| | UMBRELLA LIAB OCCUR<br>EXCESS LIAB CLAIMS-MADE<br>DED [ ] RETENTION $ | | | | | | EACH OCCURRENCE | |
| | | | | | | | AGGREGATE | |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? Y/N<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | | | | | PER STATUTE / OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | |
| A | EMPLOYMENT PRACTICES LIABILITY | | | 76 SBW IV9454 | 09/28/2019 | 09/28/2020 | Each Claim Limit | $10,000 |
| | | | | | | | Aggregate Limit | $10,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

Those usual to the Insured's Operations. Certificate Holder is an Additional Insured per the Business Liability Coverage Form SS0008 attached to this policy, and the Additional Insured- Manager/Lessor endorsement.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| K Johnson PROPERTY MANAGEMENT GRP, LLC<br>K Johnson Urban Renewal, LLC<br>K JOHNSON ENTERPRISES.LLC<br>9500 K JOHNSON BLVD<br>BORDENTOWN NJ 08505-2264 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>*Susan L. Castaneda* |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)     The ACORD name and logo are registered marks of ACORD

# EXHIBIT F

K. Johnson Urban Renewal
9500 K. Johnson Blvd.
Bordentown, NJ  08505
(609)298-0085
info@kjohnsonenterprises.com

# INVOICE

**BILL TO**
Mr. Percy Naranjo
PSSM
9500 K. Johnson Blvd.
Bordentown, NJ  08505

**INVOICE #** 2021-02
**DATE** 02/01/2021
**DUE DATE** 02/01/2021
**TERMS** Due on receipt

| DESCRIPTION | AMOUNT |
|---|---|
| **Base Rent - PSSM** <br> Base Rent - Building F | 24,600.00 |
| **CAM - PSSM** <br> CAM expense estimate 2021 | 4,040.00 |
| **CAM - Pilot** <br> CAM - Pilot Program portion | 2,369.76 |
| **CAM - Property Tax** <br> CAM - land tax portion | 667.91 |
| **MGMT FEE - PSSM** <br> Management Fee | 544.00 |
| **Utilities - PSSM** <br> PSE&G FL1 (December 25th-January 26th) | 1,650.48 |
| **Utilities - PSSM** <br> PSE&G FL2 (December 25th-January 26th) | 839.22 |

**BALANCE DUE**     **$34,711.37**

# EXHIBIT G



# K JOHNSON
## ENTERPRISES

### TENANT DIRECTION LETTER

February 15, 2021

**VIA ELECTRONIC MAIL**

Performance Spine & Sports Medicine
Ms. Brook Wadenpfuhl
Practice Administrator
9500 K. Johnson Blvd.
Bordentown, NJ 08505

**Re:** **Lease dated July 16, 2012 between K Johnson Urban Renewal LLC, as Landlord, and Performance Spine & Sports Medicine, as Tenant (the "Lease"), concerning premises known as Block 57, Lot 6, Bordentown Township, Burlington County, New Jersey (the "Property")**

Dear Madam:

As noted by the above-referenced Lease, an increase in the monthly installment of fixed base rent shall increase to the amount of $24,600.00, commencing on January 1, 2021. Please make payments payable to KJohnson Urban Renewal.

Please note that it has come to our attention that a specific notification of increasing the rental rate pursuant to the lease agreement was not provided for 2020. As there is a provision for Non-Waiver under Section 38(b), the Landlord has not waived its rights to the increase in 2020, which pursuant to the lease increases the rental rate from $278,240.00 per year in 2019 to $286,560.00 per year in 2020 pursuant to Section K of the lease. This results in an increase that was not billed in 2020 in the amount of $8,320.00. Therefore, currently, there are increases due and owing for all of 2020. Additionally, there is increased Fixed Basic Rent due and owing for January and February of 2021 in the amount of $2,826.66 as well as all rental other amounts due for February 2021. The total increased rental amounts due through February 2021 is equal to $11,146.66.

The instructions set forth herein are irrevocable and are not subject to modification in any manner, except by written notice from us.

Please call with any questions.

