UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Caption in compliance with D.N.J. LBR 9004-1

**LANCIANO & ASSOCIATES, L.L.C.**
Larry E. Hardcastle, II, Esq. – Id No.:
025742010
2 Route 31 North
Pennington, New Jersey 08534
(609) 452-7100
lhardcastle@lancianolaw.com

| | |
|---|---|
| In Re: | Chapter 11 |
| PERFORMANCE SPINE & SPORTS MEDICINE OF BORDENTOWN, L.L.C. | Case No.: 21-11786 (KCF) |
| Debtor. | |
| KJHONSON URBAN RENEWAL, L.L.C. | Adversary No.: 21-01239 (KCF) |
| Plaintiff, | |
| vs. | |
| PERFORMANCE SPINE & SPORTS MEDICINE, L.L.C., | |
| Defendant. | |

I, David P. Silber, Esquire, declare that:

1. I am an attorney licensed to practice law in the State of New Jersey, I am Corporate Counsel for K Johnson Urban Renewal, LLC ("Plaintiff"). I make this declaration in support of the Plaintiff's motion to Remand.

2. I have been employed by the Plaintiff since September 1, 2017, and I declare that the following statements and records produced were maintained through the ordinary course of business.

## DECLARATION IN SUPPORT

3. In late 2009 to early 2010, Plaintiff and Performance Spine & Sports Medicine, LLC ("Defendant"), entered into negotiations with respect to Defendant leasing approximately 16,000 sq. ft. of space from Plaintiff for the project known as Team Campus located in Bordentown, NJ.

4. Defendant provided Plaintiff various of its financial records to induce Plaintiff to enter into a lease agreement with Defendant. **Exhibit 1 and Exhibit 2** are true and correct copies of said documents.

5. To further induce Plaintiff into entering into a lease with Defendant, Defendant provided copies of its 2009-2010 Day Sheet Summary Dated April 2, 2010. **Exhibit 3** is a true and correct copy of said document.

6. Defendant also provided copies of its 2009-2010 Profit & Loss statements dated April 2, 2010 and its income statement from that same time period. **Exhibit 4 and Exhibit 5** are true and correct copies of said documents.

7. Defendant created and used the logo attached as **Exhibit 6,** which logo still remains on the leased premises and state "Performance Spine & Sports Medicine."

8. On July 5, 2010, Defendant's then-counsel, Donna J. Wengiel of the Law Offices of Stuckert and Yates, assisted the Defendant in negotiating a lease with Plaintiff. **Exhibit 7** is a true and correct copy of said document. That letter identifies the client and contractual counterparty as Performance Spine & Sports Medicine, LLC. It further identifies its agent as Percy Naranjo, the then-Chief Financial Officer of Defendant. The letter neither identifies nor mentions Performance Spine and Sports of Bordentown, LLC ("Debtor") as the client or contractual counterparty.

9. On or about January 6, 2010, KJohnson Enterprises, LLC, an affiliate of Plaintiff, entered into a Letter of Intent ("LOI") with Defendant for the leasing of space. The LOI required that the

principals provide unconditional guarantees. That LOI does not mention the Debtor. **Exhibit 8** is a true and correct copy of that document.

10. On or about April 2, 2010, KJohnson Enterprises, LLC entered into a second LOI with Defendant. The Language is nearly identical to the first LOI and again states that the principals will provide unconditional guarantees. Again, that document does not mention the Debtor. **Exhibit 9** is a true and correct copy of that document.

11. On January 12, 2012, Plaintiff and Defendant entered into a lease ("Superseded Lease"). While Superseded Lease's cover page identifies the tenant as "Performance Spine and Sports Medicine of Bordentown, LLC," its operative provisions do not; it identifies the tenant as an "[Entity Controlled by Performance Spine and Sports Medicine]." Further, Section O of the Superseded Lease requires Defendant to execute an Unconditional Guarantee and Suretyship Agreement in the form attached thereto as Exhibit I. The signature page in Plaintiff's records is distinct from Defendant in that it is signed by Percy Naranjo, who is identified as the Defendant's Chief Executive Officer. **Exhibit 10** is a true and correct copy of said document. Further, Debtor could not have entered into the Superseded Lease on January 12, 2012, because it did not exist and would not be registered until June 14, 2013, eighteen months after the parties executed the Superseded Lease. **Exhibit 11** is a true and correct copy of Debtor's status report showing its registration date.

12. On July 16, 2012, Plaintiff and Defendant executed a second lease ("Operative Lease") thereby terminating the Superseded Lease. The only true difference is that Defendant's executing the Operative Lease on behalf of Defendant obviated the need for the Unconditional Guarantee and Suretyship Agreement referenced in Section O of the Superseded Lease, so it deleted that

reference. Attached as Exhibit A to Defendant's Notice of Removal from pages 13 to 83 is a true and correct copy of the Operative Lease.

13. On or about April 13, 2013, Defendant entered into an Architectural Agreement with Architects J.R. Bernlohr for the Architectural work associated with the design for the leased premises. That agreement was signed by Percy Naranjo as an officer of the Defendant. **Exhibit 12** is a true and correct copy of that document.

14. On or about April 22, 2013, Defendant entered into a Development/Management agreement with K Johnson Enterprises, LLC for the Development/Management of the leased premises. **Exhibit 13** is a true and correct copy of said document.

15. On or about April 25, 2013, a First Amendment to the Lease was signed. Although it was signed by Debtor, Debtor still did not exist as a legal entity. *Compare* Silber Decl. Exhibit 11 (showing a registration date of June 14, 2013) *with* Silber Decl. Exhibit 14 (showing an execution date of April 25, 2013). **Exhibit 14** is a true and correct copy of said document.

16. On or about May 13, 2013, Defendant received an invoice for construction services in the amount of $13,333.33, which it paid. **See Exhibit 15.**

17. On or about June 14, 2013, Plaintiff issued Defendant an invoice for construction services in the amount of $13,333.33, which Defendant paid. **Exhibit 16** is a true and correct copy of said document.

18. On or about July 15, 2013, Plaintiff issued Defendant an invoice for construction services in the amount of $13,333.33, which it paid. **Exhibit 17** is a true and correct copy of said document.

19. On or about August 15, 2013, Plaintiff issued Defendant an invoice for construction services in the amount of $13,333.33, which it paid. **Exhibit 18** is a true and correct copy of said document.

4

20. On or about September 15, 2013, Plaintiff issued Defendant an invoice for construction services in the amount of $13,333.33, which it paid. **Exhibit 19** is a true and correct copy of said document.

21. On or about December 29, 2015, Plaintiff issued Defendant a Tenant Direction Letter advising of an increase in its monthly fixed basic rent beginning on January 1, 2016. That letter references the Operative Lease and the Defendant as Tenant. Defendant did not dispute this increase or the reference to the Operative Lease and the increase in rent was paid. **Exhibit 20** is a true and correct copy of the Tenant Direction Letter.

22. On or about December 27, 2016, Defendant received a Tenant Direction Letter advising of an increase in its monthly fixed basic rent beginning on January 1, 2017. The letter references the Operative Lease and the Defendant as Tenant. It also included a copy of the first two pages of the Operative Lease and an invoice to Defendant for January's rent. **Exhibit 21** is a true and correct copy of that document.

23. On or about February 1, 2017, Defendant received an invoice for base rent and a tax allocation. The demanded amount was paid. **Exhibit 22** is a true and correct copy of that document.

24. On or about March 1, 2017, Defendant received an invoice for "PSSM-CAM" or "Performance Spine and Sports Medicine-Common Area Maintenance" charges and Management fee charges. **Exhibit 23** is a true and correct copy of said document.

25. On or about March 1, 2017, Defendant received an invoice for base rent. The demanded amount was paid. **Exhibit 24** is a true and correct copy of said document.

26. On or about November 30, 2017, Defendant received a Tenant Direction Letter advising of an increase in its monthly fixed basic rent beginning on January 1, 2018. That letter references the Operative Lease – and included a section thereof – and the Defendant as Tenant. Defendant

did not dispute this increase and the increase in rent was paid. **Exhibit 25** is a true and correct copy of said document.

27. On or about November 28, 2018, Defendant received a Tenant Direction Letter advising of an increase in its monthly fixed basic rent beginning on January 1, 2019. The Letter references the Operative Lease and the Defendant as Tenant. Defendant did not dispute this increase and the increase in rent was paid. **Exhibit 26** is a true and correct copy of said document.

28. In 2019, Defendant contacted Plaintiff seeking to sublease a portion of its leased space to PT Administrative Services, LLC d/b/a JAG One Physical Therapy. Plaintiff's attorney, Edward Bernstein, Esq., of Bernstein & Manahan, LLC, drafted the Sub-Lease Agreement. Plaintiff reviewed the document and made some minor changes to avoid conflicts with the Operative Lease. Plaintiff did not realize the different entities on the document and was not the drafter of the sub-lease or even a party to the lease. Plaintiff was only giving its consent and the document was not one in which Plaintiff was in privity with any party. Attached as Exhibit A to Defendant's Notice of Removal from Page 92 to 106 is a true and correct copy of that document.

29. On or About January 20, 2020, Plaintiff and Defendant entered into a Second Amendment to the Operative Lease that, among other items, modified the rules and regulations of the Lease and assigned the lease from K Johnson Industries, LLC to Plaintiff. That document was executed by Matthias H. Wiederholz, M.D. the Owner of Performance Spine and Sports Medicine, LLC. Attached as Exhibit A to Defendant's Notice of Removal from Page 88 to 91 is a true and correct copy of that document.

30. In 2019 and early 2020, Defendant contacted Plaintiff seeking to sublease a portion of its leased space to Richard J. Daniels, MD, PA d/b/a Daniels Vein. Plaintiff utilized the same sub-lease created by its attorney Edward Bernstein, Esq., of Bernstein & Manahan, LLC. Plaintiff

reviewed the document and made some minor changes to avoid conflicts with the Operative Lease. Plaintiff did not realize the different entities on the document and was not the drafter of the sub-lease or even a party to the lease. Plaintiff was only giving its consent and the document was not one in which Plaintiff was in privity with any party. Attached as Exhibit A to Defendant's Notice of Removal from Page 107 to 123 is a true and correct copy of that document.

31. On May 1, 2020, Percy Naranjo, a representative of Defendant, contacted Plaintiff seeking to have the lease payments deferred due to the COVID-19 pandemic. Plaintiff agreed provided that Defendant also provided a personal guarantee for the deferred payments. The Parties both executed the First Addendum to the Lease on June 2, 2020, and June 1, 2020, respectively. However, Defendant failed to deliver the executed "Guaranty of Payment of Lease" despite agreeing to do so. The First Addendum is the latest-in-time document executed by the parties and specifically identifies each subsequent amendment to the lease and that Operative Lease was what was in effect. **Exhibit 27** is a true and correct copy of that document.

32. All rent up until February 1, 2021, was paid. On February 1, 2021, Plaintiff sent an invoice for rent for February 2021. Attached as Exhibit A to Defendant's Notice of Removal from Page 124 to 125 is a true and correct copy of that document.

33. On February 15, 2021, Plaintiff sent Defendant a Tenant Direction Letter for the increase in the Fixed Basic Rent for 2020 and 2021 and Notice of Failure to Pay Rent Letter. Attached as Exhibit A to Defendant's Notice of Removal from Page 126 to 129 is a true and correct copy of the reference document.

34. From February 15, 2021, to February 24, 2021, Plaintiff sent multiple communications to Defendant's representative, Brook R. Wadenfuhl, seeking resolution to the unpaid rent. No

satisfactory response was ever provided. Attached as Exhibit A to Defendant's Notice of Removal from Page 132 to 136 is a true and correct copy of that document.

35. On March 3, 2021, Plaintiff filed a complaint against Defendant in the Landlord Tenant Division of Burlington County for possession, which Defendant transferred to Mercer county where Defendant's Office is located. Attached as Exhibit A to Defendant's Notice of Removal from Page 137 to 148 is a true and correct copy of that document.

36. On or about March 1, 2021, Plaintiff sent Defendant an invoice for the March 2021 rent. Defendant's failed to make any payments to the outstanding rent. Attached as Exhibit A to Defendant's Notice of Removal from Page 130 to 131 is a true and correct copy of those documents.

37. On or about March 18, 2021, Plaintiff filed an action against the Defendant in Burlington County Superior Court under Docket No. BUR-L-591-21. Attached as Exhibit A to Defendant's Notice of Removal from Page 1 to 149 is a true and correct copy of that document.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 3, 2021

DAVID P. SILBER

# EXHIBIT 1



**Bank of America**

Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

Page 1 of 8
Statement Period
03/01/10 through 03/31/10
E0  P PA  0A 47                    0082187
Enclosures 0
Account Number        7228

Illaahdidladdaddadadlaallaallaadladadd

01035 001 SCM999 I1     0

PERFORMANCE SPINE & SPORTS MEDICINE LLC
4056 QUAKERBRIDGE RD STE 111
LAWRENCEVILLE NJ 08648-4779

Our free Online Banking service allows you to check balances, track account activity, pay bills and more.
**With Online Banking you can also view up to 18 months of this statement online.**
Enroll at www.bankofamerica.com/smallbusiness.

## Customer Service Information
### www.bankofamerica.com

For additional information or service, you may call:
☎ 1.888.BUSINESS (1.888.287.4637)

Or you may write to:
✉ Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

## Deposit Accounts

## Business Advantage Checking

### PERFORMANCE SPINE & SPORTS MEDICINE LLC

#### Your Account at a Glance

| | | | |
|---|---|---|---|
| Account Number | 7228 | Statement Beginning Balance | $123,126.61 |
| Statement Period | 03/01/10 through 03/31/10 | Amount of Deposits/Credits | $303,521.28 |
| Number of Deposits/Credits | 86 | Amount of Withdrawals/Debits | $172,908.51 |
| Number of Withdrawals/Debits | 91 | Statement Ending Balance | $253,739.38 |
| Number of Deposited Items | 654 | | |
| Number of Days in Cycle | 31 | Average Ledger Balance | $179,316.39 |
| | | Service Charge | $129.15 |

H

Page 2 of 8
Statement Period
03/01/10 through 03/31/10
E0  P PA  0A 47
Enclosures 0
Account Number ███████ 7228

PERFORMANCE SPINE & SPORTS MEDICINE LLC

## Your Business Advantage Pricing Relationship

| Account Name | Account Number | Qualifying Balance ($) | Type of Balance | Date |
|---|---|---|---|---|
| Business Advantage Checking | 7228 | 171,949.08 | Average | 03-30 |
| Business Economy Checking | ███ 7257 | -26.19 | Average | 03-30 |
| Business Interest Maximizer | ███ 1269 | 89,932.38 | Average | 03-30 |
| **Total Qualifying Balance** | | **$261,855.27** | | |

Thank you for banking with us. With the balances in your accounts, there is no monthly maintenance fee for your Business Advantage account this month.

## Deposits and Credits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 03/01 | 24,603.72 | Deposit | 813004570625859 |
| 03/01 | 6,033.18 | Deposit | 813004570625838 |
| 03/01 | 3,264.20 | Deposit | 813004570625903 |
| 03/01 | 550.00 | Deposit | 813004570625836 |
| 03/01 | 20.00 | American Express Des:Settlement ID:2292099843 Indn:Performance 2292099843  Co ID:1134992250 Ccd | 900657003931280 |
| 03/01 | 10.00 | American Express Des:Settlement ID:2292099843 Indn:Performance 2292099843  Co ID:1134992250 Ccd | 900660008779945 |
| 03/01 | 5.00 | BankCard      Des:Merch Setl ID:192704150287195 Indn:Performance Spine And   Co ID:1210001927 Ccd | 900660010139496 |
| 03/02 | 2,380.24 | Adp TX/Fincl Svc Des:Adp - Tax  ID:619015629622Clw Indn:Performance Spine And   Co ID:9333006057 Ccd | 900661007620929 |
| 03/02 | 180.00 | BankCard      Des:Merch Setl ID:192704150287195 Indn:Performance Spine And   Co ID:1210001927 Ccd | 900661005868023 |
| 03/02 | 20.00 | Discover Network Des:Settlement ID:601101602266122 Indn:Performance Spine And   Co ID:1510020270 Ccd | 900660010222322 |
| 03/03 | 85.00 | BankCard      Des:Merch Setl ID:192704150287195 Indn:Performance Spine And   Co ID:1210001927 Ccd | 900662001643244 |
| 03/04 | 1,423.69 | Highmark       Des:Med B Pmnt ID:1689816860 Indn:Performance Spine & Sp  Co ID:9141805001 Ccd Pmt Info:Trn*1*xxxxx7232*205296137\ | 900662007298618 |
| 03/04 | 315.00 | BankCard      Des:Merch Setl ID:192704150287195 Indn:Performance Spine And   Co ID:1210001927 Ccd | 900663009227962 |
| 03/04 | 20.00 | American Express Des:Settlement ID:2292099843 Indn:Performance 2292099843  Co ID:1134992250 Ccd | 900662005041640 |
| 03/04 | 5.00 | Discover Network Des:Settlement ID:601101602266122 Indn:Performance Spine And   Co ID:1510020270 Ccd | 900662001321186 |
| 03/05 | 12,887.33 | Deposit | 813004670180216 |
| 03/05 | 9,484.16 | Deposit | 813004670180169 |
| 03/05 | 6,667.43 | Deposit | 813004670180284 |
| 03/05 | 6,436.36 | Deposit | 813004670180159 |
| 03/05 | 5,405.81 | Deposit | 813004670180250 |
| 03/05 | 4,405.81 | Deposit | 813004670180270 |
| 03/05 | 125.00 | BankCard      Des:Merch Setl ID:192704150287195 Indn:Performance Spine And   Co ID:1210001927 Ccd | 900664004361177 |
| 03/05 | 20.00 | American Express Des:Settlement ID:2292099843 Indn:Performance 2292099843  Co ID:1134992250 Ccd | 900663011237964 |

H

Page 3 of 8
Statement Period
03/01/10 through 03/31/10
E0  P PA  0A 47            0082189
Enclosures 0
Account Number ▮▮▮7228

PERFORMANCE SPINE & SPORTS MEDICINE LLC

## Deposits and Credits - Continued

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 03/08 | 1,284.74 | Highmark       Des:Med B Pmnt ID:1689816860 Indn:Performance Spine & Sp  Co ID:9141805001 Ccd Pmt Info:Trn*1*xxxxx2309*205296137\ | 900664007536597 |
| 03/08 | 215.00 | BankCard        Des:Merch Setl ID:192704150287195 Indn:Performance Spine And  Co ID:1210001927 Ccd | 900667011189481 |
| 03/08 | 40.00 | American Express Des:Settlement ID:2292099843 Indn:Performance 2292099843  Co ID:1134992250 Ccd | 900667009676123 |
| 03/08 | 20.00 | American Express Des:Settlement ID:2292099843 Indn:Performance 2292099843  Co ID:1134992250 Ccd | 900664006031650 |
| 03/09 | 4,835.53 | Highmark        Des:Med B Pmnt ID:1689816860 Indn:Performance Spine & Sp  Co ID:9141805001 Ccd Pmt Info:Trn*1*xxxxx5024*205296137\ | 900667013880783 |
| 03/09 | 120.00 | BankCard        Des:Merch Setl ID:192704150287195 Indn:Performance Spine And  Co ID:1210001927 Ccd | 900668005426952 |
| 03/10 | 253.00 | BankCard        Des:Merch Setl ID:192704150287195 Indn:Performance Spine And  Co ID:1210001927 Ccd | 900669010568050 |
| 03/10 | 247.06 | Highmark        Des:Med B Pmnt ID:1689816860 Indn:Performance Spine & Sp  Co ID:9141805001 Ccd Pmt Info:Trn*1*xxxxx7700*205296137\ | 900668008969811 |
| 03/11 | 175.00 | BankCard        Des:Merch Setl ID:192704150287195 Indn:Performance Spine And  Co ID:1210001927 Ccd | 900670007268074 |
| 03/12 | 1,546.63 | Highmark        Des:Med B Pmnt ID:1689816860 Indn:Performance Spine & Sp  Co ID:9141805001 Ccd Pmt Info:Trn*1*xxxxx2338*205296137\ | 900670010917983 |
| 03/12 | 245.00 | BankCard        Des:Merch Setl ID:192704150287195 Indn:Performance Spine And  Co ID:1210001927 Ccd | 900671002602023 |
| 03/12 | 10.00 | Discover Network Des:Settlement ID:601101602266122 Indn:Performance Spine And  Co ID:1510020270 Ccd | 900670006574120 |
| 03/12 | 10.00 | American Express Des:Settlement ID:2292099843 Indn:Performance 2292099843  Co ID:1134992250 Ccd | 900670009644643 |
| 03/15 | 130.00 | BankCard        Des:Merch Setl ID:192704150287195 Indn:Performance Spine And  Co ID:1210001927 Ccd | 900674010058397 |
| 03/15 | 75.70 | Highmark        Des:Med B Pmnt ID:1689816860 Indn:Performance Spine & Sp  Co ID:9141805001 Ccd Pmt Info:Trn*1*xxxxx4195*205296137\ | 900671005793212 |
| 03/15 | 50.00 | American Express Des:Settlement ID:2292099843 Indn:Performance 2292099843  Co ID:1134992250 Ccd | 900674007871901 |
| 03/15 | 10.00 | American Express Des:Settlement ID:2292099843 Indn:Performance 2292099843  Co ID:1134992250 Ccd | 900671004135445 |
| 03/15 | 10.00 | Discover Network Des:Settlement ID:601101602266122 Indn:Performance Spine And  Co ID:1510020270 Ccd | 900671002638997 |
| 03/16 | 24,147.64 | Deposit | 813004670247066 |
| 03/16 | 16,978.95 | Deposit | 813004670247255 |
| 03/16 | 14,143.94 | Deposit | 813004670247193 |
| 03/16 | 9,712.23 | Deposit | 813004670247105 |
| 03/16 | 6,175.27 | Deposit | 813004670247134 |
| 03/16 | 5,781.26 | Deposit | 813004670247162 |
| 03/16 | 4,835.38 | Deposit | 813004670247231 |
| 03/16 | 1,218.50 | Highmark       Des:Med B Pmnt ID:1689816860 Indn:Performance Spine & Sp  Co ID:9141805001 Ccd Pmt Info:Trn*1*xxxxx6589*205296137\ | 900674013001071 |
| 03/16 | 275.00 | BankCard        Des:Merch Setl ID:192704150287195 Indn:Performance Spine And  Co ID:1210001927 Ccd | 900675004706061 |
| 03/17 | 280.58 | BankCard        Des:Merch Setl ID:192704150287195 Indn:Performance Spine And  Co ID:1210001927 Ccd | 900676010079993 |

H

Page 4 of 8
Statement Period
03/01/10 through 03/31/10
E0  P PA  0A 47
Enclosures 0
Account Number ▓▓▓▓ 7228

PERFORMANCE SPINE & SPORTS MEDICINE LLC

## Deposits and Credits - Continued

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 03/18 | 1,870.38 | Highmark       Des:Med B Pmnt ID:1689816860 Indn:Performance Spine & Sp  Co ID:9141805001 Ccd Pmt Info:Trn*1*xxxxx1360*205296137\ | 900676015160968 |
| 03/18 | 110.00 | BankCard       Des:Merch Setl ID:192704150287195 Indn:Performance Spine And   Co ID:1210001927 Ccd | 900677007115336 |
| 03/18 | 10.00 | Discover Network Des:Settlement ID:601101602266122 Indn:Performance Spine And   Co ID:1510020270 Ccd | 900676010087552 |
| 03/18 | 10.00 | American Express Des:Settlement ID:2292099843 Indn:Performance 2292099843   Co ID:1134992250 Ccd | 900676012925330 |
| 03/19 | 271.25 | BankCard       Des:Merch Setl ID:192704150287195 Indn:Performance Spine And   Co ID:1210001927 Ccd | 900678001136964 |
| 03/19 | 10.00 | Discover Network Des:Settlement ID:601101602266122 Indn:Performance Spine And   Co ID:1510020270 Ccd | 900677006447158 |
| 03/19 | 10.00 | American Express Des:Settlement ID:2292099843 Indn:Performance 2292099843   Co ID:1134992250 Ccd | 900677008812011 |
| 03/22 | 95.00 | BankCard       Des:Merch Setl ID:192704150287195 Indn:Performance Spine And   Co ID:1210001927 Ccd | 900681007119867 |
| 03/22 | 30.00 | American Express Des:Settlement ID:2292099843 Indn:Performance 2292099843  Co ID:1134992250 Ccd | 900678002831171 |
| 03/22 | 20.00 | American Express Des:Settlement ID:2292099843 Indn:Performance 2292099843   Co ID:1134992250 Ccd | 900681005551257 |
| 03/23 | 15,320.17 | Deposit | 813004470851288 |
| 03/23 | 8,842.35 | Deposit | 813004470851268 |
| 03/23 | 6,156.21 | Highmark       Des:Med B Pmnt ID:1689816860 Indn:Performance Spine & Sp  Co ID:9141805001 Ccd Pmt Info:Trn*1*xxxxx8590*205296137\ | 900681009482967 |
| 03/23 | 5,969.24 | Deposit | 813004470851332 |
| 03/23 | 4,625.13 | Deposit | 813004470851353 |
| 03/23 | 180.00 | BankCard       Des:Merch Setl ID:192704150287195 Indn:Performance Spine And   Co ID:1210001927 Ccd | 900682001166331 |
| 03/24 | 890.00 | BankCard       Des:Merch Setl ID:192704150287195 Indn:Performance Spine And   Co ID:1210001927 Ccd | 900683005767435 |
| 03/24 | 148.24 | Highmark       Des:Med B Pmnt ID:1689816860 Indn:Performance Spine & Sp  Co ID:9141805001 Ccd Pmt Info:Trn*1*xxxxx1499*205296137\ | 900682004300107 |
| 03/24 | 10.00 | Discover Network Des:Settlement ID:601101602266122 Indn:Performance Spine And   Co ID:1510020270 Ccd | 900682001200945 |
| 03/25 | 31,627.00 | Deposit | 813004870402625 |
| 03/25 | 13,152.27 | Deposit | 813004870402662 |
| 03/25 | 3,495.97 | Deposit | 813004870402690 |
| 03/25 | 155.00 | BankCard       Des:Merch Setl ID:192704150287195 Indn:Performance Spine And   Co ID:1210001927 Ccd | 900684002354091 |
| 03/25 | 20.00 | American Express Des:Settlement ID:2292099843 Indn:Performance 2292099843   Co ID:1134992250 Ccd | 900683009492204 |
| 03/26 | 70.00 | BankCard       Des:Merch Setl ID:192704150287195 Indn:Performance Spine And   Co ID:1210001927 Ccd | 900685006100275 |
| 03/29 | 17,089.94 | Deposit | 813004270570054 |
| 03/29 | 11,230.44 | Deposit | 813004270570017 |
| 03/29 | 125.00 | American Express Des:Settlement ID:2292099843 Indn:Performance 2292099843   Co ID:1134992250 Ccd | 900688010550592 |
| 03/29 | 50.00 | BankCard       Des:Merch Setl ID:192704150287195 Indn:Performance Spine And   Co ID:1210001927 Ccd | 900688011899950 |
| 03/29 | 20.00 | Discover Network Des:Settlement ID:601101602266122 Indn:Performance Spine And   Co ID:1510020270 Ccd | 900685006133524 |

H

Page 5 of 8
Statement Period
03/01/10 through 03/31/10
E0  P PA  0A 47                    0082191
Enclosures 0
Account Number ▮▮▮▮7228

PERFORMANCE SPINE & SPORTS MEDICINE LLC

## Deposits and Credits - Continued

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 03/30 | 2,271.01 | Highmark        Des:Med B Pmnt ID:1689816860 Indn:Performance Spine & Sp  Co ID:9141805001 Ccd Pmt Info:Trn*1*xxxxx1503*205296137\ | 900688015531819 |
| 03/30 | 560.00 | BankCard        Des:Merch Setl ID:192704150287195 Indn:Performance Spine And   Co ID:1210001927 Ccd | 900689007397511 |
| 03/30 | 95.00 | Discover Network Des:Settlement ID:601101602266122 Indn:Performance Spine And   Co ID:1510020270 Ccd | 900688011719836 |
| 03/31 | 1,568.34 | Highmark        Des:Med B Pmnt ID:1689816860 Indn:Performance Spine & Sp  Co ID:9141805001 Ccd Pmt Info:Trn*1*xxxxx4413*205296137\ | 900689012042709 |
| 03/31 | 240.00 | BankCard        Des:Merch Setl ID:192704150287195 Indn:Performance Spine And   Co ID:1210001927 Ccd | 900690003886000 |

## Withdrawals and Debits
### Checks

| Check Number | Amount ($) | Date Posted | Bank Reference | Check Number | Amount ($) | Date Posted | Bank Reference |
|---|---|---|---|---|---|---|---|
| 1223 | 125.00 | 03/15 | 813007092496897 | 1266 | 2,965.31 | 03/12 | 813006592551453 |
| 1245* | 100.00 | 03/31 | 813006592468696 | 1267 | 500.00 | 03/23 | 813004492301800 |
| 1247* | 2,380.24 | 03/01 | 813006192011850 | 1268 | 160.50 | 03/22 | 813009292136247 |
| 1248 | 150.00 | 03/01 | 813006392846190 | 1269 | 529.65 | 03/15 | 813009092923042 |
| 1249 | 150.00 | 03/03 | 813006992649439 | 1270 | 467.25 | 03/15 | 813009392496458 |
| 1250 | 425.00 | 03/08 | 813006892317110 | 1271 | 90.00 | 03/11 | 813006492360831 |
| 1252* | 415.02 | 03/09 | 813009692173347 | 1272 | 247.25 | 03/15 | 813006792271962 |
| 1253 | 3,790.12 | 03/12 | 813006592006705 | 1273 | 251.29 | 03/12 | 813006692617632 |
| 1256* | 1,240.84 | 03/11 | 813002592392556 | 1274 | 439.00 | 03/17 | 813006292368681 |
| 1257 | 612.35 | 03/11 | 813006392630901 | 1275 | 119.84 | 03/12 | 813006592637932 |
| 1258 | 12,384.33 | 03/15 | 813006892274627 | 1276 | 679.80 | 03/15 | 813006892445278 |
| 1259 | 484.18 | 03/15 | 813006892813042 | 1277 | 819.00 | 03/12 | 813002382639540 |
| 1261* | 4,754.00 | 03/12 | 813006692123241 | 1278 | 864.00 | 03/12 | 813006692568904 |
| 1262 | 50.00 | 03/30 | 813006392862829 | 1279 | 225.00 | 03/15 | 813009392510241 |
| 1263 | 204.55 | 03/16 | 813005992045820 | 1280 | 84.00 | 03/22 | 813005992556175 |
| 1264 | 4,804.03 | 03/12 | 813006492801738 | 1281 | 3,632.51 | 03/25 | 813006792934469 |
| 1265 | 2,475.00 | 03/15 | 813008192552690 | | | | |

* Gap in sequential check numbers.