Sincerely,

KJOHNSON URBAN RENEWAL, LLC, a
New Jersey limited liability company

By: _____
Name: David P. Silber
Title: General Counsel



# KJOHNSON
## E N T E R P R I S E S

# NOTICE OF FAILURE TO PAY RENT

February 15, 2021

<u>**VIA ELECTRONIC MAIL ONLY (brook@performancepainhouston.com)**</u>
Performance Spine & Sports Medicine
Ms. Brook R. Wadenpfuhl
Practice Administrator
9500 K. Johnson Blvd.
Bordentown, NJ 08505

Dear Ms. Wadenpfuhl:

Pursuant to the July 16, 2012, Lease Agreement between K Johnson Urban Renewal, LLC, and Performance Spine & Sports Medicine, you are currently delinquent in your required monthly payments, which include payments for, Fixed Basic Rent (Section 6); Real Estate Taxes (Section 7); and Operating Expenses (Section 8).

Based on the invoice sent on February 1, 2021, the lease agreement dated, July 16, 2012, your monthly payments for Fixed Basic Rent (Section 6) and the updated invoice sent out on February 15, 2021 is Twenty-Four Thousand Six Hundred Dollars /100 ($24,600.00). This payment is due "on the first day of the calendar month." (See Section 6 of the Lease Agreement)

Based on the lease agreement dated, July 16, 2012, your monthly payments for Real Estate Taxes (Section 7) is Three Thousand Thirty-Seven Dollars 67/100 ($3,037.67). This payment is due "on the first day of each month...." (See Section 7(b)(1)(a) of the Lease Agreement).

Based on the lease agreement dated, July 16, 2012, your monthly payments for Operating Expenses (Section 8) is Seven Thousand Seventy-Three Dollars 70/100 ($7,073.70). This payment is due "on the first day of each month...." (See Section 8(b)(1)(a) of the Lease Agreement).

The total amount due for the Month of February 2021 was Thirty-Four Thousand Seven Hundred Eleven Dollars and 37/100 ($34,711.37). All payments for the month of February 2021 were and are delinquent. There is currently a balance due for the rent increase for the year of 2020 in the amount of Eight Thousand Three Hundred Twenty Dollars 00/100 ($8,320.00) and a balance due for the rent increase for January 2021 in the amount of One Thousand Four Hundred Thirteen Dollars 33/100 ($1,413.33). Currently, there is a total amount due and owing in the amount of Forty-Four Thousand Four Hundred Forty-Four Dollars 70/100 ($44,444.70).

At this time, you are in violation of the leasing agreement under Section 9 of the agreement. Pursuant to that section, the landlord is now entitled to charge a late payment charge of five percent (5%) plus "Any amount due from Tenant to Landlord which is not paid when due shall



bear interest at an interest rate equal to the Prime Rate published from time to time in the Money Rates column of the Wall Street Journal plus two percent (2%) (or if lower, the highest rate then allowed under the usury laws of the State of New Jersey)(the 'Interest Rate') from the date due until the date paid. The landlord has the right to proceed with these charges along with all rights and remedies listed in the contract under the Event of Default within the Leasing Agreement.

These rights and remedies include the termination of the Exclusive Use as defined under Section M of the lease, pursuant to Section 5 of the Lease Agreement, dated July 16, 2012. Further, Tenant is in default under Section 28(a)(1) of the lease in that they have failed to pay rent. As a result, Tenant has forfeited its rights of Exclusive Use under Section 5 of the lease due to the Event of Default. Landlord is now under no obligation to provide Tenant with its rights of Exclusive Use.

Please immediately remit all payments.

Thank you for your timely attention to this matter.


Sincerely,

KJOHNSON URBAN RENEWAL, LLC,
a New Jersey limited liability company

By: _____
     David P. Silber, Esq.