## Other Debits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 03/01 | 111.02 | BankCard        Des:Merch Fees ID:192704150287195 Indn:Performance Spine And   Co ID:1210001927 Ccd | 900660010148157 |
| 03/02 | 12.50 | Discover Network Des:Settlement ID:601101602266122 Indn:Performance Spine And   Co ID:1510020270 Ccd | 900660010225126 |
| 03/04 | 600.00 | Online Banking payment to Crd 1852 Confirmation# 5073380959 | 957303043140615 |
| 03/05 | 109.76 | Adp Payroll Fees Des:Adp - Fees ID:2Rclw   9708948 Indn:Performance Spine And   Co ID:9659605001 Ccd | 900663009369810 |
| 03/08 | 416.85 | Welcome Wagon    Des:Advertisng ID:7762074 Indn:*performance        Co ID:0000637371 Ppd | 900664004635925 |
| 03/11 | 51,191.19 | Adp TX/Fincl Svc Des:Adp - Tax  ID:614025459197Clw Indn:Performance Spine And   Co ID:9333006057 Ccd | 900670008664159 |

H

Page 6 of 8
Statement Period
03/01/10 through 03/31/10
E0 P PA 0A 47
Enclosures 0
Account Number ███████7228

PERFORMANCE SPINE & SPORTS MEDICINE LLC

## Withdrawals and Debits - Continued
## Other Debits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 03/11 | 29,797.31 | Adp TX/Fincl Svc Des:Adp - Tax ID:Rkclw 031203A01 Indn:Performance Spine And   Co ID:2223006057 Ccd | 900670008655459 |
| 03/15 | 4.95 | American Express Des:Collection ID:2292099843 Indn:Performance 2292099843  Co ID:1134992250 Ccd | 900674007873206 |
| 03/16 | 150.73 | Online Banking transfer to Chk 7257 Confirmation# 4975716522 | 957303167531637 |
| 03/18 | 35.27 | American Express Des:Axp Discnt ID:2292099843 Indn:Performance 2292099843  Co ID:1134992250 Ccd | 900676012924304 |
| 03/19 | 89.09 | Adp Payroll Fees Des:Adp - Fees ID:2Rclw   0228040 Indn:Performance Spine And   Co ID:9659605001 Ccd | 900677007490983 |
| 03/23 | 90.00 | Beneflex       Des:Er Contrib ID:Er Contrib Indn:Performance Spine      Co ID:3223205534 Ppd | 900681009817955 |
| 03/25 | 16,985.51 | Adp TX/Fincl Svc Des:Adp - Tax  ID:579015981380Clw Indn:Performance Spine And   Co ID:9333006057 Ccd | 900684003454697 |
| 03/25 | 6,931.11 | Adp TX/Fincl Svc Des:Adp - Tax  ID:Rkclw 032604A01 Indn:Performance Spine And   Co ID:2223006057 Ccd | 900684003433797 |
| 03/26 | 86.50 | Beneflex       Des:Er Contrib ID:Er Contrib Indn:Performance Spine      Co ID:3223205534 Ppd | 900684004992949 |
| 03/31 | 129.15 | Excess Transaction Fee | |

**Card Account # ███████ 2742:**

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 03/01 | 146.88 | CheckCard  0227 Comcast Of Trenton | 965502271186970 |
| 03/01 | 44.86 | CheckCard  0226 Patlive      Accounting | 965502260131023 |
| 03/01 | 34.95 | CheckCard  0227 Brn*mergernetwork.com | 965502270951763 |
| 03/02 | 550.00 | CheckCard  0301 Msi*morningstar | 965503010117415 |
| 03/03 | 1,000.00 | CheckCard  0302 Gotcha Local Llc | 965503020690165 |
| 03/03 | 595.00 | CheckCard  0302 Pro Med Prod | 965503021035185 |
| 03/03 | 90.00 | CheckCard  0302 Yext Calls 8003219398 | 965503021144432 |
| 03/04 | 350.00 | CheckCard  0302 Law Enforcement Gift PR | 965503021156345 |
| 03/04 | 10.50 | CheckCard  0302 Law Enforcement Gift PR International Transaction Fee | 965503021156345 |
| 03/08 | 682.91 | CheckCard  0305 Pss World Medical | 965503050191478 |
| 03/11 | 1,938.16 | CheckCard  0310 Shore Software Solution | 965503100746227 |
| 03/11 | 1,100.00 | CheckCard  0310 Close-Up Tv News, Inc | 965503101252697 |
| 03/11 | 686.95 | CheckCard  0310 Nordic Naturals | 965503100914088 |
| 03/12 | 1,050.00 | CheckCard  0310 Allergan Sales Inc. | 965503100315116 |
| 03/12 | 41.49 | CheckCard  0311 Sky-Bit.Com | 965503110487215 |
| 03/12 | 1.24 | CheckCard  0311 Sky-Bit.Com International Transaction Fee | 965503110487215 |
| 03/15 | 495.00 | CheckCard  0312 New York University 32 | 965503120742854 |
| 03/15 | 484.50 | CheckCard  0312 Zirmed Inc | 965503120118516 |
| 03/15 | 299.00 | CheckCard  0312 Securesheet | 965503120358267 |
| 03/15 | 125.08 | CheckCard  0311 Medical Arts Press | 965503110820292 |
| 03/15 | 39.00 | CheckCard  0313 Intuit *qb Softw/Supp | 965503131114767 |
| 03/16 | 225.00 | CheckCard  0315 Shore Software Solution | 965503150714755 |
| 03/16 | 103.00 | CheckCard  0312 Hbw Accupuncture Suppl | 965503120829369 |
| 03/17 | 1,100.00 | CheckCard  0316 Close-Up Tv News, Inc | 965503161258149 |
| 03/17 | 319.50 | CheckCard  0316 Guna Inc | 965503160916531 |
| 03/17 | 229.60 | CheckCard  0316 Scrip Companies | 965503160993609 |
| 03/17 | 59.16 | CheckCard  0315 Medical Arts Press | 965503150712830 |
| 03/17 | 57.45 | CheckCard  0315 Pss World Medical | 965503150173308 |
| 03/22 | 127.80 | CheckCard  0319 Guna Inc | 965503191054306 |
| 03/23 | 4,804.00 | CheckCard  0322 Yodle Inc. | 965503220925594 |
| 03/23 | 225.73 | CheckCard  0319 Medical Arts Press | 965503190737103 |
| 03/23 | 54.55 | CheckCard  0319 Medical Arts Press | 965503190736963 |

H

Page 7 of 8
Statement Period
03/01/10 through 03/31/10
E0  P P A  0A 47          0082193
Enclosures 0
Account Number ▮▮▮▮ 7228

PERFORMANCE SPINE & SPORTS MEDICINE LLC

## Withdrawals and Debits - Continued
### Other Debits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 03/23 | 21.40 | CheckCard 0322 Ovid/Lww Online Jrnl | 965503220996251 |
| 03/25 | 421.59 | CheckCard 0325 Ccc*victory Corps | 965503251179369 |
| 03/25 | 170.99 | CheckCard 0323 Medical Arts Press | 965503230698452 |
| 03/25 | 38.98 | CheckCard 0323 Pss World Medical | 965503230202502 |
| 03/29 | 750.00 | CheckCard 0325 Bench Craft Company | 965503250016569 |
| 03/29 | 344.40 | CheckCard 0326 Scrip Companies | 965503261098355 |
| 03/29 | 41.75 | CheckCard 0326 Patlive    Accounting | 965503260336977 |
| 03/30 | 34.95 | CheckCard 0329 Brn*mergernetwork.com | 965503291108281 |
| 03/31 | 614.16 | CheckCard 0329 Pss World Medical | 965503290158444 |
| 03/31 | 38.98 | CheckCard 0329 Pss World Medical | 965503290158438 |
| **Subtotal** | **19,548.51** | | |

## Daily Ledger Balances

| Date | Balance ($) | Date | Balance ($) | Date | Balance ($) |
|---|---|---|---|---|---|
| 03/01 | 154,744.76 | 03/11 | 119,731.58 | 03/23 | 201,291.75 |
| 03/02 | 156,762.50 | 03/12 | 102,082.89 | 03/24 | 202,339.99 |
| 03/03 | 155,012.50 | 03/15 | 83,293.60 | 03/25 | 222,609.54 |
| 03/04 | 155,815.69 | 03/16 | 165,878.49 | 03/26 | 222,593.04 |
| 03/05 | 201,137.83 | 03/17 | 163,954.36 | 03/29 | 249,972.27 |
| 03/08 | 201,172.81 | 03/18 | 165,919.47 | 03/30 | 252,813.33 |
| 03/09 | 205,713.32 | 03/19 | 166,121.63 | 03/31 | 253,739.38 |
| 03/10 | 206,213.38 | 03/22 | 165,894.33 | | |

# EXHIBIT 2

H

Page 2 of 9
Statement Period
08/01/10 through 08/31/10
E0  P PA  0A 47
Enclosures 0
Account Number ████ 7228

PERFORMANCE SPINE & SPORTS MEDICINE LLC

## Deposit Accounts

## Business Advantage Checking

### PERFORMANCE SPINE & SPORTS MEDICINE LLC

### Your Account at a Glance

| | | | |
|---|---|---|---|
| Account Number | ████ 7228 | Statement Beginning Balance | $68,013.74 |
| Statement Period | 08/01/10 through 08/31/10 | Amount of Deposits/Credits | $349,369.73 |
| Number of Deposits/Credits | 86 | Amount of Withdrawals/Debits | $313,204.15 |
| Number of Withdrawals/Debits | 100 | Statement Ending Balance | $104,179.32 |
| Number of Deposited Items | 814 | | |
| | | Average Ledger Balance | $79,277.04 |
| Number of Days in Cycle | 31 | Service Charge | $205.20 |

### Your Business Advantage Pricing Relationship

| Account Name | Account Number | Qualifying Balance ($) | Type of Balance | Date |
|---|---|---|---|---|
| Business Advantage Checking | ████ 7228 | 78,983.32 | Average | 08-30 |
| Business Interest Maximizer | ████ 1269 | 482,895.65 | Average | 08-30 |
| **Total Qualifying Balance** | | **$561,878.97** | | |

Thank you for banking with us.  With the balances in your accounts, there is no monthly maintenance fee for your Business Advantage account this month.

### Deposits and Credits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 08/02 | 27,503.13 | Deposit | 813004670855947 |
| 08/02 | 13,561.14 | Deposit | 813004370599676 |
| 08/02 | 2,091.44 | Highmark      Des:Med B Pmnt ID:1689816860 Indn:Performance Spine & Sp  Co ID:9141805001 Ccd Pmt Info:Trn*1*xxxxx1323*205296137\ | 900611010716792 |
| 08/02 | 286.00 | BankCard      Des:Merch Setl ID:192704150287195 Indn:Performance Spine And   Co ID:1210001927 Ccd | 900614005390234 |
| 08/02 | 150.00 | American Express Des:Settlement ID:210M8260 Indn:Performance 2292099843  Co ID:1134992250 Ccd | 900611010599547 |
| 08/02 | 15.00 | American Express Des:Settlement ID:2292099843 Indn:Performance 2292099843  Co ID:1134992250 Ccd | 900614003655597 |
| 08/03 | 14,179.86 | Deposit | 813004370944916 |
| 08/03 | 1,844.19 | Highmark      Des:Med B Pmnt ID:1689816860 Indn:Performance Spine & Sp  Co ID:9141805001 Ccd Pmt Info:Trn*1*xxxxx4390*205296137\ | 900614008529845 |
| 08/03 | 274.00 | BankCard      Des:Merch Setl ID:192704150287195 Indn:Performance Spine And   Co ID:1210001927 Ccd | 900615010394950 |
| 08/04 | 190.00 | BankCard      Des:Merch Setl ID:192704150287195 Indn:Performance Spine And   Co ID:1210001927 Ccd | 900616005978427 |

# EXHIBIT 3

# Day Sheet - Payments Summary

## Day Sheet - Payment Summary

*Performance Spine and Sports Med*
*4056 Quakerbridge Rd Suite 111 Lawrenceville NJ 08648*
**Received By:    Werner Lindsay**

| Description | | Amount |
|---|---|---|
| Patient Payment  - Cash | | 23,340.00 |
| Patient Payment  - Check | | 20,334.38 |
| Patient Payment  - Credit Card | | 48,163.47 |
| Credit Card Type - Visa | 27,390.40 | |
| Credit Card Type - Master | 10,398.08 | |
| Credit Card Type - AMEX | 8,065.00 | |
| Credit Card Type - Discover | 1,754.99 | |
| Credit Card Type - Other | 555.00 | |
| Patient Payment - Other | | 3,003.08 |
| Insurance Payment | | 1,667,670.14 |
| | **Facility Total** | **$1,762,511.07** |

## All Facilities - DaySheet Payment Summary

**Received By:   All Users**

| Description | | Amount |
|---|---|---|
| Patient Payment  - Cash | | 23,340.00 |
| Patient Payment  - Check | | 20,334.38 |
| Patient Payment  - Credit Card | | 48,163.47 |
| Patient Payment - Other | | 3,003.08 |
| Insurance Payment | | 1,667,670.14 |
| | **All Facility Total** | **$1,762,511.07** |

# EXHIBIT 4

# PERFORMANCE SPINE & SPORTS MEDICINE
## Profit & Loss
### April 1, 2009 through April 2, 2010

|  | Apr 1, '09 - Apr 2, 10 |
|---|---|
| **Ordinary Income/Expense** |  |
| **Income** |  |
| **4000 · SALES** |  |
| 4001 · FEES-PHYSICAL THERAPY | 216,533.36 |
| 4003 · FEES-DR. H. LOPEZ | 125,795.33 |
| 4004 · FEES-DR. J. JIMENEZ | 100,246.21 |
| 4005 · FEES-DR. M. WIEDERHOLZ | 132,218.02 |
| 4006 · FEES-DR. M. NEIVERTH | 111,600.63 |
| 4000 · SALES - Other | 0.00 |
| **Total 4000 · SALES** | 686,393.55 |
| **Total Income** | 686,393.55 |
| **Cost of Goods Sold** |  |
| 4310 · PURCHASES | 39,759.37 |
| **Total COGS** | 39,759.37 |
| **Gross Profit** | 646,634.18 |
| **Expense** |  |
| 5100 · ADVERTISING | 115,324.50 |
| 6000 · SALARIES & WAGES | 369,645.55 |
| 6120 · BANK CHARGES | 877.81 |
| 6125 · MERCHANT FEES | 1,111.46 |
| 6130 · PAYROLL EXPENSE | 1,642.83 |
| 6140 · CONTRIBUTIONS | 715.00 |
| 6170 · LICENSES & REGISTRATIONS | 2,015.00 |
| 6180 · DUES & SUBSCRIPTIONS | 3,445.00 |
| 6185 · SEMINARS & EDUCATION | 8,657.60 |
| 6200 · EQUIP. RENTAL/LEASE | 3,475.00 |
| 6220 · UTILITIES | 7,381.67 |
| 6230 · INSURANCE-EMPLOYEE GRO... | 31,353.36 |
| 6240 · INSURANCE - GENERAL | 17,894.37 |
| 6260 · INTEREST EXP. | 35,668.02 |
| 6280 · MISC. | 634.51 |
| 6300 · OFFICE EXPENSE | 17,239.41 |
| 6310 · OUTSIDE SERVICES | 7,828.27 |
| 6340 · POSTAGE EXPENSE | 226.73 |
| 6360 · RENT EXPENSE | 131,284.44 |
| 6380 · REPAIRS & MAINT. | 3,253.95 |
| 6440 · SUPPLIES EXP. | 2,743.44 |
| 6485 · TAXES - SUI/SDI | 8,296.41 |
| 6490 · TAXES - PAYROLL | 27,355.46 |
| 6495 · TAXES - FUTA | 702.58 |
| 6520 · TELEPHONE | 2,762.21 |
| 6540 · TRAVEL & ENTERTAINMENT | 4,389.55 |
| **Total Expense** | 805,924.13 |
| **Net Ordinary Income** | -159,289.95 |
| **Other Income/Expense** |  |
| **Other Income** |  |
| 7020 · INTEREST INCOME | 91.55 |
| **Total Other Income** | 91.55 |
| **Net Other Income** | 91.55 |
| **Net Income** | -159,198.40 |

# EXHIBIT 5

# PROJECT West Windsor Clinic

**Income Statement**
(dollars in millions, except per share data)

| | *Projected Income Statements* | | | | |
|---|---|---|---|---|---|
| | June 2008-July 2009 | June 2009-July 2010 | June 2010-July 2011 | June 2011-July 2012 | June 2012- July 2013 |
| Revenues | $1,261,617.5 | $3,255,010.0 | $4,120,930.0 | $4,446,970.0 | $4,506,370.0 |
| EBITDA (b) | 410,441.2 | 2,158,267.1 | 2,872,211.0 | 3,235,265.7 | 3,296,501.4 |
| Depreciation | 28,840.0 | 28,840.0 | 28,840.0 | 28,840.0 | 28,840.0 |
| Existing Intangible Amortization | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| EBIT (b) | 381,601.2 | 2,129,427.1 | 2,843,371.0 | 3,206,425.7 | 3,267,661.4 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Interest Income (-) | 0.0% | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Fixed Interest Expense | 10.0% | 118,000.0 | 118,000.0 | 118,000.0 | 118,000.0 | 118,000.0 |
| Revolver Interest Expense @ | 0.0% | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |

| | June 2008-July 2009 | June 2009-July 2010 | June 2010-July 2011 | June 2011-July 2012 | June 2012- July 2013 |
|---|---|---|---|---|---|
| Other income (expense) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Pretax Income (b) | 263,601.2 | 2,011,427.1 | 2,725,371.0 | 3,088,425.7 | 3,149,661.4 |
| Taxes | 73,808.3 | 563,199.6 | 763,103.9 | 864,759.2 | 881,905.2 |
| Net Income (b) | $189,792.8 | $1,448,227.5 | $1,962,267.1 | $2,223,666.5 | $2,267,756.2 |

**Assumptions:**

| | June 2008-July 2009 | June 2009-July 2010 | June 2010-July 2011 | June 2011-July 2012 | June 2012- July 2013 |
|---|---|---|---|---|---|
| Tax Rate | 28.0% | 28.0% | 28.0% | 28.0% | 28.0% |

*(a) SOURCE PROJECTIONS*
*(b) Excludes extraordinary and non-recurring charges.*

# Day Sheet - Payments Summary

## Day Sheet - Payment Summary

*Performance Spine and Sports Med*
*4056 Quakerbridge Rd Suite 111 Lawrenceville NJ 08648*
**Received By:   Werner Lindsay**

| Description | | Amount |
|---|---:|---:|
| Patient Payment  - Cash | | 23,340.00 |
| Patient Payment  - Check | | 20,334.38 |
| Patient Payment  - Credit Card | | 48,163.47 |
| Credit  Card Type - Visa | 27,390.40 | |
| Credit  Card Type - Master | 10,398.08 | |
| Credit  Card Type - AMEX | 8,065.00 | |
| Credit  Card Type - Discover | 1,754.99 | |
| Credit  Card Type - Other | 555.00 | |
| Patient Payment - Other | | 3,003.08 |
| Insurance Payment | | 1,667,670.14 |
| **Facility Total** | | **$1,762,511.07** |

### All Facilities - DaySheet Payment Summary

**Received By:   All Users**

| Description | Amount |
|---|---:|
| Patient Payment  - Cash | 23,340.00 |
| Patient Payment  - Check | 20,334.38 |
| Patient Payment  - Credit Card | 48,163.47 |
| Patient Payment - Other | 3,003.08 |
| Insurance Payment | 1,667,670.14 |
| **All Facility Total** | **$1,762,511.07** |

# PERFORMANCE SPINE & SPORTS MEDICINE
## Profit & Loss
### April 1, 2009 through April 2, 2010

|  | Apr 1, '09 - Apr 2, 10 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| **4000 · SALES** | |
| 4001 · FEES-PHYSICAL THERAPY | 216,533.36 |
| 4003 · FEES-DR. H. LOPEZ | 125,795.33 |
| 4004 · FEES-DR. J. JIMENEZ | 100,246.21 |
| 4005 · FEES-DR. M. WIEDERHOLZ | 132,218.02 |
| 4006 · FEES-DR. NEIVERTH | 111,600.63 |
| 4000 · SALES - Other | 0.00 |
| **Total 4000 · SALES** | 686,393.55 |
| **Total Income** | 686,393.55 |
| **Cost of Goods Sold** | |
| 4310 · PURCHASES | 39,759.37 |
| **Total COGS** | 39,759.37 |
| **Gross Profit** | 646,634.18 |
| **Expense** | |
| 5100 · ADVERTISING | 115,324.50 |
| 6000 · SALARIES & WAGES | 369,645.55 |
| 6120 · BANK CHARGES | 877.81 |
| 6125 · MERCHANT FEES | 1,111.46 |
| 6130 · PAYROLL EXPENSE | 1,642.83 |
| 6140 · CONTRIBUTIONS | 715.00 |
| 6170 · LICENSES & REGISTRATIONS | 2,015.00 |
| 6180 · DUES & SUBSCRIPTIONS | 3,445.00 |
| 6185 · SEMINARS & EDUCATION | 8,657.60 |
| 6200 · EQUIP. RENTAL/LEASE | 3,475.00 |
| 6220 · UTILITIES | 7,381.67 |
| 6230 · INSURANCE-EMPLOYEE GRO... | 31,353.36 |
| 6240 · INSURANCE - GENERAL | 17,894.37 |
| 6260 · INTEREST EXP. | 35,668.02 |
| 6280 · MISC. | 634.51 |
| 6300 · OFFICE EXPENSE | 17,239.41 |
| 6310 · OUTSIDE SERVICES | 7,828.27 |
| 6340 · POSTAGE EXPENSE | 226.73 |
| 6360 · RENT EXPENSE | 131,284.44 |
| 6380 · REPAIRS & MAINT. | 3,253.95 |
| 6440 · SUPPLIES EXP. | 2,743.44 |
| 6485 · TAXES - SUI/SDI | 8,296.41 |
| 6490 · TAXES - PAYROLL | 27,355.46 |
| 6495 · TAXES - FUTA | 702.58 |
| 6520 · TELEPHONE | 2,762.21 |
| 6540 · TRAVEL & ENTERTAINMENT | 4,389.55 |
| **Total Expense** | 805,924.13 |
| **Net Ordinary Income** | -159,289.95 |
| **Other Income/Expense** | |
| **Other Income** | |
| 7020 · INTEREST INCOME | 91.55 |
| **Total Other Income** | 91.55 |
| **Net Other Income** | 91.55 |
| **Net Income** | -159,198.40 |

# PROJECT West Windsor Clinic
## Income Statement
(dollars in millions, except per share data)

| | | Projected Income Statements | | | |
| | | June 2008-<br>July2009 | June 2009-<br>July 2010 | June 2010-<br>July 2011 | June 2011-<br>July 2012 | June 2012- July<br>2013 |
|---|---|---|---|---|---|---|
| Revenues | | $1,261,617.5 | $3,255,010.0 | $4,120,930.0 | $4,446,970.0 | $4,506,370.0 |
| EBITDA (b) | | 410,441.2 | 2,158,267.1 | 2,872,211.0 | 3,235,265.7 | 3,296,501.4 |
| Depreciation | | 28,840.0 | 28,840.0 | 28,840.0 | 28,840.0 | 28,840.0 |
| Existing Intangible Amortization | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| EBIT (b) | | 381,601.2 | 2,129,427.1 | 2,843,371.0 | 3,206,425.7 | 3,267,661.4 |
| Interest Income (-) | 0.0% | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Fixed Interest Expense | 10.0% | 118,000.0 | 118,000.0 | 118,000.0 | 118,000.0 | 118,000.0 |
| Revolver Interest Expense @ | 0.0% | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other income (expense) | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Pretax Income (b) | | 263,601.2 | 2,011,427.1 | 2,725,371.0 | 3,088,425.7 | 3,149,661.4 |
| Taxes | | 73,808.3 | 563,199.6 | 763,103.9 | 864,759.2 | 881,905.2 |
| Net Income (b) | | $189,792.8 | $1,448,227.5 | $1,962,267.1 | $2,223,666.5 | $2,267,756.2 |

**Assumptions:**

| | | | | | |
|---|---|---|---|---|---|
| Tax Rate | 28.0% | 28.0% | 28.0% | 28.0% | 28.0% |

(a)  SOURCE PROJECTIONS
(b)  Excludes extraordinary and non-recurring charges.

# EXHIBIT 6



# EXHIBIT 7

WM. R. STUCKERT (1902-1960)

RICHARD DANESE, JR.
DON F. MARSHALL
STEVEN H. SAILER
D. KEITH BROWN
DONNA J. WENGIEL
LISA D. WOODWARD

OF COUNSEL
SIDNEY T. YATES

## STUCKERT AND YATES
TWO NORTH STATE STREET
POST OFFICE BOX 70
NEWTOWN, BUCKS COUNTY, PENNSYLVANIA 18940
WWW.STUCKERTYATES.COM

TELEPHONE
215.968.4700

FAX
215.968.4598
215.968.8875

PERSONAL E-MAIL
dwengiel@stuckertyates.com

July 5, 2010

**Via E-Mail (dl@kjohnsonenterprises.com)**
**And First Class Mail**

K. Johnson Enterprises LLC
1337 State Highway 33
Hamilton, NJ 08690

Attention:     Dylan Leith
                    VP of Operations

Re:  Proposed Lease Agreement between K. Johnson Enterprises, LLC and
      Performance Spine & Sports Medicine, LLC, 13,500 sq. ft.,
      Building A, Bordentown, New Jersey

Dear Mr. Leith:

I represent Performance Spine & Sports Medicine, LLC (PSSM) with respect to the proposed lease. I reviewed the "boiler plate lease" you provided to Percy Naranjo and have the following comments and requests:

1.     Lease Summary, paragraph (d) – provide a street address where Building A is located and provide a plan showing the location of the proposed Building A. Based on the background my client has provided, the following business terms are essential to moving forward with this transaction:

a.     The location and size of the Premises is as presented to my client and not subject to change without PSSM's approval.

b.     My client and Team 85 will enter into a mutually agreeable contract addressing licensing, consulting, marketing and referral of rehabilitation services to PSSM.

c.     The Lease will contain an exclusivity clause allowing PSSM to be the sole provider of rehabilitation services on the Team 85 campus. Rehabilitation services to include: chiropractic, physical therapy, acupuncture, nutritional counseling and non-surgical spine and sports medicine.



    d. A right of first refusal with respect to leasing the 2nd floor of Building A.

    e. Rent to commence when PSSM opens for business.

    f. Landlord responsibilities vis-à-vis initial construction and timing should be spelled out.

    g. Landlord to be responsible for all construction and development costs.

    h. Landlord to be responsible for complying with all laws, ordinances, etc. with respect to construction of the Project including compliance with American with Disabilities Act.

    i. An estimated Commencement Date should be stated in the Lease. Tenant is to be provided with the opportunity to terminate the Lease if construction is not completed on or before a specified outside date.

    j. Lease to be expressly contingent on Tenant obtaining a certificate of occupancy and such other approvals as are required in order to occupy and use the Premises for Tenant's intended use.

  2. Lease Summary, paragraph (h) - My client is seeking an initial lease term of five years with three options to renew for five years each.

  3. Lease Summary (g) – Lease should include the estimated Commencement Date and provide Tenant with an opportunity to terminate if Landlord is unable to obtain a certificate of completion by a specified date.

  5. Lease Summary (k) – Limit security deposit to one month's Base Rent.

  6. Lease Summary (j) – Is there sales tax payable with respect to the Lease? Delete this provision.

  7. Rent commencement date to be when the Tenant completes its fit-out and opens for business.

  8. Paragraph 1 – Remove language providing that rent is payable without setoff or adjustment. Given the fact that the Landlord's liability under Lease is limited to its equity in the

project, if any, the Tenant needs some recourse in the event the Landlord fails to meet its obligations under the Lease. Explain reference to sales tax in paragraphs 1(c) and (e).

9.　　Paragraph 3 – As written, parking and use of other facilities outside of leased Premises is shared with all tenants and subject to change or restriction by Landlord.　Please explain how the Landlord is going to ensure that there is sufficient parking for my client's use.

10.　　Paragraph 4 – Please provide the Landlord's specifications for review. The Lease should be clear as to what the Landlord is providing and what the Tenant is responsible for. Landlord should be obligated to complete construction of Landlord improvements in a good and workmanlike manner. In looking at the exhibits, it appears that Exhibits E and F cover Landlord's work. These should be specific as to the work Landlord is performing. Paragraph 4 should reference both exhibits. Rent commencement date to be after Commencement Date of Lease when client opens for business [paragraph 4(a)].

11.　　Paragraph 5 – The definition for Common Area Maintenance Costs is very broad. We would like to see some parameters on this, including limitations on property management fees.

12.　　Paragraph 6(a)– The Lease passes the cost of initial hook-up to public utilities to the Tenant. Landlord should be responsible for all development costs, such as tapping fees or connection fees for sanitary sewer, etc. We understand water and/or sewer will be separately metered – the Lease should state this.

Paragraph 6(b) – Delete since water & sewer are separately metered and not part of CAM.

13.　　Paragraph 7 – The reference to taxes and assessments is too broad and should be limited to real estate taxes.

14.　　Paragraph 8(a) – Landlord has no obligation to maintain or repair the operating systems (i.e. plumbing, electrical, HVAC) servicing the Premises. The only obligation is to maintain the roof and exterior walls and as written, Landlord's failure to do so does not constitute a breach of the Lease by Landlord and Tenant has no recourse. This is unacceptable.

15.　　Paragraph 8(b) – Tenant is responsible for maintaining the operating systems and supplying maintenance records upon request to Landlord. The Lease should provide that these systems are to be new, in good condition and working order on the Commencement Date and include an assignment of the manufacturer's warranty.

16.     Paragraph 10(g) – Tenant must be afforded the opportunity to review all "Land Documents" prior to execution of the Lease and to approve any changes made to such documents following execution of the Lease.

17.     Paragraph 10(h) –The 10 day period is not practical. If the mechanic's lien is disputed, Tenant should be afforded the opportunity to post bond as opposed to satisfying a lien it disputes.

18.     Paragraph 10(i) – Delete interest penalty of 18% per annum.

20.     Paragraph 10(i)(sic) – Delete provision requiring production of financial statements after execution of Lease.

21.     Paragraph 13(c) – Tenant also wants to prohibit any installations that would be an eyesore and not in keeping with a first-class professional office building/complex.

22.     Paragraph 13(e) – This provision allows the Landlord to amend, modify or terminate any of the Land Documents or enter into additional Land Documents. As a long-term Tenant in this Project, my client should be given notice of any changes or new documents and an opportunity to approve the same. See paragraph 16 above.

23.     Paragraph 14 – Tenant is to have the right to terminate in the event of fire or other casualty. Landlord should have an affirmative obligation to repair or rebuild and to maintain appropriate insurance. Delete provision stating that rent abatement does not apply if Tenant carries business interruption insurance.

24.     Paragraph 15 – Include a reciprocal indemnification from Landlord to Tenant for injuries or damages resulting from Landlord's breach of the Lease, i.e. failure to maintain Common Areas, etc., or negligence.

25.     Paragraph 15(b) – Landlord should have an obligation to maintain insurance sufficient to cover the replacement costs of the buildings within the Project.

26.     Paragraph 16 - Delete.

27.     Paragraph 17(a) provides that any improvements funded with the Improvement Allowance remain a part of the Premises at the end of the Lease and that this provision includes trade fixtures. Revise Lease to provide that trade fixtures are and should remain the property of the Tenant.

28.     Paragraph 18. Clarify what constitutes an "indirect expense" that would be incurred by Landlord due to an assignee or sub-lessee taking possession of the Premises. Delete paragraph 18(c).

29.     Paragraph 19. My client will be making a substantial investment in this Lease. Accordingly, my client will require a Non-Disturbance Agreement from any current and future lenders.

30.     Paragraph 23 addresses the potential for the Landlord to make alterations or additions to the Property. In the event additional space is added, the Tenant's percentage of CAM charges should be reduced accordingly.

31.     Paragraph 24. Tenant operates as an integrated practice. In the event of partial condemnation, the Tenant requires the option to terminate if in the Tenant's opinion continued operation in the portion of the Premises remaining after condemnation is not feasible or desirable.

32.     Paragraph 27(a). Please provide a 10 day notice and opportunity to cure for payment of rent and 30 day notice and opportunity to cure for other monetary obligations.

33.     Paragraph 27(c) – delete. It is inconsistent with 27(d). If the Tenant makes a business decision to relocate but continues to pay rent during the balance of the Lease term, it should not constitute an event of default.

34.     Paragraph 27(f) – change 15 day period to 30 day period.

35.     Paragraph 28. Landlord should have an obligation to mitigate its damages in the event of a Tenant default. Delete paragraph 28(a)(iv) because it can interfere with Tenant financing. Delete interest at 18% per year.

36.     Paragraph 29. The security deposit is to be held in an interest-bearing escrow account with interest to accrue to the benefit of Tenant. Any unused portion of the security deposit should be returned to Tenant promptly upon termination of the Lease.

37.     Paragraph 31(a). Delete limitation on Landlord's liability.

38.     Paragraph 31(b). Landlord should be liable for injuries or damages resulting from Landlord's negligence or breach of its obligations under the Lease. As written, Landlord's

liability is only for injuries or damages resulting from its gross negligence or intentional misconduct.

39.    Paragraph 32 – exclude costs of paralegals and legal assistants.

40.    Paragraph 34 – Delete exception to time of essence clause. Landlord must deliver the Premises in a timely fashion.

41.    Paragraph 40. Note that the Landlord may assign its rights under the Lease and that each Landlord is only responsible for obligations accrued during their period of ownership. There should be an exception for assignments to an affiliate of Landlord.

42.    Paragraph 43(a)(ii)    Tenant to receive credit against rent for any unused Improvement Allowance. Tenant may wish to address timing of payment of Tenant Allowance so as to have the funds available to pay contractors as work progresses.

43.    Paragraph 44. Delete waiver of jury trial.

Please direct your responses to me. I look forward to working with you.

Sincerely,

Donna J. Wengiel
Stuckert and Yates

DJW:drm

cc: Performance Spine & Sports Medicine, LLC
    Attn: Mr. Percy Naranjo (via e-mail)

# **EXHIBIT 8**

LETTER OF INTENT to Enter into Commercial Lease Negotiations

This Letter of Intent ("LOI") outlines the terms which K. Johnson Enterprises or its designee ("Landlord") and Performance Spine & Sports Medicine, LLC. ("Tenant"), or its designee; with unconditional guarantee of principals, will pursue lease negotiations for the premises located at New Jersey State Highway Route 130, Block 57, Lot 6.04, Bordentown Township, Burlington County, New Jersey ("Premises").

The following terms and conditions serve as an outline for a final lease agreement to be negotiated and executed by all parties. NOTE that this Letter of Intent is not binding on either party and only a fully executed mutually acceptable lease agreement between the Parties will be binding upon the Parties.


1.    PREMISES

        The Tenant intends to lease the first floor of Building A of the Project known as Team Campus Bordentown for the purpose of medical office space and physical therapy services. Building A is a two-story building containing approximately 30,000 square feet. The area on the first floor of interest to the Tenant consists of approximately 14,500 square feet with the balance of the floor area being common area.

        Upon the execution of a mutually acceptable lease agreement between the parties hereto; the Tenant will have the exclusive right to the designated space in Building A for the purpose of medical office space, physical therapy services provided that the tenant shall not have uses beyond those defined as permitted use(s) under the executed lease agreement. The terms and conditions shall be further defined within the negotiated lease document.

2.    EFFECTIVE DATE

        The Lease shall be effective as of the date of lease execution (the "Effective Date").

3.    COMMENCEMENT DATE

        The term of the lease and rent thereunder shall commence ("Commencement Date"), the sooner of:
(a)    Tenant opens the leased Premises for business to the public; or
(b)    A predetermined number of days to be agreed upon after the Delivery Date.

4.    LEASE TERM

        The term of the Lease will consist of an initial term of ten (10) years, plus two (2) renewal periods of five (5) years each, exercisable at Tenant's option, for a total term of twenty years (20).

5.    RENT

        This lease is an absolute triple net lease to the Landlord. The base net rent, paid monthly for the first year of the Lease will be Eighteen Dollars ($18.00) per square foot, further described as $261,000.00 annually or $21,750.00 monthly. Thereafter, the base rent will increase 3% per year thereafter on the anniversary date of the lease commencement.

6.    OPERATING EXPENSES

        Tenant shall pay its pro-rata share of common area maintenance, real estate taxes and exterior insurance. "Pro rata share" is further described as including the operating expenses directly related to Building A and those operating expenses attributed to the exterior of the entire Project.

7. SECURITY DEPOSIT

Tenant will provide two (2) months security deposit at the time the lease is executed.

8. INSURANCE

Tenant will carry insurance typical of a Tenant in this type of project in sufficient amounts to be confirmed in the Lease Agreement and reasonably satisfactory to Landlord. Landlord will be listed as co-insured, except on Tenant personal property.

9. LIENS

No Tenant liens are to be placed on the real property.

10. PARKING

Tenant's employees, customers and guests shall have access to park in areas of the Project Common Area designated by Landlord. Landlord and Tenant further agree to discuss the potential for designated parking for the staff.

11. ENVIRONMENTAL

Tenant will do nothing to contaminate land and will indemnity and hold the Landlord harmless in the event Tenant does anything that contaminates the property.

12. CONSTRUCTION

The Landlord will be delivering to Tenant a warm lit shell to be further defined in the Lease Agreement. Tenant will finish the interior of their leased premises in accordance with a plan to be approved by the Landlord and the Township. The Landlord further agrees to provide Tenant with a fit out allowance of $25 per square foot to be further defined and described in the lease document.