# EXHIBIT H

K. Johnson Urban Renewal
9500 K. Johnson Blvd.
Bordentown, NJ  08505
(609)298-0085
info@kjohnsonenterprises.com

# INVOICE

**BILL TO**
Mr. Percy Naranjo
PSSM
9500 K. Johnson Blvd.
Bordentown, NJ  08505

**INVOICE #** 2021-03
**DATE** 03/01/2021
**DUE DATE** 03/01/2021
**TERMS** Due on receipt

| DESCRIPTION | AMOUNT |
| --- | --- |
| **Base Rent - PSSM**<br>Base Rent - Building F | 24,600.00 |
| **CAM - PSSM**<br>CAM expense estimate 2021 | 4,040.00 |
| **CAM - Pilot**<br>CAM - Pilot Program portion | 2,369.76 |
| **CAM - Property Tax**<br>CAM - land tax portion | 667.91 |
| **MGMT FEE - PSSM**<br>Management Fee | 544.00 |
| **Utilities - PSSM**<br>PSE&G FL1 (January 27th-February 25th) | 1,825.78 |
| **Utilities - PSSM**<br>PSE&G FL2 (January 27th-February 25th) | 866.52 |

**BALANCE DUE**      **$34,913.97**

# EXHIBIT I

**dsilber@kjohnsonenterprises.com**

| | |
|---|---|
| **From:** | dsilber@kjohnsonenterprises.com |
| **Sent:** | Wednesday, February 24, 2021 4:32 PM |
| **To:** | 'Brook Wadenpfuhl' |
| **Cc:** | 'Pat Guzik'; 'Matthias H. Wiederholz, M.D.' |
| **Subject:** | RE: Rental Income/Bordentown |

Ms. Wadenpfuhl:

I have now called you on multiple occasions without a return phone call and sent you multiple e-mails. Your e-mail of February 19, 2021 is not a responsive e-mail. If a check for the outstanding rental balance is not received by Friday, February 26, 2021, then eviction proceedings will commence. To be clear this will include the removal of both your company and the companies PSSM has contracted with as Sub-Tenants, i.e. JAG One and Daniels Vein. Please provide payment immediately.

Very truly yours,

David P. Silber
KJohnson Enterprises, LLC
9500 KJohnson Blvd.
Bordentown, NJ 08505
P: 609-298-0085 Ext. 121
C: 908-246-6586

CONFIDENTIAL: This e-mail is intended only for the person to whom it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient is prohibited.

**From:** Brook Wadenpfuhl <Brook@performancepainhouston.com>
**Sent:** Friday, February 19, 2021 12:34 PM
**To:** dsilber@kjohnsonenterprises.com
**Cc:** 'Pat Guzik' <Pguzik@kjohnsonenterprises.com>; Matthias H. Wiederholz, M.D. <drw@performancepain.com>
**Subject:** RE: Rental Income/Bordentown

Yessir. I have received your emails and have responded. I am working on getting February rent.

I am in a meeting currently and cannot get to the phone.

I appreciate your understanding.

*Brook R. Wadenpfuhl*
Practice Administrator

1



Physical Medicine & Rehabilitation
Sports Medicine
Pain Management
Electrodiagnostic Medicine
Anti-Aging, Regenerative, and Functional Medicine



# *TEAM WORK MAKES THE DREAM WORK!*

**From:** dsilber@kjohnsonenterprises.com <dsilber@kjohnsonenterprises.com>
**Sent:** Friday, February 19, 2021 11:25 AM
**To:** Brook Wadenpfuhl <Brook@performancepainhouston.com>
**Cc:** 'Pat Guzik' <Pguzik@kjohnsonenterprises.com>; Matthias H. Wiederholz, M.D. <drw@performancepain.com>
**Subject:** RE: Rental Income/Bordentown

Brook,

I have now left two (2) messages at your office. The rent is now 19 days delinquent. We must have a conversation today to discuss this matter. Please immediately advise of a time you are available to speak.

Very truly yours,

David P. Silber
KJohnson Enterprises, LLC
9500 KJohnson Blvd.
Bordentown, NJ 08505
P: 609-298-0085 Ext. 121
C: 908-246-6586

CONFIDENTIAL: This e-mail is intended only for the person to whom it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient is prohibited.

**From:** Brook Wadenpfuhl <Brook@performancepainhouston.com>
**Sent:** Tuesday, February 16, 2021 5:01 PM
**To:** dsilber@kjohnsonenterprises.com
**Cc:** 'Pat Guzik' <Pguzik@kjohnsonenterprises.com>; Matthias H. Wiederholz, M.D. <drw@performancepain.com>
**Subject:** RE: Rental Income/Bordentown

David,

I am still working on February rent.