13. FINANCING

Tenant understands the Landlord is financing this project and agrees to cooperate with the Landlord by providing the lending institution with required documentation.

14. DURATION

This Letter of Intent shall be effective from the date submitted and continuing thereafter for a period of 30 days.

15. PURCHASE OPTION

The Landlord and Tenant agree that in the event the Landlord decides to condo Building A of the project, that the Tenant will have the right of first offer to purchase its leased space, the terms and price of which will be outlined in the lease document

16. CROSS MARKETING

Due to the Landlord's Lifestyle and Fitness Center use being located in Building B and the prospect of the Tenant's use in Building A there is a synergy that both parties believe is worth exploring outside of the lease document.

Therefore, the parties hereby agree to the terms as stated herein on the date as written:

Landlord
K Johnson Enterprises, LLC.

By: _____

Name: _Kevin Johnson_

Title: _Owner / Landlord_

Date: _12/31/10_

Tenant
Performance Spine & Sports Medicine, LLC.

By: _____

Name: _Performance Spine i Sports Med_

Title: _Chief Finan Offia_

Date: _1-6-2010_

# EXHIBIT 9

LETTER OF INTENT to Enter into Commercial Lease Negotiations

This Letter of Intent ("LOI") outlines the terms which K Johnson Enterprises or its designee ("Landlord") and Performance Spine & Sports Medicine, LLC. ("Tenant"), or its designee; with unconditional guarantee of principals, will pursue lease negotiations for the premises located at New Jersey State Highway Route 130, Block 57, Lot 6.04, Bordentown Township, Burlington County, New Jersey ("Premises").

The following terms and conditions serve as an outline for a final lease agreement to be negotiated and executed by all parties. NOTE that this Letter of Intent is not binding on either party and only a fully executed mutually acceptable lease agreement between the Parties will be binding upon the Parties.

## 1. PREMISES

The Tenant intends to lease the first floor of Building A of the Project known as Team Campus at Bordentown for the purpose of medical office space. Building A is a two-story building containing approximately 30,000 square feet. The area on the first floor of interest to the Tenant consists of approximately 13,500 square feet with the balance of the floor area being common area.

Upon the execution of a mutually acceptable lease agreement between the parties hereto; the Tenant will have the exclusive right to the designated space in Building A for the purpose of medical office space, provided that the tenant shall not have uses beyond those defined as permitted use(s) under the executed lease agreement.

## 2. EFFECTIVE DATE

The Lease shall be effective as of the date of lease execution (the "Effective Date").

## 3. COMMENCEMENT DATE

The term of the lease and rent thereunder shall commence ("Commencement Date"), the sooner of:
(a)     Tenant opens the leased Premises for business to the public; or
(b)     A predetermined number of days to be agreed upon after the Delivery Date.

## 4. LEASE TERM

The term of the Lease will consist of an initial term of ten (10) years, plus two (2) renewal periods of five (5) years each, exercisable at Tenant's option, for a total term of twenty years (20).

## 5. RENT

This lease is an absolute triple net lease to the Landlord. The base net rent, paid monthly, will be twenty ($20.00) per square foot, further described as $270,000.00 annually or $22,500.00 monthly. Thereafter, the base rent will increase three percent (3%) per year on the anniversary date of the lease commencement.

## 6. OPERATING EXPENSES

Tenant shall pay its pro-rata share of common area maintenance, real estate taxes and exterior insurance. "Pro rata share" is further described as including the operating expenses directly related to Building A and those operating expenses attributed to the exterior of the entire Project.

## 7. SECURITY DEPOSIT

Tenant will provide one (1) months security deposit at the time the lease is executed.

8.    INSURANCE

Tenant will carry insurance typical of a Tenant in this type of project in sufficient amounts to be confirmed in the Lease Agreement and reasonably satisfactory to Landlord. Landlord will be listed as co-insured, except on Tenant personal property.

9.    LIENS

No Tenant liens are to be placed on the real property.

10.   PARKING

Tenant's employees, customers and guests shall have access to park in areas of the Project Common Area designated by Landlord. Landlord and Tenant further agree to discuss the potential for designated parking for the staff.

11.   ENVIRONMENTAL

Tenant will do nothing to contaminate land and will indemnity and hold the Landlord harmless in the event Tenant does anything that contaminates the property.

12.   CONSTRUCTION

The Landlord will be delivering to Tenant a warm lit shell to be further defined in the Lease Agreement. Tenant will finish the interior of their leased premises in accordance with a plan to be approved by the Landlord and the Township. The Landlord further agrees to provide Tenant with a fit out allowance of $15 per square foot to be further defined and described in the lease document.

13.   FINANCING

Tenant understands the Landlord is financing this project and agrees to cooperate with the Landlord by providing the lending institution with required documentation.

14.   DURATION

This Letter of Intent shall be effective from the date submitted and continuing thereafter for a period of 30 days.

15.   PURCHASE OPTION

The Landlord and Tenant agree that in the event the Landlord decides to condo Building A of the project, that the Tenant will have the right of first offer to purchase its leased space, the terms and price of which will be outlined in the lease document

16.   CROSS MARKETING

Due to the Landlord's Lifestyle and Fitness Center use being located in Building B and the prospect of the Tenant's use in Building A there is a synergy that both parties believe is worth exploring outside of the lease document.

17.   LETTER OF INTENT DEPOSIT

The Tenant will place in the escrow account of the Landlord's Title Company the amount of $15,000.00 of which $10,000.00 will be non refundable at the signing of this letter, except as otherwise provided below. After June 1, 2010, either party can terminate negotiations of the lease agreement

contemplated hereunder by providing written notice to the other party. If the Tenant elects to terminate negotiations, and the Landlord has negotiated and proceeded with the project in good faith, the Tenant will receive the balance of the deposit and the non-refundable portion of the deposit shall be released to the Landlord. If the Landlord elects to terminate negotiations, or if the Landlord has not negotiated or proceeded with the project in good faith , the tenant will receive a full refund of the deposit.

Therefore, the parties hereby agree to the terms as stated herein on the date as written;

Landlord
K Johnson Enterprises, LLC.

By: _____

Name: _____

Title: _Owner_____

Date: _4/2/10_____

Tenant
Performance Spine & Sports Medicine, LLC.

By: _____

Name: _Percy Naranjo, MBA_____

Title: _Chief Financial Office____

Date: _4/2/10_____

# EXHIBIT 10

# LEASE

**by and between**

**KJOHNSON URBAN RENEWAL LLC**

**(as Landlord)**

**And**

**Performance Spine and Sports Medicine of Bordentown, LLC**

**(as Tenant)**

Date: <u>January 22</u>, 2012

**Premises: Building F, located at New Jersey State Highway Route 130**

**Block 57, Lot 6.01, Bordentown Township, Burlington County, New Jersey**

# TABLE OF CONTENTS

1. **Definitions.** ..................................................................................................... 5
2. **Premises.** .......................................................................................................... 6
3. **Completion of Premises.** ................................................................................. 6
4. **Commencement Date.** ...................................................................................... 7
5. **Use of Premises.** ............................................................................................... 7
6. **Fixed Basic Rent.** ............................................................................................. 7
7. **Real Estate Taxes.** ............................................................................................ 7
8. **Operating Expenses.** ........................................................................................ 9
9. **Interest and Late Charge.** ............................................................................. 15
10. **Insurance.** ...................................................................................................... 15
11. **Repairs and Maintenance.** ............................................................................ 18
12. **Utilities and Services.** .................................................................................... 19
13. **Governmental Regulations.** .......................................................................... 20
14. **Alterations, Additions and Fixtures.** .......................................................... 20
15. **Construction Liens.** ....................................................................................... 22
16. **Negative Covenants of Tenant.** .................................................................... 22
17. **Landlord's Right of Entry; Right to Cure.** ................................................. 25
18. **Damage by Fire or Other Casualty.** ............................................................ 26
19. **Non-Abatement of Rent.** ............................................................................... 27
20. **Indemnification.** ............................................................................................ 27
21. **Eminent Domain.** ........................................................................................... 28
22. **Quiet Enjoyment.** ........................................................................................... 29
23. **Rules and Regulations.** .................................................................................. 29
24. **Assignment and Sublease.** ............................................................................. 29
25. **Subordination.** ............................................................................................... 32
26. **Curing Tenant's Defaults.** ............................................................................ 32
27. **Surrender.** ...................................................................................................... 32
28. **Defaults-Remedies.** ........................................................................................ 33
29. **Brokers' Commission.** ................................................................................... 35
30. **Notices.** .......................................................................................................... 36
31. **Inability to Perform.** ..................................................................................... 36
32. **Survival.** ......................................................................................................... 36
33. **Corporate Tenant.** ......................................................................................... 36
34. **Waiver of Invalidity of Lease.** ..................................................................... 37
35. **Security Deposit.** ............................................................................................ 37
36. **Estoppel Certificate.** ..................................................................................... 37
37. **Rights Reserved by Landlord.** ..................................................................... 37
38. **Miscellaneous.** ............................................................................................... 38
39. **OFAC.** ............................................................................................................ 40

THIS LEASE (this "**Lease**") is made the 22 day of January, 2012 between **[K JOHNSON ENTERPRISES OR ITS DESIGNEE]** ("**Landlord**"), a LLC, and **[ENTITY CONTROLLED BY PERFORMANCE SPINE AND SPORTS MEDICINE]** ("**Tenant**"), a LLC.

**PREAMBLE**

**BASIC LEASE PROVISIONS AND DEFINITIONS**

In addition to other terms elsewhere defined in this Lease, the following terms whenever used in this Lease shall have only the meanings set forth in this Section, unless such meanings are expressly modified, limited or expanded elsewhere in this Lease.

A.      **ADDITIONAL RENT** shall mean all sums in addition to Fixed Basic Rent payable by Tenant to Landlord or to third parties pursuant to the provisions of the Lease.

B.      **ASSOCIATION** shall mean any association created under any Declaration or Master Deed.

C.      **BUILDING** shall mean an approximately 16,000 square foot, two story medical office building known as Building F,

D.      **BUILDING HOLIDAYS** shall be those holidays listed on Exhibit D.

E.      **COMPLEX** shall mean Lot 6.02 and a portion of Lot 6.01 in Block 57 on the tax map of the Township of Bordentown, excluding that portion of Lot 6.01 containing the granary business and more particularly described on the site plan attached as Exhibit B-2 to this Lease, including all of the buildings and improvements thereon and commonly known as the "Team Campus," as such area may be amended or subdivided by Landlord from time to time.

F.      **COMMENCEMENT DATE** shall mean the date Tenant takes possession after Landlord's work is completed.

G.      **DATE OF THIS LEASE** shall mean the date of acceptance and execution of this Lease by Landlord, following execution and delivery thereof to Landlord by Tenant and that date shall be inserted in the space provided in the Preamble.

H.      **DECLARATION** shall mean such declarations, covenants, restrictions and agreements of public record to which the Property or the Complex may be subject relating to the development, operation and maintenance of the Complex.

I.      **DELIVERY DATE** shall be on or about 425 days from the date Landlord receives building permits necessary to commence construction of the Building

J.      **EXHIBITS** shall be the following, attached to this Lease and incorporated in this Lease and made a part of this Lease:

Rider A                          Renewal Options

Rider B                    Option to Purchase Unit

Exhibit A                  Premises
Exhibit B-1                Legal Description of Property
Exhibit B-2                Legal Description of the Premises
Exhibit C                  Landlord Work Letter
Exhibit D                  Building Holidays
Exhibit E                  Janitorial Specifications
Exhibit F                  Rules and Regulations
Exhibit G                  Tenant Estoppel Certificate
Exhibit H                  Confirmation of Lease Term
Exhibit I                  Unconditional Guaranty and Suretyship Agreement
Exhibit J                  Tenant Work Letter

K.    **FIXED BASIC RENT** shall mean:

| Lease Year | Rentable Square Feet | Rate Per Rentable Square Feet | Annual Fixed Basic Rent | Monthly Installment of Fixed Basic Rent |
|---|---|---|---|---|
| 1 | 16,000 | $15.00 | $240,000.00 | $20,000.00 |
| 2 | 16,000 | $15.45 | $247,200.00 | $20,600.00 |
| 3 | 16,000 | $15.91 | $254,560.00 | $21,213.33 |
| 4 | 16,000 | $16.39 | $262,240.00 | $21,853.33 |
| 5 | 16,000 | $16.88 | $270,080.00 | $22,506.67 |
| 6 | 16,000 | $17.39 | $278,240.00 | $23,186.67 |
| 7 | 16,000 | $17.91 | $286,560.00 | $23,880.00 |
| 8 | 16,000 | $18.45 | $295,200.00 | $24,600.00 |
| 9 | 16,000 | $19.00 | $304,000.00 | $25,333.33 |
| 10 | 16,000 | $19.57 | $313,120.00 | $26,093.33 |
| **First Renewal Term** | | | | |
| 11 | 16,000 | $20.16 | $322,560.00 | $26,880.00 |
| 12 | 16,000 | $20.76 | $332,160.00 | $27,680.00 |
| 13 | 16,000 | $21.38 | $342,080.00 | $28,506.67 |
| 14 | 16,000 | $22.02 | $352,320.00 | $29,360.00 |
| 15 | 16,000 | $22.68 | $362,880.00 | $30,240.00 |
| **Second Renewal Term** | | | | |
| 16 | 16,000 | $23.36 | $373,760.00 | $31,146.67 |
| 17 | 16,000 | $24.06 | $384,960.00 | $32,080.00 |
| 18 | 16,000 | $24.78 | $396,480.00 | $33,040.00 |
| 19 | 16,000 | $25.52 | $408,320.00 | $34,026.67 |

-2-

| 20 | 16,000 | $26.29 | $420,640.00 | $35,053.33 |

L. **EXCLUDED USE** shall be any use for medical office and clinical uses, ambulatory surgery, radiation oncology, dialysis, and hyperbaric oxygen therapy; health, sport and/or fitness club; and health or wellness center. Landlord shall have the right to add additional uses to supplement the Excluded Uses by written notice to Tenant, except that if at the time of the notice Tenant is actively engaged in any additional Excluded Use contained in the notice, Tenant may continue such use for so long as the additional Excluded Use continues without interruption, termination or default. Notwithstanding anything to the contrary contained in this Lease, the term "Excluded Use" shall not be deemed to include the Permitted Use.

M. **EXCLUSIVE USE** shall be fore physical rehabilitation services, which shall include physical medicine, chiropractic services, acupuncture and physical therapy which incorporate the following subservices: gait training, balance training, postural analysis, movement analysis, manual therapy, neuromuscular reeducation, therapeutic exercise, therapeutic activities, aquatic therapy, joint mobilizations, electrotherapy modalities, hydrotherapy and physical agents, and related self care, injury prevention and occupational therapy.

N. **FORCE MAJEURE** shall mean a strike, labor troubles, acts of war, terrorism, or bioterrorism, a general utility outage, extraordinary weather event, or any other cause whatsoever beyond Landlord's control

O. **GUARANTY** shall mean that certain Unconditional Guaranty and Suretyship Agreement of even date herewith between Landlord and Performance Spine and Sports Medicine LLC, a limited liability company, which Guaranty shall be in the form attached hereto as Exhibit I.

P. **IMPROVEMENT ALLOWANCE** shall mean the sum of Twenty-Five Dollars ($25.00) per rentable square foot of the Premises, for a total of Four Hundred Thousand Dollars and 00/100 Dollars ($400,000.00).

Q. **LANDLORD** as used in this Lease includes the Landlord named above as well as its successors and assigns, each of whom shall have the same rights, remedies, powers, authorities and privileges as it would have had it originally signed this lease as Landlord. Any such person, whether or not named herein, shall have no liability hereunder after ceasing to hold title to the Property. No principal of Landlord, whether disclosed or undisclosed, shall have any personal liability with respect to any of the provisions of this Lease, the Premises, the Property or the Complex.

R. **LEASE YEAR** shall mean, with respect to the first Lease Year, the period commencing on the Commencement Date and ending on the last day of the month which is twelve (12) consecutive calendar months following the Commencement Date and, with respect to each Lease Year thereafter, each consecutive twelve (12) calendar month period thereafter.

S. **MORTGAGE or mortgage** as used in this Lease includes any lien or encumbrance on the Premises or the Property or on any part of or interest in or appurtenance to

#15241254 v2

any of the foregoing, including without limitation any ground rent or ground lease if Landlord's interest is or becomes a leasehold estate. The word "Mortgagee" or "mortgagee" is used herein to include the holder of any such mortgage, including any ground lessor if Landlord's interest is or becomes a leasehold estate. Whenever any right is given to a mortgagee, that right may be exercised on behalf of such mortgagee by any representative or servicing agent of such mortgagee.

T. **PERSON** shall mean a natural person, a partnership, a corporation, an association, and any other form of business association or entity.

U. **RENT** shall mean all Fixed Basic Rent and Additional Rent and any other rent or other sums due from Tenant under this Lease.

V. **PERMITTED USE** shall mean use of the Premises for, physical therapy and other rehabilitative services, to include a spine and sports medicine center performing all phases of rehabilitation, including without limitation, chiropractic, physical therapy, occupational therapy, acupuncture, nutritional counseling and non-surgical spine and sports medicine and related activities.

W. **POSSESSION DATE** shall mean the date of Substantial Completion of Landlord's Work in accordance with Exhibit C.

X. **PREMISES** shall mean the entire Building, consisting of approximately 16,000 rentable square feet as shown on Exhibit A.

Y. **PREMISES TAX** shall mean (i) Tenant's Building Proportionate Share of any Real Estate taxes separately assessed to the Building; and/or (ii) any taxes that are payable by Landlord under a financial agreement with the Township of Bordentown based on the rents received under the terms of this Lease.

Z. **PROPERTY** shall mean Block 57, Lot 6.01 on the tax map of the Township of Bordentown, as more particularly described on Exhibit B-1 attached to the Lease.

AA. **SECURITY DEPOSIT** shall be the sum of $40,000.00 which shall be held in accordance with Section 36 of the Lease.

BB. **TENANT** as used in this Lease includes Tenant named above as well as its heirs, successors and assigns, each of which shall be under the same obligations, liabilities and disabilities and each of which shall have the same rights, privileges and powers as it would have possessed had it originally signed this Lease as Tenant. Each and every person named above as Tenant shall be bound jointly and severally by the terms, covenants and agreements contained herein. However, no such rights, privileges or powers shall inure to the benefit of any assignee of Tenant, immediate or remote, unless the assignment to such assignee is permitted or has been approved in writing by Landlord. Any notice required or permitted by the terms of this Lease may be given by or to any one of the persons named above as Tenant, and shall have the same force and effect as if given by or to all of them.

-4-

CC.    **TENANT'S BUILDING PROPORTIONATE SHARE** shall mean the fraction, the numerator of which shall be the total square footage of the Premises and the denominator of which shall be the total square footage of the Building.

DD.    **TENANT'S COMPLEX PROPORTIONATE SHARE** shall mean a fraction, the numerator of which shall be the total square footage of the Premises, and the denominator of which shall be the total square footage of all of the buildings in the Complex that have received a certificate of occupancy at the time any costs assessed hereunder are accrued.  The denominator shall not include the square footage of any of the Common Facilities, the indoor practice field or the maintenance building on Lot 6.01.  Tenant acknowledges that Landlord is in the process of developing the Complex and therefore Tenant's Complex Proportionate Share is subject to change.

EE.    **TENANT'S PROPORTIONATE TAX SHARE** shall mean the fraction, the numerator of which shall be the total square footage of the Premises, and the denominator of which shall be the total square footage of the buildings on the Property that have been approved by the Township of Bordentown.  As of the date hereof the parties agree the total square footage approved is 202,300 square feet, which is subject to adjustment if the actual square footage of all of the buildings is more or less than 202,300 square feet, after all buildings have received certificates of occupancy.  The denominator shall not include the square footage of any of the Common Facilities or the indoor practice field.

FF.    **TENANT'S TAX SHARE** shall mean the Premises Tax plus Tenant's Proportionate Tax Share of any Real Estate Taxes chargeable to (1) the land (excluding any improvements thereon) constituting the Property; (2) the Common Facilities; and (3) any other Real Estate Taxes assessed against the Property as a whole and not associated with any improvements thereon, including, for example a payment in lieu of taxes based on the Rent received under the terms of this Lease pursuant to a financial agreement with the Township of Bordentown.  To the extent that the Premises Tax cannot be separated from the Real Estate Taxes on the Property, Tenant's Tax Share shall be Tenant's Proportionate Tax Share of the Real Estate Taxes on the Property.  Any taxes paid by Tenant on the land constituting the Property shall be credited against the Premises Tax payable by Tenant to the same extent Landlord receives such a credit pursuant to a financial agreement with the Township of Bordentown

GG.    **TERM** shall mean the period of time commencing on the Commencement Date (as defined in Section 4 of the Lease) and ending on the date which is ten (10) Lease Years following the Commencement Date, unless otherwise terminated or extended pursuant to the terms of this Lease.

For and in consideration of the covenants contained in this Lease, and upon the terms and conditions set forth in this Lease, Landlord and Tenant, intending to be legally bound, agree as follows:

1.    **Definitions.**  The definitions set forth in the preceding Preamble shall apply to the same capitalized terms appearing in this Lease.  Additional definitions are contained in Section 41 and throughout this Lease.

#15241254 v2

2.     **Premises.**

a.     Landlord hereby demises and leases the Premises to Tenant and Tenant hereby leases and takes the Premises from Landlord for the Term and upon the terms, covenants, conditions, and provisions set forth in this Lease, including the Preamble.  Tenant's interest in the Premises as tenant shall include the right, in common with Landlord and other occupants of the Complex, to use driveways, sidewalks, storm water management basin, loading and parking areas and other facilities which are located within the Complex and that are designated by Landlord from time to time for the use of all of the tenants of the Complex (the "**Common Facilities**").  Notwithstanding anything to the contrary contained in this paragraph, Tenant shall at all times have available to it (for itself, its employees, patients and invitees) at least 40 parking spaces in the area designated on Exhibit B-2.

b.     Tenant acknowledges that Landlord may subject the Complex, including the Premises, to a master deed under the New Jersey Condominium Act (a "**Master Deed**") or to a Declaration, in which case some of Landlord's obligations hereunder may be undertaken by an Association pursuant to the Declaration or the Master Deed and the parties' obligations shall be amended to account for any changes made necessary by such Declaration or Master Deed. Landlord shall deliver a copy of Landlord's proposed form of Master Deed or Declaration to Tenant prior to recording such document with the Burlington County Clerk, and Landlord shall not record the same without the prior written consent of Tenant, which consent shall not be unreasonably withheld, conditioned or delayed; provided that Tenant may only object to such Master Deed or Declaration on the grounds that it (i) materially affects Tenant's use and enjoyment of, or access to, the Premises and/or the Common Facilities, and/or (ii) results in any increase to the financial obligations of Tenant. If Tenant fails to deliver to Landlord its written objections to Landlord's form of Declaration or Master Deed on or before the thirtieth (30th) day after the date Tenant receives the copy of such Master Deed or Declaration from Landlord, Tenant shall be deemed to have consented to the same, and Landlord may proceed with the recording thereof.

3.     **Completion of Premises.**  The Premises shall be completed in accordance with the Landlord Work Letter attached hereto as Exhibit C and the Tenant Work Letter attached hereto as Exhibit J.  If the Landlord Work is not Substantially Completed (as defined in the Landlord Work Letter) and delivered to Tenant on or before the Delivery Date for any reason, whether or not within Landlord's control, Landlord shall not be subject to any liability to Tenant and no such failure to deliver the Premises by the Delivery Date or any other date shall in any respect affect the validity or continuance of this Lease of any obligation of Tenant hereunder; provided, however, that in the event the Premises are not Substantially Completed on or before September 1, 2013  (as such date shall be extended due to Tenant Delay or Force Majeure), Tenant shall have the right to terminate this Lease by written notice to Landlord, in which event Landlord shall fully and promptly return to Tenant the Security Deposit and this Lease shall be NULL and VOID and neither party shall have any further obligation to the other.  Landlord shall have the right to re-measure the Premises following the Possession Date and/or the Commencement Date and if the Premises are found to contain more or less than 16,000 rentable square feet, the relevant provisions of this Lease shall be adjusted accordingly.

4.    **Commencement Date.**  The Term shall commence on the Commencement Date, provided however, that if Tenant has been unable to obtain a Certificate of Occupancy for the Permitted Use from the Township of Bordentown prior to the Commencement Date based solely upon a failure of Landlord to complete the Landlord Work in accordance with the Landlord Work Letter, the Commencement Date shall be postponed by the number of required for Landlord to complete such work. Upon Landlord's request, Tenant shall execute the Confirmation of Lease Term attached hereto as <u>Exhibit H</u>.

5.    **Use of Premises.**  Tenant shall occupy the Premises throughout the Term and shall use the same for, and only for, the Permitted Use.  Landlord covenants and agrees that during the Term, as long as no Event of Default has occurred, Landlord shall not lease or permit any property within the Complex to be used for an Exclusive Use hereunder.  Tenant shall forfeit its right to the Exclusive Uses upon the occurrence of an Event of Default.

6.    **Fixed Basic Rent.**  Commencing on the Commencement Date, Tenant shall pay, throughout the Term, the annual Fixed Basic Rent in the amount specified in the Preamble, without notice or demand and without setoff or deduction, in monthly installments equal to one-twelfth of the annual Fixed Basic Rent, in advance, on the first day of each calendar month during the Term.

7.    **Real Estate Taxes.**

a.    **Definitions**. The following terms shall be defined as hereinafter provided:

(1)    "**Real Estate Taxes**" shall mean all taxes, liens, charges, imposts and assessments of every kind and nature, ordinary or extraordinary, foreseen or unforeseen, general or special, levied, assessed or imposed by any governmental authority, including without limitation payments in lieu of taxes, with respect to the Property, as well as all fees or assessments payable on account of the Property being located in any special services district. Notwithstanding the foregoing:

(a)    if at any time during the Term the present system of ad valorem taxation of real property shall be changed or supplemented so that in lieu of or in addition to the ad valorem tax on real property there shall be assessed on Landlord or the Property any tax of any nature which is imposed in whole or in part, in substitution for, addition to, or in lieu of any tax which would otherwise constitute a Real Estate Tax, such tax shall be included within the term "Real Estate Taxes," but only to the extent that the same would be payable if the Property were the only property of Landlord;

(b)    Real Estate Taxes shall also encompass all of Landlord's expenses, including but not limited to reasonable attorney's fees and expenses, incurred by Landlord in any effort to minimize Real Estate Taxes whether by contesting proposed increases in assessments, applying for the benefit of any tax abatement program available for the Property, appealing the denial of any such tax abatement, or contesting any challenge to the validity of any tax abatement program or its applicability to the Property or by any other means or procedures appropriate in the circumstances; provided, however, that under no circumstances shall Landlord have any obligation to undertake any contest, appeal or other procedure to minimize Real Estate

Taxes or to obtain or maintain the benefits of any tax abatement program for the Property; and

(c)     except as otherwise provided in Section 7a1(a) above, there shall be excluded from Real Estate Taxes all net income, excess profit (except to the extent such net income and/or excess profits are used by the applicable taxing authority for the purpose of calculating a payment in lieu of taxes based on the Rent received under the terms of this Lease pursuant to a financial agreement with the Township of Bordentown), excise, franchise, estate, succession and inheritance taxes, penalties due to Landlord's lateness or failure to pay taxes when due and transfer taxes imposed on Landlord.

(2)     "**Tax Year**" shall mean each calendar year, or such other period of twelve (12) months as now or hereafter may be duly adopted as the fiscal year for real estate tax purposes of the governmental unit in which the Property is located, occurring during the Term.

(3)     "**Tax Statement**" shall mean a statement provided by Landlord, setting forth in reasonable detail: (a) the Real Estate Taxes for the Tax Year(s) (or portion thereof if less than full Tax Year(s) immediately preceding the Tax Year in which such statement is issued, (b) Tenant's Tax Payment (defined in Section 7b) for such preceding Tax Year(s), prorated if only a part of a Tax Year falls within the Term; (c) the amount of payments made by Tenant on account of Tenant's Tax Payment during such preceding Tax Year(s); (d) the amount of payments of the Monthly Tax Payment Estimate (defined in Section 7b(1)(a)) made to date by Tenant in the Tax Year in which the Tax Statement is issued; and (e) the Monthly Tax Payment Estimate for the Tax Year in which the Tax Statement is issued.

b.     **Payment of Tenant's Tax Payment**. Commencing on the Commencement Date, Tenant shall pay to Landlord, as Additional Rent hereunder, an amount equal to Tenant's Tax Share, prorated for any partial Tax Year within the Term ("**Tenant's Tax Payment**").

(1)     Such Tenant's Tax Payment shall be paid in the following manner:

(a)     Beginning on the Commencement Date and continuing thereafter during each Tax Year during the Term on the first day of each month until receipt of the next Tax Statement, Tenant will pay Landlord an amount set by Landlord sufficient to pay Landlord's estimate (reasonably based on the actual Real Estate Taxes for the preceding Tax Years (but subject to the provision of Section 7(b)(ii) below) and Landlord's projections of any anticipated increases or decreases thereof) of Tenant's Tax Payment for the current Tax Year (or remaining portion thereof) (the "**Monthly Tax Payment Estimate**"). The Monthly Tax Payment Estimate for a period less than a full calendar month shall be duly prorated.

(b)     Following the end of each Tax Year, Landlord shall furnish Tenant a Tax Statement setting forth the information described in Section 7a(3) above. Within thirty (30) days following the receipt of such Tax Statement (the "**Tax Expense Share Date**") Tenant shall pay to Landlord: (i) the amount by which the Tenant's Tax Payment for the Tax Year (or portion thereof) covered by the Tax Statement exceeds the aggregate of Monthly Tax Payment Estimates paid by Tenant with respect to such Tax Year (or portion thereof); and (ii) the amount by which the Monthly Tax Payment Estimate for the current Tax Year as shown on the

Tax Statement multiplied by the number of months elapsed to date in the current Tax Year (including the month in which payment is made) exceeds the aggregate amount of payments of the Monthly Tax Payment Estimate theretofore made in the Tax Year in which the Tax Statement is issued.  Landlord shall diligently endeavor to furnish Tenant a Tax Statement not later than one hundred and twenty (120) days following the end of each Tax Year.

(c)     On the first day of the first month following receipt by Tenant of any annual Tax Statement and continuing thereafter on the first day of each succeeding month until the issuance of the next ensuing Tax Statement, Tenant shall pay Landlord the amount of the Monthly Tax Payment Estimate shown on the Tax Statement.

(d)     If on any Tax Expense Share Date Tenant's payments of the installments of the Monthly Tax Payment Estimate for the preceding year's Real Estate Taxes are greater than Tenant's Tax Payment for such preceding Tax Year, Landlord shall credit Tenant with any excess, which credit may be offset by Tenant against next due installments of Rent.  If the Term expires prior to the Tax Expense Share Date for the applicable Tax Year and if Tenant's payments of Monthly Tax Payment Estimate either exceed or are less than Tenant's Tax Payment, Landlord shall send the Tax Statement to Tenant, and an appropriate payment from Tenant to Landlord or refund from Landlord to Tenant shall be made on the Tax Expense Share Date. The provisions of this Section 7(b)(i)(4) shall remain in effect notwithstanding any termination of this Lease; provided however, that if upon termination of this Lease Tenant owes Landlord any sums under this Lease (for Rent or otherwise), Landlord shall have the right to reduce the amount of any refund due Tenant under this Section 7(b)(i)(4) against such sums owed by Tenant to Landlord.

(2)     Real Estate Taxes with respect to a Tax Year which is the subject of an appeal filed by or on behalf of Landlord shall be paid on the basis of the amount reflected in the tax bill and shall not be adjusted until the final determination of the appeal.  Upon such determination of any appeal, Landlord will notify Tenant in writing of the actual amount of Tenant's Tax Share of the Real Estate Taxes for the year or years which were the subject of the appeal and the amount, if any, remaining due by Tenant in excess of Tenant's estimated payments.  Tenant shall pay such entire amount so due on the due date for the next installment of Fixed Basic Rent, or if this Lease has terminated, Tenant shall pay the amount due within fifteen (15) days after receipt of Landlord's notice.  If the final determination of the appeal results in a reduction of the Real Estate Taxes at issue and Landlord receives a cash refund from the taxing authority on account of overpayment of Real Estate Taxes for such year, Tenant shall receive a credit against the installment of Fixed Basic Rent next coming due in the amount by which Tenant's payments on account of Tenant's Tax Share of such Real Estate Taxes exceeded the payments actually due for the applicable year.

c.     **Tenant's Personalty**. Tenant shall pay all taxes imposed upon Tenant's furnishings, trade fixtures, equipment or other personal property.

8.     **Operating Expenses.**

a.     **Definitions**.  As used in this Section 8 the following terms shall be defined as hereinafter provided:

(1)    "**Operating Year**" shall mean each calendar year, or such other period of twelve (12) months as hereafter may be adopted by Landlord as its fiscal year, occurring either in whole or in part during the Term.

(2)    "**Operating Expense Statement**" shall mean a statement provided by Landlord, setting forth in reasonable detail:  (a) the Operating Expenses for the Operating Year (or portion thereof if less than a full Operating Year) immediately preceding the Operating Year in which the statement is issued, reasonably detailed by major categories, (b) the Tenant's Expense Payment (defined in Section 8b) for such preceding Operating Year, prorated if only a part of the Operating Year falls within the Term, (c) the amount of payments made by Tenant on account of the Tenant's Expense Payment during such preceding Operating Year, (d) the amount of payments of the Monthly Operating Expense Estimate (defined in Section 8b(1)(a)) made to date by Tenant in the Operating Year in which the Expense Statement is issued, and (e) the Monthly Operating Expense Estimate for the Operating Year in which the Operating Expense Statement is issued.