Thank you,

**Brook R. Wadenpfuhl**
Practice Administrator



Physical Medicine & Rehabilitation
Sports Medicine
Pain Management
Electrodiagnostic Medicine
Anti-Aging, Regenerative, and Functional Medicine



| HOUSTON, TX | RARITAN, NJ |
|---|---|
| 4126 Southwest Freeway, Suite 1700 | 903 US 202 South, Suite 2A |
| Houston, TX 77027 | Raritan, NJ 08869 |
| (346) 217-1111 (p) | (908) 751-0980 (p) |
| (346) 571-2189 (f) | (908) 704-7359 (f) |

www.performancepain.com



| LAWRENCEVILLE, NJ | EAST BRUNSWICK, NJ |
|---|---|
| 4056 Quakerbridge Road, Suite 111 | 555 Route 18 |
| Lawrenceville, NJ 08648 | East Brunswick, NJ 08816 |
| (609) 588-8600 (p) | (732) 955-9139 (p) |
| (609) 588-8602 (f) | (732) 387-8594 (f) |

www.performancepain.com



# *TEAM WORK MAKES THE DREAM WORK!*

**From:** dsilber@kjohnsonenterprises.com <dsilber@kjohnsonenterprises.com>
**Sent:** Monday, February 15, 2021 3:38 PM
**To:** Brook Wadenpfuhl <Brook@performancepainhouston.com>
**Cc:** 'Pat Guzik' <Pguzik@kjohnsonenterprises.com>; Matthias H. Wiederholz, M.D. <drw@performancepain.com>
**Subject:** Rental Income/Bordentown

Dear Ms. Wadenpfuhl:

3

Our offices were advised by Ms. Janice DeLellis to direct correspondance to you with respect to PSSM's outstanding rental payments at 9500 K Johnson Blvd., Bordentown, NJ 08505. Attached please find correspondance with respect to this matter. Please feel free to contact me to discuss this matter.

Very truly yours,

David P. Silber
KJohnson Enterprises, LLC
9500 KJohnson Blvd.
Bordentown, NJ 08505
P: 609-298-0085 Ext. 121
C: 908-246-6586

CONFIDENTIAL: This e-mail is intended only for the person to whom it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient is prohibited.

# EXHIBIT J

**Your filing has been successfully submitted.**

## Case details

| Court | Venue | Docket tpe | Case number |
|---|---|---|---|
| Special Civil Part | BURLINGTON | Suing for eviction of tenant | |

## Filing details

| Transaction ID | Filing date | Filing submitted by | Filing type |
|---|---|---|---|
| EP-576256 | 03/03/2021 | David P Silber | Complaint |

| Documents received | Filing fee | Additional fee(s) |
|---|---|---|
| pssmvercom.pdf | $50.00 | $9.00 |
| pssmltsummons.pdf | | |
| pssmltattorney cert.pdf | | |
| pssmltlcert.pdf | | |
| PSSM Lease Amandment.pdf | | |
| Lease Amendment executed by PSSM.pdf | | |
| 2_15_2021_ltr to PSSM regarding delinuqent rent.pdf | | |
| KJUR - PSSM (BLDG F) Rent & CAM Invoice 03-2021.pdf | | |
| KJUR - PSSM (BLDG F) Rent & CAM Invoice 02-2021.pdf | | |

## Payment details

| Payment type | Account number | Amount paid |
|---|---|---|
| Judiciary Account Charge System(JACS) | 148977 | $59.000 |

MiMi

**From:** JEDSDoNotReply.Mailbox@njcourts.gov
**Sent:** Wednesday, March 3, 2021 11:30 AM
**To:** David Silber; david.paul.silber@gmail.com
**Subject:** NJ JEDS Filing Confirmation - Special Civil Part Case

## Superior Court of New Jersey – Burlington County
The following was filed by David P Silber on 03/03/2021 at 11:29:59 AM :

| | |
|---|---|
| Case Caption: | Not available |
| Case Number: | Not available |
| Docket Text: | Complaint submitted by David P Silber, K Johnson Enterprises, Llc. JEDS EF-576256 |
| Transaction ID: | Not available |
| JEDS EF ID: | EF-576256 |