(3)    "**Operating Expenses**" shall mean

(a)    The expenses incurred by Landlord in connection with the operation, repair, maintenance, protection and management of the Premises, Building, Common Facilities and Complex, from and after the completion of the Project upon the Property by Landlord, including by way of example rather than of limitation, the following:

i)    Wages, salaries, fees and other compensation and payments, payroll taxes, contributions to any social security, unemployment insurance, welfare, pension or similar fund and payments for other fringe benefits made to or on behalf of any and all employees of Landlord performing services rendered in connection with the operation, repair, maintenance, protection and management of the Complex, including, without limitation: window cleaners; porters; janitors; miscellaneous handymen; watchmen; persons engaged in patrolling and protecting the Complex; carpenters; engineers; firemen; mechanics; electricians; plumbers; landscapers; insurance risk managers; building superintendent and assistants; property manager; and clerical and administrative personnel all of which expenses shall not exceed the market rate for such services for other comparable buildings in the area of the Building. Landlord may contract for any of the foregoing to be performed by independent contractors, in which event all sums paid to such independent contractors shall be included within Operating Expenses pursuant to Section 8(a)(iii)(1)(p) below.

ii)    The cost of employee uniforms, and the cleaning, pressing and repair thereof.

iii)    Cleaning costs for the Complex, including the facade, windows and sidewalks, all costs for snow and rubbish removal and the costs of all labor, supplies, equipment and materials incidental to such cleaning.

iv)    Premiums and other charges incurred by Landlord with respect to all insurance relating to the Complex and the operation and maintenance thereof, including without limitation:  all risk of physical damage or fire and extended coverage

-10-

insurance; public liability insurance; elevator insurance; workmen's compensation insurance; boiler and machinery insurance; sprinkler leakage insurance; rent insurance; and health, accident and group life insurance for employees.

v)     The cost of heat, electricity, gas, water, sewer and all other utility services, servicing the Building and/or the Complex generally to the extent not billed directly to Tenant in accordance with Section 12(a) below.

vi)     Costs incurred for operation, service, maintenance, inspection and repairs of the Complex, including the heating, air conditioning, ventilating, plumbing, electrical and elevator systems of the Building, and the costs of labor, materials, supplies and equipment used in connection with all of the aforesaid items.

vii)     Sales and excise taxes and the like upon any of the expenses enumerated herein.

viii)     Management fees of the managing agent for the Building.

ix)     Legal fees, other than those incurred in the negotiation or enforcement of tenant leases.

x)     The cost of tools, equipment, and supplies and any replacement thereof.

xi)     All assessments and fees payable pursuant to any Declaration or Master Deed or assessed by any Association pursuant to such Declaration or Master Deed.

xii)     The cost of repainting or otherwise redecorating any part of the Building, and the cost of displays or decorations for public portions of the Complex.

xiii)     The cost of telephone, telecopier and courier services, postage and delivery charges, office supplies, maintenance and repair of office equipment, and similar costs.

xiv)     The cost of licenses, permits and similar fees and charges.

xv)     Auditing and accounting fees including accounting fees incurred in connection with the preparation and certification of the Tax Statements and the Operating Expense Statements.

xvi)     All costs incurred by Landlord to comply with governmental requirements enacted after the Commencement Date, whether federal, state or municipal; and all repairs, replacements and improvements which are appropriate for the continued operation of the Building as a first class building, including capital expenditures.

-11-

xvii)    All costs and expenses associated with the acquisition and installation of any energy or cost saving devices or alternative renewable energy devices or sources, but only to the extent of savings realized by Tenant as a result of the installation and/or use of such improvements, devices or sources.

xviii)    Cost of independent contractors performing services, including, but not limited to, cleaning, janitorial, window-washing, rubbish removal, security, landscaping, snow and ice removal services, electrical, painting, plumbing, elevator, heating, ventilation and air conditioning maintenance and repair and all fees due such independent contractors.

xix)    Capital expenditures necessitated by casualties to the extent the same are not covered by insurance.

xx)    Any and all other expenditures of Landlord which are properly expensed in accordance with generally applied real estate accounting practices consistently applied with respect to the operation, repair, maintenance, protection and management of first-class buildings in the locality of the Building.

xxi)    If Landlord shall purchase any item of capital equipment or make any capital expenditure as described in Sections 8(a)(iii)(1)(n), or 8(a)(iii)(1)(o), or 8(a)(iii)(1)(q, or 8(a)(iii)(1)(r) above (jointly the "**Capital Expenditures**") then the costs for same shall be amortized on a straight line basis beginning in the year of installation and continuing for the useful life thereof, but not more than ten (10) years, or such shorter time as may be hereinafter provided, with a per annum interest factor equal to the rate of Interest on the date of purchase of any item described in Sections 8(a)(iii)(1)(n), or 8(a)(iii)(1)(o), or 8(a)(iii)(1)(q), or 8(a)(iii)(1)(r) above.  The amount of amortization for such costs shall be included in Operating Expenses for each Operating Year to which the amortization relates. Tenant agrees that the determination by Landlord's accountants of the useful life of the subject of such Capital Expenditures shall be binding on Tenant.  If Landlord shall lease such items of capital equipment, then the lease shall be included in Operating Expenses for each Operating Year in which they are incurred.  Notwithstanding the foregoing, if Landlord shall effectuate savings in labor or energy related costs as a result of the installation of new devices or equipment, then Landlord may, in lieu of the above, elect to include up to the full amount of any such savings in each Operating Year (beginning with the Operating Year in which the equipment is placed in service) as an Operating Expense until Landlord has recovered thereby the cost of installation of said devices or equipment and interest thereon as above provided, even if the result of such application will result in the amortization of such costs over a period shorter than the useful life of such installation.  Landlord shall notify Tenant in writing if Landlord elects to apply such savings to the cost of such equipment and shall include a statement of the amount of such savings in the Expense Statement for each applicable Operating Year.  Operating Expenses shall thereafter be reduced by the amount of any previous capital expenditures included therein expensed pursuant to this Section 8(a)(v)(1)(u) 8(a)(iii)(1)(s) when such amortization has been completed.

(b)    Operating Expenses shall be "net" and, for that purpose, shall be reduced by the amounts of any reimbursement or credit received by Landlord with respect to an item of cost that is included within Operating Expenses.

-12-

(c)     Notwithstanding the provisions of Section 8, "Operating Expenses" shall not include expenditures for any of the following:

i)      Any capital addition made to the Complex except as set forth in Sections 8(a)(iii)(1)(n), or 8(a)(iii)(1)(o), or 8(a)(iii)(1)(q), or 8(a)(iii)(1)rt) above.

ii)     Repairs or other work occasioned by fire, windstorm or other insured casualty or hazard, to the extent that Landlord shall receive proceeds of such insurance.

iii)    Leasing commissions and advertising expenses incurred in leasing or procuring new tenants.

iv)     Repairs or rebuilding necessitated by condemnation to the extent that Landlord has received condemnation proceeds for such repairs or rebuilding.

v)      Depreciation and amortization of the Building, other than as permitted pursuant to Section 8(a)(iii)(1)(s).

vi)     Real Estate Taxes.

vii)    The salaries and benefits of executive officers of Landlord, if any.

viii)   Debt service payments on any indebtedness applicable to the Complex, including any mortgage debt.

ix)     Development and construction costs for the Project.

b.      **Tenant's Expense Payment**.  Commencing on the Commencement Date, Tenant shall pay to Landlord as Additional Rent hereunder an amount equal to Tenant's Building Proportionate Share of all Operating Expenses incurred with respect to the Building and Operating Expenses incurred with respect to the Complex generally that are allocable to the Building ("**Tenant's Expense Payment**").  For any portion of an Operating Year less than a full twelve (12) month period occurring within the Term, Tenant's Expense Payment shall be prorated on a per diem basis.

(1)     Such Tenant's Expense Payment shall be paid in the following manner:

(a)     Beginning on the Commencement Date and continuing thereafter during each Operating Year during the Term on the first day of each month until receipt of the next Operating Expense Statement, Tenant will pay Landlord an amount set by Landlord sufficient to pay Landlord's estimate (reasonably based on the actual Operating Expenses for the preceding Operating Year and Landlord's projections of any anticipated increases or decreases thereof) of Tenant's Expense Payment for the current Operating Year (or remaining portion thereof) (the "**Monthly Operating Expense Estimate**"). The Monthly Operating Expense Estimate for a period less than a full calendar month shall be duly prorated.

-13-

(b)     Following the end of each Operating Year, Landlord shall furnish Tenant an Operating Expense Statement setting forth the information described in Section 8(a)(ii) above. Within thirty (30) days following the receipt of such Operating Expense Statement (the "**Expense Share Date**") Tenant shall pay to Landlord: (i) the amount by which the Tenant's Expense Payment for the Operating Year (or portion thereof) covered by the Operating Expense Statement exceeds the aggregate of Monthly Operating Expense Estimates paid by Tenant with respect to such Operating Year (or portion thereof); and (ii) the amount by which the Monthly Operating Expense Estimate for the current Operating Year as shown on the Operating Expense Statement multiplied by the number of months elapsed to date in the current Operating Year (including the month in which payment is made) exceeds the aggregate amount of payments of the Monthly Operating Expense Estimate theretofore made in the Operating Year in which the Operating Expense Statement is issued. Landlord shall diligently endeavor to furnish Tenant an Operating Expense Statement not later than one hundred and twenty (120) days following the end of each Operating Year.

(c)     On the first day of the first month following receipt by Tenant of any annual Operating Expense Statement and continuing thereafter on the first day of each succeeding month until the issuance of the next ensuing Operating Expense Statement, Tenant shall pay Landlord the amount of the Monthly Operating Expense Estimate shown on the Operating Expense Statement.

(d)     If on any Expense Share Date Tenant's payments of the installments of the Monthly Operating Expense Estimate for the preceding year's Operating Expenses are greater than Tenant's Expense Payment for such preceding Operating Year, Landlord shall credit Tenant with any excess, which credit may be offset by Tenant against next due installments of Rent. If the Term expires prior to the Expense Share Date for the applicable Operating Year and if Tenant's payments of Monthly Operating Expense Estimate either exceed or are less than Tenant's Expense Payment, Landlord shall send the Operating Expense Statement to Tenant, and an appropriate payment from Tenant to Landlord or refund from Landlord to Tenant shall be made on the Expense Share Date. The provisions of this Section 8(b)(i)(4) shall remain in effect notwithstanding any termination of this Lease; provided however, that if upon termination of this Lease Tenant owes Landlord any sums under this Lease (for Rent or otherwise), Landlord shall have the right to reduce the amount of any refund due Tenant under this Section 8(b)(i)(4) against such sums owed by Tenant to Landlord.

c.     **Tenant's Audit Right**. Any Operating Expense Statement, Tax Statement or other notice from Landlord pursuant to this Section 8 shall be deemed approved by Tenant as correct unless, within sixty (60) days after the furnishing thereof, Tenant shall notify Landlord in writing that it disputes the correctness of the Operating Expense Statement, Tax Statement or other notice, specifying in detail the basis for such assertion. Within thirty (30) days of Tenant's dispatch of such notice, Tenant shall have the right, at its sole cost and expense, to audit or have its appointed accountant, agents or employees audit, Landlord's records related to actual Operating Expenses or Real Estate Taxes, provided that any such audit may not occur more frequently than once each calendar year, nor apply to any years prior to the year of the applicable statement. Books and records shall be made available to Tenant, Tenant's employees, accountants or agents to conduct the audit, which (at Landlord's option) may be either at the Premises, or at Landlord's property manager's office for the area in which the Premises are

-14-

located. Pending resolution of any such audit, Tenant shall make payments in accordance with the applicable Operating Expense Statement, Tax Statement or other notice. In the event Tenant's audit discloses any discrepancy, in the amount of Operating Expenses and/or Real Estate Taxes billed to Tenant, the appropriate party shall, within thirty (30) days after the date of such determination, pay the other party the deficiency or overpayment, as applicable. Tenant may use its usual auditors of its normal books and records (provided the same are certified public accountants) or any firm of independent certified public accountants having at least fifty (50) partners or shareholders and a reputation in the industry for performing quality audits similar to those performed by any of the so-called "big four" accounting firms to conduct the audit described in this Section so long as such auditor is not being compensated on a contingency, commission or bonus basis depending on the results obtained. Tenant shall pay Landlord, within sixty (60) days after receipt of invoice and reasonable backup and as Additional Rent, Landlord's actual out of pocket cost without markup or fee for: (a) the photocopying of documents; and (b) the retrieval of documents from Landlord's storage archives. If the audit reveals that the applicable Operating Expense Statement, Tax Statement or other notice set forth dollar amounts in excess of the actual expenses, Landlord shall reimburse Tenant for expenses incurred in connection with the audit.

9.  **Interest and Late Charge.** Landlord may charge a late payment charge of five percent (5%) of any installment of Fixed Basic Rent or Additional Rent that is not paid within five (5) days of the due date thereof. Any amount due from Tenant to Landlord which is not paid when due shall bear interest ("**Interest**") at an interest rate equal to the Prime Rate published from time to time in the Money Rates column of the Wall Street Journal plus two percent (2%) (or, if lower, the highest rate then allowed under the usury laws of the State of New Jersey) (the "**Interest Rate**") from the date due until the date paid. The right of Landlord to charge a late charge and interest with respect to past due installments of Fixed Basic Rent and Additional Rent is in addition to Landlord's rights and remedies upon an Event of Default.

10.  **Insurance.**

a.  **Tenant's Insurance.**

(1)  Tenant covenants and represents, such covenants and representations being specifically designed to induce Landlord to execute this Lease, that during the entire Term, at its sole cost and expense, Tenant shall obtain, maintain and keep in full force and affect the following insurance:

(a)  "Special Form" property insurance against fire, theft, vandalism, malicious mischief, sprinkler leakage and such additional perils as are now, or hereafter may be, included in a standard extended coverage endorsement from time to time in general use in the State of New Jersey upon property of every description and kind owned by Tenant and or under Tenant's care, custody or control located within the Premises or for which Tenant is legally liable, including by way of example and not by way of limitation, furniture, fixtures, fittings, installations and any other personal property in an amount equal to the full replacement cost thereof.

-15-

(b)     Commercial General Liability Insurance coverage to include personal injury, bodily injury, broad form property damage, operations hazard, contractual liability, products and completed operations liability naming Landlord and Landlord's mortgagee or trust deed holder and ground lessors (if any) as additional named insureds in limits of not less than Three Million Dollars ($3,000,000.00).

(c)     Business interruption insurance in such amounts as will reimburse Tenant for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent tenants or assumed by Tenant pursuant to this Lease or attributable to prevention or denial of access to the Premises as a result of such perils.

(d)     Workers' Compensation insurance in form and amount as required by law.

(e)     Any other form or forms of insurance or any increase in the limits of any of the aforesaid enumerated coverages or other forms of insurance as Landlord or the mortgagees or ground lessors (if any) of Landlord may reasonably require from time to time if in the reasonable opinion of Landlord or said mortgagees or ground lessors said coverage and/or limits become inadequate or less than that commonly maintained by prudent tenants in similar buildings in the area by tenants making similar uses.

(2)     All property insurance policies shall be taken out with insurers rated A-VIII (or if such ratings are not in effect, the equivalent thereof) by Best Rating Service, or any successor thereto (or if there be none, an organization having a national reputation) who are licensed to do business in the state in which the Property is located and shall be in form satisfactory from time to time to Landlord. A policy or certificate evidencing such insurance together with a paid bill shall be delivered to Landlord not less than fifteen (15) days prior to the date of commencement of the construction of the Tenant Improvements. Such insurance policy or certificate will provide that the insurers to notify Landlord and the mortgagees or ground lessors (if any) of Landlord in writing not less than thirty (30) days prior to any material change, reduction in coverage, cancellation, or other termination thereof. Should a certificate of insurance initially be provided a policy shall be furnished by Tenant within thirty (30) days of the Commencement Date. The aforesaid insurance shall be written with commercially reasonable deductibles.

(3)     In the event of damage to or destruction of the Building and/or Premises entitling Landlord or Tenant to terminate this Lease pursuant to Section 18 of this Lease, and if this Lease shall be so terminated, Tenant shall immediately pay to Landlord all of its insurance proceeds, if any, relating to the leasehold improvements and alterations (but not Tenant's trade fixtures, equipment, furniture or other personal property of Tenant in the Premises) which have become Landlord's property on installation or would have become Landlord's property at the Term's expiration or sooner termination. If the termination of the Lease, at Landlord's election, is due to damage to the Building, and if the Premises have not been so damaged, Tenant will deliver to Landlord, in accordance with the provisions of this Lease, the improvements and alterations to the Premises which have become an installation or would have become at the Term's expiration, Landlord's property.

(4)      Tenant agrees that it will not keep or use or offer for sale (if sales of goods is a permitted use pursuant to this Lease) in or upon the Premises or within the Complex any article which may be prohibited by any insurance policy in force from time to time covering the Complex or Premises.  In the event Tenant's occupancy or conduct of business in or on the Premises or in the Complex, whether or not Landlord has consented to the same, results in any increase in premiums for insurance carried from time to time by Landlord with respect to the Complex or the Premises, Tenant shall pay such increase in premiums as Additional Rent within ten (10) days after being billed therefor by Landlord.  In determining whether increased premiums are a result of Tenant's use and occupancy a schedule issued by the organization computing the insurance rate on the Complex or Premises showing the components of such rate shall be conclusive evidence of the items and charges making up such rate.  Tenant shall promptly comply with all reasonable requirements of the insurance authority or of any insurer now or hereafter in effect relating to the Complex or Premises.

(5)      If any insurance policy carried by either party as required by this Section 10 shall be cancelled or cancellation shall be threatened or the coverage thereunder reduced or threatened to be reduced in any way by reason of the use or occupation of the Premises or any part thereof by Tenant or any assignee or subtenant of Tenant or anyone permitted by Tenant to be upon the Premises, and if Tenant fails to remedy the conditions giving rise to such cancellation or threatened cancellation or reduction in coverage on or before (i) forty-eight (48) hours after notice thereof from Landlord, or (ii) prior to such cancellation or reduction becoming effective, Tenant shall be in default and an Event of Default shall occur under this Lease and Landlord shall have all of the remedies available to Landlord pursuant to this Lease.

b.      **Landlord's Insurance.**  Landlord covenants and agrees that throughout the Term it will insure the Complex and the Building (excluding any property with respect to which Tenant is obligated to insure pursuant to Section 10(a)(i)(1) above) against damage by perils covered by the "special form" of property insurance and commercial general liability insurance in such reasonable amounts with such reasonable deductibles as required by any mortgagee or ground lessor, or, if none, as would be carried by a prudent owner of a similar building in the area.  In addition, Landlord shall maintain and keep in force and effect during the Term, rental income insurance insuring Landlord against abatement or loss of Fixed Basic Rent, including items of Additional Rent, in case of fire or other casualty similarly insured against, in an amount at least equal to the Fixed Basic Rent and Additional Rent during, at the minimum, one Lease Year hereunder.  Landlord may, but shall not be obligated to, take out and carry any other forms of insurance as it or the mortgagee or ground lessor (if any) of Landlord may require or reasonably determine available.  All costs and expenses incurred by Landlord for insurance carried by Landlord on the Building and the Complex or in connection with its ownership or operation thereof shall be included as Operating Expenses pursuant to Section 8. Notwithstanding its inclusion as an Operating Expense or any contribution by Tenant to the cost of insurance premiums by Tenant as provided herein, Tenant acknowledges that it has no right to receive any proceeds from any such insurance policies carried by Landlord although Landlord shall use such proceeds in the repair and reconstruction of the Complex and the Premises. Tenant further acknowledges that the exculpatory provisions of this Lease as set forth in this Section 10 as to Tenant's insurance are designed to insure adequate coverage as to Tenant's property and business without regard to fault and avoid Landlord obtaining similar coverage for

-17-

such loss for its negligence or that of its agents, servants or employees which would result in double coverage for the same perils includable as part of Operating Expenses which are payable in part by Tenant.  Landlord will not carry insurance of any kind on Tenant's furniture or furnishings, or on any fixtures, equipment, appurtenances or improvements of Tenant under this Lease, and Landlord shall not be obligated to repair any damage thereto or replace the same.

        c.        **Waiver of Subrogation.**  Any policy or policies of fire, extended coverage or similar property insurance, which either party obtains in connection with the Premises, Building or Complex, shall include a clause or endorsement denying the insurer any rights of subrogation against the other party (i.e. Landlord or Tenant) for all perils covered by such policy.  Should such waiver not be available then the policy for which the waiver is not available must name the other party as an additional named insured affording it the same coverage as that provided the party obtaining such coverage. Any provision of this Lease to the contrary notwithstanding, Landlord and Tenant hereby release the other from any and all liability or responsibility to the other or anyone claiming through or under them by way of subrogation or otherwise (a) from any and all liability for any loss or damage to the property of the releasing party, (b) for any loss or damage that may result, directly or indirectly, from the loss or damage to such property (including rental value and business interruption), and (c) from legal liability for any loss or damage to property (no matter who the owner of the property may be), all to the extent that the releasing party's loss or damage is insured or, if not insured, was insurable under commercially available "special form" property insurance policies, including additional coverages typically obtained by owners and tenants of comparable buildings in the vicinity of the Building, even if such loss or damage or legal liability shall be caused by or result from the fault or negligence of the other party or anyone for whom such party may be responsible and even if the releasing party is self insured in whole or in part or the amount of the releasing party's insurance is inadequate to cover the loss or damage or legal liability.  It is the intention of the parties that Landlord and Tenant shall look solely to their respective insurance carriers for recovery against any such property loss or damage or legal liability, without such insurance carriers having any rights of subrogation against the other party.

      11.      **Repairs and Maintenance.**

        a.        **Tenant's Obligations.** Tenant shall, throughout the Term, and at Tenant's sole cost and expense subject to Section 11(b) of this Lease, keep and maintain the Premises in a neat and orderly condition; and, upon expiration of the Term or earlier termination of this Lease, Tenant shall leave the Premises in broom clean condition, ordinary wear and tear, damage by fire or other casualty alone excepted, and for that purpose and except as stated in this sentence, Tenant will make all necessary repairs and replacements to the Premises to deliver it in such condition.  Tenant shall not permit any waste to the Premises.  Tenant shall not use any portion of the Common Facilities for other than their intended use as reasonably specified by Landlord from time to time.

        b.        **Landlord's Obligations.** Landlord shall, throughout the Term, make all necessary repairs to the roof, foundation, structural elements and Building operating systems, mechanical, electrical and HVAC systems and exterior windows and doors of the Premises. Landlord shall, throughout the Term, make all necessary repairs to the parking, sidewalks and walkways and the Common Facilities; provided, however, that Landlord shall have no

responsibility to make any repairs in the Premises unless and until Landlord receives written notice of the need for such repair. All interior Premises repairs that are necessary to the Premises and are not Landlord's responsibility shall be performed at Tenant's sole cost and expense. Landlord shall keep and maintain all Common Facilities of the Complex and any sidewalks, parking areas, curbs and access ways adjoining the Complex in a good order and repair, in a clean and orderly condition, free of accumulation of dirt and rubbish and ice and snow and shall keep and maintain all landscaped areas within the Complex in a neat and orderly condition. All repairs and maintenance shall be done in a first class manner in keeping with comparable first class buildings in the locale of the Building. All costs and expenses incurred by Landlord in connection with Landlord's obligations under this Section 11(b) shall be included in Operating Expenses unless such expense is expressly excluded from the definition of Operating Expenses.

c. **Infectious Waste.** Notwithstanding anything to the contrary contained in this Lease, Tenant shall be responsible and shall pay for all costs of disposing of all Infectious Waste generated by Tenant at or from the Building. All Infectious Waste shall be identified, segregated, measured, stored and disposed of by Tenant in a manner that complies with all federal, state and local laws or regulations applicable to Infectious Waste. As used herein, the term "**Infectious Waste**" means any infectious waste as defined in the infectious waste regulations of the State of New Jersey, as amended from time to time.

12. **Utilities and Services.**

a. **Services to the Premises.**

(1) Tenant shall have access to the Premises, including elevators as set forth in Section 12(c) and utilities including HVAC, electricity, water, and heat twenty-four hours per day, seven days per week.

(2) Tenant agrees to apply for all utilities necessary for its use of the Premises in its own name and to pay monthly as Additional Rent (but not as an Operating Expense) all charges for electricity and other utilities used by Tenant at the Premises. Tenant shall pay all bills for utility usage at the Premises on or before the date due. Tenant shall authorize each utility provider to provide to Landlord upon Landlord's request information about Tenant's utility consumption and billing (including copies of bills).

(3) In addition, Tenant agrees to pay as Additional Rent Tenant's Building Proportionate Share for any common, untenantable areas of the Building and Tenant's Complex Proportionate Share of all charges for electricity used for Common Facilities at the Complex and not within tenantable areas of the Complex. In no event will the charges under Section 12(a)(ii) or this Section 12(a)(iii), as the case may be, duplicate any charges under any other provision. Tenant shall be charged for such electricity at the rate Landlord is charged for same without mark-up or fee assessed by Landlord, other than any meter reading fee charged by a third party, and Tenant acknowledges that the effective rate charged to Tenant may be different than the actual rate charged by the electricity provider for any particular kilowatt hour of electricity consumption.

#15241254 v2

(4)     Tenant's use of electric energy in the Premises shall not at any time exceed the safe capacity of any of the electric conductors and equipment in or otherwise serving the Premises.

b.     **Light Bulbs.** Landlord, upon Tenant's request, shall replace light bulbs, tubes and ballasts for lighting fixtures when required in the Premises.  The cost of replacement light bulbs, tubes, and ballasts, plus the reasonable costs incurred by Landlord for such replacement, shall be paid by Tenant as Additional Rent in accordance with Landlord's then current schedule of costs and assessments therefor.

c.     **Common Facilities.** Within the Common Facilities of the Complex and consistent with other first class buildings in the locale of the Building, Landlord shall furnish: (i) adequate electricity and utilities, (ii) landscaping, (iii) parking facility maintenance, (iv) Common Facilities maintenance; and (v) snow and ice removal.  Landlord shall also furnish cleaning services for the Premises (on a five-day a week basis except for Building Holidays) after 6:00 p.m. in accordance with Exhibit E attached hereto and made a part hereof.  The cost of the services provided by Landlord pursuant to this Section 12(c) shall be included as part of Operating Expenses.

d.     **Liability.** Landlord shall not be liable for any damages to or incurred by Tenant (and Tenant's property located in the Premises) resulting from the quality, quantity, failure, unavailability or disruption of any services and the same shall not constitute a termination of this Lease or an actual or constructive eviction or entitle Tenant to an abatement of Rent unless caused by Landlord's reckless or willful conduct.

13.     **Governmental Regulations.**  Tenant shall comply with all laws, ordinances, notices, orders, rules, regulations and requirements of all federal, state and municipal government or any department, commission, board of officer thereof, or of the National Board of Fire Underwriters or any other body exercising similar functions, relating to its use and occupancy of the Premises.  Tenant shall not knowingly do or commit, or suffer to be done or committed anywhere in the Building, the Property or the Complex any act or thing contrary to any of the laws, ordinances, regulations and requirements referred to in this Section.  Tenant shall give Landlord prompt written notice of any accident in the Premises and of any breakage, defect or failure in any of the systems or equipment servicing the Premises or any portion of the Premises.

14.     **Alterations, Additions and Fixtures.**

a.     **Tenant Alterations.** Tenant and its Space Tenants (as hereinafter defined) shall have the right to install in the Premises (excluding the roof and exterior of the Building) any trade fixtures and other removable property including without limitation, phone and alarm systems, equipment, shelving, lighting, and other personal property which is capable of being removed from the Premises without material damage thereto ("**Tenant's Property**") provided, however, that no such installation and no removal thereof shall be permitted which materially adversely affects any structural component or operating system of the Building and that Tenant shall repair and restore any damage or injury to the Premises or the Complex caused by installation or removal.  All of Tenant's Property which may be installed or placed in or upon the

-20-

Premises shall remain the property of Tenant. Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term. Landlord waives any right it may have in Tenant's Property. To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such lien or security interest. Landlord shall provide to Tenant, within twenty (20) days after Tenant's request therefor, a written waiver in form reasonably satisfactory to Tenant and Landlord evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.

        b.      **Trade Fixtures.** Tenant shall have the right to install in the Premises any trade fixtures; provided, however, that no such installation and no removal thereof shall be permitted which affects any structural component or operating system of the Premises without Landlord's approval and that Tenant shall repair and restore any damage or injury to the Premises or the Complex caused by installation or removal.

        c.      **Notice and Consent.** Tenant shall not make or permit to be made any alterations, improvements or additions to the Premises or Complex without on each occasion first presenting plans and specifications to Landlord and obtaining Landlord's prior written consent, which shall not be unreasonably withheld or delayed, but may be conditioned upon compliance with reasonable requirements of Landlord as provided in this Lease. If Landlord consents to any proposed alterations, improvements or additions, then Tenant at Tenant's sole cost and expense, may make the proposed alterations, improvements and additions provided that: (i) Tenant supplies any necessary permits and approvals; (ii) such alterations and improvements do not, in Landlord's judgment, impair the structural strength of the Building, or any other improvements or reduce the value of the Property and are at least equal in quality to the Tenant Improvements; (iii) Tenant takes or causes to be taken all steps that are otherwise required by Section 15 of this Lease and that are required or permitted by law in order to avoid the imposition of any construction liens upon the Premises or the Property; (iv) Tenant uses a contractor approved by Landlord, such approval not to be unreasonably withheld, conditioned or delayed, so long as such contractor shall not disturb labor relations with or interfere with Landlord's employees, agents, contractors or subcontractors; (v) Tenant ensures that the occupants of the Property and the Complex are not annoyed or disturbed by such work; (vi) the alterations, improvements or additions shall be installed in accordance with the approved plans and specifications and completed according to a construction schedule approved by Landlord such approval not to be unreasonably withheld, conditioned or delayed; (vii) Tenant maintains or causes its Space Tenants or contractors to maintain insurance of the types and coverage amounts reasonably required by Landlord; and (viii) Tenant takes or causes its Space Tenants and their respective contractors to take such reasonable steps and implement such reasonably appropriate policies and practices to preserve labor harmony at the Complex. Any and all alterations, improvements and additions to the Premises which are constructed, installed or otherwise made by Tenant shall be the property of Tenant until the expiration or sooner termination of this Lease; at that time all such alterations and additions shall remain on the Premises and become the property of Landlord without payment by Landlord unless, upon the termination of this Lease, Landlord instructs Tenant in writing to remove the same in which event Tenant will remove such alterations, improvements and additions, and repair and restore any damage to the Property or the Premises caused by the installation or removal. Notwithstanding anything to the contrary contained in this

Lease, Landlord may withhold its approval to any proposed alterations, additions or improvements to the Premises in its absolute and sole discretion with respect to any such alteration, addition or improvement which Landlord determines involves any modification to the Building's exterior or its structural, electrical, mechanical or plumbing systems and any components thereof.

15. **Construction Liens.**

a. **No Encumbrances.** Tenant covenants that it shall not (and has no authority to) create or allow any encumbrance against the Premises, the Property, or any part thereof or of Landlord's interest therein.

b. **No Liens.** Tenant covenants that it shall not suffer or permit to be created, or to remain, any lien or claim thereof (arising out of any work done or services, material, equipment or supplies furnished for or at the request of Tenant or by or for any contractor or subcontractor of Tenant, other than such furnished by Landlord) which is or may become a lien upon the Premises, the Property, or any part of any thereof or the income therefrom or any fixture, equipment or similar property therein.

c. **Removal of Liens.** If any lien or claim shall be filed, Tenant shall within ten (10) business days after notice of the filing thereof, cause the same to be discharged of record by payment, deposit, bond or otherwise. If Tenant shall fail to cause such lien or claim to be discharged and removed from record within that period, then, without obligation to investigate the validity thereof and in addition to any other right or remedy Landlord may have, Landlord may, but shall not be obligated to, contest the lien or claim or discharge it by payment, deposit, bond or otherwise; and Landlord shall be entitled, if Landlord so decides, to compel the prosecution of an action for the foreclosure of such lien by the lienor and to pay the amount of the judgment in favor of the lienor with interest and costs. Any amounts so paid by Landlord and all costs and expenses, including attorneys' fees, incurred by Landlord in connection therewith, together with Interest from the respective dates of Landlord's making of the payment or incurring of the cost or expense, shall constitute Additional Rent payable by Tenant under this Lease and shall be paid by Tenant to Landlord promptly on demand.

d. **Tenant's improvements not for Landlord's Benefit.** Notwithstanding anything to the contrary in this Lease or in any other writing signed by Landlord, neither this Lease nor any other writing signed by Landlord shall be construed as evidencing, indicating, or causing an appearance that any erection, construction, alteration or repair to be done, or caused to be done, by Tenant is or was in fact for the immediate use and benefit of Landlord. Further, notwithstanding anything contained herein to the contrary, nothing contained in or contemplated by this Lease shall be deemed or construed in any way to constitute the consent or request on the part of Landlord for the performance of any work or services or the furnishing of any materials for which any lien could be filed against the Premises or the Property or any part of any thereof, nor as giving Tenant any right, power, or authority to contract for or permit the performance of any work or services or the furnishing of any materials for which any lien could be filed against the Premises, the Property or any part of any thereof.

16. **Negative Covenants of Tenant.**

-22-

a.    **System Changes**. Supplementing the provisions of Section 14 above, Tenant shall not install any equipment of any kind or nature whatsoever which would or could, in Landlord's reasonable judgment, necessitate any change, replacement or addition to (or which might cause damage to) the plumbing, heating, air-conditioning or electrical systems serving the Premises or any portion thereof without the prior written consent of Landlord, which shall not be unreasonably withheld, unless such change affects any Building system servicing other Building tenants, in which case such change, replacement or addition shall be approved in Landlord's sole discretion.  In the event such consent is granted, all costs in connection with such changes, replacements or additions shall be paid for by Tenant in advance.

b.    **Sales**. Without the prior written consent of Landlord, Tenant shall not exhibit, sell or offer for sale (or permit the exhibition, sale or offering for sale) in the Premises, or at the Property, any article or thing except those articles and things connected with the Permitted Use of the Premises by Tenant.

c.    **Prohibited Uses**. Tenant will not make or permit to be made any use of the Premises or any part thereof which would violate any of the covenants, agreements, terms, provisions and conditions of this Lease or which directly or indirectly is forbidden by public law, ordinance, governmental regulation, or matters of record or which may be dangerous to life, limb or property or which may invalidate or increase the premium cost of any policy of insurance carried on the Complex or covering its operation or which will suffer or permit the Premises or any part thereof to be used in any manner or which would permit anything to be brought into or kept therein which, in the reasonable judgment of Landlord, would in any way impair or tend to impair the character, reputation or appearance of the Building as a high quality building or which would impair or interfere with or tend to impair or interfere with any of the services performed by Landlord for the Building or which could threaten the safety of the Building or any of its occupants.

d.    **Signs**. Tenant shall be permitted to install signage on the exterior of the Building and to install monument signage on the Property (in an area immediately adjacent to the Building) at Tenant's sole cost and expense, subject to Landlord's prior written approval (which shall not be unreasonably withheld), including without limitation Landlord's approval of the size, location and construction of any such signage, and Tenant's receipt of all necessary permits and approvals for same from governmental authorities and any Association, if required pursuant to any Declaration or Master Deed.

e.    **Advertising**. Without Landlord's prior written consent in each instance, Tenant shall not:  (1) advertise the business, profession or activities of Tenant conducted at the Premises in any manner which violates the letter or spirit of any code of ethics adopted by any recognized association or organization pertaining to such business, profession or activities; or (2) use the name of the Building for any purpose other than that of the business address of Tenant; or (3) advertise (or otherwise notify third parties) that the Premises or any part therefore are available for lease or sublease.

f.    **Locks**. Locks or similar devices may only be attached to or removed from any door or window in the Premises with Landlord's prior written consent.

g.    **Hazardous Substances.**

(1)    Tenant represents, warrants and covenants that (1) the Premises shall not be used by Tenant, its employees, licensees, agents, sublessees or contractors (collectively, "**Tenant Parties**") for any dangerous, noxious or offensive trade or business and that Tenant Parties will not cause or maintain a nuisance there, (2) Tenant Parties shall not bring, generate, treat, store or dispose of Hazardous Substances (as hereinafter defined) at the Premises in violation of Environmental Laws, (3) Tenant Parties shall at all times comply with all Environmental Laws (as hereinafter defined) and shall cause the Premises to comply, (4) Tenant shall keep the Premises free of any lien imposed pursuant to any Environmental Laws by reason of Tenant's breach of any of the foregoing warranties and covenants, and (5) Tenant shall not perform or cause to be performed any environmental testing on the Premises or the Property without Landlord's prior written approval, to be given or withheld in Landlord's sole discretion.