Documents Filed:

| Document Type | Document Description | File Name |
|---|---|---|
| Complaint | Complaint | pssmvercom.pdf |
| Tenancy summons and return of service | Tenancy summons and return of service | pssmltsummons.pdf |
| Other | Certification of Landlord's Attorney | pssmltattorney cert.pdf |
| Other | Certification of Landlord | pssmltllcert.pdf |
| Other | Lease with First Amendment | PSSM Lease Amandment.pdf |
| Other | 2nd Amendment to Lease | Lease Amendment executed by PSSM.pdf |
| Other | Delinquent Notice of 2/15/2020 | 2_15_2021_ltr to PSSM regarding delinuqent rent.pdf |
| Other | March 2021 Invoice | KJUR - PSSM (BLDG F) Rent & CAM Invoice 03-2021.pdf |

| Other | February 2021 Invoice | KJUR - PSSM (BLDG F) Rent & CAM Invoice 02-2021.pdf |

This email is for notification purposes only and was sent from a notification-only address that cannot accept incoming email. **Please do not reply to this message.**

Once processed by court staff, you will receive another email with information on how to view the filed copy of the document.

**NOTICE:** This is a public document, which means the document as submitted will be available to the public upon request. Therefore, do not enter personal identifiers on it, such as Social Security number, driver's license number, vehicle plate number, insurance policy number, active financial account number, active credit card number, or military status.

**Plaintiff or Filing Attorney Information:**

Name  David P. Silber, ESq.

NJ Attorney ID Number  013202010

Address  9500 K Johnson Boulevard
Bordentown, NJ 08505

Email  dsilber@kjohnsonenterprises.com

Telephone Number  609-298-0085 ext. 121

KJohnson Urban Renewal, LLC

_____ Plaintiff(s)

**versus**

Performance Spine and Sports Medicine,
LLC

_____ Defendant (s)

**Superior Court of New Jersey**
**Law Division, Special Civil Part**
**Burlington**          County

~~Burlington County Courts Facility~~
49 Rancocas Road
Mount Holly, NJ 0800

(609) 288-9500     ext.38093

**Docket Number: LT -** _____
(to be provided by the court)

**Civil Action**
**SUMMONS**
**LANDLORD/TENANT**

**Defendant Information:**

Name:  Performance Spine and Sports Medicine, L

Address:  4056 Quakerhridge Road
Lawrenceville, NJ 08648

Email  drw@performancepain.com

Phone:  609-373-2270

X  Nonpayment
___  Other
X  Commercial
___  Residential

**NOTICE TO TENANT: The purpose of the attached complaint is to permanently remove you and your belongings from the premises. You will be notified when a court proceeding is scheduled. Please contact the Office of the Special Civil Part at (609) 288-9500  ext. 38093 regarding your case. Please go to njcourts.gov for general information on landlord/tenant actions.**

If you cannot afford to pay for a lawyer, free legal advice may be available by contacting Legal Services at
 609-261-1088_____ . If you can afford to pay a lawyer but do not know one, you may call the Lawyer Referral Services of your local county Bar Association at  609-261-4862_____ .

You may be eligible for housing assistance. To determine your eligibility, you must immediately contact the welfare agency in your county at  Burlington County Human Services_____ , telephone number 609-2655800_____ .

If you need an interpreter or an accommodation for a disability, you must notify the court immediately.

Si ud. no tiene dinero para pagar a un abogado, es posible que pueda recibir consejos legales gratuitos si se comunica con Servicios Legales (Legal Services) al 609-261-1088_____ . Si tiene dinero para pagar a un abogado pero no conoce ninguno puede llamar a Servicios de Recomendación de Abogados (Lawyer Referral Services) del Colegio de Abogados (Bar Association) de su condado local al 609-261-4862_____ .

Es posible que pueda recibir asistencia con la vivienda si se comunica con la agencia de asistencia publica (welfare agency) de su condado al Burlington County Human Services_____ , telefono 609-2655800_____ .