(2)    Tenant shall enter into a contract with a licensed disposal company for the regular and lawful disposal of all medical waste generated at the Premises and shall provide Landlord with evidence thereof (together with all required manifests, if any) promptly upon written request for same.  Tenant warrants that it shall promptly deliver to Landlord, (i) copies of any documents received from the United States Environmental Protection Agency and/or any state, county or municipal environmental or health agency concerning Tenant's operations upon the Premises, (ii) copies of any documents submitted by Tenant to the United States Environmental Protection Agency and/or any state, county or municipal environmental or health agency concerning its operations on the Premises, including but not limited to copies of permits, licenses, annual filings and registration forms, and (iii) upon the request of Landlord, Tenant shall provide Landlord with evidence of compliance with Environmental Laws.

(3)    At the expiration or earlier termination of this Lease, Tenant shall surrender the Premises to Landlord free of any and all Environmental Defaults (defined below).

(4)    An "**Environmental Default**" shall mean the occurrence of any one or more of the following:  (1) a breach of Tenant's warranty contained in Section 16(g)(i), above, (2) a release, spill or discharge of a Hazardous Substance on or from the Premises by any Tenant Party, or (3) the discovery of an environmental condition requiring response which violation, release, or condition is attributable to the acts or omissions of any Tenant Party, or (4) an emergency environmental condition caused by or attributable to any Tenant Party.  Upon occurrence of an Environmental Default, Landlord shall have the right, but not the obligation, to immediately enter the Premises, to supervise and approve any actions taken by Tenant to address the violation, release, or environmental condition, or if Landlord deems it necessary, then Landlord may perform, at Tenant's expense, any lawful actions necessary to address the violation, release, or environmental condition.

(5)    Tenant shall indemnify, defend (with counsel approved by Landlord, such approval not to be unreasonably withheld) and hold Landlord and Landlord's affiliates, shareholders, directors, officers, employees and agents harmless from and against any and all claims, judgments, damages (including consequential damages), penalties, fines, liabilities, losses, suits, administrative proceedings, costs and expense of any kind or nature, known or unknown, contingent or otherwise, which arise at any time during or after the Term

-24-

(including, but not limited to, reasonable attorneys', consultant, laboratory and expert fees and including, without limitation, diminution in the value of the Building or Property or Complex, damages for the loss or restriction on use of rentable space or of any amenity of the Building or Property or Complex and damages arising from any adverse impact on marketing of space in the Building or Complex), arising from or related to the occurrence of one or more Environmental Defaults during the Term.

(6)    Definitions.

(a)    The term "**Hazardous Substances**" means (i) asbestos and any asbestos containing material and any substance that is then defined or listed in, or otherwise classified pursuant to, any Environmental Laws or any applicable laws or regulations as a "hazardous substance", "hazardous material", "hazardous waste," "infectious waste", "toxic substance", "toxic pollutant" or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, toxicity, reproductive toxicity, or Toxicity Characteristic Leaching Procedure (TCLP) toxicity, (ii) any petroleum and drilling fluids, produced waters, and other wastes associated with the exploration, development or production of crude oil, natural gas, or geothermal resources, and (iii) petroleum products, polychlorinated biphenyls, urea formaldehyde, radon gas, radioactive material (including any source, special nuclear, or by-product material), and medical waste.

(b)    The term "**Environmental Laws**" collectively means and includes all present and future laws and any amendments thereto (whether common law, statute, rule, order, regulation or otherwise), permits, and other requirements or guidelines of governmental authorities applicable to the Premises and relating to the environment and environmental conditions or to any Hazardous Substance (including, without limitation, CERCLA, 42 U.S.C. §601, et seq., the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §901, et seq., the Hazardous Materials Transportation Act, 49 U.S.C. §801, et seq., the Federal Water Pollution Control Act, 33 U.S.C. §51, et seq., the Clean Air Act, 33 U.S.C. §401, et seq., the Clean Air Act, 42 U.S.C. §41, et seq., the Toxic Substances Control Act, 15 U.S.C. §601-2629, the Safe Drinking Water Act, 42 U.S.C. §300f-300j, the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. §101, et seq., and any so-called "Super Fund" or "Super Lien" law, any law requiring the filing of reports and notices relating to hazardous substances, environmental laws administered by the Environmental Protection Agency, and any similar state and local laws and regulations, all amendments thereto and all regulations, orders, decisions, and decrees now or hereafter promulgated thereunder concerning the environment, industrial hygiene or public health or safety).

(c)    Survival.  The provisions of this Section 16(g) shall survive any termination of this Lease or the expiration of the Term.

h.    **Floor Load**.  Tenant shall not place or permit to be placed upon any floor of the Premises any item of any nature the weight of which shall exceed such floor's rated floor load limit unless additional floor loads are approved in writing by Landlord in advance.

17.    **Landlord's Right of Entry; Right to Cure.**

a. **Entry for Inspection and Repairs.** Tenant shall permit Landlord and the authorized representatives of Landlord and of any mortgagee or any prospective mortgagee to enter the Premises at all reasonable times, with prior notice to Tenant, for the purpose of (i) inspecting the Premises or (ii) making any necessary repairs to the Premises and performing any work therein. During the progress of any work on the Premises, Landlord will use commercially reasonable efforts not to inconvenience Tenant, but shall not be liable for inconvenience, annoyance, disturbance, loss of business or other damage to Tenant by reason of making any repair or by bringing or storing materials, supplies, tools and equipment in the Premises during the performance of any work, and the obligations of Tenant under this Lease shall not be thereby affected in any manner whatsoever.

b. **Entry to Show.** Landlord shall have the right at all reasonable times, with prior notice to Tenant, to enter and to exhibit the Premises for the purpose of inspection or showing the Premises in connection with a sale or mortgage and, during the last twelve (12) months of the Term, to enter upon and to exhibit the Premises to any prospective tenant.

c. **Entry upon Vacation by Tenant.** If the Premises are vacated or abandoned by Tenant, Landlord shall be permitted to show the Premises at any time and to prepare the Premises for re-occupancy, including the demolition, alteration and reconstruction of tenant improvements therein provided, however, nothing herein shall relieve Tenant of its obligation to pay Rent in accordance with the terms of this Lease.

d. **Entry upon Default.** In the event Tenant fails to comply with any provision of this Lease following the expiration of any applicable notice and cure period, Landlord may, at its option but without obligation, and without notice to Tenant, perform any and all of Tenant's required obligations and otherwise cure such default as it deems appropriate in its sole and absolute discretion. All costs and fees incurred by Landlord in the exercise of such right, including without limitation consultant fees and reasonable legal fees, shall be deemed Additional Rent payable by Tenant upon demand, together with interest thereon at the Interest Rate from the date of demand until paid in full.

18. **Damage by Fire or Other Casualty.**

a. **Repairs by Landlord.** If the Premises or Building is damaged or destroyed by fire or other casualty, Tenant shall promptly notify Landlord whereupon Landlord shall, subject to the consent of Landlord's present or future mortgagee and to the conditions set forth in this Section 18, repair, rebuild or replace such damage and restore the Premises to substantially the same condition as the Premises were in immediately prior to such damage or destruction; provided, however, that Landlord shall only be obligated to restore such damage or destruction to the extent of the proceeds of fire and other extended coverage insurance policies. Notwithstanding the foregoing, if the Premises is destroyed or damaged to the extent that the Premises cannot be repaired or restored within one (1) year after such casualty, as estimated by Landlord in Landlord's reasonable judgment, then, in such event, either Landlord or Tenant may terminate this Lease by written notice to the other party within ninety (90) days after the date of such casualty.

#15241254 v2

b. **Time for Repairs.** The repair, rebuilding or replacement work shall be commenced promptly and completed with due diligence, taking into account the time required by Landlord to effect a settlement with, and procure insurance proceeds from, the insurer, and for delays beyond Landlord's reasonable control.

c. **Insurance.** The net amount of any insurance proceeds recovered by reason of the damage or destruction of the Building (meaning the gross insurance proceeds excluding proceeds received pursuant to a rental coverage endorsement and the cost of adjusting the insurance claim and collecting the insurance proceeds) shall be applied towards the cost of restoration. Notwithstanding anything to the contrary in this Lease, if in Landlord's reasonable opinion the net amount of insurance proceeds will not be adequate to complete such restoration, Landlord shall have the right to terminate this Lease and all the unaccrued obligations of the parties hereto by sending a written notice of such termination to Tenant specifying a termination date no less than ten (10) days after its transmission; provided, however, that Tenant may require Landlord, except during the last two (2) years of the Term unless Tenant has exercised a Renewal Option (and Tenant shall be permitted to exercise same early for this purpose), to withdraw the notice of termination by agreeing to pay the cost of restoration in excess of the net insurance proceeds and by giving Landlord adequate security for such payment prior to the termination date specified in Landlord's notice of termination. If the net insurance proceeds are more than adequate, the amount by which the net insurance proceeds exceed the cost of restoration will be retained by Landlord or applied to repayment of any mortgage secured by the Property.

d. **Limitations on Landlord's Obligations.** Notwithstanding the foregoing, Landlord's obligation or election to restore the Premises under this Section or to terminate this Lease shall be subject to the terms of any present or future mortgage affecting the Premises and to the mortgagee's consent if required in the mortgage and shall not, in any event, include the repair, restoration or replacement of the fixtures, improvements, alterations, furniture or any other property owned, installed, made by, or in the possession of Tenant.

e. **Rent Proration.** If Tenant is dispossessed of the Premises due to fire or other casualty, Tenant will receive a pro-rata abatement of its Fixed Basic Rent and Additional Rent during the period Tenant is dispossessed to the extent of such dispossession.

19. **Non-Abatement of Rent.** Except as otherwise expressly set forth in this Lease, there shall be no abatement or reduction of the Fixed Basic Rent, Additional Rent or other sums payable under this Lease for any cause whatsoever and this Lease shall not terminate, nor shall Tenant be entitled to surrender the Premises, in the event of fire, casualty or condemnation or any default by Landlord under this Lease.

20. **Indemnification.** Unless such loss, costs or damages were caused by negligence of Landlord, its employees, agents or contractors, Tenant hereby agrees to indemnify, defend and hold Landlord and its employees, agents and contractors harmless from any loss, costs and damages (including reasonable attorney's fees and costs) suffered by Landlord, its agents, employees or contractors, as a result of any claim by a third party, its agents, employees or contractors arising from Tenant's use or occupancy of the Premises. Tenant shall have the right to designate counsel acceptable to Landlord, such approval not to be unreasonably withheld, to

#15241254 v2

assume the defense of any such third party claim on behalf of itself and Landlord. Landlord shall not have the right to settle any claim without the prior written consent of Tenant which shall not be unreasonably withheld. This indemnity shall survive the expiration of the Term or earlier termination of this Lease.

21. **Eminent Domain.**

a. **Total or Partial Taking**. In the event of exercise of the power of eminent domain whereby:

(1) such portion of the Property is taken that access to the Premises is permanently impaired thereby and reasonable alternate access is not provided by Landlord within a time period which is reasonable under the circumstances; or

(2) all or substantially all of the Premises or the Property is taken; or

(3) less than substantially all of the Property is taken but Landlord, acting in good faith, determines that it is economically unfeasible to continue to operate the uncondemned portion of the Building for the Permitted Use; or

(4) less than substantially all of the Premises is taken, but Tenant, acting in good faith, determines that because of such taking it is economically unfeasible to continue to conduct its business in the uncondemned portion of the Premises;

then in the case of (i) or (ii), either party, and in the case of (iii), Landlord, and in the case of (iv), Tenant, shall have the right to terminate this Lease as of the date when possession of that part which was taken is required to be delivered or surrendered to the condemning authority; and in such case all Fixed Basic Rent, Additional Rent and other charges shall be adjusted to the date of termination. A "taking" as such term, is used in this Section 21 shall include a transfer of title or of any interest in the Property by deed or other instrument in settlement of or in lieu of transfer by operation of law incident to condemnation proceedings.

b. **Temporary Taking**. Notwithstanding anything hereinabove provided, in the event of a taking of only the right to or for possession of the Premises or any part thereof for a fixed period of time or for the duration of an emergency or other temporary condition, then this Lease shall continue in full force and effect with an abatement of Fixed Basic Rent and Additional Rent from the date of such temporary condemnation, and the amounts payable by the condemnor with respect to any period of time prior to the expiration or sooner termination of this Lease shall be paid by the condemnor to Landlord and the condemnor shall be considered a subtenant of Tenant. The above notwithstanding, if any such temporary taking shall continue for a period in excess of one hundred eighty (180) days, Tenant shall have the right to terminate this Lease upon ten (10) days written notice to Landlord.

c. **Tenant's Waiver**. Regardless of whether this Lease shall terminate, Tenant shall have no right to participate or share in any condemnation claim, damage award or settlement in lieu thereof with respect to any taking of any nature; provided, however, that Tenant shall not be precluded from claiming or receiving payment for Tenant's relocation and

-28-

moving expenses and the value of Tenant's improvements as may be permitted under applicable law so long as the amount of same does not reduce the award that Landlord is entitled to receive.

22.     **Quiet Enjoyment.**  Tenant, upon paying the Fixed Basic Rent, Additional Rent and other charges herein required and observing and keeping all covenants, agreements and conditions of this Lease, shall quietly have and enjoy the Premises during the Term without hindrance or molestation by anyone claiming by or through Landlord, subject, however, to the exceptions, reservations and conditions of this Lease, any Declaration, matters of public record and any mortgage to which this Lease shall be subordinate.

23.     **Rules and Regulations.**  Landlord hereby reserves the right to prescribe, from time to time, at its sole discretion, reasonable rules and regulations, (herein collectively called the "**Rules and Regulations**"), which shall include rules and regulations set forth in any Declaration or Master Deed or prescribed by an Association, governing the use and enjoyment of the Premises and the remainder of the Complex and the current Rules and Regulations are attached hereto as Exhibit F.  The Rules and Regulations shall not materially interfere with Tenant's use and enjoyment of the Premises in accordance with the provisions of this Lease for the Permitted Use and shall not materially increase or modify Tenant's obligations under this Lease.  In the event of a conflict between this Lease and such rules and regulations, this Lease shall control.  Tenant shall comply at all times with the Rules and Regulations and shall cause its agents, employees, invitees, visitors, and guests to do so.  Landlord shall not be responsible to Tenant for non-observance or violation of any of the Rules and Regulations by any tenant of the Complex, but shall enforce such Rules and Regulations in a uniform manner.

24.     **Assignment and Sublease.**

a.     **Conditions.**  Tenant may assign this Lease or sublet the whole or any portion of the Premises, subject to Landlord's prior written consent, not to be unreasonably withheld, conditioned or delayed, on the basis of the following terms and conditions:

(1)     Tenant shall provide to Landlord the following:

(a)     The name and address of the proposed assignee or subtenant;

(b)     All the terms and conditions of the assignment or subletting;

(c)     The nature and character of the business of the proposed assignee or subtenant;

(d)     Banking, financial and other credit information relating to the proposed assignee or subtenant reasonably sufficient to enable Landlord to determine the proposed assignee's or sublessee's financial responsibility; and

(e)     In the event of a sublease of only a portion of the Premises, plans and specifications for the proposed tenant's layout, partitioning, and electrical installations for the portion of the Premises to be subleased.

-29-

(2)     Tenant acknowledges that it shall not be unreasonable for Landlord to withhold its consent if Tenant shall seek to assign or sublet to the following:

(a)     To a government or quasi-government agency; or

(b)     To an entity whose financial or business character is not consistent with the other tenants of the Complex; or

(c)     To any tenant of Landlord or any affiliate of Landlord; or

(d)     To any entity with which Landlord or any affiliate of Landlord is negotiating a lease or the terms of a lease.

(3)     The assignee or subtenant shall assume, in the case of an assignee, or agree to be bound by, in the case of a subtenant, by written instrument, all of the obligations of Tenant as provided by this Lease, and a copy of such assumption agreement or sublease agreement shall be furnished to Landlord within ten (10) days of its execution, provided, however, any such subtenants shall only be obligated to assume Tenant's obligations arising under this Lease with respect to the portion of the Premises sublet.  Any sublease shall expressly acknowledge that said subtenant's rights in and to the Premises shall be no greater than those of Tenant.  In addition, any request by Tenant for Landlord's consent to an assignment or sublease other than an assignment under Section 24(b) shall not include any option or right of expansion, renewal, first refusal, option or first offer or first refusal to purchase or any other right or option with respect to the Premises, any other portion of the Complex or for any period of time beyond the original Term, Tenant hereby acknowledging that such rights and options, if any, are personal to Tenant.

(4)     Tenant and each assignee shall be and remain liable for the observance of all the covenants and provisions of this Lease, including, but not limited to, the payment of Fixed Basic Rent and Additional Rent reserved herein, through the entire Term, as the same may be renewed, extended or otherwise modified.

(5)     In any event, the acceptance by Landlord of any rent from the assignee or from any of the subtenants or the failure of Landlord to insist upon a strict performance of any of the terms, conditions and covenants herein shall not release Tenant herein, nor any assignee or subtenant, from any and all of the obligations to be performed by it in accordance herewith during and for the entire Term.

(6)     Tenant shall pay to Landlord the sum of Seven Hundred Fifty Dollars ($750.00) to cover its handling charges for each consent to any sublet or assignment prior to its consideration of the same.  Tenant acknowledges that its sole remedy with respect to any assertion that Landlord's failure to consent to any sublet or assignment is unreasonable shall be the remedy of specific performance and Tenant shall have no other claim or cause of action against Landlord as a result of Landlord's actions in refusing to consent thereto.

b.     **Assignments or Subleases to Affiliates.** Notwithstanding the foregoing, Tenant may assign this Lease or sublease all or a portion of the Premises to any of the following without Landlord's prior written consent, provided notice of same is delivered to Landlord at

least ten (10) business days prior to the effective date of such assignment or sublease and that the Guaranty remains in full force and effect (each, a "**Permitted Affiliate Transfer**"): (i) any parent company of Tenant, (ii) any wholly owned subsidiary of Tenant, (iii) any entity controlling, controlled by or under common control with Tenant, (iv) with respect to space leases, license agreements or concessions only for the Permitted Use and made in the ordinary course of business at the Premises, third parties (the "**Space Tenants**").

          c.      **Corporate Transfers.** If Tenant is a corporation other than a corporation whose stock is listed and traded on a nationally recognized stock exchange, the provisions of Section 24(a) hereof shall apply to a transfer (however accomplished, whether in a single transaction or in a series of related or unrelated transactions) of stock (or any other mechanism such as, by way of example, the issuance of additional stock, a stock voting agreement or change in class(es) of stock) which results in a change of control of Tenant as if such transfer of stock (or other mechanism) which results in a change of control of Tenant were an assignment of this Lease, and if Tenant is a partnership, limited liability company or joint venture, said provisions shall apply with respect to a transfer (by one or more transfers) of an interest in the distributions of profits and losses of such partnership, limited liability company or joint venture (or other mechanism, such as, by way of example, the creation of additional general partnership or limited partnership or member interests) which results in a change of control of such a partnership, limited liability company or joint venture, as if such transfer of an interest in the distributions of profits and losses of such partnership or joint venture which results in a change of control of such partnership, limited liability company or joint venture were an assignment of this Lease; but said provisions shall not apply to transactions with a corporation into or with which Tenant is merged or consolidated or to which all or substantially all of Tenant's assets are transferred, provided that in the event of such merger, consolidation or transfer of all or substantially all of Tenant's assets (i) the successor to Tenant has a net worth computed in accordance with generally accepted accounting principles at least equal to the greater of (1) the net worth of Tenant immediately prior to such merger, consolidation or transfer, or (2) the net worth of Tenant herein named on the Date of this Lease, (ii) proof satisfactory to Landlord of such net worth shall have been delivered to Landlord at least ten (10) days prior to the effective date of any such transaction, and (iii) the Guaranty shall remain in full force and effect (each, a "**Permitted Corporate Transfer**" and collectively, with Permitted Affiliate Transfers, "**Permitted Transfers**").

          d.      **Bankruptcy.** Without limiting any of the provisions of this Section 24, if pursuant to the Federal Bankruptcy Code (herein referred to as the "**Code**"), or any similar law hereafter enacted having the same general purpose, Tenant is permitted to assign this Lease notwithstanding the restrictions contained in this Lease, adequate assurance of future performance by an assignee expressly permitted under such Code shall be deemed to mean the deposit of cash security in an amount equal to the sum of one year's Fixed Basic Rent plus an amount equal to the Additional Rent for the calendar year preceding the year in which such assignment is intended to become effective, which deposit shall be held by Landlord for the balance of the Term, without interest, as security for the full performance of all of Tenant's obligations under this Lease, to be held and applied in the manner specified for any security deposit required hereunder.

#15241254 v2

e.     **Limitations.** Except as specifically set forth above, no portion of the Premises or of Tenant's interest in this Lease may be acquired by any other person or entity, whether by assignment, mortgage, sublease, transfer, operation of law or act of Tenant, nor shall Tenant pledge its interest in this Lease.

25.     **Subordination.** This Lease and Tenant's rights under this Lease shall be subject and subordinate at all times in lien and priority to any mortgage or other encumbrance now or hereafter placed upon or affecting the Property or the Premises, and to all renewals, modifications, consolidations and extensions thereof, without the necessity of any further instrument or act on the part of Tenant. Tenant shall execute and deliver upon demand any instrument or instruments confirming the subordination of this Lease to the lien of any such mortgage, and any further instrument or instruments of attornment that may be desired by any such mortgagee or Landlord, provided, however, that any holder of such lien or mortgage agrees not to disturb the use and occupancy of the Premises in accordance with the terms of this Lease upon any foreclosure. Notwithstanding the foregoing, any mortgagee may at any time subordinate its mortgage to this Lease, without Tenant's consent, by giving notice in writing to Tenant and thereupon this Lease shall be deemed prior to such mortgage without regard to their respective dates of execution and delivery. In that event such mortgagee shall have the same rights with respect to this Lease as though this Lease had been executed prior to the execution and delivery of the mortgage and had been assigned to such mortgagee. Provided that Landlord complies with the provisions set forth in Section 2(b), then, in such event, (i) Landlord and Tenant each acknowledge that this Lease shall be subject and subordinate to any Declaration or Master Deed without the necessity of any further instrument or act on the part of Tenant; (ii) Tenant shall execute and deliver upon demand any instrument or instruments confirming the subordination of this Lease to any Declaration or Master Deed as may be desired by Landlord or any Association; and (iii) Tenant shall comply with the terms and conditions of any Declaration or Master Deed to the extent same affects the Premises.

26.     **Curing Tenant's Defaults.** If Tenant defaults in the performance of any of its obligations under this Lease, Landlord may, without any obligation to do so and in addition to any other rights it may have in law or equity, elect to cure such default on behalf of Tenant after written notice (except in the case of emergency) to Tenant and a reasonable opportunity to cure. Tenant shall reimburse Landlord upon demand for any sums paid or costs incurred by Landlord in curing such default, including Interest thereon from the respective dates of Landlord's making the payments and incurring such costs, which sums and costs together with interest thereon shall be deemed Additional Rent payable within ten (10) days of demand.

27.     **Surrender.**

a.     **Broom Clean Condition.** At the expiration of the Term or earlier termination of this Lease, Tenant shall promptly yield up the Premises and all improvements, alterations and additions thereto, and all fixtures and equipment servicing the Premises in a condition which is clean of garbage and debris and broom clean and in the same condition, order and repair in which they are required to be kept throughout the Term, ordinary wear and tear and damage from casualty (provided the related insurance proceeds are retained by Landlord) excepted.

#15241254 v2

b.     **Holdover Rent.** If Tenant, or any person claiming through Tenant, continues to occupy the Premises after the expiration of the Term or earlier termination of this Lease or any renewal thereof without prior written consent of Landlord, the Fixed Basic Rent during such continued occupancy shall be one hundred fifty percent (150%) of the Fixed Basic Rent for the last year of the Term.  In addition, Tenant shall indemnify Landlord for any loss or damage incurred by reason of Tenant's failure to surrender the Premises.  Anything to the contrary notwithstanding, any holding over by Tenant without Landlord's prior written consent shall constitute an Event of Default under this Lease and shall be subject to all the remedies set forth in Section 29(b) of this Lease.

28.     **Defaults-Remedies.**

a.     **Defaults.**  It shall be an Event of Default under this Lease if any one or more of the following events occurs (each, an "**Event of Default**"):

(1)     Tenant fails to pay in full any and all installments of Fixed Basic Rent or Additional Rent or any other charges or payments due and payable under this Lease whether or not herein included as Rent within five (5) days after the same is first due and payable.

(2)     Tenant violates or fails to perform or otherwise breaches any agreement, term, covenant or condition contained in this Lease within thirty (30) days following receipt of notice from Landlord specifying the nature of the breach; provided, however, that in the case of a violation or breach that requires longer than thirty (30) days to cure, such violation or breach shall not be an Event of Default so long as Tenant commences a cure of such violation or breach within such thirty (30) day period and diligently pursues the same to completion, but in no event for longer than ninety (90) days.

(3)     Tenant abandons the Premises without notice.

(4)     Tenant fails to furnish a Tenant Estoppel Certificate within ten (10) days following receipt of notice from Landlord of Tenant's failure to furnish such Tenant Estoppel Certificate within the time period provided by Section 37.

(5)     Tenant or Tenant's guarantor pursuant to the Guaranty becomes insolvent or bankrupt in any sense or makes an assignment for the benefit of creditors or if a petition in bankruptcy or for reorganization or for an arrangement with creditors under any federal or state law is filed by or against Tenant, or a bill in equity or other proceeding for the appointment of a receiver or similar official for any of Tenant's assets is commenced, or if any of the real or personal property of Tenant shall be levied upon by any sheriff, marshal or constable; provided, however, that any proceeding brought by anyone other than the parties to this Lease under any bankruptcy, reorganization arrangement, insolvency, readjustment, receivership or similar law shall not constitute an Event of Default until such proceeding, decree, judgment or order has continued unstayed for more than sixty (60) consecutive days.

(6)     Any of the events enumerated in Sections (a)(i) through (a)(v) of this Section 29 happen to any guarantor of this Lease.

-33-

b. **Remedies.** Upon the occurrence of an Event of Default under this Lease, Landlord shall have all of the following rights:

(1) Landlord may charge a late payment charge and Interest in accordance with Section 9 of this Lease. If Landlord incurs a late charge in connection with any payment which Tenant has failed to make within the times required in this Lease, Tenant shall pay Landlord, in addition to such payment due, the full amount of such late charge incurred by Landlord. Nothing in this Lease shall be construed as waiving any rights of Landlord arising out of any default of Tenant, by reason of Landlord's imposing or accepting any such late charge(s) and/or Interest; the right to collect such late charge(s) and/or Interest is separate and apart from any rights relating to remedies of Landlord after default by Tenant including, without limitation, the rights and remedies of Landlord provided herein.

(2) Landlord shall be entitled to damages computed in accordance with Section 28(c) below.

(3) Landlord may re-enter the Premises and, at the option of Landlord, remove all persons and all or any property therefrom, either by self help or by summary dispossess proceedings or by any suitable action or proceeding at law or by force or otherwise, without being liable for prosecution or damages therefor, and Landlord may repossess and enjoy the Premises. Upon recovering possession of the Premises by reason of or based upon or arising out of a default on the part of Tenant, Landlord may, at Landlord's option, either terminate this Lease or make such alterations and repairs as may be necessary, as reasonably determined by Landlord, in order to relet the Premises and may relet the Premises or any part or parts thereof, either in Landlord's name or otherwise, for a term or terms which may, at Landlord's option, be less than or exceed the period which would otherwise have constituted the balance of the Term and at such rent or rents and upon such other terms and conditions as in Landlord's sole discretion may seem advisable and to such person or persons as may in Landlord's discretion seem best; upon each such reletting all rents received by Landlord from such reletting shall be applied as follows: first, to the payment of any costs and expenses of such reletting, including all costs of alterations and repairs; second, to the payment of any indebtedness other than Fixed Basic Rent, Additional Rent or other charges due hereunder from Tenant to Landlord; third, to the payment of Fixed Basic Rent, Additional Rent and other charges due and unpaid hereunder; and the residue, if any, shall be held by Landlord and applied in payment of future rent as it may become due and payable hereunder. If rentals received from reletting during any month are less than that to be paid during that month by Tenant, Tenant shall pay any such deficiency to Landlord. Such deficiency shall be calculated and paid monthly. No such re-entry or taking possession of the Premises or the making of alterations or improvements thereto or the reletting thereof shall be construed as an election on the part of Landlord to terminate this Lease unless written notice of termination is given to Tenant. Landlord shall in no event be liable in any way whatsoever for failure to relet the Premises or, in the event that the Premises or any part or parts thereof are relet, for failure to collect the rent thereof under such reletting. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for such previous breach.

-34-

(4)     Landlord may terminate this Lease and the Term without any right on the part of Tenant to waive the forfeiture by payment of any sum due or by other performance of any condition, term or covenant broken.

c.     **Damages.**

Regardless of whether Landlord elects to terminate this Lease pursuant to Section 29(b)(iv) above, notwithstanding reentry upon the Premises by Landlord, Tenant shall be and remain liable to Landlord in an amount computed as follows: (a) an amount equal to the sum of all Rent then in arrears plus the aggregate of all Rent which is payable under this Lease for the balance of the Term, computed as if no Event of Default had occurred and any reentry had not been made (including, without limitation, Operating Expenses and Real Estate Taxes allocable to Tenant and other Additional Rent that would be owing for the remainder of the Term, as reasonably estimated by Landlord); plus (b) all costs and expenses incurred by Landlord in connection with the Event of Default and any reletting of the Premises, including, without limitation, (i) costs of reentry, repair and renovation, (ii) the value of all inducements granted or paid to new tenants of the Premises in connection with reletting including, without limitation, construction allowances and the value of rent-free periods, (iii) brokers' commissions and advertising expenses, (iv) watchman's wages and any sheriff's, marshall's, constable's or other officials' commissions, whether chargeable to Landlord or Tenant, and (v) reasonable attorneys' fees, costs and expenses; plus (c) Interest accrued on the aggregate of the aforesaid sums from the date each was payable (or, with respect to sums owing under clause (b) from the date each was incurred by Landlord) until paid by Tenant (whether before or after judgment); which sum shall be credited with (d) all rentals actually received by Landlord during the remainder of the Term from any replacement tenant to which the Premises are relet.

d.     **Waiver of Jury Trial; Attorneys Fees.**  IT IS MUTUALLY AGREED BY AND BETWEEN LANDLORD AND TENANT THAT (A) THEY HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTER-CLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES OR CLAIM OF INJURY OR DAMAGE, AND (B) IN ANY ACTION ARISING HEREUNDER, THE REASONABLE ATTORNEYS' FEES AND COSTS OF THE PREVAILING PARTY WILL BE PAID BY THE OTHER PARTY TO THE ACTION.

e.     **Rights and Remedies Cumulative.**  No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy provided herein or by law, but each shall be cumulative and in addition to every other right or remedy given herein or now or hereafter existing at law or in equity or by statute. Landlord shall have no duty to mitigate its damages in the event of Tenant's default under this Lease.

29.     **Brokers' Commission.**  Landlord and Tenant each represent and warrant to one another that it has negotiated with no brokers in bringing about this Lease and each party agrees to indemnify and hold the other party (and, in the case of Landlord, its mortgagee(s)) harmless from any and all claims of other brokers and expenses in connection therewith arising out of or in connection with the breach of the foregoing representation and warranty by such party.

-35-

30. **Notices.** All notices, demands, requests, consents, certificates, and waivers required or permitted hereunder from either party to the other shall be in writing and sent by United States certified mail, return receipt requested, postage prepaid, or by nationally recognized overnight courier, addressed as follows:

        If to Tenant:


        with a copy to:
        Donna J. Wengiel, Esquire
        Stuckert and Yates
        2 North State Street
        PO Box 70
        Newtown, PA 18940

        If to Landlord:


        with a copy to:
        Michael J. Mann, Esquire
        Pepper Hamilton LLP
        301 Carnegie Center, Suite 400
        Princeton, NJ  08543-5276

Either party may at any time, in the manner set forth for giving notices to the other, specify a different address to which notices to it shall thereafter be sent.  All notices shall be effective upon receipt or rejection of receipt by the addressee.  Notices from either party may be given by such party's agent or attorney.

31. **Inability to Perform.**  If Landlord is delayed or prevented from performing any of its obligations under this Lease due to Force Majeure the period of such delay or such prevention shall be deemed added to the time herein provided for the performance of any such obligation by Landlord.

32. **Survival.**  Notwithstanding anything to the contrary contained in this Lease, the expiration of the Term, whether by lapse of time or otherwise, shall not relieve Tenant from its obligations accruing prior to the expiration of the Term.