Si necesita un interprete o alguna acomodación para un impedimento fisico, tiene que notificárselo inmediatamente al tribunal.

**Date:**  03/01/2021_____

_____
**Clerk of the Superior Court**

## COURT OFFICER'S RETURN OF SERVICE (FOR COURT USE ONLY)

Docket Number: _____ Date: _____ Time: _____

WM ____ WF ____ BM ____ BF__ OTHER _____ HT ____ WT _____ AGE ___ MUSTACHE ___ BEARD ___ GLASSES __

NAME: _____ RELATIONSHIP: __ _____

Efforts Made to Personally Serve _____

_____

Description of Premises if Posted _____

_____

I hereby certify the above to be true and accurate: _____

Special Civil Part Officer

Revised effective 07/14/2020 by 07/14/2020 Order, CN 10822 (Appendix XI-B)

## Appendix XI-X Verified Complaint - Nonpayment of Rent

**NOTICE:** This is a public document, which means the document as submitted will be available to the public upon request. Therefore, do not enter personal identifiers on it, such as Social Security number, driver's license number, vehicle plate number, insurance policy number, active financial account number, active credit card number or military status.

**Plaintiff or Filing Attorney Information:**

Name   David P. Silber

NJ Attorney ID Number 013202010

Address   9500 K Johnson Enterprises.com

Bordentown, NJ 08505

Email   dsilber@kjohnsonenterprises.com

Telephone Number 609-298-0085 ext 121

Superior Court of New Jersey
Law Division, Special Civil Part

Burlington ▼ County

Docket Number: LT _____

Civil Action

KJohnson Urban Renewal, LLC
                Name of Plaintiff(s)/Landlord(s),
                              v.

Performance Spine and Sports Medicine,
                Name of Defendant(s)/Tenant(s).

**Verified Complaint
Landlord/Tenant**

☒ Non-payment of Rent
☐ Other (Required Notices Attached)
☐ Commercial
☐ Residential

Address of Rental Premises: 9500 KJohnson Boulevard, Bordentwon, NJ 08505

Tenant's Phone Number: 346-271-1111                 .          Tenant's Email:  drw@performancepain.com                 .

1. The owner of record is (name of owner) KJohnson Urban Renewal, LLC                 .

2. Plaintiff is the owner or (check one) ☐ agent, ☐ assignee, ☐ grantee or ☐ prime tenant of the owner.

3. The landlord ☐ did  ☒ did not acquire ownership of the property from the tenant(s).

4. The landlord ☐ has  ☒ has not given the tenant(s) an option to purchase the property.

5. The tenant(s) now reside(s) in and has (have) been in possession of these premises since (date) 03/01/2021   , under (check one) ☒ written or ☐ oral agreement

6. ☐ Check here if the tenancy is subsidized pursuant to either a federal or state program or the rental unit is public housing.

7. The landlord has registered the leasehold and notified tenant as required by *N.J.S.A.* 46:8-27.

8. The amount that must be paid by the tenant(s) for these premises is $ 24,600.00 payable on the 1st   day of each ☒ month or ☐ week in advance.

## Complete Paragraphs 9A and 9B if Complaint is for Non-Payment of Rent

9A. There is due, unpaid and owing from tenant(s) to plaintiff/landlord rent as follows:

| $ | 24,600.00 | base rent for | February - 2021 | (specify the week or month) |
|---|---|---|---|---|
| $ | 24,600.00 | base rent for | March - 2021 | (specify the week or month) |
| $ | 29,956.07 | base rent for | Cam/Tax for Feb/Mar 2021/rent inc 2020/21 | (specify the week or month) |
| $ | 8,113.50 | late charge* for | 10.25% late fee per Section 9 of lease | (specify the week or month) |
| $ | | late charge* for | | (specify the week or month) |
| $ | | late charge* for | | (specify the week or month) |
| $ | 5,000.00 | attorney fees* | | |
| $ | | other* (specify) | | |

$ _____92,269.57_ TOTAL

\* The late charges, attorney fees and other charges are permitted to be charged as rent for purposes of this action by federal, state and local law (including rent control and rent leveling) and by the lease.

9B. The date that the next rent is due is (date) **04/01/2021** .