33. **Corporate Tenant.**  Tenant hereby covenants and warrants that: Tenant is a duly formed _____ qualified to do business in the State of New Jersey; Tenant will remain qualified to do business in the State of New Jersey throughout the Term and any renewals thereof; and the person(s) executing this Lease on behalf of Tenant are duly authorized to execute and deliver this Lease on behalf of the _____.  Tenant hereby represents and warrants to Landlord that (i) Tenant's most recent financial statements delivered to Landlord in connection with the execution of this Lease are true in all material respects and no material adverse changes have occurred with respect thereto and (ii) on each anniversary of the

Commencement Date, Tenant will deliver to Landlord current financial statements which shall be prepared in accordance with generally accepted accounting principles consistently applied.

34.     **Waiver of Invalidity of Lease.**  Each party agrees that it will not raise or assert as a defense to any obligation under this Lease or make any claim that this Lease is invalid or unenforceable due to any failure of this document to comply with ministerial requirements including, without limitation, requirements for corporate seals, attestations, witnesses, notarizations or other similar requirements and each party hereby waives the right to assert any such defenses or make any claim of invalidity or unenforceability due to any of the foregoing.

35.     **Security Deposit.**  As additional security for the full and prompt performance by Tenant of the terms and covenants of this Lease, Tenant has deposited with Landlord the Security Deposit.  The Security Deposit shall not constitute Rent for any month (unless so applied by Landlord on account of Tenant's default hereunder).  Tenant shall, upon demand, restore any portion of the Security Deposit which may be applied by Landlord to cure any default by Tenant hereunder.  To the extent that Landlord has not applied the Security Deposit or any portion thereof on account of a default, the Security Deposit, or such remaining portion of the Security Deposit, shall be returned to Tenant, without interest, within thirty (30) days following the termination of this Lease.

36.     **Estoppel Certificate.**  Tenant shall from time to time, within ten (10) days after Landlord's request or that of any mortgagee of Landlord, execute, acknowledge and deliver to Landlord a written instrument in recordable form, substantially in the form attached hereto as Exhibit G (the "**Tenant Estoppel Certificate**").

37.     **Rights Reserved by Landlord.**  Landlord waives no rights, except those that may be specifically waived herein, and explicitly retains all other rights including, without limitation, the following rights, each of which Landlord may exercise without notice to Tenant and without liability to Tenant for damage or injury to property, person or business on account of the exercise thereof, and the exercise of any such rights shall not be deemed to constitute an eviction or disturbance of Tenant's use or possession of the Premises and shall not give rise to any claim for set-off or abatement of Rent or any other claim:

        a.      To change the street address of the Building;

        b.      The right to use the name of the Building for all purposes;

        c.      To change or alter the land that constitutes the Property or the Complex and to change or alter the Common Facilities, provided such change does not materially alter or interfere with Tenant's Permitted Use of the Premises and Tenant is given at least thirty (30) days advanced notice;

        d.      To decorate or to make repairs, alterations, additions, or improvements, whether structural or otherwise, in and about the Building, or any part thereof, and for such purposes to enter upon the Premises and during the continuance of any of such work, to temporarily close doors, entry ways, public space and corridors in the Building and to interrupt or temporarily suspend services or use of Common Facilities, all without affecting any of Tenant's obligations hereunder, so long as the Premises are reasonably accessible and usable;

-37-

e.      To furnish door keys for the entry door(s) in the Premises on the Commencement Date and to retain at all times, and to use in appropriate instances, keys to all doors within and into the Premises.  Upon the expiration of the Term or Tenant's right to possession, Tenant shall return all keys to Landlord and shall disclose to Landlord the combination of any safes, cabinets or vaults left in the Premises;

f.      To designate and approve all window coverings used in the Building;

g.      To approve the weight, size and location of safes, vaults and other heavy equipment and articles in and about the Premises and the Building so as not to exceed the legal load per square foot designated by the structural engineers for the Building;

h.      To erect, use and maintain pipes, ducts, wiring and conduits, and appurtenances thereto, in and through the Premises; provided that such materials are concealed and do not interfere with Tenant's Permitted Use of the Premises;

i.      The right to use or dispose of the use of the roof of the Building; and

j.      During the last six (6) months of the term of this Lease, if during or prior to that time Tenant has vacated the Premises, to decorate, remodel, repair, alter or otherwise prepare the Premises for reoccupancy, without affecting Tenant's obligation to pay Rent for the Premises.

38.      **Miscellaneous.**

a.      **Irrevocable Offer and Required Approval**. The submission of this Lease for examination does not constitute an offer to lease, or a reservation of or option for the Premises.  This Lease shall only become effective only upon execution and delivery thereof by both Landlord and Tenant.

b.      **Non Waiver**. The failure of either party hereto in any one or more instances to insist upon the strict performance of any one or more of the agreements, terms, covenants, conditions or obligations of this Lease, or to exercise any right, remedy or election herein contained, shall not be construed as a waiver or relinquishment of the right to insist upon such performance or exercise in the future, and such right shall continue and remain in full force and effect with respect to any subsequent breach, act or omission.

c.      **Partial Payment**. No payment by Tenant or receipt by Landlord of a lesser amount than the correct Fixed Basic Rent or Additional Rent due hereunder shall be deemed to be other than a payment on account, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed to effect or evidence an accord and satisfaction and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance or pursue any other remedy in this Lease or at law provided.

d.      **Entire Agreement**. This Lease constitutes the entire agreement between the parties relating to the subject matter contained herein.  Neither party hereto has made any representations or promises to the other except as expressly contained herein.  This Lease

-38-

supersedes all prior negotiations, agreements, informational brochures, letters, promotional information and other statements and materials made or furnished by Landlord or its agents. No rights, easements or licenses are acquired in the Property or in any land adjacent thereto, by Tenant by implication or otherwise, except as expressly set forth in this Lease. No agreement hereinafter made shall be effective to change, modify, discharge or effect an abandonment of this Lease, in whole or in part, unless such agreement is in writing and signed by the party against whom enforcement of the change, modification, discharge or abandonment is sought.

       e.      **Partial Invalidity**. If any of the provisions of this Lease, or the application thereof to any person or circumstances, shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such provision or provisions to persons or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and every provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

       f.      **Choice of Law**. This Lease has been executed and delivered in the State of New Jersey and shall be construed in accordance with the laws of the State of New Jersey. Any action brought to enforce or interpret this Lease shall be brought in the court of appropriate jurisdiction in the county in which the Building is located. Should any provision of this Lease require judicial interpretation, it is agreed that the court interpreting or considering same shall not apply the presumption that the terms hereof shall be more strictly construed against a party by reason of the rule or conclusion that a document should be construed more strictly against the party who itself or through its agent prepared the same. It is agreed and stipulated that all parties hereto have participated equally in the preparation of this Lease and that legal counsel was consulted by each responsible party before the execution of this Lease.

       g.      **No Recordation**. This Lease shall not be recorded in whole or in memorandum form by either party hereto without the prior written consent of the other.

       h.      **Receipt of Money**. No receipt of money by Landlord from Tenant after the termination of this Lease or after the service of any notice or after the commencement of any suit, or after final judgment for the possession of the Premises, shall reinstate, continue or extend the term of this Lease or affect any such notice, demand or suit or imply consent for any action for which Landlord's consent is required.

       i.      **No Joint Venture**. This Lease shall create only the relationship of Landlord and Tenant between Landlord and Tenant and no estate shall pass out of Landlord. Nothing herein is intended to be construed as creating a joint venture or partnership relationship between the parties hereto.

       j.      **No Third Party Beneficiaries**. Notwithstanding anything to the contrary contained herein, no provision of this Lease is intended to benefit any party other than the signatories hereto and their permitted heirs, personal representatives, successors and assigns, and no provision of this Lease shall be enforceable by any other party.

       k.      **Exhibits**. All exhibits referred to in this Lease are attached hereto and shall be deemed an integral part hereof.

#15241254 v2

l.      **Captions**. The captions included in this Lease, whether for sections, subsections, paragraphs, Table of Contents, Exhibits, or otherwise, are inserted and included solely for convenience and shall not be considered or given any effect in construing the provisions hereof, and are not to be used in interpreting this Lease or for any other purpose in the event of any controversy.

m.      **Representations**. Landlord has made no representation, agreement, condition, warranty, understanding, or promise, either oral or written, other than as set forth herein, with respect to this Lease, the Property, the Premises, and the Complex or otherwise.

n.      **Gender; Plural Terms; Persons**. The masculine, feminine, or neuter pronoun shall each include the masculine, feminine, and neuter genders.  A reference to person shall mean a natural person, a trustee, a corporation, a partnership and any other form of legal entity.  All references (including pronouns) in the singular or plural number shall be deemed to have been made, respectively, in the plural or singular number as well, as the context may require.

o.      **Time**. Time is of the essence of this Lease with respect to the performance by the parties of all of their obligations hereunder.

39.      **OFAC.**  Tenant represents, warrants and covenants that neither Tenant, any guarantor pursuant to the Guaranty, nor any of their officers or directors (i) is listed on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Asset Control, Department of the Treasury ("**OFAC**") pursuant to Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) ("Order") and all applicable provisions of Title III of the USA Patriot Act (Public Law No. 107-56 (October 26, 2001)); (ii) is listed on the Denied Persons List and Entity List maintained by the United States Department of Commerce; (iii) is listed on the List of Terrorists and List of Disbarred Parties maintained by the United States Department of State; (iv) is listed on any other publicly available list of terrorists, terrorist organizations or narcotics traffickers maintained by the United States Department of State, the United States Department of Commerce or any other governmental authority or pursuant to the Order, the rules and regulations of OFAC (including without limitation the Trading with the Enemy Act, 50 U.S.C. App. 1-44; the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06; the unrepealed provision of the Iraq Sanctions Act, Publ.L. No. 101-513; the United Nations Participation Act, 22 U.S.C. § 2349 as-9; The Cuban Democracy Act, 22 U.S.C. §§ 60-01-10; The Cuban Liberty and Democratic Solidarity Act, 18 U.S.C. §§ 2332d and 233; and The Foreign Narcotic Kingpin Designation Act, Publ. L. No. 106-120 and 107-108, all as may be amended from time to time); or any other applicable requirements contained in any enabling legislation or other Executive Orders in respect of the Order (the Order and such other rules, regulations, legislation or orders are collectively called the "**Orders**"); (v) is engaged in activities prohibited in the Orders; or (vi) has been convicted, pleaded nolo contendere, indicted, arraigned or custodially detained on charges involving money laundering or predicate crimes to money laundering, drug trafficking, terrorist-related activities or other money laundering predicate crimes or in connection with the Bank Secrecy Act (31 U.S.C. §§ 5311 et seq.).  Tenant hereby agrees to defend, indemnify, and hold harmless Landlord from and against any and all claims, damages, losses, risks, liabilities, and expenses (including reasonable attorney's fees and

costs) arising from or related to any breach of the foregoing representation, warranty and covenant.

**IN WITNESS WHEREOF**, and in consideration of the mutual entry into this Lease and for other good and valuable consideration, and intending to be legally bound, each party hereto has caused this agreement to be duly executed under seal.

**Landlord:**

Date Signed:_____            KJOHNSON URBAN RENEWAL, LLC

                                         By:  _____
                                              Name:_____
                                              Title:_____


**Tenant:**

Date Signed:_____            [ENTITY CONTROLLED BY PERFORMANCE SPINE AND SPORTS MEDICINE]

                                         By:  _____
                                              Name:_____
                                              Title:_____

#15241254 v2

**IN WITNESS WHEREOF**, and in consideration of the mutual entry into this Lease and for other good and valuable consideration, and intending to be legally bound, each party hereto has caused this agreement to be duly executed under seal.

**Landlord:**

Date Signed: _1/ 23/ 12_

KJOHNSON URBAN RENEWAL, LLC

By: _____

Name: _Kevin Johnson_

Title: _Owner_

**Tenant:**
Date Signed: _1/23/2012_

[ENTITY CONTROLLED BY PERFORMANCE SPINE AND SPORTS MEDICINE]

By: _____

Name: _Percy Naranjo_

Title: _Chief Executive Officer_

#15241254 v2

**RIDER A**

**RENEWAL OPTIONS**

Tenant is hereby granted two (2) options (each, a "**Renewal Option**") to renew this Lease for five (5) years each (each, a "**Renewal Term**") upon all the terms and conditions of this Lease and the Fixed Basic Rent for each Renewal Term shall be as set forth in the Preamble of this Lease.  As a condition to the effectiveness of each Renewal Option, at the time of the exercise of each Renewal Option and at the commencement of each Renewal Term, Tenant shall not be in default of this Lease beyond any applicable grace or notice periods.  If Tenant wishes to exercise a Renewal Option, Tenant shall so notify Landlord in writing no later than twelve (12) months prior to the expiration of the then current Term.  Tenant's failure to timely exercise any Renewal Option shall automatically be deemed a waiver of such Renewal Option and all subsequent Renewal Options.

# RIDER B

## RIGHT OF FIRST OFFER TO PURCHASE UNIT

If Landlord decides to impose a condominium regime on the Property as provided in Section 2(b) of the Lease whereby the lot, unit or tract of land on which the Building is located could be sold in fee simple, separate and apart from the balance of the Property, except as otherwise set forth herein, and Landlord desires to sell the condominium unit on which the Building is located (the "Unit"), Landlord agrees to notify Tenant in writing of such desire and the price (the "ROFO Price") and other terms at which Landlord so desires to sell the Unit. Tenant shall advise Landlord within ten (10) business days after receiving such notice if Tenant is interested in purchasing the Unit for the ROFO Price and upon such other terms. If Tenant fails to respond within such time period and/or if Tenant responds that Tenant is not interested in purchasing the Unit, then Tenant shall have no further right hereunder to purchase the Unit under the terms set forth in Landlord's notice. However, if Tenant notifies Landlord within such time period that Tenant is interested in purchasing the Unit at the ROFO Price and upon such other terms set forth in Landlord's notice, then Landlord and Tenant shall have thirty (30) days following Landlord's receipt of such notice from Tenant within which to negotiate and execute a mutually satisfactory agreement for the sale of the Unit to Tenant.

In the event that Landlord and Tenant fail to enter into an agreement of sale and purchase within such thirty (30) day period, then Tenant shall have no further right hereunder to purchase the Unit with respect to such offer, subject to the balance of this paragraph. Thereafter, Landlord may negotiate with any third party for the sale and purchase of the Unit; provided, however, that Landlord will not finally enter into an agreement of sale with any third party for an effective purchase price that is less than 90% of the ROFO Price (or on economic terms materially less favorable to Landlord than those offered to Tenant with the ROFO Price) unless Landlord first allows Tenant ten (10) days within which to agree to purchase the Unit at such lesser price and/or upon such amended terms. Upon any sale to a third party made in compliance with this Rider B, Tenant's rights under this Rider B shall terminate and be of no further force and effect and upon Landlord's request, Tenant agrees to execute and acknowledge a memorandum, in proper form, for recording evidencing such termination.

If Landlord and Tenant enter into an agreement of sale and purchase but transfer of the Unit to Tenant is not consummated for any reason other than Landlord's default under such agreement of sale and purchase, then Tenant shall have no further right hereunder to purchase the Unit.

Tenant's right of first offer set forth above shall not apply to (but shall not be extinguished by) (i) any transfer of the Unit in mortgage foreclosure, by deed in lieu of foreclosure or as part of a settlement with the mortgagee, or (ii) a condemnation or transfer by deed in lieu of condemnation, (iii) any transfer of the Unit to an affiliate of Landlord or to a joint venture in which Landlord or its affiliate is a controlling venturer or has a material interest, or (iv) a transfer in which Landlord proposes to sell the Unit together with other buildings, improvements and/or property located at the Property or elsewhere.

Landlord shall have no obligation to notify Tenant of Landlord's intention to sell and Tenant shall have no right to purchase the Unit (or any portion thereof) at any time during which Tenant is in default under any of the provisions of this Lease beyond the expiration of any applicable notice and cure period.

From the time of Tenant's exercise of its right to purchase the Unit as aforesaid until the closing of the conveyance of the Unit to Tenant, Tenant and Landlord shall continue to enjoy and be bound by all of their respective rights and obligations under this Lease, including the obligation of Tenant to pay Rent as required herein through the date of such conveyance.

**EXHIBIT A**

**PREMISES**

**EXHIBIT B-1**

**LEGAL DESCRIPTION OF PROPERTY**

**EXHIBIT B-2**

**LEGAL DESCRIPTION OF COMPLEX**

**EXHIBIT C**

**LANDLORD WORK LETTER
ATTACHED TO AND MADE PART OF LEASE BETWEEN
KJOHNSON URBAN RENEWAL LLC, AS LANDLORD,
AND [*ENTITY CONTROLLED BY PERFORMANCE SPINE
AND SPORTS MEDICINE*], AS TENANT**

As a material inducement to Tenant to enter into the Lease, and in consideration of the covenants herein contained, Landlord and Tenant, intending to be legally bound, agree as follows:

1.     **Lease; Defined Terms.**  The Lease is hereby incorporated by reference to the extent that the provisions of this Landlord Work Letter apply thereto.  Terms not otherwise defined in this Landlord Work Letter shall have the meanings given to them in the Lease.  The Building Shell, Core and Site work (described in Section 2) is sometimes referred to as "**Landlord's Work**."

2.     **Base Building Work**.

a.     Landlord has retained, at its sole cost and expense, the services of architects and engineers for the design and engineering of the base Building and the development of the base Building site ("**Landlord's Design Professionals**").  Landlord shall cause Landlord's Design Professionals to prepare plans and specifications for the construction of the Building shell, core and site (the "**Building Shell, Core and Site Work**"), which for purposes of this Lease shall mean the improvements described in the preliminary plans and outline specifications set forth on Schedule 2 attached hereto ("**Base Building Plans**").  The Base Building Plans shall be prepared in conjunction with Tenant.  Tenant shall participate in such design and construction meetings and provide Tenant's design requirements as may be necessary for Landlord's Design Professionals to prepare the Base Building Plans.  The Base Building Plans shall conform with all applicable federal, state and local laws, ordinances including the Americans With Disabilities Act and building and zoning codes, and requirements of public authorities and insurance underwriters (collectively, "**Laws and Requirements**").

b.     The Base Building Plans shall be submitted to Tenant for Tenant's review and approval on or before the date set forth on the Project Schedule attached hereto as Schedule 1 for the submission of the Base Building Plans.  Tenant shall have the time period identified in the Project Schedule to approve or disapprove of the Base Building Plans.  Any notice of disapproval from Tenant shall state the specific reasons for such disapproval.  Tenant shall be obligated to approve the Base Building Plans unless the Building Shell, Core and Site Work as delineated therein (i) does not conform with Laws and Requirements, (ii) does not conform to the preliminary plans and outline specifications set forth on Schedule 2, (iii) would, in Tenant's reasonable judgment, adversely affect the integrity or effectiveness of any building system, including, without limitation, HVAC, electrical, plumbing, fire protection, sprinkler, security or life safety systems, or (iv) would, in Tenant's reasonable opinion, create a health hazard within the Building.  In the event Tenant does not approve or disapprove the Base Building Plans (or

relevant portion thereof) within the applicable time period provided on the Project Schedule as provided above, Tenant will be deemed to have approved such plans.  If Tenant disapproves of the Base Building Plans, Tenant shall provide to Landlord the requested revisions thereto and Landlord shall incorporate the revisions to which it agrees in its reasonable judgment and resubmit same to Tenant for its review and approval during the time period set forth on the Project Schedule.

c. Landlord shall provide to Tenant a preliminary budget of the cost of the Building Shell, Core and Site Work for Tenant's approval and Tenant within the time period set forth on the Project Schedule shall either approve the budget or request revisions to the Base Building Plans in order to achieve cost savings.  Landlord shall incorporate the requested revisions to which it agrees in its reasonable judgment and resubmit the Base Building Plans, as revised, to Tenant for its review and approval on or before the date for such resubmission as set forth on the Project Schedule.

d. Following Tenant's approval of the Base Building Plans after any revisions are incorporated as described in Section 2(c) above, Landlord shall cause Landlord's Design Professionals to prepare construction documents based upon the final approved Base Building Plans (the "**Base Building Construction Documents**").  The Base Building Construction Documents shall contain any value engineering add-alternates being evaluated by the parties and shall be prepared and submitted to Tenant for Tenant's review on or before the date set forth on the Project Schedule for such preparation and delivery and Tenant shall have the time period set forth on the Project Schedule to review and approve of same.  Tenant shall be obligated to approve of the Base Building Construction Documents unless they (i) do not conform to Laws and Requirements or (ii) do not conform to the approved Base Building Plans. Once approved by Tenant, the Base Building Construction Documents shall become the "Final Base Building Construction Documents."

e. Landlord shall enter into a construction contract with a reputable contractor it selects ("**Base Building Contractor**") on or before the applicable date on the Project Schedule.

f. Landlord may make minor, non-material changes or additions to the Final Base Building Construction Documents, those necessitated by field conditions, and those required in connection with the governmental approvals for Landlord's Work without the prior written approval of Tenant; with respect to other changes requiring Tenant's approval, such approval shall not be unreasonably withheld, delayed or conditioned.  Tenant shall not be obligated to consent to the change or addition unless the proposed change or addition (i) is consistent with the quality and scope of the Building Shell, Core and Site Work as set forth in the existing Final Base Building Construction Documents, (ii) does not interfere with Tenant's Permitted Use of the Premises, and (iii) does not increase Tenant's monetary obligations under this Lease.  In the event Tenant does not respond to Landlord's request for approval of any change or addition to the Final Base Building Construction Documents within ten (10) days after receipt of Landlord's written request therefor, Tenant shall be deemed to have approved the proposed change or addition.  Any notice of disapproval or request for clarification sent by Tenant shall state the specific reasons for such disapproval and/or the items to be clarified, as applicable.  Any changes to the Final Base Building Construction Documents shall be

documented by Landlord, in writing, at the regular job meetings and shall be communicated to Tenant's representative.

g. Landlord shall cause, at Landlord's sole cost and expense, the Base Building Contractor to commence and diligently pursue to completion the construction of the Building Shell, Core and Site Work in accordance with Final Base Building Construction Documents.

3. **Tenant Delay**. As used in this Landlord Work Letter, the term "**Tenant Delay**" shall mean any:

a. delays caused by Tenant's failure to comply with the specific time periods established in this Landlord Work Letter including, but not limited to, the failure to timely review and/or approve any plans, documents or budgets;

b. delays resulting from any changes to Landlord's Work requested by Tenant;

c. delays, not caused by Landlord, in furnishing materials or procuring labor for completion of Landlord's Work.

4. **Work Standards**. Landlord shall cause Landlord's Work to be done in a good and workmanlike manner in conformity with the Final Base Building Construction Documents and all Laws and Requirements. Landlord shall cause Landlord's Work to be carried forward expeditiously and with adequate work forces so as to achieve Substantial Completion of Landlord's Work on or before the Delivery Date (as defined in the Lease), as such date shall be extended one (1) day for each one (1) day of Tenant Delay. Landlord shall secure and pay for the building permit and all other permits and fees, licenses, and inspections necessary for the proper execution and completion of the Building Shell, Core and Site Work. Landlord shall be responsible for initiating, maintaining, and supervising all safety precautions and programs in connection with performance of Landlord's Work. Landlord shall obtain all customary warranties available from contractors and manufacturers in connection with Landlord's Work. Landlord shall enforce all warranties from contractors and manufacturers on behalf of Landlord and Tenant to the extent such warranties are not solely in favor of Tenant. Landlord, without cost to Tenant, shall promptly repair, replace, restore, or rebuild any work included in Landlord's Work that Landlord has been given notice (during the one (1) year period following the date of Substantial Completion of Landlord's Work) contains defects in material or workmanship, or to which damage has occurred because of such defects. "**Substantial Completion**" shall mean that Landlord's Work has been completed in a good and workmanlike manner in accordance with the Final Base Building Construction Documents and in compliance with all Laws and Requirements, subject only to the completion of minor finishing and other minor construction aspects of Landlord's Work.

**SCHEDULE 1**

**PROJECT SCHEDULE**

| | Date(s)/Periods |
|---|---|
| | |
| Base Building Plans Submission Date | |
| Tenant Review and Approval/Rejection of Base Building Plans | |
| Base Building Plans Resubmitted to Tenant (if applicable) | |
| Revised Base Building Plans Approved by Tenant (if applicable) | |
| Base Building Preliminary Budget | |
| Base Building Plans Revised and Final (if applicable) | |
| Base Building Construction Documents | |
| Tenant Review and Approval/Rejection of Base Building Construction Documents | |
| Final Base Building Construction Documents | |
| Commence Building Shell, Core and Site Work | |
| Delivery Date | |

**SCHEDULE 2**

**BASE BUILDING PRELIMINARY PLANS AND SPECIFICATIONS**

**EXHIBIT D**

**BUILDING HOLIDAYS**

* NEW YEAR'S DAY *

* MEMORIAL DAY *

* INDEPENDENCE DAY *

* LABOR DAY *

* THANKSGIVING DAY *

* CHRISTMAS DAY *

**EXHIBIT E**

**JANITORIAL SPECIFICATIONS**

## RULES AND REGULATIONS

1.  **DESIGNATED SMOKING AREA:**

Tenant, its employees and guests shall comply with the restrictions on smoking on the Property as set by Landlord.

2.  **WINDOWS:**

Windows in the Premises shall not be covered or obstructed by Tenant. No bottles, parcels or other articles shall be placed on the window sills, in the halls, or in any other part of the Building other than the Premises. No article shall be thrown out of the doors or windows of the Premises.

3.  **PROJECTIONS FROM BUILDING:**

No awnings, air-conditioning units, or other fixtures shall be attached to the outside walls or the window sills of the Building or otherwise affixed so as to project from the Building, without prior written consent of Landlord.

4.  **FLOOR COVERING:**

Tenant shall not lay linoleum or other similar floor covering so that the same shall come in direct contact with the floor of the Premises. If linoleum or other similar floor covering is desired to be used, an interlining of builder's deadening felt shall first be fixed to the floor by a paste or other material that may easily be removed with water, the use of cement or other similar adhesive material being expressly prohibited.

5.  **LOCKS:**

Tenant, before closing and leaving the Premises, shall ensure that all windows are closed and entrance doors locked. All locks and hardware must conform to Building Standard and be keyed to the Building master.

6.  **CONTRACTORS:**

No contract of any kind with any supplier of towels, water, toilet articles, waxing, rug shampooing, venetian blind washing, furniture polishing, lamp servicing, cleaning of electrical fixtures, removal of waste paper, rubbish, garbage, or other like service shall be entered into by Tenant, nor shall any machine of any kind be installed in the Building or the Premises, without the prior written consent of Landlord. Tenant shall not employ any persons other than Landlord's janitors for the purpose of cleaning the Premises without prior written consent of Landlord. Landlord shall not be responsible to Tenant for any loss of property from the Premises occurring, or for any damage to the effects of Tenant by such janitors or any of its employees, or by any other person or any other cause.

7.      **ACTIVITIES PROHIBITED ON PREMISES:**

Tenant shall not conduct, or permit any other person to conduct, any auction upon the Premises, manufacture or store goods, wares or merchandise upon the Premises without the prior written approval of Landlord, except the storage of usual supplies and inventory to be used by Tenant in the conduct of its business, make any unusual noises in the Premises, permit to be played musical instrument on the Premises, permit any radio to be played, or television, recorded or wired music in such loud manner as to disturb or  annoy other tenants, or permit any unusual odors to be produced on the Premises. No bicycles, vehicles or animals of any kind shall be brought into or kept in or about the Premises.

8.      **PLUMBING AND ELECTRIC FACILITIES:**

Plumbing facilities shall not be used for any purpose other than those for which they were constructed; and no sweepings, rubbish, ashes, newspaper or other substances of any kind shall be thrown into them.  Waste (including beverages of any kind) and excessive or unusual amounts of water is prohibited.

9.      **SAFES AND OTHER HEAVY EQUIPMENT:**

Landlord reserves the right to prescribe the weight and position of all safes and other heavy equipment so as to distribute properly the weight thereof and to prevent any unsafe condition from arising.

10.     **PARKING:**

Tenant and its employees shall park their cars only in those portions of the parking area designated by Landlord.  Tenant and its employees are prohibited from parking in the designated visitor parking areas and areas clearly marked as Fire Lanes.

11.     **SPEED LIMIT:**

All users shall comply with the posted Speed Limit for the Property at all times.

**EXHIBIT G**

**TENANT ESTOPPEL CERTIFICATE**

TO: _____ ("_____") pursuant to that certain _____ Agreement (the "Agreement") dated _____, 20_, by and between _____ and _____ ("Landlord").

      1.     The undersigned ("Tenant") is the tenant under that certain Lease dated _____, 20__, by and between Landlord and Tenant (the "Lease"), covering a portion of those certain premises commonly known and designated as_____ _____, New Jersey, consisting of approximately _____ square feet (the "Premises"). A true, complete and correct copy of the Lease is attached hereto as Exhibit "A".

      2.     The Lease has not been modified, changed, altered or amended in any respect (except as indicated following this sentence) and is the only lease or agreement between the undersigned and Landlord affecting the Premises. If none, state "none".

_____

_____

      3.     The undersigned has made no agreements with Landlord or its agents or employees, which are not described in the Lease concerning free rent, partial rent, rebate of rental payments or any other type of rental concession with respect to the Lease (except as indicated following this sentence). If none, state "none".

_____

_____

      4.     The undersigned accepted possession of the Premises on _____, 20_, currently occupies the Premises and has been open for business since _____, 20_. The current term of the Lease began on _____, 20_. The current term of the Lease will expire on _____, 20_, and Tenant has no present right to cancel or terminate the Lease under the terms thereof, or otherwise. No Rent payable pursuant to the Lease has been prepaid for more than one (1) month, and no monies otherwise payable to Landlord under the Lease have been paid in advance of the due date therefor as set forth in the Lease. The Fixed Basic Rent currently being paid under the Lease is $_____ per month. Future changes to the Fixed Basic Rent are as set forth in the Lease. The undersigned also pays amounts on account of its share of Operating Expenses and Real Estate Taxes, as set forth in the Lease, which amounts have been paid to and including _____, 20_.

      5.     The Lease is fully valid and enforceable and is currently in full force and effect. Neither Landlord nor Tenant is in default thereunder, and all conditions and obligations on the part of Landlord to be fulfilled under the terms of the Lease have been satisfied or fully performed including, without limitation, all required tenant improvements, allowances, alterations, installations and construction, and payment therefor has been made in full. Tenant has no offset, claim, defense or counterclaim against any Rent or other sum payable by Tenant

under the Lease or against any other obligation of Tenant under the Lease. No condition exists which with the giving of notice or the passage of time, or both, would constitute a default under the Lease.

6.       Tenant has not suffered any assignment of the Lease or sublet the Premises or any portion thereof, and no person or entity, other than Tenant, has any possessory interest in the Premises or right to occupy the Premises or any portion thereof, except as permitted under the Lease.

7.       Tenant claims no right, title or interest in or to the Premises or right to possession of the Premises, except as tenant under the terms of the Lease. The Lease does not contain and the undersigned does not have any outstanding options or rights of first refusal to purchase the Premises or any portion thereof or the Property of which the Premises are a part, except as otherwise set forth below. If none, state "none".

_____
_____

8.       No actions, whether voluntary or otherwise, are pending against the undersigned under the bankruptcy laws of the United States or any state thereof, and Tenant knows of no fact or pending or threatened claim or litigation that might result in the insolvency or bankruptcy of Tenant.

9.       Tenant is a [corporation][limited partnership][general partnership] duly organized and validly existing and in good standing under the laws of the State of _____ [and qualified to do business in the State of New Jersey]. [_____, a _____, owns and holds all of the issued and outstanding stock in and of Tenant, and is a separate and distinct entity from Tenant].

10.     Tenant's occupancy of the Premises complies fully with all local, state and federal laws, ordinances, codes, rules, regulations and orders including, without limitation, those concerning hazardous wastes, hazardous materials, asbestos, oil and underground storage tanks. In addition, no such hazardous wastes, hazardous materials, asbestos, oil or underground storage tanks have been or are incorporated in, stored on or under, released from, treated on, transported to or from or disposed of, on or from the Premises or any portion thereof except as permitted by law with respect to medical waste.

11.     All inspections, licenses, permits, consents, permissions, approvals and certificates required, whether by law, regulation or insurance standards, to be made or issued with respect to the conduct of Tenant's business, the Premises and the use and occupancy of the Premises by Tenant have been made by or issued by all necessary private parties, the appropriate governmental or quasi-governmental authorities or other authorities having jurisdiction over the Premises and/or Tenant's business, are in full force and effect, and Tenant has not received notification from any such authority that Tenant or the Premises is in material noncompliance with such laws, regulations or standards, that the Premises is being used, operated or occupied unlawfully or that Tenant has failed to obtain such inspections, permits, consents, permissions, approvals, licenses or certificates, as the case may be. Tenant has not received notice of any

violation or failure to conform to any such law, ordinance, regulation, standard, license, permit, consent, permission, approval or certificate.

12.     All insurance policies required to be maintained by Tenant under the Lease have been maintained, are in full force and effect and all premiums with respect thereto have been paid in full.

13.     [Upon receipt of notice of the closing of the purchase and sale of the Premises as set forth in the Agreement, Tenant shall recognize _____ as landlord under the Lease, and all payments of rent and other sums due to landlord under the Lease and all communications permitted or required under the Lease shall be directed to _____ c/o _____, and all communications permitted or required under the Lease shall be directed to Tenant at the address for Tenant set forth in the Lease (except as otherwise indicated following this sentence), unless and until otherwise specified in written notice by the party to whom notice is to be given at such address.  If none, state "none".

_____
_____]

14.     [This certification is made to induce _____ [to enter into the Agreement] [to provide financing to Landlord] knowing that _____ is relying upon the truth of this Tenant Estoppel Certificate in [entering into the Agreement,] [providing such financing] and that [the acquisition of the Premises by _____ pursuant to the Agreement] [the financing provided to Landlord] shall be deemed good and valuable consideration to Landlord for the foregoing representations made by Tenant.]

Dated this _____ day of _____, 200_.