If this case is scheduled for trial before that date, the total amount you must pay to have this complaint dismissed is (Total from line 9A) $ **92,269.57** .

If this case is scheduled for trial on or after that date, the total amount you must pay to have this complaint dismissed is $ **126,980.94** .
(Total from line 9A plus the amount of the next rent due)

These amounts do not include late fees or attorney fees for Section 8 and public housing tenants. Payment may be made to the landlord or the clerk of the court at any time before the trial date, but on the trial date payment must be made by 4:30 p.m. to get the case dismissed.

Check Paragraphs 10 and 11 if the Complaint is for other than, or in addition to, Non-Payment of Rent. Attach All Notices to Cease and Notices to Quit/Demands For Possession.

10. ☐ Landlord seeks a judgment for possession for the additional or alternative reason(s) stated in the notices attached to this complaint. **State Reasons:** (Attach additional sheets if necessary.)

_____

_____

_____

_____

11. ☒ The tenant(s) has (have) not surrendered possession of the premises and tenant(s) hold(s) over and continue(s) in possession without the consent of landlord.

**WHEREFORE,** plaintiff/landlord demands judgment for possession against the tenant(s) listed above, together with costs

Dated: __03/01/2021__          S/David P. Silber, Esq.
                              (Signature of Filing Attorney or Landlord Pro Se)

                              David P. Silber, Esq.
                              (Printed or Typed Name of Attorney or Landlord Pro Se)

# Landlord Verification

1. I certify that I am the ☐ landlord, ☐ general partner of the partnership, or ☒ authorized officer of a corporation or limited liability company that owns the premises in which tenant(s) reside(s).

2. I have read the verified complaint and the information contained in it is true and based on my personal knowledge.

3. The matter in controversy is not the subject of any other court action or arbitration proceeding now pending or contemplated and no other parties should be joined in this action except (list exceptions or indicate none):
_____.

4. I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b).

5. The foregoing statements made by me are true and I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

At the trial plaintiff will require:

An interpreter ☐ Yes ☒ No   Indicate language _____

An accommodation for a disability ☐ Yes ☒ No   Required accommodation _____

Dated: 03/01/2021 _____

_____
(Signature of Landlord, Partner or Officer)

Kevin, L Johnson
_____
(Printed Name of Landlord, Partner or Officer)

**NOTICE**: This is a public document, which means the document as submitted will be available to the public upon request. Therefore, do not enter personal identifiers on it, such as Social Security number, driver's license number, vehicle plate number, insurance policy number, active financial account number, or active credit card number.

**Filing Attorney Information or Pro Se Litigant:**

Name  David P. Silber, ESq.

NJ Attorney ID Number 013202010

Address  9500 K Johnson Boulevard
Bordentown, NJ 080505

Telephone Number 609-298-0085 ext . 121

|  |
|---|
| Superior Court of New Jersey |
| Law Division, Special Civil Part |
| Burlington ▼ County |
| Docket Number: LT_____ |

K Johnson Urban Renewal, LLC_____,
                                    Plaintiff,

                    v.

_Performance Spine and Sports Medicine, L_____,
                                    Defendant.

Landlord-Tenant Division

**Certification by Landlord's Attorney**

1. I am the attorney for the landlord in this matter and make this certification pursuant to *Rule* 6:6-3(b) or *Rule* 6:6-4.

2. The landlord has asserted that the tenant has failed to pay rent now due and owing in this matter.

3. I have reviewed the applicable federal, state, and local law and the written lease between the parties, and in my opinion the charges and fees sought, other than the base rent, are permitted to be included in the rent for purposes of this action.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Date: 03/01/2021

Signature

David P. Silber, Esq.
Print Name

NOTICE: This is a public document, which means the document as submitted will be available to the public upon request. Therefore, do not enter personal identifiers on it, such as Social Security number, driver's license number, vehicle plate number, insurance policy number, active financial account number, or active credit card number.

**YOU MUST COMPLETE THIS PART: Filing Attorney Information or Landlord:**

Name <u>David P. Silber, Esq.</u>

NJ Attorney ID Number <u>013202010</u>

Address <u>9500 K Johnson Boulevard</u>
<u>Bordentown, NJ 08505</u>

Telephone Number <u>609-298-0085 ext. 121</u>

<u>K Johnson Urban Renewal, LLC</u> ,
Plaintiff,

v.