TENANT:

_____,

a _____

BY:_____

Name:_____

Title:_____

**EXHIBIT H**

**CONFIRMATION OF LEASE TERM**

THIS MEMORANDUM is made as of the ___ day of _____, 20____, between _____, a _____, with an office at _____("Landlord") and _____, a_____, with its principal place of business at _____ _____ ("Tenant"), who entered into a lease dated for reference purposes as _____ __, 20__ (the "Lease"), covering certain premises located at _____. All capitalized terms, if not defined herein, shall be defined as they are defined in the Lease.

      1.      The parties to this Memorandum hereby agree that the date of _____, 20__ is the "Commencement Date" of the Term, and the date of _____ is the expiration date of the Lease.

      2.      Tenant hereby confirms the following:

           a.      That it has accepted possession of the Premises pursuant to the terms of the Lease;

           b.      That the improvements, including Landlord's Work, required to be furnished according to the Lease by Landlord have been Substantially Completed;

           c.      That Landlord has fulfilled all of its duties of an inducement nature or they are otherwise set forth in the Lease;

           d.      That there are no offsets or credits against rentals, and the $_____ Security Deposit has been paid as provided in the Lease;

           e.      That there is no default by Landlord or Tenant under the Lease and the Lease is in full force and effect.

      3.      This Memorandum, each and all of the provisions hereof, shall inure to the benefit of, or bind, as the case may require, the parties hereto, and their respective successors and assigns, subject to the restrictions upon assignment and subletting contained in the Lease.

**<u>Landlord</u>:**
Date Signed:_____

_____
By:_____
Name:_____
Title:_____
Attest:_____


**<u>Tenant</u>:**
Date Signed:_____

_____
By:_____
Name:_____
Title:_____
Attest:_____

# EXHIBIT I

## UNCONDITIONAL GUARANTY AND SURETYSHIP AGREEMENT

**THIS UNCONDITIONAL GUARANTY AND SURETYSHIP AGREEMENT** (this "Guaranty") dated _____ ___, 20___, is executed by **PERFORMANCE SPINE AND SPORTS MEDICINE LLC** ("Guarantor"), in favor of _____ ("Landlord").

## BACKGROUND

A.      Pursuant to a Lease (the "Lease") dated the date of this Guaranty by and between Landlord, as landlord, and _____, as tenant ("Tenant"), Landlord has demised and let unto Tenant a portion of the building to be constructed for the Term and upon the conditions set forth in the Lease.

B.      Landlord requires Guarantor to execute and deliver to Landlord this Guaranty as a condition precedent to Landlord's entering into the Lease.

C.      Guarantor will receive a direct financial benefit from Tenant entering into the Lease.

D.      Unless otherwise specifically defined in this Guaranty, all capitalized terms used herein shall have the same meanings as are given to such terms in the Lease.

**NOW, THEREFORE**, incorporating the foregoing Background herein by this reference, in consideration of the premises contained in this Guaranty, and in consideration of the Lease and other accommodations from Landlord to Tenant and Guarantor made as of the date of this Guaranty and from time to time after the date of this Guaranty to be made by Landlord for the benefit of Tenant and Guarantor, and in order to induce Landlord to enter into the Lease, Guarantor, intending to be legally bound hereby, agrees as follows:

1.      The undersigned hereby absolutely, unconditionally, and irrevocably guarantees to Landlord, its successors and assigns, subject to any grace period set forth in the Lease as applicable to Tenant and further subject to any rights or defenses applicable to the obligations of Tenant (excluding a discharge or release in bankruptcy or other similar proceedings), the prompt and full payment of all amounts payable by Tenant and the performance of all obligations of Tenant arising pursuant to the Lease as same may be modified or amended, with or without Guarantor's consent for the Term of the Lease as same may be extended (collectively, "Lease Obligations"). If Tenant defaults in the performance of the Lease Obligations, upon Landlord's request, Guarantor will perform the Lease Obligations. In addition to the Lease Obligations, Guarantor also agrees to pay Landlord's reasonable costs and attorneys' fees in enforcing this Guaranty. This Guaranty is a guarantee of payment and performance and not a guarantee of collection. This Guaranty is an agreement of suretyship as well as of guaranty.

2.      Guarantor hereby waives any notice of the acceptance hereof, of any action taken or omitted in reliance hereon, or of any nonpayment, nonperformance, or default of Tenant. With the exception of full payment and performance, no act or thing which but for this provision could act as a release shall in any way terminate, affect, or impair the liability of Guarantor

hereunder, whether or not notice is given to Guarantor, including without limitation: (1) any extension, renewal, amendment, modification, sublease, transfer, or assignment of the Lease; (2) a discharge or release in bankruptcy or other proceedings of any of the Lease Obligations or any defenses otherwise available to a surety or guarantor; (3) any waiver, indulgence, or consent granted to Tenant, any delay or lack of diligence in the enforcement of the Lease Obligations; and (4) any receipt, application, or release of any security for the Lease Obligations.

3.      Guarantor agrees that this Guaranty shall continue in full force and effect until the Lease Obligations shall have been fully paid, performed and discharged and the Lease and all other arrangements between each of Tenant and Guarantor and Landlord have been terminated. If Guarantor shall have any right under applicable law otherwise to terminate or revoke this Guaranty which cannot be waived, Guarantor agrees that such termination or revocation shall not be effective until a written notice of such revocation or termination, specifically referring hereto and signed by Guarantor, is actually received by Landlord; provided, however, that no such notice shall affect the right and power of Landlord to enforce remedies or rights arising prior to Landlord's actual receipt of such notice.  If, in reliance upon this Guaranty, Landlord takes any action after any such termination or revocation by Guarantor, but prior to the actual receipt by Landlord of such written notice, the rights of Landlord with respect to any such action so taken shall be the same as if such termination or revocation had not occurred.  Guarantor expressly acknowledges and agrees that any such notice of revocation shall not be effective to release Guarantor from liability for: (i) such Lease Obligations that are contingent, unliquidated, undetermined or not due as of the date of such notice of revocation and which later become absolute, liquidated, determined or due, or (ii) any and all renewals, extensions, substitutions, amendments and modifications of the Lease Obligations that are granted after the date of such notice of revocation.

4.      Until full payment and performance of the Lease Obligations, Guarantor shall have no right of subrogation against Tenant by reason of any payment or performance by Guarantor; waives any right to enforce any remedy which Guarantor now or hereafter shall have against Tenant by reason of any payment or performance hereunder; and subordinates any liability or indebtedness of Tenant now or hereafter held by Guarantor to the Lease Obligations.

5.      Landlord is hereby authorized, at any time and from time to time, without notice to or demand upon Guarantor, and without in any way affecting or impairing the liability of Guarantor under this Guaranty, to renew, extend, accelerate or otherwise change the time for payment of or other terms relating to the Lease Obligations, and otherwise to modify, amend or change the terms of any agreement, document or instrument now or in the future executed by Tenant or any other guarantor of such Lease Obligations.  Landlord is also authorized without notice to or the consent of Guarantor to accept partial payments on the Lease Obligations from Tenant, to take and hold security or collateral for the payment and performance of the Lease Obligations and this Guaranty and any other guarantees of the Lease Obligations and other liabilities of Tenant, and to exchange, enforce, waive and release any such security or collateral. Landlord may apply any such security or collateral and direct the order or manner of sale thereof as the lender in its discretion may determine, and may settle, release, compromise, collect or otherwise liquidate the Lease Obligations, any guarantee of the Lease Obligations, and any security or collateral for the Lease Obligations or for any such guarantee in any manner.

6.        Each of Landlord's rights under the Lease, this Guaranty, or any other agreement securing the Lease is separate and may be exercised and enforced one at a time or all at once, or any combination thereof, in any order and against Tenant, Guarantor, or any other person liable for any of the Lease Obligations separately or against all of them together.  A waiver by Landlord of any right in a specific instance, or any delay or failure to act, shall not operate as a waiver of the right itself or prevent the future exercise or enforcement of the right.

7.        This Guaranty shall be governed in all respects by the laws of the State of New Jersey and may not be amended, modified, revoked or terminated except in writing signed by Guarantor and Landlord.

8.        This Guaranty shall be binding upon each person and entity signing below, and such person's heirs or successors and assigns, whether or not signed by any other person or entity.  If this Guaranty is signed by more than one person, their liability shall be joint and several.  For purposes of this Guaranty, the term "Tenant" shall also include the successors and permitted assigns of Tenant.

9.        If any provision of this Guaranty is declared by a court of competent jurisdiction to be void, prohibited or unenforceable in any jurisdiction, such provision shall, solely as to such jurisdiction, be ineffective only to the extent of such invalidity, prohibition or enforceability without affecting any other provision hereof.  Any such invalidity, prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.        **GUARANTOR AND, BY ITS ACCEPTANCE OF THIS GUARANTY, LANDLORD KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE BETWEEN THEM, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, AND IN ANY WAY ARISING OUT OF, CONNECTED WITH, OR RELATED OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH OR PURSUANT TO THIS GUARANTY OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED HERETO OR TO THE LEASE AND AGREE THAT IN ANY ACTION ARISING HEREUNDER, THE ATTORNEYS' FEES AND COSTS OF THE PREVAILING PARTY WILL BE PAID BY THE OTHER PARTY TO THE ACTION.  GUARANTOR AND, BY ITS ACCEPTANCE OF THIS GUARANTY, LANDLORD, AGREE AND CONSENT THAT ANY SUCH DISPUTE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY A COURT BY TRIAL WITHOUT A JURY, AND THAT EACH OF THEM MAY FILE THE ORIGINAL OR A COPY OF THIS GUARANTY WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY.**

11.        **GUARANTOR IRREVOCABLY CONSENTS TO THE JURISDICTION AND VENUE OF ANY STATE OR FEDERAL COURT SITTING IN THE STATE OF NEW JERSEY.**

12.     Guarantor represents and warrants that it has consulted with counsel or such other experts or advisors as it has deemed necessary in connection with the execution and delivery of this Guaranty.  Guarantor further represents and warrants that it understands and accepts the terms of this Guaranty, including the consent to jurisdiction and waiver of jury trial and that it has delivered this Guaranty because it is in Guarantor's best interest under the circumstances.

IN WITNESS WHEREOF, the undersigned has caused this Guaranty to be executed as of the day and year first above written.

Witness:                                              **GUARANTOR:**

_____                     **PERFORMANCE SPINE AND SPORTS**
Print Name:                                           **MEDICINE LLC**


By:_____
Name:_____
Title:_____


[NOTARY BLOCK]

**EXHIBIT J**

**TENANT WORK LETTER**
**ATTACHED TO AND MADE PART OF**
**LEASE BETWEEN [K JOHNSON ENTERPRISES,**
**AS LANDLORD, AND [ENTITY CONTROLLED BY PERFORMANCE SPINE AND**
**SPORTS MEDICINE], AS TENANT**

As material inducement to Tenant to enter into the Lease, and in consideration of the covenants herein contained, Landlord and Tenant, intending to be legally bound, agree as set forth herein. The Lease is hereby incorporated by reference to the extent that the provisions of this Tenant Work Letter apply thereto. Terms not otherwise defined in this Tenant Work Letter shall have the meanings given to them in the Lease.

**ARTICLE 1**
**DESCRIPTION AND COORDINATION OF WORK**

1.1     Tenant's Work. The work to be performed by Tenant and paid from the Improvement Allowance provided by Landlord consists of the construction of tenant improvements and the installation of fixtures, equipment and cabling in the Premises required by Tenant for its occupancy and any other costs incurred in the construction of the Tenant Improvements as described in more detail in the Tenant's Final Construction Documents, as defined in Article 2 of this Tenant Work Letter (the "Tenant's Work" or the "Tenant Improvements").

1.2     Representatives.

a)      Appointment of Representatives. Landlord and Tenant have appointed or shall appoint representatives to act for each of them with respect to all construction and construction related matters involving the Tenant's Work (respectively, "Landlord's Construction Representative" and "Tenant's Construction Representative", and together, the "Representatives"). The Representatives shall be available to attend regularly scheduled and special meetings with each other in person or by conference call.

b)      Tenant's Representative. Tenant's Construction Representative will be Percy Naranjo, provided, however, Tenant may change such person from time to time, which change shall be effective upon receipt by Landlord of written notice of such change. Tenant's Construction Representative shall have the authority to act on Tenant's behalf at all times (including at all construction meetings and inspections) and to bind Tenant with respect to issues relating to the construction of the Tenant Improvements including, but not limited to, cost and scheduling changes, change orders and financial matters involving items previously approved by Landlord or Tenant, as the case may be, or any new item.

c)      Landlord's Construction Representative. Landlord's Construction Representative will be Kevin Johnson, provided, however, Landlord may change such person from time to time, which change shall be effective upon the receipt by Tenant of written notice of such change or changes. Landlord's Construction Representative shall be generally available at the Premises during the construction of the Tenant Improvements and shall inspect the Tenant

Improvements from time to time to determine compliance with requirements of this Tenant Work Letter. Landlord's Construction Representative shall have the authority to act on Landlord's behalf at all times and to bind Landlord with respect to issues relating to the construction of the Tenant Improvements.

**ARTICLE 2**
**TENANT'S PLANS**

2.1     <u>Tenant's Design Professionals</u>.  Tenant will engage an architect ("Tenant's Architect") to document the design of the Tenant Improvements.  Each of Tenant's Architect and any other design professional engaged by Tenant or Tenant's Architect to design any aspect of the Tenant Improvements ("Tenant's Design Professionals"), shall maintain at all times errors and omissions professional liability insurance in an amount not less than $1,000,000 per occurrence and $2,000,000 in the aggregate covering any negligent act, error or omission of such party, evidence of which shall be provided to Landlord upon request.  Tenant's Design Professionals shall also maintain Worker's Compensation, Employer's Liability Insurance and Commercial General Liability, in commercially reasonable amounts.

2.2     <u>Tenant's Proposed Space Plan</u>.  Tenant shall cause to be prepared by Tenant's Architect and delivered to Landlord, for Landlord's approval as described below, a space plan (the "Tenant's Proposed Space Plan") for the construction of the Tenant Improvements.  To facilitate Landlord's review of the Tenant's Proposed Space Plan, Tenant shall forward to Landlord and Landlord's architect from time to time at reasonable intervals interim drafts of all or any portion of the Tenant's Proposed Space Plan.  In reviewing such partial and/or interim Tenant's Proposed Space Plan, Landlord shall endeavor to promptly identify any problems which would be grounds for rejection of Tenant's Proposed Space Plan based upon the criteria applicable to rejection of Tenant's Construction Documents by Landlord under Section 2.4 below.  Landlord and Tenant will work cooperatively so that Tenant's Architect can commence preparation of construction documents based upon the approved Tenant's Proposed Space Plan.

2.3     <u>Tenant's Construction Documents.</u>  Tenant shall cause to be prepared by Tenant's Architect and delivered to Landlord, for Landlord's approval as described below, complete architectural drawings, specifications and finish schedules (the "Tenant's Construction Documents") for the Tenant Improvements, based upon Tenant's Proposed Space Plan as approved by Landlord.  The Tenant's Construction Documents, once completed and ready for submission to Landlord for approval by Landlord under Section 2.4 below, shall, in the opinion of Tenant's Architect, be ready to be signed and sealed by Tenant's Architect (and, if applicable, any other Tenant's Design Professionals) licensed and registered in the State of New Jersey.  The Tenant's Construction Documents shall conform to all applicable Laws and Requirements.  The Tenant's Construction Documents shall contain, at a minimum and where applicable, floor plans, reflected ceiling plans, finish schedules and all related details and schedules.  Tenant's Architect shall provide mechanical, plumbing and electrical drawings, plans and specifications for the Tenant Improvements and prepare the life safety and fire protection plans for the Tenant Improvements.  Tenant, at its cost, shall provide engineering services as necessary, in connection with Tenant's Construction Documents.

2.4     Landlord Approval of Tenant's Construction Documents

    a)    Standards for Approval.  Within ten (10) days after receipt of Tenant's Construction Documents for the Premises, Landlord shall give notice to Tenant either approving or disapproving the Tenant's Construction Documents.  The applicable time period within which Landlord is required to respond to Tenant's submissions or resubmission of Tenant's Construction Documents under this Section 2.4 is hereinafter referred to as "Landlord's Approval Response Period".  Any notice of disapproval from Landlord shall state the specific reasons for such disapproval.  Landlord shall be obligated to approve the Tenant's Construction Documents unless the Tenant Improvements as delineated therein (i) do not conform with all applicable Laws and Requirements or Tenant's Construction Documents, as then amended (ii) would, in Landlord's reasonable judgment, adversely affect the integrity or effectiveness of any building system, including, without limitation, HVAC, electrical, plumbing, fire protection, sprinkler, security or life safety systems, (iii) would impair the structural integrity of the Building, (iv) would affect the appearance of the Building from outside the Building, (v) do not otherwise conform with the requirements set forth in Section 2.3 above, or (vi) would, in Landlord's reasonable opinion, create a health hazard within the Building.  Landlord's review of the Tenant's Construction Documents shall be solely for the benefit of Landlord and may not be relied upon by Tenant or any other party as being in conformity with any Laws or Requirements.

    b)    Rejection of Tenant's Construction Documents by Landlord.  In the event Landlord rejects the Tenant's Construction Documents or any portion thereof as provided in Section 2.4(a) above, Tenant shall resubmit to Landlord the Tenant's Construction Documents or relevant portion thereof, including the revisions required by Landlord.  Landlord shall review and approve any resubmitted plans within seven (7) days after receipt, provided they contain all of the revisions, modifications or changes which are unacceptable to Landlord applying the standards set forth in Section 2.4(a) above.  The Tenant's Construction Documents, as completed by Tenant's Architect and in the form finally approved by Landlord are referred to hereinafter as the "Tenant's Final Construction Documents".  Upon completion of the Tenant Improvements, Tenant shall have Tenant's Architect furnish Landlord a copy of the Tenant's Final Construction Documents with any changes made by Tenant's Architect noted thereon, as well as copies of any CADD disks.

    c)    In the event Landlord does not approve or disapprove Tenant's Construction Documents (or relevant portion thereof) within the Landlord's Approval Response Period, Landlord will be deemed to have approved such documents.

2.5     Permits.  Tenant, at Tenant's sole cost and expense shall file (or cause the general contractor to file) Tenant's Final Construction Documents with the governmental agencies having jurisdiction and obtain all necessary permits for same.

## ARTICLE 3
## PERFORMANCE OF TENANT'S WORK

3.1     Performance of Tenant's Work.

a)      Tenant, at its sole cost and expense, subject to Landlord's obligation to pay the Improvement Allowances provided for herein, shall, except as provided below, perform the Tenant's Work with architects, construction managers, general contractors of Tenant's own choosing, subject to Landlord's prior approval thereof, such approval not to be unreasonably withheld, conditioned or delayed.  Tenant shall perform the Tenant's Work in accordance with (i) the Tenant's Final Construction Documents, (ii) good construction practices, (iii) all Laws and Requirements, (iv) all other requirements of this Tenant Work Letter, and (v) all requirements set forth in the Lease for the performance of alterations by Tenant.

b)      Tenant and its contractors and subcontractors shall be solely responsible for the transportation, storage and safekeeping of materials and equipment used in the performance of the Tenant's Work, for the removal of waste and debris resulting therefrom on a daily basis, and for any damage caused by them to any portion of the Building.

c)      In addition to any insurance which may be required under the Lease, throughout the prosecution of the Tenant's Work, Tenant shall secure, pay for and maintain or cause Tenant's contractors to secure, pay for and maintain insurance (and provide evidence of same to Landlord upon request) in the following minimum coverage and limits of liability:

1.      Worker's compensation in statutory limits for the State of New Jersey, and Employer's Liability Insurance in statutory limits.

2.      Comprehensive General Liability Insurance including Broad Form Contractual, Broad Form Property Damage, Personal Injury, Completed Operations and Products coverage, and deletion of any exclusion pertaining to explosion, collapse and underground property damage hazards, with limits of not less than $5,000,000.00 combined single limit for bodily injury and property damage.

3.      Comprehensive Automobile Liability Insurance including Owned, Non-Owned and Hired Car coverage, with limits of not less than $1,000,000.00 combined single limit for both bodily injury and property damage.

d)      At any time after the Tenant's Final Construction Documents are approved by Landlord and thereafter throughout Tenant's prosecution of the Tenant's Work, Tenant shall be permitted to direct changes in the Tenant's Work (each a "Tenant Change Order") it being agreed, however, that Tenant must obtain Landlord's approval, not to be unreasonably withheld, conditioned or delayed, before prosecuting any Tenant Change Order it being agreed that Landlord shall either approve or reject the Tenant Change Order within three (3) business days. Once approved by Landlord, a Tenant Change Order shall become part of the Tenant's Final Construction Documents and the work shown on such Tenant Change Order shall be part of the

Tenant's Work.  In the event Landlord does not approve or reject the Tenant Change Order within the time required, Landlord will be deemed to have approved such Tenant Change Order.

e)     Landlord shall reasonably cooperate with Tenant's efforts to obtain, at Tenant's expense, any permits, certificates or final approvals in connection with any portion of the Tenant's Work including, without limitation, executing and delivering any documents or instruments that Landlord is required to sign and which are reasonably required by Tenant in connection therewith.

f)     Landlord shall permit Tenant to bring and store on the Premises all equipment, supplies and other property required or appropriate in connection with the Tenant's Work.  Tenant entry upon the Premises prior to the Commencement Date for the purpose of prosecuting Tenant's Work shall be upon all of the terms and conditions of the Lease except with respect to payment of Fixed Basic Rent, Operating Expenses or Real Estate Taxes (and except with respect to provisions such as use and maintenance that are inapplicable during Tenant's construction).

g)     The work of Tenant's contractors shall be performed in coordination with any work being performed by Landlord or its contractors at the Property.

h)     Tenant shall cause its contractor to use due care with respect to and to be responsible for (i) transportation, safekeeping and storage of materials and equipment used in the performance of the work by its contractors, (ii) for removal of debris and waste resulting therefrom, (iii) for defective design and work caused by its separate contractors and (iv) for any damage caused by its separate contractors.

i)     Tenant shall cause its contractor to use reasonable efforts not to cause labor disruptions at the Building and shall at all times adopt and implement policies and practices which are intended to have the effect of avoiding work stoppages, slowdowns, disputes, or strikes at the Property.  If Tenant's contractors cause work stoppages, slowdowns, disputes or strikes at the Property, then Landlord upon one (1) business day prior written notice to Tenant shall be permitted to cause Tenant to cease all work at the Premises until such time as it can be completed without such disruptions and Landlord shall have the right to equitable relief from a court of competent jurisdiction in order to accomplish same.

## ARTICLE 4
## IMPROVEMENT ALLOWANCE

4.1     Disbursement of Allowance.  Landlord shall pay without offset or deduction to Tenant or to others as designated by Tenant the Improvement Allowance from time to time in accordance with the provisions of this Article 4.  The Improvement Allowance will be paid to Tenant without offset or deduction and disbursed as provided below.  Tenant may request payment of the allowance applicable to such work from time to time (but not more frequently than once a calendar month) by delivering to Landlord a disbursement request (each, a "Disbursement Request"), each of which Disbursement Requests shall be accompanied by (i) a certificate from Tenant's Architect or project manager that the portion of Tenant's Work requested in the Disbursement Request is substantially complete; and (ii) photocopies of invoices

evidencing that the amount being requested pursuant to such Disbursement Request has been paid or incurred by Tenant in connection with the Tenant's Work; and (iii) except in the case of the first Disbursement Request, lien releases from Tenant's general contractor (or construction manager, as the case may be) for all work and services completed by such persons through the date of the Disbursement Request immediately preceding the Disbursement Request in question. Provided Landlord receives such request, together with all supporting documentation required above, on or before the 10th day of the calendar month in which the request is made, Landlord, on or before the 30th day of the same month, shall pay to Tenant or to others as designated by Tenant the amount being requested in such Disbursement Request. Notwithstanding anything to the contrary contained herein, the final Disbursement Request shall not be paid until all of the following have occurred: (i) the Tenant's Work is substantially completed and invoices therefor are presented to Landlord; (ii) Tenant provides evidence that the Tenant's Work has otherwise been paid for in full or will be paid in full upon final disbursement; (iii) Tenant's project manager has certified substantial completion, and Landlord has approved the Tenant's Work to the extent required in this Tenant Work Letter; (iv) if requested, Tenant shall have provided an estoppel to Landlord and its lender in the form required by the Lease; (v) if required by applicable Laws and Requirements, Tenant shall have obtained a certificate of occupancy, or its equivalent from the local governmental authorities for the Premises; and (viii) Tenant has provided to Landlord final releases of liens from the contractor in form and substance reasonably satisfactory to Landlord or the time period in which a mechanics lien would be required to be filed in order to be enforceable shall have elapsed without the filing thereof. Landlord agrees to timely fund without offset or deduction the final Disbursement Request to Tenant when Tenant becomes entitled thereto in accordance with the preceding sentence.

4.2    No Further Obligations. Tenant acknowledges and agrees that, except for Landlord's obligation to pay the Improvement Allowance, it is Tenant's responsibility to prepare Tenant's Final Construction Documents for the Tenant's Work, to perform Tenant Improvements and to pay the entire cost of Tenant's Work. Notwithstanding Landlord's obligation to pay the Improvement Allowance, Landlord shall have no privity of agreement with any contractors, subcontractors or third party vendors.

# EXHIBIT 11

```
Status Report For:      PERFORMANCE SPINE AND SPORTS MEDICINE OF
                        BORDENTOWN LLC
Report Date:            4/19/2021
Confirmation Number:    211092296402
```

## IDENTIFICATION NUMBER, ENTITY TYPE AND STATUS INFORMATION

```
Business ID Number:     0400581010
Business Type:          DOMESTIC LIMITED LIABILITY COMPANY
Status:                 ACTIVE
Original Filing Date:   06/14/2013
Stock Amount:           N/A
Home Jurisdiction:      NJ
Status Change Date:     NOT APPLICABLE
```

## REVOCATION/SUSPENSION INFORMATION

```
DOR Suspension Start    N/A
Date:
DOR Suspension End      N/A
Date:
Tax Suspension Start    N/A
Date:
Tax Suspension End      N/A
Date:
```

## ANNUAL REPORT INFORMATION

```
Annual Report Month:    JUNE
Last Annual Report      09/21/2020
Filed:
Year:                   2020
```

## AGENT/SERVICE OF PROCESS (SOP)INFORMATION

```
Agent:                  PERFORMANCE SPINE AND SPORTS MEDICINE
Agent/SOP Address:      9500 K JOHNSON BLVD STE 1,BORDENTOWN,NJ,08505
Address Status:         DELIVERABLE
Main Business Address:  9500 K. JOHNSON BLVD, SUITE 1, BORDENTOWN,
                        NJ, 08505
Principal Business      N/A
Address:
```

## ASSOCIATED NAMES

```
Associated Name:        PERFORMANCE WELLNES
Type:                   FC
```

## PRINCIPALS

Following are the most recently reported officers/directors (corporations), managers/members/managing members (LLCs), general partners (LPs), trustees/officers (non-profits).

|  |  |
|---|---|
| Title: | OTHER |
| Name: | MATTHIAS H WIEDERHOLZ, |
| Address: | 9500 K. JOHNSON BLVD., BORDENTOWN, , , US |

## FILING HISTORY -- CORPORATIONS, LIMITED LIABILITY COMPANIES, LIMITED PARTNERSHIPS AND LIMITED LIABILITY PARTNERSHIPS

To order copies of any of the filings below, return to the service page, https://www.njportal.com/DOR/businessrecords/Default.aspx and follow the instructions for obtaining copies. Please note that trade names are filed initially with the County Clerk(s) and are not available through this service. Contact the Division for instructions on how to order Trade Mark documents.

Charter Documents for Corporations, LLCs, LPs and LLPs

| Original Filing (Certificate)Date: | 2013 |
|---|---|

Changes and Amendments to the Original Certificate:

| Filing Type | Year Filed |
|---|---|
| CHANGE OF AGENT AND OFFICE | 2018 |
| ALTERNATE NAME FILING | 2014 |
| Annual Report Filing with address change | 2014 |
| Annual Report filing with officer/member change | 2018 |
| Annual Report filing with officer/member change | 2020 |

Note:
Copies of some of the charter documents above, particularly those filed before June 1988 and recently filed documents (filed less than 20 work days from the current date), may not be available for online download.

- For older filings, contact the Division for instructions on how to order.
- For recent filings, allow 20 work days from the estimated filing date, revisit the service center at https://www.njportal.com/DOR/businessrecords/Default.aspx periodically, search for the business again and build a current list of its filings. Repeat this procedure until the document shows on the list of documents available for download.

The Division cannot provide information on filing requests that are in process. Only officially filed documents are available for download.

# **EXHIBIT 12**

April 30, 2013

Percy Naranjo, MBA
Chief Financial Officer / Managing Founder
Performance Spine & Sports Medicine, LLC
Lawrenceville, NJ 08648

Re:     A/E Services- Bordentown, NJ

Dear Mr. Naranjo,

Our firm appreciates the opportunity to submit this proposal for architectural design services for the 16,000 sf., two story Performance Spine & Sports Medicine facility to be located within Building F of the Team 85 Campus. It is our understanding that this is a non-licensed business use which does not require Department of Health approvals. We recommend the following phased outline in order to complete the project in the most cost effective manner. The scope of our services is listed below.

## ARCHITECTS BASIC SERVICES
JRBA's services shall be performed as expeditiously as is consistent with professional skill and care and the orderly progress of the Work. Included in Basic Services shall be the preparation of contract documents for a typical interior tenant improvement project. Mechanical, Electrical, and Plumbing Engineering is included in our scope of basic services. Structural Engineering is excluded as we anticipate adequate shell improvements for all of your requirements.

## SCHEMATIC DESIGN PHASE
Based on the owner's existing space plan and any additional requirements, the Architect shall prepare, for approval by the Owner, a floor plan confirming all relevant components of the project. Changes to the floor plan after the schematic design approval may constitute additional services.

## DESIGN DEVELOPMENT PHASE
Upon schematic design approval, the Architect shall develop lighting plans and power plans for final design approval. Finish Plans shall be provided by others but coordinated within our architectural set of drawings. Upon owner approval of Construction Plan, Reflected Ceiling Plan, and Power & Data Plans, JRBA shall release and coordinate all information to the MEP Engineers for the execution of the Construction Documents.

## CONSTRUCTION DOCUMENTS PHASE-
Construction Documents consisting of Drawings and Specifications setting forth in detail the requirements for the construction of the Project. We have included three field inspections and coordination meetings within our basic services.

## ADDITIONAL SERVICES
## DESIGN CHANGES (Additional Service)
Providing services due to significant changes in the Project including, but not limited to, size, quality, complexity, the Owner's schedule, or the method of bidding or negotiating and contracting for construction shall result in additional services. Making revisions in Drawings, Specifications or other documents after an approved Schematic Design Phase may result in additional fees when such revisions are:

.1   inconsistent with approvals or instructions previously given by the Owner, including revisions made necessary by adjustments in the Owner's program or Project budget;

.2   required by the enactment or revision of codes, laws or regulations subsequent to the preparation   of   such documents such as civil or site engineering;

.3   due to changes required as a result of the Owner's failure to render decisions in a timely manner

## OWNER'S RESPONSIBILITIES

The Owner shall provide full information regarding requirements for the Project, including a program that shall set forth the Owner's objectives, schedule, constraints and criteria, including space requirements and relationships, flexibility, expandability, special equipment, systems and site requirements.

The Owner shall furnish existing site drawings and surveys describing physical characteristics, legal limitations and utility locations for the site of the Project, and a written legal description of the site. All site work associate with the proposed building shall  be provided by the owner and his engineering consultants.

The Owner shall furnish the services of other consultants when such services are reasonably required by the scope of the Project and are requested by the Architect.

## BIDDING OR NEGOTIATION PHASE  (Additional Service)
## CONSTRUCTION ADMINISTRATION PHASE Above 3 site visits (Additional Service)
## PERMIT EXPEDITING  (Additional Service)
## NJ STATE REGULATORY MEDICAL APPROVALS (Additional Service)

## CONSTRUCTION COST

A construction budget for this project shall be the responsibility of the owner.

Construction Cost does not include the compensation of the Architect and Architect's consultants, the costs of the land, rights-of-way, and financing or other costs that are the responsibility of the Owner.

The Architect cannot and does not warrant or represent that bids or negotiated prices will not vary from the Owner's Project budget or from any estimate of Construction Cost.

## USE OF ARCHITECT'S DOCUMENTS

The Drawings, Specifications and other documents prepared by the Architect for this Project are instruments of the Architect's service for use solely with respect to this Project and, unless otherwise provided, the Architect shall be deemed the author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright.

## TERMINATION, SUSPENSION OR ABANDONMENT

In the event of termination, suspension, or abandonment, the Architect shall be compensated for services performed. Failure of the Owner to make payments to the Architect in accordance with this Agreement shall be considered substantial nonperformance and cause for termination. This Agreement may be terminated by either party upon not less than seven days' written notice should the other party fail substantially to perform in accordance with the terms of this Agreement through no fault of the party initiating the termination.

## MISCELLANEOUS PROVISIONS

Unless otherwise provided, this Agreement shall be governed by the laws of Maryland.

Terms in this Agreement shall have the same meaning as those in AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement.

The Owner and the Architect, respectively, bind themselves, their partners, successors, assigns and legal representatives to this Agreement.  Neither party shall assign this Agreement without the written consent of the other.

The Architect and the Architect's consultants shall have no responsibility for the discovery, presence,

handling, removal or disposal of or exposure of persons to hazardous materials in any form at the Project site.

## PAYMENTS AND COMPENSATION TO THE ARCHITECT

J.R. Bernlohr • Architects propose to complete the design and construction document phases for a fixed fee of forty eight thousand dollars ($48,000.00) which equates to three dollars per square foot for complete architectural and engineering serivces. A $6,000.00 retainer shall be paid to JRBA as part of this executed contract prior to the scheduling of the work. Monthly invoices shall be submitted to the owner with final payment for all services made to JRBA prior to issuing stamped and sealed drawings to the owner.

## COMPENSATION FOR BASIC ARCHITECTURE/ENGINEERING SERVICES

| | |
|---|---|
| **Schematic Design** | **$6,000 (Retainer)** |
| **Design Development** | **$6,000** |
| **Construction Documents** | **$36,000** |

### TOTAL COMPENSATION FOR A/E SERVICES:     $48,000.00

## COMPENSATION FOR ADDITIONAL SERVICES

Additional as requested / hourly at $125/hr

## REIMBURSABLE EXPENSES

Reimbursable Expenses are in addition to compensation for Basic and Additional Services and include expenses incurred by the Architect and Architect's employees and consultants in the interest of the Project. Such expenses may include transportation in connection with the Project, reproductions, postage and handling of Drawings, Specifications, renderings, 3-D models and mock-ups requested by the Owner. All permit fees shall be considered a reimbursable expense to the architect and are not included in any fees above.