<u>Performance Spine and Sports Medicine, L</u> ,
Defendant.

Superior Court of New Jersey
Law Division, Special Civil Part
<u>Burlington</u> ▼ County
Landlord-Tenant Division
Docket Number: LT _____

Civil Action

**Certification by Landlord**

The landlord should complete Part A or Part B or both (if both apply). Cross out any paragraphs in those parts that do not apply in this case. Part C applies to all cases and must be completed.

## A. When the Eviction is Based on Unpaid Rent

1. The tenant has failed to pay rent now due and owing in the amount of $ <u>92,269.57</u> . That amount consists of basic rent of $ <u>49,200.00</u> , late charges of $ <u>8,113.50</u> , legal fees *relating to this action for eviction* of $ <u>5,000.00</u> , filing fees and costs of $ <u>56.00</u> , and other (specify) <u>29,956.07 - Cam/Tax and rent increase</u> .
2. All of the items listed above are included in the lease agreement as rent.
3. All of those items are permitted by applicable federal, state and local laws (including rent control or rent leveling, if applicable) to be charged as rent for purposes of this action.

## B. When the Eviction is Based on Other Grounds

Eviction is sought because:

_____

_____

## C. In All Cases

1. I have attached a copy of all notices that have been served on the tenant.
2. These notices were served on the tenant (select all that apply)
   ☐ by ordinary mail, ☐ by certified mail, ☒ personally, on <u>02/15/2021</u> .
3. All of the facts stated in the notices are true.
4. If I proceeded without an attorney, I certify that I own the property in my own name or in the name of a general partnership of which I am a partner.
5. I have complied with the registration requirements of *N.J.S.A.* 46:8-27 *et seq.*
6. The tenant did not transfer ownership to me and I have not given the tenant an option to buy the property.
7. The tenant is not in the military service of the United States nor any of its allies, nor is the premises used for dwelling purposes of the spouse, a child or other dependent of a person in the military service of the United States.

I, the landlord, certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Date: <u>03/01/2021</u>

Landlord Signature

Kevin Johnson
Print Name

Revised 9/1/2008, CN 10512-English (Appendix XI-T - Certification by Landlord)

91-21   03/18/2021 3:27:1



MERCER SPECIAL CIVIL PART 1ST FL
175 SOUTH BROAD STREET
PO BOX 8068
TRENTON NJ 08650

KJOHNSON URBAN RENEW
PERFORMANCE URBAN RE LLC

# Civil Case Information Statement

## Case Details: BURLINGTON | Civil Part Docket# L-000591-21

**Case Caption:** KJOHNSON URBAN RENEW AL, LLC  VS
PERFORMANCE SPIN

**Case Initiation Date:** 03/18/2021

**Attorney Name:** DAVID P SILBER

**Firm Name:** K JOHNSON ENTERPRISES, LLC

**Address:** 9500 KJOHNSON BLVD.
BORDENTOWN NJ 08505

**Phone:** 6092980085

**Name of Party:** PLAINTIFF : KJohnson Urban Renewal, LLC

**Name of Defendant's Primary Insurance Company**
**(if known):** Unknown

**Case Type:** CONTRACT/COMMERCIAL TRANSACTION

**Document Type:** Complaint

**Jury Demand:** NONE

**Is this a professional malpractice case?**  NO

**Related cases pending:** YES

**If yes, list docket numbers:** MER-LT-354-21 - Eviction 21-11786-KCF
- bankruptcy of related entity to Defendant

**Do you anticipate adding any parties (arising out of same
transaction or occurrence)?** YES

**Are sexual abuse claims alleged by:** KJohnson Urban Renewal,
LLC? NO

## THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE
### CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Business

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual
management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
**If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
**If yes, for what language:**

**Please check off each applicable category:** Putative Class Action? NO  Title 59? NO  Consumer Fraud? NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the
court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

03/18/2021
Dated

/s/ DAVID P SILBER
Signed