Payments due for additional services and reimbursable expenses are payable thirty (30) days from the date of the Architect's invoice. Amounts unpaid thirty (30) days after the invoice date shall bear interest at the legal rate prevailing from time to time at the principal place of business of the Architect.

This Agreement entered into as of the day and year first written above.

OWNER                                                    ARCHITECT

_(Signature)_                                          _(Signature)_
Percy Naranjo, Officer for                             James R Bernlohr, AIA, Principal
Performance Spine & Sports Medicine, LLC               J.R. Bernlohr • Architects

# **EXHIBIT 13**



Attn: Mr. Percy Naranjo – Chief Financial Officer

Re: Performance Spine and Sports Medicine
9500 K. Johnson Boulevard
Bordentown, New Jersey 08505

***Proposed Interior Fit out – Construction Services***

### Development / Management Contract

K. Johnson Enterprises, LLC. (The Developer) shall provide Management services to **Performance Spine and Sports Medicine,** (The "Owner") for the development and interior fit out of **Building F at Team Campus** (The "Project") for a flat fee of $80,000.00. The fee shall be inclusive of the following coordination in conjunction with the General Contractor and Casa Bella Design Build Firm, LLC.

1. Central Point of Contact
2. Project Scope Development
3. Preparation of work scopes per trade discipline
4. Pre bid meeting with contractors and vendors
5. Receipt and qualification of subcontractor proposals
6. Contract administration and management
7. Prepare project and program budgets
8. Pre-construction and bi-weekly progress meetings
9. Creation and tracking of a project schedule
10. Quality controls
11. Enforcement of the construction documents and specifications
12. Coordination of public utilities and related agencies
13. Coordination of inspections and interior fit out approvals
14. Conduct bi-weekly job site meetings
    i. Owners Meeting
    ii. Contractors Meeting
15. Prepare and review payment requisitions with client
    a. Receive and validate "partial / final lien releases"
16. Change Order Management / Controls
17. Dispute resolution/support/mitigation
18. Coordination of owner supplied equipment/materials/vendors/professionals
19. Prepare required warranty documents from contractors/vendors
20. Expedite "Substantial Completion" and final inspections/approvals
21. Submission of all closeout documents to the client
    • Warranties
    • Operation and Maintenance Manuals
    • Final Lien Waivers
    • Final Job Cost Documentation
22. Coordinate receipt of the final certificate of occupancy
23. Coordinate transfer from construction operations to tenant FF&E



## Supervision and Management:

K. Johnson Enterprises, LLC. shall provide a Project Management "TEAM" inclusive of a single point contact and site specific Project Manager to be named. The Developer shall be in charge of and manage the General Contractor, Casa Bella Design Build Firm, LLC. and vendors on a daily basis and shall coordinate ALL activities as required and related to contractors, vendors, and materials as provided by the tenant, Performance Spine and Sport Medicine. The Project Manager shall oversee installations, inspections, workmanship, workmen and final turn-over to the Owner/Tenant.

## Clarification and Reimbursement of Fees:

The following items and descriptions are excluded and shall be deemed as additional to the contract and shall be reimbursed as a *"COST PLUS FEE OF 8 %"* payable to K. Johnson Enterprises, LLC.

1. Losses and expenses not compensated by insurance or otherwise sustained by the Developers general Contractor, Subcontractors, Vendors, Suppliers" in connection with said work and not resulting from neglect and causes and fault of the Developer and their representatives.
2. Costs incurred for actions taken to prevent loss, damage and threats of injury to persons and property in the event of emergency situations.
3. Costs associated with changes, directive, performance and acceleration of the project as approved and / or requested and authorized in advance by the "tenant."
4. Costs associated with permit, land use, zoning, traffic control, utility fees and/or tap fees, etc.
   a. Attendance and representation at Planning Board meetings by the following;
      i. Developer
      ii. Civil Engineers
      iii. Design Professionals
      iv. Legal Counsel
5. Cost of reproduction of project plans, copies, contracts, purchase orders, etc.
   a. Upon submission of invoices, receipts, and purchase orders
6. Due to the daily rising costs of material, the Developer shall make fair and reasonable efforts to advise the Project Owner and make recommendations so as to obtain/secure the most advantageous/creative methods in an effort to avoid cost increases throughout the project, including, but not limited to, labor, material, fuel surcharges, etc.
7. We have *EXCLUDED* any and all direct responsibility and relationships regarding the necessary health and medical requirements as it relates to any state, federal , governmental , or quasi-governmental agencies for the purposes of approvals, construction, installations, and Final CO for the intended use of medical, surgical, out-patient, and or hospital designations.
   However, we will *ASSIST* in the coordination and implement any / all requirements and installations as directed by a duly authorized representative of PSSM employed for the express AND exclusive purpose of facilitating any/all health and medical requirements necessary to obtain a Final CO and subsequent operations of the intended tenant facility.



*The following information is for Illustration Purposes Only and all FINAL Project Budget Estimates and fees shall/will be adjusted in accordance with the format as outlined and as follows contained within this attachment.*

**Project Budget / Fee Basis** *( FOR ILLUSTRATION PURPOSES ONLY)*

A.           The "Project" budget estimates have been projected and agreed at $1,000,000.00 (One Million Dollars and 00/100) for the Interior Fit out of Building "F" @ Team Campus for the purpose of contract negotiations only, as the Construction Documents and Specifications have not been completed and/or issued at this time.

B.           Upon receipt of the Construction Documents and Specifications, the formal bidding process will commence in order to provide a Schedule of Values by trade breakdown to the Owner for a more accurate assessment and review of the budget assessment

C.           Upon review and approval, the budget estimates shall be increased and / or decreased as required in order to adjust and modify the payment schedule through to the " project " completion

D.           At the completion of the "Project", K. Johnson Enterprises, LLC. shall provide to the "Owner", Performance Spine and Sports Medicine, a complete "OPEN BOOK" review of all related project / job costs whereas a final accounting shall be concluded to determine any balances / credits due to the respective parties.

| | |
|---|---|
| **Estimated Construction Costs** | **$1,000,000.00** |
| **Landlord Contribution -Tenant Improvement Dollars** | (**$   400,000.00**) |
| **Balance remaining – Deficit** | **$  600,000.00** |

**PSSM agrees to place the balance of remaining funds of $600,000.00 into a PSSM / KJE Escrow account to be drawn upon for an estimated 6 monthly installments as outlined below.**

**Determination of Project Fee:** *(ESTIMATED)*

A FLAT FEE                               **$80,000.00**

**Payment Terms:** *(ESTIMATED)*

| | |
|---|---|
| Total Estimated Project Fee | **$$80,000.00** |
| Less Retainer | **$   0.00** |
| **Balance Remaining** | **$80,000.00** |
| $80,000.00 paid over 6 months = | $13,333.33 monthly payment |



Commencing on the 15 of each month and due as agreed, KJE shall draw upon the PSSM / KJE Escrow account the sum of $13,333.33 as outlined below until such time the full contract value of $80,000.00 is realized.

| | | |
|---|---|---|
| May 15, 2013 | July 15, 2013 | September 15, 2013 |
| June 15, 2013 | August 15, 2013 | October 15, 2013 |

KJE shall provide written documentation of all funds drawn from said account.

Agreed and accepted by:

By: _____
Performance Spine and Sports Medicine, LLC

Date: _____4/ 22/ 2013_____

By: _____
K. Johnson Enterprises, LLC.

Date: _____4/ 2/ 13_____

# **EXHIBIT 14**

# FIRST AMENDMENT TO LEASE

by and between

## KJOHNSON URBAN RENEWAL, LLC

(as Landlord)

And

## Performance Sports and Spine Medicine of Bordentown, LLC

(as Tenant)

Date: April 25, 2013

Premises: Building F, located at New Jersey State Highway Route #130
Block 57, lot 6.01, Bordentown Township, Burlington County, New Jersey

A. Landlord and tenant hereby agree that Section GG, Item #3, Completion of Premises of the original lease is hereby amended to change the date of substantial completion from September 1, 2013 to December 1, 2013. All other terms and conditions remain in effect.

IN WITNESS WHEREOF, and in consideration of the mutual entry into this First Lease Amendment and for other good and valuable consideration, and intending to be legally bound, each party hereto has caused this agreement to be duly executed under seal.

Landlord:

Date Signed: 4/25/13

KJOHNSON URBAN RENEWAL, LLC

BY:

Name: _Kevin Johnson_

Title: _Owner_

Tenant:

Date Signed: 4/25/2013

PERFORMANCE SPORTS AND SPINE MEDICINE OF BORDENTOWN, LLC

BY:

Name: _Percy Narungu_

Title: CEO

# EXHIBIT 15



May 14, 2013

To;   Performance Spine and Sports Medicine
      4056 Quakerbridge Road
      Lawrenceville, New Jersey

Attn;  Mr. Percy Naranjo – Chief Financial Officer

Re;   Performance Spine and Sports Medicine
      9500 K. Johnson Boulevard
      Bordentown, New Jersey 08505

_Proposed Interior Fit out – Construction Services._

# Invoice # 001

Mr. Naranjo,

Please accept this Invoice #001 as the first of 6 monthly installment payments as indicated and agreed to in the KJE Development / Management Contract dated April 1, 2013 and executed on April 22, 2013 by your office.

Commencing on the 15th of each month and due as agreed, KJE shall invoice and receive payment for services indicated in the contract beginning on May 15, 2013 and continue as follows;

| May 15, 2013 | $13,333.33 |
| June15, 2013 | $13,333.33 |
| July 15, 2013 | $13,333.33 |
| August15, 2013 | $13,333.33 |
| September 15, 2013 | $13,333.33 |
| October 15, 2013 | $13,333.33 |

Amount due this Invoice # 006……………………………..**$13,333.33**

# EXHIBIT 16



June 14, 2013

To;    Performance Spine and Sports Medicine
        4056 Quakerbridge Road
        Lawrenceville, New Jersey

Attn:  Mr. Percy Naranjo – Chief Financial Officer

Re;    Performance Spine and Sports Medicine
        9500 K. Johnson Boulevard
        Bordentown, New Jersey 08505

*<u>Proposed Interior Fit out – Construction Services.</u>*

# Invoice # 002

Mr. Naranjo,

      Please accept this Invoice #001 as the first of 6 monthly installment payments as indicated and agreed to in the KJE Development / Management Contract dated April 1, 2013 and executed on April 22, 2013 by your office.

Commencing on the 15th of each month and due as agreed, KJE shall invoice and receive payment for services indicated in the contract beginning on May 15, 2013 and continue as follows;

| | | |
|---|---|---|
| May 15, 2013 | $13,333.33 | Received |
| June15, 2013 | $13,333.33 | |
| July 15, 2013 | $13,333.33 | |
| August15, 2013 | $13,333.33 | |
| September 15, 2013 | $13,333.33 | |
| October 15, 2013 | $13,333.33 | |

**Amount due this Invoice # 002**………………………………..**$13,333.33**

# EXHIBIT 17



July 15, 2013

To;   Performance Spine and Sports Medicine
      4056 Quakerbridge Road
      Lawrenceville, New Jersey

Attn:  Mr. Percy Naranjo – Chief Financial Officer

Re;   Performance Spine and Sports Medicine
      9500 K. Johnson Boulevard
      Bordentown, New Jersey 08505

*Proposed Interior Fit out – Construction Services.*

# Invoice # 003

Mr. Naranjo,

   Please accept this Invoice #001 as the first of 6 monthly installment payments as indicated and agreed to in the KJE Development / Management Contract dated April 1, 2013 and executed on April 22, 2013 by your office.

Commencing on the 15th of each month and due as agreed, KJE shall invoice and receive payment for services indicated in the contract beginning on May 15, 2013 and continue as follows;

| May 15, 2013 | $13,333.33 | Received |
| June15, 2013 | $13,333.33 | Received |
| July 15, 2013 | $13,333.33 | |
| August15, 2013 | $13,333.33 | |
| September 15, 2013 | $13,333.33 | |
| October 15, 2013 | $13,333.33 | |

**Amount due this Invoice # 003**……………………………..**$13,333.33**

# **EXHIBIT 18**



August 15, 2013

To;      Performance Spine and Sports Medicine
         4056 Quakerbridge Road
         Lawrenceville, New Jersey

Attn:   Mr. Percy Naranjo – Chief Financial Officer

Re;      Performance Spine and Sports Medicine
         9500 K. Johnson Boulevard
         Bordentown, New Jersey 08505

*Proposed Interior Fit out – Construction Services.*

## Invoice # 004

Mr. Naranjo,

      Please accept this Invoice #001 as the first of 6 monthly installment payments as indicated and agreed to in the KJE Development / Management Contract dated April 1, 2013 and executed on April 22, 2013 by your office.

Commencing on the 15th of each month and due as agreed, KJE shall invoice and receive payment for services indicated in the contract beginning on May 15, 2013 and continue as follows;

| | | |
|---|---|---|
| May 15, 2013 | $13,333.33 | Received |
| June15, 2013 | $13,333.33 | Received |
| July 15, 2013 | $13,333.33 | Received |
| August15, 2013 | $13,333.33 | |
| September 15, 2013 | $13,333.33 | |
| October 15, 2013 | $13,333.33 | |

**Amount due this Invoice # 004**……………………………..**$13,333.33**

# EXHIBIT 19



Sepember 15, 2013

To;    Performance Spine and Sports Medicine
       4056 Quakerbridge Road
       Lawrenceville, New Jersey

Attn:  Mr. Percy Naranjo – Chief Financial Officer

Re;    Performance Spine and Sports Medicine
       9500 K. Johnson Boulevard
       Bordentown, New Jersey 08505

_Proposed Interior Fit out – Construction Services._

# Invoice # 005

Mr. Naranjo,

     Please accept this Invoice #001 as the first of 6 monthly installment payments as indicated and agreed to in the KJE Development / Management Contract dated April 1, 2013 and executed on April 22, 2013 by your office.

Commencing on the 15th of each month and due as agreed, KJE shall invoice and receive payment for services indicated in the contract beginning on May 15, 2013 and continue as follows;

| | | |
|---|---|---|
| May 15, 2013 | $13,333.33 | Received |
| June15, 2013 | $13,333.33 | Received |
| July 15, 2013 | $13,333.33 | Received |
| August15, 2013 | $13,333.33 | Received |
| September 15, 2013 | $13,333.33 | |
| October 15, 2013 | $13,333.33 | |

**Amount due this Invoice # 005**……………………………..**$13,333.33**

# EXHIBIT 20



**K** **J O H N S O N**
**E N T E R P R I S E S**

## TENANT DIRECTION LETTER

December 29, 2015

Performance Spine & Sports Medicine
Mr. Percy Naranjo
Chief Financial Officer
9500 K. Johnson Blvd.
Bordentown, NJ 08505

> Re: **Lease dated July 16, 2012 between K Johnson Urban Renewal LLC, as Landlord, and Performance Spine & Sports Medicine, as Tenant (the "Lease"), concerning premises known as Block 57, Lot 6, Bordentown Township, Burlington County, New Jersey (the "Property")**

Dear Sir:

As noted by the above-referenced Lease, an increase in the monthly installment of fixed base rent shall commence January 1, 2016 in the amount of **$21,213.33**. Please make payments payable to KJohnson Urban Renewal.

The instructions set forth herein are irrevocable and are not subject to modification in any manner, except by written notice from us.

Please call with any questions.

Sincerely,

KJOHNSON URBAN RENEWAL, LLC, a
New Jersey limited liability company

By: K Johnson Enterprises LLC, its sole
member

By: _____
Name: Kevin Johnson
Title: Sole Member

# INVOICE

KJOHNSON URBAN RENEWAL
9500 K. Johnson Blvd.
Bordentown, NJ 08505
609.298.0085

TO: PSSM
9500 K. Johnson Blvd.
Bordentown, NJ 08505

| ADMIN. | DESCRIPTION OF SERVICES | PAYMENT TERMS | DUE DATE |
|--------|------------------------|---------------|----------|
| MP | | Due on Receipt | January 1, 2016 |

| QUANITY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---------|-------------|------------|------------|
| | January 2016 Monthly Installment of Fixed Base Rent | 21,213.33 | 21,213.33 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| | |
|---|---|
| Subtotal | 21,213.33 |
| Sales Tax | |
| Total | 21,213.33 |

Please make all checks payable to KJohnson Urban Renewal.
THANK YOU!



# EXHIBIT 21



**K** J O H N S O N
E N T E R P R I S E S

**TENANT DIRECTION LETTER**

December 27, 2016

Performance Spine & Sports Medicine
Mr. Percy Naranjo
Chief Financial Officer
9500 K. Johnson Blvd.
Bordentown, NJ 08505

> **Re:** **Lease dated July 16, 2012 between K Johnson Urban Renewal LLC, as**
> **Landlord, and Performance Spine & Sports Medicine, as Tenant (the**
> **"Lease"), concerning premises known as Block 57, Lot 6, Bordentown**
> **Township, Burlington County, New Jersey (the "Property")**

Dear Sir:

As noted by the above-referenced Lease, an increase in the monthly installment
of fixed base rent shall increase to the amount of **$21,853.33**, commencing on January 1, 2017.
Please make payments payable to KJohnson Urban Renewal.

The instructions set forth herein are irrevocable and are not subject to
modification in any manner, except by written notice from us.

Please call with any questions.

Sincerely,

KJOHNSON URBAN RENEWAL, LLC, a
New Jersey limited liability company

By: K Johnson Enterprises LLC, its sole
member

By:_____
Name: Kevin Johnson
Title: Sole Member

# LEASE

by and between

## K JOHNSON INDUSTRIES LIMITED LIABILITY COMPANY

(as Landlord)

And

## Performance Spine and Sports Medicine LLC

(as Tenant)

Date: July 16, 2012

**Premises: Building F, located at New Jersey State Highway Route 130**
**Block 57, Lot 6.01, Bordentown Township, Burlington County, New Jersey**

THIS LEASE (this "**Lease**") is made the 16th day of July, 2012 between **K JOHNSON INDUSTRIES, LIMITED LIABILITY COMPANY** ("**Landlord**"), a New Jersey limited liability company, and **PERFORMANCE SPINE AND SPORTS MEDICINE LLC** ("**Tenant**"), a New Jersey limited liability company.

## PREAMBLE

### BASIC LEASE PROVISIONS AND DEFINITIONS

In addition to other terms elsewhere defined in this Lease, the following terms whenever used in this Lease shall have only the meanings set forth in this Section, unless such meanings are expressly modified, limited or expanded elsewhere in this Lease.

A.    **ADDITIONAL RENT** shall mean all sums in addition to Fixed Basic Rent payable by Tenant to Landlord or to third parties pursuant to the provisions of the Lease.

B.    **ASSOCIATION** shall mean any association created under any Declaration or Master Deed.

C.    **BUILDING** shall mean an approximately 16,000 square foot, two story medical office building known as Building F,

D.    **BUILDING HOLIDAYS** shall be those holidays listed on Exhibit D.

E.    **COMPLEX** shall mean Lot 6.02 and a portion of Lot 6.01 in Block 57 on the tax map of the Township of Bordentown, excluding that portion of Lot 6.01 containing the granary business and more particularly described on the site plan attached as Exhibit B-2 to this Lease, including all of the buildings and improvements thereon and commonly known as the "Team Campus," as such area may be amended or subdivided by Landlord from time to time.

F.    **COMMENCEMENT DATE** shall mean the date that Tenant receives a temporary or final certificate of occupancy permitting it to occupy the Premises for the Permitted Use, but in no event more than 120 days after the Possession Date.

G.    **DATE OF THIS LEASE** shall mean the date of acceptance and execution of this Lease by Landlord, following execution and delivery thereof to Landlord by Tenant and that date shall be inserted in the space provided in the Preamble.

H.    **DECLARATION** shall mean such declarations, covenants, restrictions and agreements of public record to which the Property or the Complex may be subject relating to the development, operation and maintenance of the Complex.

I.    **DELIVERY DATE** shall be on or about 425 days from the date Landlord receives building permits necessary to commence construction of the Building

J.    **EXHIBITS** shall be the following, attached to this Lease and incorporated in this Lease and made a part of this Lease:

**K. Johnson Urban Renewal**

9500 K. Johnson Blvd.

Bordentown, NJ  08505

(609)298-0085

kj@kjohnsonenterprises.com

# INVOICE

**BILL TO**

Mr. Percy Naranjo

Performance Spine & Sports

Medicine

9500 K. Johnson Blvd.

Bordentown, NJ  08505

**INVOICE #** 2017-1

**DATE** 01/01/2017

**DUE DATE** 01/01/2017

**TERMS** Due on receipt

| ACTIVITY | AMOUNT |
|---|---|
| **Base Rent**<br>Base rent for January 2017 - Building F | 21,853.33 |

BALANCE DUE **$21,853.33**

# EXHIBIT 22

**K. Johnson Urban Renewal**

9500 K. Johnson Blvd.
Bordentown, NJ  08505
(609)298-0085
kj@kjohnsonenterprises.com

# INVOICE

**BILL TO**

Mr. Percy Naranjo
Performance Spine & Sports
Medicine
9500 K. Johnson Blvd.
Bordentown, NJ  08505

**INVOICE #** 2017-4
**DATE** 02/01/2017
**DUE DATE** 02/01/2017
**TERMS** Due on receipt

| ACTIVITY | AMOUNT |
|---|---|
| **Base Rent**<br>Base rent for February 2017 - Building F | 21,853.33 |

BALANCE DUE **$21,853.33**

**Kjohnson Urban Renewal**
**Tenant Tax Allocation**
**For the Year Ending December 31, 2016**

**Performance Spine & Sports Medicine**

Complex Proportionate Share Allocation (per Lease Agreement):

| | | |
|---|---|---|
| Building A | 30,000 | 14.258% |
| Building B | 75,000 | 35.646% |
| Building C | 78,503 | 37.311% |
| Building E (pad site) | 2,900 | 1.378% |
| Building F | 24,000 | 11.407% |
| | 210,403 | 100.000% |

PSSM Building F Proportionate Share Allocation:

| | | |
|---|---|---|
| PSSM square footage | 16,000 | 66.667% |

| | |
|---|---|
| 2016 Land Tax - Complex | $ 128,025.43 |
| Building F share of Land Tax | $ 14,603.86 |
| PSSM share of Building F Land Tax | $ 9,735.91 |
| Land Tax per square foot | $ 0.61 |
| | |
| Building F Pilot Payment (per Township calculation) | $ 59,125.44 |
| PSSM share of Building F Pilot Payment | $ 39,416.96 |
| Pilot Payment per square foot | $ 2.46 |
| | |
| Total PSSM share of 2016 taxes | $ 49,152.87 |
| Total portion of CAM payments related to 2016 taxes | $ 3.07 |

# EXHIBIT 23



**K. Johnson Property Management Group LLC.**
9500 K. Johnson Blvd.
Bordentown, NJ  08505
(609) 298-0085
cthompson@kjohnsonenterprises.com

# INVOICE

**BILL TO**
Mr. Percy Naranjo
Performance Spine and Sports
Medicine
9500 K. Johnson Blvd.
Suite 1
Bordentown, NJ  08505 US

**INVOICE #** 1225
**DATE** 03/01/2017
**DUE DATE** 03/01/2017
**TERMS** Due on receipt

| ACTIVITY | AMOUNT |
| --- | --- |
| **PSSM - CAM**<br>March 2016 CAM charges | 6,666.66 |
| **MGMT FEES**<br>Management Fees | 533.33 |

BALANCE DUE **$7,199.99**

# EXHIBIT 24

**K. Johnson Urban Renewal**

9500 K. Johnson Blvd.

Bordentown, NJ  08505

(609)298-0085

kj@kjohnsonenterprises.com



# INVOICE

**BILL TO**

Mr. Percy Naranjo

Performance Spine & Sports

Medicine

9500 K. Johnson Blvd.

Bordentown, NJ  08505

| | |
|---|---|
| **INVOICE #** | 2017-12 |
| **DATE** | 0/ u01u2017 |
| **DUE DATE** | 0/ u01u2017 |
| **TERMS** | DYe on receipt |

| ACTIVITg | AMOUNT |
|---|---|
| **Base Rent - PSSM**<br>Base rent for March 2017 - BYildinF 3 | 21,85/ ./ / |

| | BALANCE DUE | **$21,85/ ./ /** |
|---|---|---|

# EXHIBIT 25



## TENANT DIRECTION LETTER

November 30, 2017

**VIA EMAIL AND CERTIFIED REGISTERED MAIL**

Performance Spine & Sports Medicine
Mr. Percy Naranjo
Chief Financial Officer
9500 K. Johnson Blvd.
Bordentown, NJ 08505

> **Re:** **Lease dated July 16, 2012 between K Johnson Urban Renewal LLC, as Landlord, and Performance Spine & Sports Medicine, as Tenant (the "Lease"), concerning premises known as Block 57, Lot 6, Bordentown Township, Burlington County, New Jersey (the "Property")**

Dear Sir:

As noted by the above-referenced Lease, an increase in the monthly installment of fixed base rent shall increase to the amount of **$22,506.67**, commencing on January 1, 2018. Please make payments payable to KJohnson Urban Renewal.

The instructions set forth herein are irrevocable and are not subject to modification in any manner, except by written notice from us.

Please call with any questions.

Sincerely,

KJOHNSON URBAN RENEWAL, LLC, a
New Jersey limited liability company

By: K Johnson Enterprises LLC, its sole
member

By:
Name: Kevin Johnson
Title: Sole Member

| Rider A | Renewal Options |
|---|---|
| Rider B | Option to Purchase Unit |

| | |
|---|---|
| Exhibit A | Premises |
| Exhibit B-1 | Legal Description of Property |
| Exhibit B-2 | Legal Description of the Premises |
| Exhibit C | Landlord Work Letter |
| Exhibit D | Building Holidays |
| Exhibit E | Janitorial Specifications |
| Exhibit F | Rules and Regulations |
| Exhibit G | Tenant Estoppel Certificate |
| Exhibit H | Confirmation of Lease Term |
| Exhibit I | Tenant Work Letter |

K.   **FIXED BASIC RENT** shall mean:

| Lease Year | Rentable Square Feet | Rate Per Rentable Square Feet | Annual Fixed Basic Rent | Monthly Installment of Fixed Basic Rent |
|---|---|---|---|---|
| 1 | 16,000 | $15.00 | $240,000.00 | $20,000.00 |
| 2 | 16,000 | $15.45 | $247,200.00 | $20,600.00 |
| 3 | 16,000 | $15.91 | $254,560.00 | $21,213.33 |
| 4 | 16,000 | $16.39 | $262,240.00 | $21,853.33 |
| 5 | 16,000 | $16.88 | $270,080.00 | $22,506.67 |
| 6 | 16,000 | $17.39 | $278,240.00 | $23,186.67 |
| 7 | 16,000 | $17.91 | $286,560.00 | $23,880.00 |
| 8 | 16,000 | $18.45 | $295,200.00 | $24,600.00 |
| 9 | 16,000 | $19.00 | $304,000.00 | $25,333.33 |
| 10 | 16,000 | $19.57 | $313,120.00 | $26,093.33 |
| **First Renewal Term** | | | | |
| 11 | 16,000 | $20.16 | $322,560.00 | $26,880.00 |
| 12 | 16,000 | $20.76 | $332,160.00 | $27,680.00 |
| 13 | 16,000 | $21.38 | $342,080.00 | $28,506.67 |
| 14 | 16,000 | $22.02 | $352,320.00 | $29,360.00 |
| 15 | 16,000 | $22.68 | $362,880.00 | $30,240.00 |
| **Second Renewal Term** | | | | |
| 16 | 16,000 | $23.36 | $373,760.00 | $31,146.67 |
| 17 | 16,000 | $24.06 | $384,960.00 | $32,080.00 |
| 18 | 16,000 | $24.78 | $396,480.00 | $33,040.00 |
| 19 | 16,000 | $25.52 | $408,320.00 | $34,026.67 |

#15241254 v7

# EXHIBIT 26



## TENANT DIRECTION LETTER

November 28, 2018

<u>**VIA ELECTRONIC MAIL**</u>

Performance Spine & Sports Medicine
Mr. Percy Naranjo
Chief Financial Officer
9500 K. Johnson Blvd.
Bordentown, NJ 08505

> **Re:** **Lease dated July 16, 2012 between K Johnson Urban Renewal LLC, as
> Landlord, and Performance Spine & Sports Medicine, as Tenant (the
> "<u>Lease</u>"), concerning premises known as Block 57, Lot 6, Bordentown
> Township, Burlington County, New Jersey (the "<u>Property</u>")**

Dear Sir:

As noted by the above-referenced Lease, an increase in the monthly installment
of fixed base rent shall increase to the amount of **$23,186.67**, commencing on January 1, 2019.
<u>Please make payments payable to KJohnson Urban Renewal</u>.

The instructions set forth herein are irrevocable and are not subject to
modification in any manner, except by written notice from us.

Please call with any questions.

Sincerely,

KJOHNSON URBAN RENEWAL, LLC, a
New Jersey limited liability company

By: _____
Name: Kevin Johnson
Title: Sole Member

# EXHIBIT 27

## FIRST ADDENDUM TO THE LEASE

**THIS FIRST ADDEDNUM TO THE LEASE** entered into this ___ day of May 2020, by and between **KJOHNSON URBAN RENEWAL, LLC** OR ITS DESIGNEE hereinafter referred to as "Landlord", and **PERFORMANCE SPINE AND SPORTS MEDICINE, LLC,** hereinafter referred to as "Tenant"

**WHEREAS,** by LEASE dated the 16th Day of July 2012, commencing on the 1st day of January 2014, (hereinafter referred to as "Lease") which consists of 16,000 square feet of rentable space after allocating for common areas in the building located at 9500 K. Johnson Boulevard, Building F, Bordentown, New Jersey 08505 hereinafter referred to as the ("Building")

**WHEREAS,** the LEASE was amended by the FIRST AMENDMENT TO LEASE executed by the Parties on April 25, 2013. (hereinafter referred to "First Amendment")

**WHEREAS,** the LEASE was amended by the SECOND AMENDMENT TO LEASE executed by the Parties on January 20, 2020. (hereinafter referred to "Second Amendment")

**WHEREAS,** As a result of the Covid-19 Pandemic of 2020 (hereinafter "Covid-19"), Tenant on May 1, 2020, through its representative Percy Naranjo (hereinafter "Naranjo") sent an electronic mail communication requesting relief associated with the rent of Tenant

**WHEREAS,** Landlord agreed to a deferment of 50% ($11,593.34) of the Tenants Fixed Basic Rent ($23,186.67 per month) for May, June and July 2020 a total deferment of $34,780.00, with repayment of that deferment to divided over the months of August, September, October, November and December 2020 at a rate of $6,956.00 per month. All other CAM charges, Real Estate Taxes, PILOT payments, Operational Expenses, Repair and Maintenance Expenses or Utilities and services associated with the Tenancy are NOT deferred and would be paid in full each month that they became due. Further Tenant agrees to provide a Guarantee on these payments as set forth below.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereto do hereby covenant and agree to and with each other as follows:

1. **Deferment of payment of 50% of Fixed Basic Rent as defined under Paragraph M and Paragraph 6 of the Lease titled Fixed Basic Rent:** Paragraph K of the Lease titled Fixed Basic Rent and Paragraph 6 titled Fixed Basic Rent, which is incorporated by reference, shall be modified to include the following language, which has been agreed to by both Landlord and Tenant:

    a. Landlord will agree to grant a three (3) month Deferment in Tenant's payment of Fixed Basic Rent of 50% or $11,593.34 per month for May 2020, June 2020, and July 2020

payment of Fixed Basic Rent, for a total deferment of Tenant's Fixed Basic Rent for this period of $34,780.00 ("Deferment").

b.  The three (3) month Deferment outlined in Paragraph 1(a) will only include Fixed Basic Rent as denoted in Section 6 of the lease and will NOT include any CAM, Real Estate Taxes, PILOT payments, Operational expenses, Repair and Maintenance Expenses or Utilities and services associated with the Tenancy. These costs must be paid in full by Tenant each month as required under the lease.

c.  The Deferment of the Fixed Basic Rent for May 2020, June 2020 and July 2020 will not be forgiven. This Deferment shall be added on to the remainder of the Lease year and pro-rated over the remainder of the year. Therefore, the Deferment outlined above shall be paid in addition and at the same time as all rents due for the months of August 2020, September 2020, October 2020, November 2020, and December 2020. The Deferment shall be paid in five (5) equal payments of $6,956.00 per month in addition to all rents regularly due for this monthly payment.

d.  If Tenant fails to make these payments at all or on time as set forth in the Lease, then the Tenant agrees to be charged interest and late charges for these late payments as set forth in in the Lease, specifically as set forth in Section 9 of the Lease.

e.  Tenant will provide a Guaranty of Payment of Lease from its parent company Trinity Health that these payments will be made as described above and as set forth in the Lease.

f.  **DEFAULT**: A violation of this Amendment shall be governed by Paragraph 28 of the lease titled Defaults-Remedies and incorporated by reference to this Amendment.

2.  Except as herein modified, all of the terms and conditions of Said Lease shall remain in full force and effect.

3.  The signatories whose names are herein below affixed are authorized to bind their respective parties to the terms and conditions of this **FIRST ADDENDUM TO THE LEASE.**

   **IN WITNESS WHEREOF**, the parties hereto have duly executed this **FIRST ADDENDUM TO THE LEASE** delivered to the parties hereto and is effective as of the day and year first written above.

*-Signatures on Following Page-*

**Signature Page to First Addendum to the Lease**

**By and Between**

**KJOHNSON URBAN RENEWAL, LLC, as Landlord**

**and**

**PERFROMANCE SPINE AND SPORTS MEDICINE, LLC, as Tenant**

**Landlord**

Date Signed: ___6/1/2020___

KJOHNSON URBAN RENEWAL, LLC
A New Jersey Limited Liability Company

By: _____
Kevin Johnson, Sole Member

**Tenant**

Date Signed: ___6/1/2020___

PERFORMANCE SPINE AND SPORTS
MEDICINE, LLC
A New Jersey Limited Liability Corporation

By: _____

Name: _Matthias H Wiederholz_____

Title: _Owner_____